UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No.:  17-62005-CIV-MORENO


MITCHELL SILVERMAN,

      Plaintiff,

vs.

NOVA SOUTHEASTERN UNIVERSITY, INC.,

      Defendant.
_____/




DEPOSITION OF MITCHELL SILVERMAN

TAKEN ON BEHALF OF THE DEFENDANT
FEBRUARY 19, 2018
2:11 P.M. TO 5:04 P.M.

UNIVERSAL COURT REPORTING
888 EAST LAS OLAS BOULEVARD, SUITE 508
FORT LAUDERDALE, FLORIDA 33301




REPORTED BY:
VICTORIA SUAREZ, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



877.291.3376
www.UCRinc.com

Silverman, Mitchell  02-19-2018

---

**2**

```
1              APPEARANCES OF COUNSEL
2  ON BEHALF OF THE PLAINTIFF:
3      APRIL S. GOODWIN, Esquire
       THE GOODWIN FIRM
4      801 West Bay Drive
       Suite 705
5      Largo, Florida 33770
       727.316.5333
6      goodwinlawoffices@gmail.com
7  ON BEHALF OF THE DEFENDANT:
8      RICHARD A. BEAUCHAMP, Esquire
       JAMES. H. HORTON, IV, Esquire
9      PANZA, MAURER & MAYNARD, P.A.
       2400 East Commercial Boulevard
10     Suite 905
       Fort Lauderdale, Florida 33308
11     954.390.0100
       rbeauchamp@panzamaurer.com
12     jhorton@panzamaurer.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1              INDEX OF EXAMINATION
2  WITNESS: MITCHELL SILVERMAN
                                PAGE
3  DIRECT EXAMINATION
     By Mr. Beauchamp                    5
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1              INDEX OF EXHIBITS
2  EXHIBIT        DESCRIPTION          PAGE
3   1             Transcript            98
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
1          DEPOSITION OF MITCHELL SILVERMAN
2               FEBRUARY 19, 2018
3  Thereupon:
4               MITCHELL SILVERMAN
5  was called as a witness, and after having been first
6  duly sworn, testified as follows:
7               DIRECT EXAMINATION
8  BY MR. BEAUCHAMP:
9     Q.  Please state your full name.
10    A.  Mitchell Lawrence Silverman.
11    Q.  Mr. Silverman, have you had your deposition
12 taken before?
13    A.  Yes.
14    Q.  All right.  How many times?
15    A.  Once or twice.  Not very often.
16    Q.  And do you recall what those cases were about?
17    A.  The only one I can recall was an auto accident
18 case.
19    Q.  When was that approximately?
20    A.  Thirty years ago.
21    Q.  Okay.  So as a reminder I'm going to be asking
22 you a series of questions about the lawsuit that you
23 brought against my client Nova Southeastern University.
24 If at any time you don't understand a question that I
25 ask you, please tell me so and I'll restate it hopefully
```



Silverman, Mitchell    02-19-2018

---

**6**

1  in a more understandable fashion. All right?

2        Your responses to questions has to be verbal,

3  a yes, no, or whatever the verbal answer is. Nods of

4  the head, uh-uh's, uh-huh's she can't take down. Okay?

5    A.  Yes.

6    Q.  Thank you. Everybody does it. I'll remind

7  you if you do. Okay?

8    A.  Thank you.

9    Q.  If at any time you need to take a break for

10  whatever reason, let me know and we'll go ahead and take

11  a break.

12    A.  Thank you.

13    Q.  Okay. So tell me where you currently reside.

14    A.  301 Dunwoody Lane, Hollywood, Florida.

15    Q.  How long have you lived there?

16    A.  Seventeen or 18 years. I'm just getting out

17  some eye drops.

18    Q.  Okay. And who do you live with?

19    A.  My wife.

20    Q.  And what is her name?

21    A.  Her legal name is Becky Katz and that's the

22  name she -- her legal name is probably Becky Katz

23  Silverman. She didn't completely change her name when

24  we got married.

25    Q.  How long have you been married?

---

**7**

1    A.  Since September 7th, 2000.

2    Q.  Had you ever been married before that?

3    A.  No.

4    Q.  Any children?

5    A.  No.

6    Q.  How long have you lived in Broward County?

7    A.  On and off since 1970.

8    Q.  Where else have you lived besides Broward

9  County since 1970?

10    A.  Yellow Springs, Ohio; Sarasota, Florida; and

11  Tallahassee, Florida.

12    Q.  All right. Your educational background would

13  include obviously a high school degree. Where did you

14  go to high school?

15    A.  Nova High School in Davie, Florida.

16    Q.  When did you graduate?

17    A.  1983.

18    Q.  College?

19    A.  My Bachelor's degree is from New College, New

20  College of the University of South Florida now known as

21  New College of Florida in Sarasota, 2000.

22    Q.  When did you receive your Bachelor's?

23    A.  1994.

24    Q.  And what is it, just a BA?

25    A.  A BA in general studies.

---

**8**

1    Q.  And postgraduate education?

2    A.  I have a law degree from the Florida State

3  University College of Law which I received in December

4  of 1998, and I have a Master of Science in Information

5  Studies from the Florida State University College of

6  Information which I received in 2008.

7    Q.  Any other degrees?

8    A.  No.

9    Q.  Any other significant training, certificates,

10  licenses?

11    A.  I am a member of the Florida Bar. I'm a

12  member of the Bar of the Southern District of Florida,

13  the Federal Southern District of Florida.

14    Q.  Do you practice law?

15    A.  Yes.

16    Q.  Let's talk about employment currently. I

17  understand from your interrogatory responses that you

18  have your own law firm.

19    A.  Yes. Right at the moment all I'm doing is

20  contract work for other attorneys.

21    Q.  Okay.

22    A.  I should note that I did enter an appearance

23  in a case for a colleague as part of that.

24    Q.  What case was that?

25    A.  JFS Pizza versus Modiano (ph) I believe.

---

**9**

1    Q.  What type of case was that?

2    A.  Professional malpractice.

3    Q.  Legal?

4    A.  My friend is being sued for legal malpractice,

5  yes.

6    Q.  The firm -- you have your own law firm?

7    A.  Correct.

8    Q.  Is it a PA?

9    A.  Currently it's a sole proprietorship.

10    Q.  Mitchell Silverman --

11    A.  I would assume Mitchell Silverman --

12    Q.  -- Attorney at Law?

13    A.  -- Attorney At Law, yes, and usually with my

14  middle initial, but...

15    Q.  And the middle initial is?

16    A.  L. for Lawrence.

17    Q.  How long have you operated this sole

18  proprietorship?

19    A.  I would have to check my records, but between

20  the sole proprietorship and the PA since some time in

21  2000.

22    Q.  There was an iteration of your law firm that

23  was a PA?

24    A.  Correct.

25    Q.  Okay. And during what period of time?

---



Silverman, Mitchell  02-19-2018

---

**10**

1    A.  I don't recall when we - that is to say my
2    wife is my business manager basically - closed the
3    corporation administratively.
4        Q.  Did it change the operation of the law firm in
5    any way?
6        A.  No.
7        Q.  Is there a reason why you closed the PA
8    administratively?
9        A.  I wasn't doing very much business with it.
10       Q.  Do you remember approximately when it was that
11   you closed the PA administratively?
12       A.  No.
13       Q.  You say your wife -- I don't know if you were
14   being facetious as your business manager.  Is she your
15   business manager?
16       A.  She has an MBA.
17       Q.  Okay.  Does she manage your business other
18   than just telling you what to do?  Let me strike that.
19           Does she manage your business?
20       A.  Financially, yes.  She doesn't -- there's no
21   case management.  She doesn't have any case management
22   role, if that makes any sense.
23       Q.  Yeah.  She's not an attorney; right?
24       A.  No.
25       Q.  Okay.  What types of cases do you do?

---

**11**

1        A.  Right at the moment legal consultations; not,
2    not litigation support as you would expect from an
3    appellate attorney.  I find that I know a lot about a
4    lot of different areas of the law, and I can help
5    attorneys work with the legal issues in their cases
6    basically.
7        Q.  On a contract basis?
8        A.  Mm-hmm.
9        Q.  Yes?
10       A.  Yes.  Sorry.
11       Q.  That's all right.  Like I said, everybody does
12   it.  I'll remind you.
13       A.  Thank you.
14       Q.  Any other sources of income that are not
15   passive besides the sole proprietorship currently?
16       A.  No.
17       Q.  How about any other sources of income that are
18   not passive since your separation from Nova Southeastern
19   besides the sole proprietorship?
20       A.  I don't recall.
21       Q.  Do you file income tax returns?
22       A.  Yes.
23       Q.  Jointly with your wife?
24       A.  Yes.
25       Q.  How long did you work at Nova Southeastern?

---

**12**

1        A.  A little bit less than seven years.
2        Q.  During the seven years approximately that you
3    worked at Nova Southeastern, did you have any outside
4    business interests besides the sole proprietorship or
5    the PA?
6        A.  I don't recall.
7        Q.  Are you a director or officer of any
8    corporations?
9        A.  I might be an officer of my wife's
10   professional corporation.  I don't believe so.  It's not
11   a PA, I mean, the one she does business under.
12       Q.  Do the legal consultation services that you
13   provide on a contract basis, do they include employment
14   law?
15       A.  No.  I'm sorry.  Yes, they do.  Yes.
16       Q.  Do any of those legal consultation services
17   let's say in the last -- well, strike that.
18           How long have you been providing those types
19   of services, the legal consultation on a contract basis?
20       A.  Generally?
21       Q.  Yeah.
22       A.  Since about November of 2000.
23       Q.  Since November of 200.  Okay.
24           And would any of the legal consultations that
25   you performed on a contract basis involve ADA issues?

---

**13**

1        A.  No.
2        Q.  How about before Nova Southeastern where did
3    you work, your last job before Nova?
4        A.  I believe it was a law firm at the time called
5    Tolgyesi, Katz, Hankin & Katz.  And if you ask me to
6    spell that first attorney's name I would have to say I
7    don't recall.
8        Q.  Where was it located?
9        A.  Hollywood.
10       Q.  Say it out loud again.
11       A.  Tolgyesi, Katz, Hankin & Katz.
12       Q.  Does that firm still exist?
13       A.  An iteration of that firm exists, yes.
14       Q.  Do you know what the current iteration is?
15       A.  Katz & Katz.
16       Q.  How long did you work with them?
17       A.  Less than a year.
18       Q.  Were you an associate attorney with them?
19       A.  Yes.
20       Q.  And forgive me.  When was this?  This was the
21   year leading up to your employment with Nova?
22       A.  No.  This was between when I became an
23   attorney and about November of 2000.
24       Q.  Okay.  So you received your law degree in 1998
25   from FSU.  Did you pass the Bar on your first try?

---



Silverman, Mitchell   02-19-2018

14

1    A.  No.
2    Q.  Pass your Bar on the second try?
3    A.  Yes.
4    Q.  Okay.  Were you employed as a clerk after
5  graduating from - with your JD - from FSU?
6    A.  Yes.
7    Q.  Where?
8    A.  At Tolgyesi, Katz, Hankin & Katz for some
9  time. I should clarify.
10   Q.  Sure.
11   A.  My practice has evolved towards contract law,
12 but I did directly represent clients and work as an
13 independent contractor before that happened, so...
14   Q.  So it wasn't always consultation services for
15 on a contract basis?
16   A.  Correct.  And I didn't -- I apologize if -- I
17 did not intend to mislead you obviously.
18   Q.  No.
19   A.  Since about when I started working for Nova I
20 think that's all I've done on the side.
21   Q.  The consultation contract services?
22   A.  Yes.
23   Q.  Okay.  All right.  So let me just dig down a
24 little bit more on this Tolgyesi, Katz, Hankin & Katz
25 firm down in Hollywood.

15

1    A.  Mm-hmm.
2    Q.  You worked with them as a clerk after
3  graduation from FSU in 1998.
4    A.  Yes.
5    Q.  Did they continue to employ you after your
6  first attempt at the Bar was unsuccessful?
7    A.  I don't recall when I started working for
8  them, but it was not that soon after I graduated from
9  law school. I don't recall the dates.
10   Q.  Okay.  Did you, just so I can get some kind of
11 a chronology here, did you -- were they the first firm
12 that you worked for once you graduated with your JD?
13   A.  I don't recall.
14   Q.  Okay.  Had you taken, made your first attempt
15 at the Bar when you began working for Tolgyesi Katz?
16   A.  I don't believe so.
17   Q.  Okay.  So you -- and I don't want to misstate.
18   A.  I understand.
19   Q.  You just tell me if I'm incorrect.  But did
20 you get your clerking job with Tolgyesi Katz while you
21 were waiting for the results from your first attempt at
22 the Bar?
23   A.  No.
24   Q.  All right.  Did you get your clerk job at
25 Tolgyesi Katz after your second attempt at the Bar?

16

1    A.  Yes.
2    Q.  But before you learned the results?
3    A.  I don't recall.
4    Q.  Okay.  The reason I'm asking is that you were
5  employed as a clerk, once you get your Bar results you
6  get your ticket punched.
7    A.  Yeah. Yes.
8    Q.  So you worked with Tolgyesi Katz for a period
9  of time before you got your Bar results; fair or am I
10 guessing?
11   A.  I don't remember when I got my Bar results and
12 so forth and so on.
13   Q.  Mm-hmm.
14   A.  I started working for them before I got sworn
15 in as a clerk and continued working for them after I got
16 sworn in as an associate.
17   Q.  Perfect.
18   A.  That's all I remember.
19   Q.  That's fine.
20       And you say you worked with them as an
21 associate for less than a year?
22   A.  Correct.
23   Q.  All right.  Who was your, would you identify
24 as your supervisor or the person that you reported to at
25 Tolgyesi Katz?

17

1    A.  Joe Hankin, H-A-N-K-I-N.
2    Q.  And why did you leave Tolgyesi Katz?
3    A.  Litigation in their field, which was PI and
4  PIP, the defense, just really didn't suit me, not --
5  just the work style and the lifestyle.
6    Q.  Any other reason?
7    A.  No.
8    Q.  Where did you work after that?
9    A.  For a few different lawyers and law firms on
10 an independent contractor basis.
11   Q.  So this would be leading up to your employment
12 at Nova in approximately 2009, 2010?
13   A.  I believe I started at Nova as a temporary
14 employee in 2009 and became a permanent employee in
15 2010.
16   Q.  Okay.  So between the time that you left
17 Tolgyesi Katz and the time that you started at Nova you
18 worked as an independent contractor for several
19 different law firms.  Do you recall any of them?
20   A.  One was for a lawyer by the name of Bradford
21 Beilly, B-E-I-L-L-Y, and one was for a lawyer by the
22 name of Austin Frye, F-R-Y-E.
23   Q.  Are those lawyers located in Hollywood?
24   A.  Mr. Beilly is here in Fort Lauderdale. Mr.
25 Frye is in northern Miami-Dade County.



Silverman, Mitchell  02-19-2018

18

1    Q.  Okay.  With respect to your law license, has
2  it ever been the subject of any disciplinary
3  proceedings?
4    A.  No.
5    Q.  And do you maintain it today?
6    A.  Yes.
7    Q.  So the lawsuit that you filed against Nova
8  alleges, in part any way, that you have various
9  disabilities which impact your ability to perform the
10  life function of working; is that fair?
11    A.  Yes.
12    Q.  Okay.  Would you tell me what disabilities you
13  have?
14    A.  I have Bipolar disorder type 2 and I am on the
15  Autism spectrum.  I've been diagnosed with what used to
16  be called -- I was originally diagnosed with Asperger
17  syndrome, but the name of the diagnosis has changed.
18  Asperger syndrome or Autism are accompanied in my case
19  by fairly bad ADHD symptoms.  Because of the Bipolar
20  disorder I'm not able to take stimulant medications to
21  treat the ADHD symptoms.
22    Q.  Before we get into the intricacies -- and I
23  don't mean to cut you off.
24    A.  That's all right.
25    Q.  -- but the first thing I want to do before we

19

1  delve into each of these conditions and the impacts --
2    A.  Mm-hmm.
3    Q.  -- is I'd like to run through the disabilities
4  that you have.
5    A.  Sure.
6    Q.  So I've got Bipolar disorder type 2, I've got
7  Autism spectrum which used to be referred to as
8  Asperger's, and I have ADHD.
9    A.  Correct.
10    Q.  Any other disabilities from which you suffer?
11    A.  An anxiety disorder, and I can't recall
12  anything else.
13    Q.  Okay.  So that's -- you live with these
14  disabilities on a daily basis?
15    A.  Yes.
16    Q.  All right.  So are we talking about only
17  diagnosed conditions?  Are all four of these conditions
18  been diagnosed by a specialist?
19    A.  Can you explain what you mean by a
20  "specialist"?
21    Q.  A medical doctor.
22    A.  No.  No.
23    Q.  Okay.  Has your Bipolar disorder type 2 been
24  diagnosed by a medical doctor?
25    A.  No.

20

1    Q.  Okay.  Who diagnosed your Bipolar disorder?
2    A.  Oh, I'm sorry, Counselor.  This is -- you're
3  asking a complicated series of questions.  Some of the
4  conditions were diagnosed by medical doctors.  Some of
5  them were diagnosed by psychologists.
6    Q.  Right.
7    A.  The Bipolar disorder was originally diagnosed
8  by a social worker by the name of Sheli Bernstein-Goff
9  in Tallahassee.
10    Q.  Okay.
11    A.  It was confirmed by a medical doctor in the
12  employ of her practice whose name I don't recall.
13    Q.  In the employer for practice?
14    A.  In the employ of her clinical practice.
15    Q.  Okay.  Got it.
16    A.  Whose name I don't recall.
17    Q.  In Tallahassee.
18    A.  Correct.
19    Q.  Do you take any medication for the Bipolar
20  disorder?
21    A.  Yes.
22    Q.  What do you take?
23    A.  As I recall - I'm not allowed to use notes - I
24  take -- Counselor, I take a lot of medications.
25    Q.  Mm-hmm.

21

1    A.  I don't want to misremember everything.  I
2  have a pretty precise list which I would rather supply
3  later.
4    Q.  So what I would like to do right now -- and I
5  offer -- I appreciate the offer to supply me with a
6  precise list.  I'll probably send an interrogatory for
7  it, but part of what's going on here, as you might
8  imagine, is my testing your ability to remember things.
9    A.  Sure.
10    Q.  Okay.  So I would like you, as long as you can
11  do so without guessing, I'd like you to give me a
12  reasonable approximation of medications that you can
13  remember.  If you can't remember them at all, then just
14  tell me so.
15    A.  Okay.  Again, this is what amounts to a guess.
16  That's what you've asked for.
17    Q.  No, I've not asked for a guess.  I've asked
18  for reasonable approximation.  If you cannot, if you
19  cannot answer the question without guessing, then just
20  tell me so.  The back and forth here is really not
21  appropriate.
22    A.  I'm sorry, Counselor, but I'm attempting to
23  be--
24    MS. GOODWIN:  He's just getting clarification.
25    You can ask him for clarification.



Silverman, Mitchell   02-19-2018

22

1    A.  I'm attempting to be as precise as I can
2   without, without supplying you with an incorrect list in
3   such a way that it prejudices my case.
4   BY MR. BEAUCHAMP:
5    Q.  Okay.  You can either tell me that as you sit
6   here right now you do not remember the medications that
7   you take for your Bipolar disorder, or you can say, I
8   believe these are the medications that I take for my
9   Bipolar disorder subject to later clarification.
10    A.  I believe these are the medications that I
11   take for my Bipolar disorder subject to later
12   clarification. Thank you, Counselor.
13    Q.  Mm-hmm.
14    A.  Lamotrigine, Tiagabine, Cymbalta, Latuda.  I
15   don't recall any others right at the moment.
16    Q.  There you go.  Okay.  Not a problem.
17        So who currently prescribes these medications
18   for you?
19    A.  Svetlana Schwartz who is a licensed -- pardon
20   me -- an advanced registered nurse practitioner.
21    Q.  An advanced --
22    A.  A nurse practitioner.
23    Q.  Nurse practitioner.
24    A.  Yeah.
25    Q.  Where is she located?

23

1    A.  Hollywood.  She works at the Memorial
2   Outpatient Behavioral Health Center.
3    Q.  Does your -- strike that.
4        Other than the nurse practitioner Svetlana
5   Schwartz, do you see any other healthcare professional
6   for your Bipolar disorder?
7    A.  Yes.  Cheryl Gotthelf who's a clinical
8   psychologist.
9    Q.  Cheryl Gotthelf?
10    A.  G-O-T-T-H-E-L-F.
11    Q.  Oh, okay.  Where is Cheryl Gotthelf located?
12    A.  Also in Hollywood.
13    Q.  Anyone else that you see related to your
14   Bipolar disorder?
15    A.  No.
16    Q.  When was the last time you saw someone other
17   than Nurse Schwartz or Cheryl Gotthelf for your Bipolar
18   disorder?
19    A.  I was treating with a psychiatrist by the name
20   of Neil Edison also in Hollywood or Dania, I'm not sure
21   which city his office is located in, until a few months
22   ago.
23    Q.  Okay.  A few months ago being before the first
24   of the year?
25    A.  Yes.

24

1    Q.  How long had you treated with Dr. Neil Edison?
2    A.  Several years.
3    Q.  And what type of physician or doctor is Dr.
4   Neil Edison?
5    A.  He's a psychiatrist.
6    Q.  So he's a medical doctor on top of being a
7   licensed psychiatrist?
8    A.  Correct.
9    Q.  All right.  Why do you no longer see Dr.
10   Edison?
11    A.  I increasingly felt he wasn't a good fit.
12    Q.  In what sense?
13    A.  Emotionally.
14    Q.  Can you explain that for me?
15    A.  I felt as if he was treating a set of symptoms
16   and not a person.
17    Q.  Did you voice that complaint to him?
18    A.  I believe so.
19    Q.  Okay.  And forgive me.  You say that you
20   treated with him for several years?
21    A.  Correct.
22    Q.  Do you recall approximately when you began
23   treating with him?
24    A.  No.
25    Q.  Did you treat -- by the way, when were you

25

1   first diagnosed with the Bipolar disorder?  While you
2   were going to school?
3    A.  Yes, while I was in law school.
4    Q.  Had you been diagnosed with any other
5   disabilities while you were in law school besides the
6   Bipolar disorder?
7    A.  I don't recall.  I don't believe so.
8    Q.  Did you seek or obtain any type of
9   accommodations related to your matriculation through law
10   school?
11    A.  Yes.
12    Q.  What accommodations did you seek or receive?
13    A.  Extra time on exams.
14    Q.  Time and a half?
15    A.  I don't recall.
16    Q.  And who was it that suggested that that would
17   be an appropriate accommodation for you?
18    A.  I don't recall.
19    Q.  Any other accommodation besides extra time on
20   exams during your matriculation through law school?
21    A.  I don't recall.
22    Q.  After you left law school and came back to
23   south Florida did you continue to treat with anyone with
24   respect to your Bipolar disorder?
25    A.  Yes.



Silverman, Mitchell  02-19-2018

26

1      Q.  Give me the chronology of healthcare
2  professionals that you treated with up until you got to
3  Dr. Edison.
4      A.  When I first came to south Florida I treated
5  with a psychiatrist by the name of Arnold Hartman.
6      Q.  Okay.
7      A.  I next treated with a psychiatrist named Jaime
8  Rejtman.  And I'll spell that.  J-A-I-M-E,
9  R-E-J-T-M-A-N.
10     Q.  Okay.
11     A.  And then Dr. Edison.
12     Q.  All of these individuals are in the Hollywood
13  area?
14     A.  No.  Dr. Hartman was in south Palm Beach
15  County and Dr. Rejtman was in central western Broward
16  County, Sunrise I believe.
17     Q.  Okay.  You how long did you treat with Dr.
18  Hartman approximately?
19     A.  Until about 2006/2007.
20     Q.  Okay.  And then Dr. Rejtman from 2006/2007
21  until?
22     A.  I don't recall, some time while I was working
23  for Nova.
24     Q.  Why did you stop seeing Dr. Hartman?
25     A.  He closed his private practice.

27

1      Q.  Did he retire?
2      A.  No.
3      Q.  Do you know what became of him?
4      A.  At the time he limited his practice to working
5  for the government.
6      Q.  Okay.  How about Dr. Rejtman, why did you stop
7  seeing him?
8      A.  He gave me some poor medication advice and I
9  was advised to switch psychiatrists.
10     Q.  Who advised you to switch psychiatrists?
11     A.  My brother-in-law who's a psychiatrist.  His
12  advice was solely psychopharmacological however.
13     Q.  Okay.  You say his advice was solely
14  pharmacological.  You're talking about your brother-in-
15  law --
16     A.  Correct.
17     Q.  -- or you're talking about --
18     A.  No.  Correct.
19     Q.  With any of these individuals - Dr. Hartman,
20  Dr. Rejtman, Dr. Edison - were you also receiving any
21  kind of psychotherapy?
22     A.  I was talking to them about my condition and
23  they were discussing it and giving me feedback.
24     Q.  Did you consider that to be psychotherapy?
25     A.  Yes.

28

1      Q.  That would include Hartman, Rejtman, and
2  Edison?
3      A.  Yes.
4      Q.  The Autism spectrum formerly known as
5  Asperger's, when were you first diagnosed with that?
6      A.  1999.
7      Q.  And who diagnosed you with that --
8      A.  Dr. -- sorry.  Dr. Hartman.
9      Q.  And did you continue to treat with Dr. Edison
10  for that condition after Dr. Hartman?  Strike that.  Let
11  me back up.
12         Did you treat at all with Dr. Rejtman for the
13  Autism diagnosis?
14         MS. GOODWIN:  You can't keep -- we're not the
15     senate.
16  BY MR. BEAUCHAMP:
17     Q.  Yeah, just ask me.  If you need clarification
18  as to a question you can ask me --
19         MS. GOODWIN:  Yeah.
20  BY MR. BEAUCHAMP:
21     Q.  -- okay, and I won't bite.
22     A.  Well, but you're not my lawyer.
23     Q.  No, I'm certainly not.  But if you don't
24  understand my question or if you need clarification as
25  to what I'm asking you ask me.

29

1      A.  What do you mean by "treat"?
2      Q.  Prescribe medication or provide any kind of
3  psychotherapy.
4      A.  Yes.
5      Q.  So the yes question was related to Dr.
6  Rejtman.
7      A.  Yes.
8      Q.  Okay.  What did Dr. -- first of all, what did
9  Dr. Hartman prescribe, if anything, to you medication
10  wise for the Autism spectrum?
11     A.  Directly, nothing.
12     Q.  Indirectly?
13     A.  Anything that was prescribed that would have
14  affected my mood.  Counselor, I'm not trying to be
15  difficult.
16     Q.  And I'm not taking you as being difficult, so
17  I understand --
18     A.  Okay.  Autism, Autism can't really be treated
19  pharmacologically.  Its symptoms sometimes can.
20     Q.  Okay.  So I'm going to be patient.
21     A.  Thank you.
22     Q.  I ask you to be patient.  We'll work our way
23  through this interrogation.  All right?  I suspect it's
24  going to take more than today to work our way through
25  it.  But I do understand you have a myriad of disability



Silverman, Mitchell  02-19-2018

---

30

1  issues that interrelate in some respect and the
2  medications interrelate in some respect, so we're just
3  going to try to unwind them as much as we can.  Okay? So
4  the --
5      A.  Counselor, if I may.
6      Q.  Mm-hmm.
7      A.  Could you ask your fellow attorney to hand me
8  that box of tissues that's behind him.  It would make my
9  life easier when I'm putting in eye drops.
10     Q.  Certainly.
11     A.  Thank you so much.
12        MR. SILVERMAN:  What's your name?
13        MR. HORTON:  Jay.
14        MR. SILVERMAN:  Thank you, Jay.
15 BY MR. BEAUCHAMP:
16     Q.  Okay.  So understanding that there's no
17 pharmacological treatment for Autism but symptomatically
18 there may be some medications that are prescribed to
19 address symptoms --
20     A.  Yes.
21     Q.  -- tell me as best you can what symptoms you
22 were experiencing related to the Autism and what
23 medications you were receiving to address them.
24     A.  Depression, anxiety, and ADHD symptoms I think
25 are all that any of my psychiatrists tried to treat, I

---

31

1  think.
2      Q.  Okay.  And so do you take any medications now-
3  - well, I guess we're going to get there with the
4  anxiety and ADHD.
5         The depression, do you take any medication for
6  depression?
7      A.  Yes.
8      Q.  What do you take?
9      A.  Cymbalta, and another Bipolar medication I
10 didn't remember is Lithium Carbonate which has, as I
11 recall, some protective effect with depression.
12 Tiagabine also I think is an anti-anxiety medication
13 although that's not usually why it's prescribed.
14     Q.  Is this an off label use?
15     A.  I believe so.
16     Q.  These are the medications that you're taking
17 currently?
18     A.  As best I recall.
19     Q.  Understood.  How long have you been taking the
20 Cymbalta?
21     A.  I don't recall.
22     Q.  How about the Lithium Carbonate?
23     A.  I also don't recall.
24     Q.  The other, the medications that you mentioned
25 for the Bipolar disorder:  the Lamotrigine, Tiagabine,

---

32

1  we talked about the Cymbalta, and the last one was
2  Latuda --
3      A.  Yes.
4      Q.  -- how long have you been taking those?
5      A.  I don't recall.
6      Q.  Were you taking those medications while you
7  were employed at Nova Southeastern?
8      A.  Yes.
9      Q.  Were you taking those medications for the
10 entirety of the time that you were employed at Nova
11 Southeastern?
12     A.  I don't believe so.
13     Q.  Okay.  Maybe the better way to do this is to
14 ask you this question.  What medications are you
15 currently taking for anything?
16     A.  Well, the ones I've already mentioned,
17 Metformin --
18     Q.  Say that again.
19     A.  -- Metformin, Pioglitazone, Spiriva which is
20 an inhaler, Singulair, Levalbuterol, I receive regular
21 injections of Botox for chronic migraine headache,
22 Naproxen, prescription Naproxen, Tylenol --
23     Q.  Over the counter?
24     A.  Over the counter, yes, Acetaminophen --
25 Sucralfate, Carafate, C-A-R-F-A-T-E (sic) is the trade

---

33

1  name.
2      Q.  Say that -- I'm sorry.
3      A.  Sorry.  C-A-R-F-A-T-E (sic).  It's not an
4  antacid that neutralizes the acid.  It kind of coats
5  your stomach.
6      Q.  Okay.
7      A.  Those are the only medications I can remember
8  right at the moment.
9      Q.  Okay.  And that would be in addition to the
10 other meds you mentioned to me earlier?
11     A.  Correct.
12     Q.  The Lamotrigine, Tiagamine --
13     A.  Tiagabine with a B.
14     Q.  With a B?
15     A.  Yes.
16     Q.  -- Cymbalta, and Latuda.
17     A.  Yes.  Sorry.
18     Q.  Do you have a single physician that manages
19 all these medications?
20     A.  I rely on my primary a lot, but no.
21     Q.  Who is your primary?
22     A.  Marc Greenstein, M-A-R-C, G-R-E-E-N-S-T-E-I-N.
23     Q.  Who do you see for the ADHD?
24     A.  Svetlana Schwartz and Cheryl Gotthelf.  To be
25 clear, I have not been diagnosed with ADHD.

---



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

Silverman, Mitchell  02-19-2018

34

1    Q.   That was my next question.
2    A.   I have been diagnosed with ADHD symptoms as a
3  part of the Autism spectrum disease, Autism spectrum.
4    Q.   Okay.  So there's been no formal ADHD
5  diagnosis that you're aware of?
6    A.   ADHD and Autism are incompatible diagnoses.
7  You can't be diagnosed with both.  So I have been
8  formally diagnosed with Autism.
9    Q.   Mm-hmm.
10    A.   And I have been formally diagnosed with ADHD
11  symptoms.
12    Q.   Okay.  Who formally diagnosed you with ADHD
13  symptoms?
14    A.   Thomas Crum, C-R-U-M.
15    Q.   Where is Dr. Crum located?
16    A.   Hollywood.  He's a Ph.D. psychologist, a
17  rehabilitation psychologist formally I think.
18    Q.   When did he diagnose you with ADHD symptoms?
19    A.   Some time in the last three or four years.
20    Q.   Which of the medications that you've indicated
21  you take on a daily basis do you believe are for your
22  ADHD symptoms?
23    A.   None of them.
24    Q.   Before Dr. Crum, had anyone else ever
25  diagnosed you with ADHD symptoms?

35

1    A.   Formally, no.
2    Q.   Informally?
3    A.   I believe I had discussed it with previous
4  clinicians.  I don't recall exactly.
5    Q.   The anxiety disorder, when were you first
6  diagnosed with anxiety disorder?
7    A.   Dr. Hartman diagnosed me with what he called
8  an incomplete panic disorder.
9    Q.   Did you understand that to be something akin
10  to an anxiety disorder?
11    A.   Yes.
12    Q.   Did he tell you that?
13    A.   I don't recall.
14    Q.   When did Dr. Hartman diagnose you with this
15  incomplete panic disorder?
16    A.   Some time when I was treating with him.  I
17  don't recall beyond that.
18    Q.   Any of the medications that you currently take
19  do you believe addressed the symptoms associated with
20  either incomplete panic disorder or anxiety disorder?
21    A.   I believe the Latuda does, and I've been told
22  that the Tiagabine does.
23    Q.   What about the Levalbuterol, what is that for?
24    A.   It's a rescue bronchodilator and --
25    Q.   Do you have asthma?

36

1    A.   I don't.  According to my pulmonologist, I
2  just had a test and he said no, but I do have, I'm on an
3  inhaler at a strength used for COPD and it seems to be
4  helping me.  Go figure.  I'm not being obtuse.  I really
5  don't know what's going on.  And the Levalbuterol is
6  intended to treat something and it helps.
7    Q.   How old are you?
8    A.   Fifty-two.
9    Q.   Do you have other conditions that you don't
10  consider to be disabilities but have an impact on your
11  ability to work?
12    A.   I have diabetes and I do consider that to be a
13  disability and I did disclose it to Nova.
14    Q.   Do you have any kind of intestinal issues?
15    A.   I do have IBS, an irritable bowel syndrome.
16    Q.   Has that been diagnosed?
17    A.   I believe so.
18    Q.   When do you believe it was diagnosed?
19    A.   In the early 21st century by a
20  gastroenterologist whose name I cannot recall.
21    Q.   Do you treat currently for IBS?
22    A.   I take Metamucil on a daily basis.  I believe
23  I've discussed with my primary that it's for IBS.  It,
24  shall we say, regularizes my bowel habits somewhat.
25    Q.   What about the migraines, have they been --

37

1    A.   I've seen -- I apologize.
2    Q.   That was a stupid question.  Let me ask it
3  this way.  Have you been diagnosed with migraines?
4    A.   Yes.
5    Q.   And who diagnosed you with migraines?
6    A.   A neurologist by the name of Islon Seliger,
7  S-E-L-I-G-E-R.
8    Q.   Where is Islon Seliger?
9    A.   Pembroke Pines.
10    Q.   Approximately when was that diagnosis made?
11    A.   Within the last five or six years.
12    Q.   Medication for that condition, do you take
13  any?
14    A.   Yes.
15    Q.   What do you take?
16    A.   The Acetaminophen, the Naproxen, the Botox,
17  the inhalers.  There seems to be some relationship
18  between how well I'm breathing and how headachy I am
19  when I wake up, which I'm -- one reason I'm seeing a
20  pulmonologist.
21    Q.   Do you still treat with Dr. Seliger?
22    A.   No.
23    Q.   Who prescribes the Botox and the Naproxen for
24  you?
25    A.   Current -- well, my primary prescribes the



Silverman, Mitchell   02-19-2018

**38**

1 Naproxen and the Botox is administered by Maike Blaya,
2 B-L-A-Y-A, who is a neurologist headache – pardon me --
3 a neurologist fellowship trained in headaches in
4 Hollywood.
5    Q.  Does he treat you apart from administering the
6 Botox?  Is he treating you for migraines?
7    A.  She.
8    Q.  She, Maike.
9    A.  That's all right.  Yes.
10    Q.  So when I asked you about disabilities
11 impacting your ability to work, you did not tell me
12 about migraines or IBS.  Why is that?
13    A.  I forgot ADHD.  I certainly wasn't intending
14 to mislead you, Counselor.
15    Q.  No, I don't -- I'm not trying to suggest that
16 you were by my question.  I'm just trying to figure out
17 if there's anything else out there that you've forgotten
18 besides the migraines and the IBS that may have an
19 impact on your ability to work.
20       Any other conditions that you suffer from,
21 treat for, receive medication for besides the ones that
22 we've discussed thus far?
23    A.  I'm going to say those are all that I recall.
24 It's complicated.
25    Q.  When you were working at Tolgyesi Katz, did

**39**

1 you have any type of accommodation for the work that you
2 were doing?
3    A.  I don't believe so.
4    Q.  What type specifically of work were you doing
5 for them?  I know you mentioned PI and PIP.
6    A.  Sure.
7    Q.  But what were you doing?  Were you making
8 court appearances?
9    A.  Yes.
10    Q.  Okay.  Which would involve preparing for the
11 hearing, going to the hearing, arguing the hearing?
12    A.  Yes.
13    Q.  Okay.  Were you experiencing difficulties
14 doing any of that as a result of any of the medical
15 conditions that you've described for us today?
16    A.  I don't recall.
17    Q.  So something I didn't mention when we started
18 out, as we go through this process if you think of
19 something that you left out accidentally, feel free to
20 say -- and you've done this on a couple of occasions
21 already, but I want you to know that I want you to say,
22 oh, by the way, I have this or I take that, whatever it
23 happens to be.
24    A.  I'll do so.
25    Q.  All right.  Great.  Give me a moment just to--

**40**

1    A.  Would now be a good time to take a break?
2    Q.  Now would be an excellent time to take a
3 break.
4       (Off the record 3:07 p.m.)
5       (On the record 3:22 p.m.)
6 BY MR. BEAUCHAMP:
7    Q.  It's interesting you mentioned self
8 medicating.  Did any of the medications that you take,
9 Mr. Silverman, have an impact on your ability to
10 remember events?
11    A.  Not that I, not that I know of.  Not that I,
12 not that I've experienced, no.
13    Q.  Any of the conditions that you suffer from
14 have an impact on your ability to remember events?
15    A.  The ADHD sometimes.
16    Q.  As in the case of the IBS and the migraines,
17 right, you forgot about those?
18    A.  I'm going to say that's the ADHD and also
19 being nervous.
20    Q.  Would that be part of the anxiety disorder?
21    A.  Absolutely.  Thank you for pointing that out.
22    Q.  Sure.  So have you ever applied for Social
23 Security Disability?
24    A.  No.
25    Q.  Do you have any kind of disability insurance

**41**

1 whatsoever?
2    A.  No.
3    Q.  Have you ever applied for disability
4 insurance?
5    A.  I don't recall.  May I elaborate on my comment
6 about self-medicating before we go further?
7    Q.  Sure.
8    A.  The only medication, over-the-counter
9 medication essentially that I found that I can take,
10 that I can take that helps for the ADHD symptoms and it
11 helps with the migraines is caffeine.  I can't take any
12 of the particular stimulant medications for ADHD because
13 of the Bipolar disorder.  No one will prescribe them for
14 me, and I don't even really want to try.
15       The only supposedly non stimulant medication
16 that I am aware of for ADHD right at the moment is
17 Strattera, S-T-R-A-T-T-E-R-A.  I've tried it twice, once
18 within the last couple of years while I was working at
19 NSU and this last time it made me fairly agitated
20 actually which it's not really supposed to do, but
21 whatever.  So the caffeine helps.  I can titrate the
22 dosage myself, and it's fairly fast acting.
23    Q.  So were you experiencing an onset of
24 symptomatology that you would attribute to the ADHD?
25    A.  At the moment?



877.291.3376
www.UCRinc.com

Silverman, Mitchell   02-19-2018

42

1    Q.  Within the last, within the last half hour or
2  so?
3    A.  I would say I'm taking it more for alertness
4  and caffeine -- and the migraines.  I'm starting to get
5  a little bit of a headache and I have already taken some
6  Acetaminophen.  You know, as far as an onset of the ADHD
7  symptoms I would say I experience them to a greater or
8  lesser degree all the time I'm awake.
9    Q.  But the intensity of those symptoms does vary
10  from time to time; yes?
11    A.  Sure.  I mean, I can being feeling perfectly
12  fine.  I can be working in a groove on an assignment.  I
13  can walk into the kitchen because I remembered I need
14  something and then forget what it was.
15    Q.  So let's talk about the Bipolar disorder for a
16  moment.
17    A.  Sure.
18    Q.  What types of symptoms do you have that you
19  associate with the Bipolar disorder?
20    A.  Hyperverbality, elevated mood, agitation and
21  irritation, depressed mood, a feeling of sadness
22  sometimes.  I can't think of any other right at the
23  moment.
24    Q.  How often do you experience these symptoms?
25    A.  I can't -- daily, weekly, monthly?

43

1    Q.  Well, I can't answer that question.  Are you
2  saying that you experience these symptoms daily?
3    A.  Sometimes yes, sometimes no.  Regularly, you
4  know, some days I'm happy, some days I'm sad, some days
5  I'm both, some days it's normal, some days it's not.
6    Q.  What impact does -- what impact do these
7  symptoms have on your ability to function?
8    A.  It depends on the severity of the symptoms at
9  a given moment.  Some days I'll wake up feeling
10  refreshed and bounce out of bed and sometimes it will
11  take me 45 minutes or an hour to drag my butt out of
12  bed.  Some days, you know, as with -- you know, I'll be
13  able to sit down and begin work immediately.  Some days
14  the depression will lead me to not get stuff done in a
15  really timely fashion.
16    Q.  And do you experience these symptoms whether
17  you take medication or not?
18    A.  I would say that I experience these symptoms
19  now to a lesser extent than I believe that I would if I
20  didn't take the medication.
21    Q.  So you --
22    A.  I can't tell you --
23    Q.  So I understand.  I get that it all varies.  I
24  get that.  Let me finish.
25    A.  Sorry.

44

1    Q.  It's your belief that the medication that you
2  take serves to lessen the symptoms that you experience?
3    A.  Yes.
4    Q.  All right.  Yet even with the medication you
5  have days where you, to use your vernacular, takes you
6  45 minutes to get your butt out of bed, even with the
7  medication?
8    A.  That's been much more the case since I was
9  terminated by Nova, yes.
10    Q.  But you experienced that while you were
11  employed by Nova as well; yes?
12    A.  To that extent, no.
13    Q.  You didn't?
14    A.  No.
15    Q.  Okay.  Did you experience agitation and
16  irritation as a result of your Bipolar disorder
17  condition while you were employed at Nova?
18    A.  Sometimes.
19    Q.  How about the hyperverbality, did you
20  experience that --
21    A.  Yes.  Yes.
22    Q.  -- while you were at Nova?
23    A.  Yes.
24    Q.  All right.  Elevated mood?
25    A.  Yes.

45

1    Q.  Depressed mood?
2    A.  Yes.
3    Q.  Sadness?
4    A.  Yes.
5    Q.  Okay.  So you experienced all of those things
6  while you were at Nova and you were taking the
7  medication for Bipolar disorder while you were at Nova;
8  correct?
9    A.  Yes.
10    Q.  All right.  Has your medication changed since
11  your separation from Nova with respect to the Bipolar
12  disorder?
13    A.  I'm not sure.
14    Q.  Regardless if there was a change in your
15  medication or not, those symptoms that we've described
16  are symptoms that you experienced while you were
17  employed at Nova?
18    A.  Yes.
19    Q.  Okay.  When you're experiencing the depressed
20  mood and the sadness, how do you deal, what do you do to
21  deal with that?
22    A.  Talk to friends.  There are some cognitive
23  behavioral techniques that work:  self talk, positive
24  self talk, putting one foot in front of the other.
25    Q.  Do you find yourself overwhelmed at times by



**46**

1  the depression and the sadness?
2      A.  No.
3      Q.  How about the agitation and irritation, how do
4  you deal with that?
5      A.  Deep breathing.  Not, not being facetious.
6      Q.  No, I understand.
7      A.  And, and taking a break can be very useful.
8      Q.  So give me some -- and I understand that this
9  is very fluid in terms of how you experience these
10  things, but in terms of the Bipolar disorder and the
11  symptoms that you've described for me, is there any way
12  for you to predict when you're going to feel these
13  things?
14      A.  I can sometimes get a little bit of a sense
15  and, I mean, sometimes the transitions are fairly rapid,
16  but, I mean, it's, it's usually not like a light bulb.  I
17  mean, it's hard to say.  It's also it's like it's so
18  much in the moment it's hard for me to see some of the
19  patterns sometimes.  That's why I see a therapist.
20      Q.  The therapy you believe helps you with the
21  Bipolar disorder in addition to the medication?
22      A.  Absolutely.
23      Q.  Have you noticed an improvement in your
24  Bipolar disorder symptomatology over the course of time?
25      A.  I've noticed that the therapy has helped me

**47**

1  deal with the Bipolar disorder.
2      Q.  In what way?
3      A.  Well, insight, some of those techniques that
4  we've talked about.  There are more of them.  I can't
5  recall the rest of them right at the moment.  I can try
6  if you'd like.  But having someone who understands
7  what's going on with me, has seen it all before and can
8  act as a sort of a reality check.
9      Q.  How often do you receive that sort of therapy?
10      A.  I see Dr. Gotthelf once a week.
11      Q.  Once a week.  And while you were at Nova how
12  long did you see the doctor for that type of therapy?
13      A.  I saw her at least -- correction.  I began
14  seeing Dr. Gotthelf at some point while I was at Nova.
15      Q.  Right.
16      A.  I don't recall much of the time and I don't
17  recall the proportions.  I saw her once a week.  Some of
18  the time I was at Nova I saw her twice a week.
19      Q.  Currently you see her once a week?
20      A.  Correct.
21      Q.  So while you were working at Nova and you
22  experienced agitation or irritation, what impact did
23  that have on your ability to perform your work?
24      A.  It sometimes made it hard for me to accomplish
25  task work.  Part of the problem is it was often hard or

**48**

1  impossible for me to tell whether it was the Bipolar
2  disorder, the ADHD, or some combination of both.
3      Q.  So but let me follow up on that.
4      A.  Sure.
5      Q.  What difference would it have made to you to
6  understand that this was either ADHD or Bipolar disorder
7  when you're in that moment?
8      A.  What difference would it have made to me to
9  understand it?
10      Q.  No, to understand what was causing it at that
11  particular moment.
12      A.  Right.  Right.
13      Q.  Because you're already taking the medication
14  for the Bipolar disorder --
15      A.  Right.
16      Q.  -- right?
17      A.  Right.  Right.
18      Q.  Strike -- stop that.
19          But is there an additional medication that you
20  could have taken for the Bipolar disorder if you
21  understood that that symptomatology was being caused by
22  that condition?
23      A.  Not that I know of, no.
24      Q.  Okay.  So back to my original question, what
25  difference would it have made to you in the moment and

**49**

1  in terms of its impact on your ability to work to know
2  it was ADHD versus Bipolar?
3      A.  None.  What I'm saying is that the symptoms
4  just kind of merge.  It's hard for me, impossible for me
5  to draw that line.
6      Q.  Right.  And I'm not asking you to.
7      A.  Right.
8      Q.  I'm just curious as to the statements you made
9  which was --
10      A.  Right.
11      Q.  -- you know, you didn't know which one it
12  was--
13      A.  Right.
14      Q.  -- as if that would have made a difference.
15      A.  I mean, that's why I'm saying it.  I wish, I
16  wish I understood everything about everything, and
17  that's -- I guess curiosity is part of my nature.  It
18  helped me, it helps me in my life as a librarian, but
19  there are times when it doesn't matter what questions
20  you ask or it doesn't matter if you ask some questions.
21      Q.  Okay.  So regardless of whether it's being
22  caused by the ADHD or the Bipolar disorder, when you're
23  feeling agitated or irritated you need to step back, do
24  some deep breathing, you need to go through some of the
25  cognitive strategies --

Silverman, Mitchell   02-19-2018

50

1    A.   Sure.
2    Q.   -- that you've talked about; correct?
3    A.   Sure.
4    Q.   All right. Similarly, when you experience
5  sadness or depressed mood, what do you do when you're at
6  work in order to deal with that?
7    A.   Take a lunch break, go for a walk, change what
8  I'm doing if I'm able to do that. Sometimes I was,
9  sometimes I wasn't, you know. Working on the reference
10  desk was usually atomic for me. Helping people always
11  made me feel good.
12    Q.   And yet it seemed to bring on your migraines,
13  did it not, working at the reference desk?
14    A.   I wouldn't say working at the reference desk
15  brought on my migraines.
16    Q.   Well, the environment around the reference
17  desk, the light.
18    A.   When I wasn't able to arrange the
19  accommodations that I suggested that seemed very
20  reasonable and that when in moment it would work, yes,
21  sometimes the lighting at the reference desk caused me a
22  problem.
23    Q.   So we'll delve into the request for
24  accommodations at a later date, but what I'm asking you
25  is in connection with your statement that working at the

51

1  reference desk was atomic for you, you also experienced
2  difficulties with respect to some of your conditions
3  while you were working at the reference desk, correct,
4  including migraines?
5    A.   Yes, but as far as migraines were concerned
6  the two biggest issues were light and noise, and noise
7  was not really not a general issue.
8    Q.   Noise shouldn't be an issue in a library,
9  right, generally speaking?
10    A.   Well, yes, but there was a fair amount of
11  construction that went on during one long period in our
12  library.
13    Q.   Right. That construction was affecting the
14  entire library, was it not?
15    A.   True.
16    Q.   Anyone who was in the library anywhere in the
17  library would be subjected to that type of construction
18  noise?
19    A.   True.
20    Q.   So the Autism spectrum, what are the symptoms
21  that you associate with the Autism spectrum condition?
22    A.   It seems to me that my biggest issues with
23  being on the spectrum have to do with sometimes
24  understanding other people, understanding social cues. I
25  would say that some social interactions and the ADHD

52

1  symptoms were the worst as far as I can recall.
2    Q.   Give me examples, if you can, of your
3  inability to understand social cues.
4    A.   I often find it hard to tell if someone is
5  lying to me. I'm not, I'm not as good at it as someone
6  who doesn't, who isn't on the Autism spectrum. I can
7  sometimes figure out what I'm missing, but it takes some
8  time and some thought. It's not, it's not intuitive as
9  it is with most people.
10    Q.   You think that most people can intuitively
11  tell if someone's lying to them?
12    A.   No. I think that most people are better at it
13  than I am, and I think that most people can figure out
14  in general what the sort of non linguistic part of what
15  someone is saying. That was kind of a compound
16  statement, Counselor. I apologize.
17        I'm not as good with the lying and I'm not as
18  good with the figuring out, but I can figure out and I
19  don't think anyone is perfect with the lying.
20    Q.   So beyond the issues that you've just
21  described with respect to being able to determine if
22  someone is not telling you the truth or lying, what
23  other social cues do you have difficulty with as a
24  result of being on the Autism spectrum?
25    A.   Emotion often.

53

1    Q.   Can you be more descriptive than that?
2    A.   If someone is, I don't know, being short with
3  me verbally, for example, it's sometimes hard for me to
4  tell whether they're annoyed in general, annoyed at me,
5  annoyed at someone else. I'm having trouble coming up
6  with any examples.
7    Q.   Does it have an impact on how you interact
8  with individuals?
9    A.   Yes.
10    Q.   Does it have an impact on your emotions when
11  you interact with other people?
12    A.   Yes.
13    Q.   Okay. Does it result or has it resulted in
14  your losing your temper with other people, getting upset
15  with them?
16    A.   Getting upset with them, yes, definitely.
17    Q.   Being short with them?
18    A.   Yes.
19    Q.   Okay. And so when those things happen, what
20  do you do? Let me say -- that was a crappy question.
21  Sorry.
22        So when you find yourself, let's say you're at
23  Nova, all right, working and there's an interaction with
24  someone where you find yourself getting upset with that
25  person or being short with that person, how do you deal



Silverman, Mitchell   02-19-2018

54

1  with that? What do you do?
2      A.  Try to remove myself from the situation.  I
3  think, I think that's, that's like the biggest one.  The
4  other one would be to -- well, what you just did is kind
5  of a good example, to say something along the lines of,
6  I'm sorry, that's a crappy question, let me try that
7  again.
8      Q.  Okay.
9      A.  You know, to take, either to take a longer
10  break or just to take a shorter break and say, you know,
11  let's try that again, let's, you know, wind things down
12  a little bit.
13      Q.  In those instances where you've taken a longer
14  break, you say you remove yourself from that situation,
15  what specifically do you do?
16      A.  Go back to my office, sit in the quiet,
17  sometimes even with the lights off for a little while.
18      Q.  Okay.
19      A.  I had a yoga mat in my office that a couple of
20  times I would resort to just laying down on for a few
21  minutes.
22      Q.  Is that something that happened with some
23  frequency while you were at Nova?
24      A.  On at least two or three occasions.
25      Q.  In the entirety of the time that you were

55

1  working at Nova you believe that happened two or three
2  occasions?
3      A.  That I can recall.
4      Q.  Does it cause you, the Autism, being on the
5  Autism spectrum, does it cause you to get frustrated
6  more easily with people?
7      A.  Sometimes, yes.
8      Q.  And how would you -- how would that manifest
9  itself in your interactions?
10      A.  I would be tense.  I would, you know, probably
11  become kind of short with someone.  I think it's very
12  similar to what you described, what we just described,
13  you know.  It would be either the interaction would go,
14  would go poorly and it would end or I or the other
15  person would realize that it was going poorly and try
16  and take a short step back or a longer step back.  It,
17  you know, it made it harder for me to communicate or to
18  understand.
19      Q.  And forgive me.  You had been diagnosed as
20  being on this Autism spectrum the entire time you were
21  at Nova; right?
22      A.  Yes.
23      Q.  And the Bipolar disorder as well; correct?
24      A.  Yes.
25      Q.  The entire time you were at Nova?

56

1      A.  Let me make a clarification.  There is a
2  difference between clinical diagnosis by a psychiatrist
3  and a diagnosis from testing, and Dr. Hartman diagnosed
4  me clinically in 1999.
5      Q.  Mm-hmm.
6      A.  And I went to see Dr. Crum because I wanted to
7  get, you know, the piece of paper, if you will.  I knew
8  for sure I was on the spectrum, but I did that in large
9  part to provide the paper to Nova.
10      Q.  You were clinically diagnosed as being on the
11  Autism spectrum in 1999?
12      A.  Correct.
13      Q.  Okay.  And you began working at Nova around
14  2009/2010?
15      A.  Correct.
16      Q.  All right.  So you've been on -- you've had
17  the diagnosis clinically the entirety of your work
18  experience at Nova?
19      A.  Yes.
20      Q.  Same with the Bipolar disorder?
21      A.  Yes.
22      Q.  You've this that diagnosis --
23      A.  Yes.
24      Q.  -- the entirety of the time that you worked at
25  Nova?

57

1      A.  I don't believe -- I don't really understand
2  why Autism has to be diagnosed by testing.  Bipolar
3  disorder, a clinical diagnosis is fine.  So, you know, I
4  understand a fair amount about this whole thing.
5      Q.  Sure.
6      A.  That I don't really understand.
7      Q.  So just so the record is clear, because I'm
8  not sure I got the direct answer to the direct question,
9  which was you have had the diagnosis of being, of
10  suffering from Bipolar disorder the entirety of the time
11  that you worked at Nova; right?
12      A.  Yes. Yes.
13      Q.  All right.  Any other symptoms that you
14  associate with being on the Autism spectrum that impact
15  your ability to work other than what you've already
16  described for me?
17      A.  Not that I can recall.
18      Q.  Okay.  So it primarily focuses on your ability
19  to interact with third persons, correct, the Autism,
20  being on the Autism spectrum?
21      A.  And the ADHD symptoms.
22      Q.  Just so I'm clear, when you say "and the ADHD
23  symptoms", you're saying that that has an ability or an
24  impact on your ability to impact with others as well?
25      A.  No.



Silverman, Mitchell   02-19-2018

58

1    Q.  All right.
2    A.  You asked me, you asked me, as I understand
3    it--
4    Q.  Mm-hmm.
5    A.  -- you said are the only symptoms of Autism
6    that interfere with your ability to work, your inability
7    or your problems dealing with people, and the ADHD
8    symptoms are actually of the Autism diagnosis.  I don't
9    have ADHD as such.  It's a fine distinction and maybe it
10   doesn't matter, but...
11   Q.  Well, let's talk about it for a second,
12   because I'm not sure I understand what you just said.
13   I'll try to.
14       We've talked about the symptoms, the effect of
15   being on the Autism spectrum as it relates to your
16   ability to interact with people, your ability to deal
17   with your emotional reaction to situations; correct?
18   A.  Mm-hmm.
19   Q.  Yes?
20   A.  I don't know that I said that.  I'm not -- I'm
21   concerned more with communication issues.  I don't
22   think-- I don't recall, and it's a long conversation,
23   saying anything that it caused me problems dealing with
24   situations emotionally.  What I was talking about, I
25   think, was the idea that I had trouble communicating

59

1    with people, not dealing emotionally with those
2    situations.
3    Q.  Well --
4    A.  The anxiety and the Bipolar disorder I see as
5    more being where that comes from.
6    Q.  So being where what comes from?
7    A.  The, the problems dealing emotionally with,
8    with conflict with dealing with other people.
9    Q.  Okay.  Getting upset with people or being
10   short with people, that type of thing?
11   A.  Right.
12   Q.  Okay.  So you think that that's more ADHD than
13   Bipolar?
14   A.  It's so hard to say.
15   Q.  Okay.  We'll just do the best that we can as
16   we go through it.  All right?
17   A.  Right.  Sure.
18   Q.  Okay.
19   A.  I have all these diagnoses, I have all these
20   symptoms.
21   Q.  Right.  And you have -- you're on the Autism
22   spectrum all the time; correct?
23   A.  Yes.
24   Q.  Okay.  There's no medication for that?
25   A.  Correct.

60

1    Q.  All right.  So you have this situational
2    response, whether it's the Bipolar disorder, whether
3    it's the ADHD, or whether it's the Autism spectrum, you
4    have situational responses to interactions that may
5    require you to take a break, for example; right?
6    A.  May, yes.
7    Q.  Sure.  And you have?
8    A.  Mm-hmm.
9    Q.  Yes?
10   A.  Yes.
11   Q.  Okay.  And there's no way to predict when
12   that's going to happen, is there?
13   A.  Yes.
14   Q.  Yes, there is, or no, there isn't?
15   A.  No, I'm agreeing with your --
16   Q.  Okay.  Well, I'm going to clarify it.  Okay?
17   A.  Sure.
18   Q.  Is there a way for you to be able to predict
19   when that's going to happen?
20   A.  Predict for sure, no.  I mean, there are
21   patterns that fit, you know, like I can guess.  You
22   know, there were times when I thought I might have an
23   issue and times when I thought that I wouldn't.
24   Q.  Okay.  And on those occasions when you thought
25   that you might have an issue you need to withdraw, you

61

1    need to move to separate yourself from the situation in
2    advance?
3    A.  I would try to, yes.
4    Q.  Go for a walk?
5    A.  For example, yes.
6    Q.  Take a lunch?
7    A.  Yes.
8    Q.  Go to your office, lay on the yoga mat?
9    A.  Yes.
10   Q.  What other types of strategies did you employ
11   at work when you felt as though, whether it's Bipolar,
12   whether it's ADHD, or whether it's Autism spectrum, when
13   you felt as though there was going to be a situation
14   that you were going to have to deal with?
15   A.  I would try to avoid the situation when I
16   could.
17   Q.  Mm-hmm.  Okay.  Not always possible, but okay.
18   A.  Yes.
19   Q.  All right.  And if you couldn't avoid the
20   situation?
21   A.  I would -- sorry.  Go ahead.
22   Q.  I'm sorry.  When you say try to avoid the
23   situation, are we talking about taking the walk, going
24   to the office, taking lunch, those types of things?
25   A.  Rescheduling a meeting, cancelling a meeting



Silverman, Mitchell   02-19-2018

**62**

1  when I could.
2      Q.  Okay.  Did deadlines sometimes have the effect
3  or the impact on you of having or giving rise to these
4  types of responses where you felt as though you needed
5  to step back, you needed to reschedule?
6      A.  I'm not sure what you mean.
7      Q.  Okay.  We'll talk about that more later.
8      A.  Sure.
9      Q.  Okay.  So understanding that there's some
10  carry-over amongst and between --
11      A.  Mm-hmm.
12      Q.  -- these conditions is there anything else
13  that you attribute to being on the Autism spectrum that
14  had an adverse impact on your ability to work --
15      A.  Nothing.
16      Q.  -- besides, I'm sorry, besides the
17  Interactions, the social interactions that we've
18  described?
19      A.  Not that I can recall.
20      Q.  Okay.  And was there anything more than what
21  you had previously told me about the Bipolar disorder
22  beyond what we described - you said the hyperverbality,
23  elevated mood, agitation/irritation, depressed mood,
24  sadness - do you attribute some of your interaction
25  difficulties with third parties to the Bipolar disorder?

**63**

1      A.  Yes.
2      Q.  And do those take place or did those take
3  place regardless of whether or not you were on
4  medication? Let me ask it a different way.
5          When you took the Bipolar medication, did that
6  cure it, did you have no issues as it related to those
7  type of problems?
8      A.  No.
9      Q.  How about ADHD, what symptoms do you believe
10  that you suffered relating to the ADHD that had an
11  adverse impact on your ability to work?
12      A.  Well, it was hard for me to accomplish tasks
13  when I was being interrupted.  And I'll give you two
14  examples, two sort of general examples.
15          When I was expected to accomplish tasks while
16  I was on the reference desk, and even when the automatic
17  door, the automatic front door of the library would open
18  my head would jerk around.  My reactions to things like
19  that are that kind of automatic.
20          Plus, if a patron comes up to me at the desk
21  and asks me a question, whether the question is 30
22  seconds or 5 minutes, it's, well, depending on how long
23  it is, it's going to be hard for me to get back to what
24  I was working on.
25          And contrariwise, if I'm working in my office

**64**

1  and I'm on some sort, working on some sort of project
2  with a deadline and someone knocks on my door it breaks
3  my concentration either, and that happened to me
4  frequently.
5          My office was in a publicly accessible area
6  and students, faculty, lawyers who use the library,
7  self-represented patrons turned, you know, wound up
8  knowing where my office was, so they would come find me.
9  And I would send them off to the reference desk when I
10  could, but when a faculty member came and talked to me I
11  kind of couldn't say no, and that happened.  And even
12  when all I had to do was send them to the reference
13  desk, that still -- and, you know, there was no way for
14  me to predict how any of this would go on.
15      Q.  There is no way to predict that, is there?
16      A.  No.
17      Q.  I mean, people come in, you're working at the
18  reference desk, people come in and ask you questions?
19      A.  Yes.
20      Q.  And that could happen 10, 20 times a day?
21      A.  Or more than that.
22      Q.  Or more.  And there's no way to predict when
23  It's going to happen, when it's not going to happen;
24  correct?
25      A.  Yes.

**65**

1      Q.  And the door is going to open and close --
2      A.  Yes.
3      Q.  -- scores of times a day?
4      A.  Yes.
5      Q.  Okay.  And each time one of those events
6  happens it breaks your concentration?
7      A.  Yes.
8      Q.  Okay.  And when you're back in your office, I
9  presume that it doesn't even need to be a knock at the
10  door; it could be some noise outside?
11      A.  Generally, no.  Generally, no.  My office was
12  never in a super noisy area.
13      Q.  What about the construction?
14      A.  I mean, there were times when it was
15  impossible for me to do anything.  You know, at one
16  point Nova's suggestion to me as an accommodation to the
17  construction noise was to go and buy a pair of $350
18  noise-canceling headphones which I did.
19      Q.  Did that have any positive impact?
20      A.  It did help, yes.
21      Q.  Regardless, you wouldn't be able to hear
22  somebody knocking on your door if you had the noise-
23  canceling headphones on; correct?
24      A.  True, but my blinds were usually open and my
25  desk faced the window, so, I mean, at least I would -



Silverman, Mitchell   02-19-2018

66

1  you know, I had low lighting in my office at that point
2  because I had the migraines - I would see a shadow cross
3  the door.
4      Q.  So but getting back to the ADHD, the trigger
5  for the breaking concentration was not simply audio, was
6  just sounds; it could be someone walking past your
7  office, wouldn't it?
8      A.  Walking past not so much, but if somebody
9  stood in front of my office door that was -- you know,
10  it doesn't, it doesn't block much light when somebody
11  walks three feet from your door versus somebody standing
12  in front of your --
13      Q.  They just happen to stop outside your door to
14  talk to someone --
15      A.  It was much more, it was much more propulsive
16  interruptions, if I'm pronouncing that --
17      Q.  Which happened pretty frequently?
18      A.  Yes.
19      Q.  I'm not sure I know that word, but okay.
20      A.  Like with purpose.  You know what it means,
21  Counselor.
22      Q.  Purposeful.
23      A.  If that's the right word.  I don't know.
24      Q.  Nor do I.
25      So regardless, those types of interactions

67

1  would result in a loss of concentration as to whatever
2  task you would perform; correct?
3      A.  Sure.  Sometimes in my office sometimes worse
4  than others.  I mean, at the reference desk it was
5  basically impossible for me to concentrate on task work.
6  In my office sometimes it was very easy, sometimes it
7  wasn't.
8      Q.  Mm-hmm.  Do you have a phone in your office?
9      A.  Yes.
10      Q.  And when that rang would it create the same
11  type of issues for you?
12      A.  Yes.
13      Q.  Okay.  You said that -- I guess that deals
14  more with the migraines, the lighting in your office;
15  correct?
16      A.  Mm-hmm.
17      Q.  Yes?
18      A.  Yeah.  I'm sorry.  Yes.  I did that again.
19      Q.  That's all right.  Like I said, people do it.
20      No way to predict when any of these
21  interruptions are going to take place; right?
22      A.  Yes.
23      Q.  Correct?
24      A.  Yes.
25      Q.  So tell me, when you're on a task and one of

68

1  these interruptions takes place, what do you have to do
2  to get yourself back on task?
3      A.  It depended on how much information I had had
4  in my head.  You know, there's a difference between, I
5  don't know, drafting a memorandum of law - and I'm using
6  examples that I probably should -- well, let me take
7  another example.
8      Writing a report, writing a research memo, in
9  some ways those weren't the worst.  In some ways where I
10  was manipulating data is probably the worst example.
11  Transposing information from a spreadsheet into a word
12  processor document for example.  The problem with that
13  is it just, it's so precise and I would have to go back
14  and figure out where I was, you know, all the way to --
15  I don't know, like I can't really come up with an
16  example of something that was easy for me to get back
17  into it.
18      Q.  Well, on a spectrum of, you know, depending on
19  the significance of the interruption and the complexity
20  of the task that you're working on --
21      A.  Mm-hmm.
22      Q.  -- I mean, it could be everything from, you
23  know, 10 or 15 seconds to get yourself back on track to,
24  I got to go back and basically start over here to make
25  sure I'm where I ought to be.

69

1      A.  Sure.
2      Q.  Right?
3      A.  I mean, that does happen occasionally.
4      Q.  Is that fair?
5      A.  Yeah, it did happen occasionally, yes.
6      Q.  Even something like somebody checking on the
7  status of a task that you're working on could
8  conceivably result in interruption that would get you
9  off task; correct?
10      A.  Yes.
11      Q.  Did that happen?
12      A.  Yes.
13      Q.  Happen frequently?
14      A.  Yes.  The interruptions happened frequently,
15  how, how often -- you know, if I was giving the status
16  of the task I was working on it might have been easier
17  for me to get back on task.
18      Q.  Simply put, I mean, whether you were at the
19  reference desk where you have a significant amount of
20  interruptions -- correct?
21      A.  Mm-hmm.
22      Q.  -- or you're back in your office where you
23  have maybe not as many but you still have interruptions
24  with the phone, people knocking on the door, people
25  stopping in front of your window, those types of things,



Silverman, Mitchell    02-19-2018

---

70

1  I mean, this happened frequently?
2      A.  Yes.
3      Q.  And daily?
4      A.  Yes.
5      Q.  And you've told me you can't take medication
6  for ADHD; correct?  You can't take any stimulants?
7      A.  Yes.
8      Q.  So you take - tell me if I'm misrepresenting
9  what you said - but you take no medication that is
10  directly for ADHD symptoms?
11      A.  Nothing that's prescribed for ADHD symptoms,
12  no.
13      Q.  What do you take that's off label use for
14  ADHD?
15      A.  I don't think I take anything off label.  I
16  think probably a couple of the medications probably help
17  me, but they're not even prescribed off label for the
18  ADHD.
19      Q.  What medications do you think help you for the
20  ADHD?
21      A.  The Cymbalta and the Tiagabine perhaps.  The,
22  I don't know, maybe the Latuda because it helps with
23  anxiety and that's connected to it, too.  It's hard for
24  me to say.
25      Q.  Did any of those have an adverse impact on

---

71

1  your Bipolar symptoms?
2      A.  No, or I wouldn't be taking them.
3      Q.  Let's talk about the anxiety disorder.  Is
4  that something that you feel you have all the time?
5      A.  I have the anxiety disorder all the time.  I
6  didn't experience the symptoms all the time.
7      Q.  What symptoms do you have when you are
8  experiencing them?  What types of symptoms do you
9  experience?
10      A.  Nervousness, agitation, increased pulse rate,
11  increased respiration rate, sweatiness, cold
12  extremities.
13      Q.  And what types of situations -- and I'm
14  focusing on your work experience primarily.
15      A.  Sure.
16      Q.  What types of situations while you were at
17  Nova would give rise to your anxiety disorder becoming
18  symptomatic?
19      A.  Often they seemed to center around
20  interactions with my supervisor.
21      Q.  Okay.  And that would be who?
22      A.  Rebecca Rich.
23      Q.  Did you -- give me an idea of the frequency of
24  your interactions with Rebecca Rich resulting in
25  symptoms associated with your anxiety disorder.

---

72

1      A.  Towards the end of my employ at Nova, every
2  time I met with her I would go into her office with a
3  warm vest or a fleece and a bottle of water because I
4  would experience dry mouth, cold extremities, and I
5  would break out in a cold sweat.
6      Q.  How long was she your supervisor?
7      A.  I don't recall exactly.
8      Q.  Was it more than a year?
9      A.  Yes.
10      Q.  Was it more than two years?
11      A.  It was about five years.
12      Q.  Five years.  Okay.  Did you, during the
13  entirety of that five years that she was your -
14  approximately five years - that she was your supervisor
15  have that type of a reaction to interactions with her?
16      A.  It got worse over time.
17      Q.  So in the first few years of your experience
18  with her, did you suffer regular onsets of symptoms of
19  anxiety disorder when you interacted with her?
20      A.  I don't, I don't really recall in detail the
21  progression.  All I can say is that it got worse over
22  time and a lot worse.  I don't really, I don't really
23  know what that looked like.  I described a curve with my
24  hand.  I don't know how that works.
25      Q.  So you, during the entirety of this five-year

---

73

1  period, did you take regular medication or did you
2  medicate regularly for symptoms associated with anxiety
3  disorder?
4      A.  Counselor, I've been pretty much completely
5  compliant except by accident with my medication regime
6  since I was diagnosed for anything I was diagnosed for,
7  so if you know about a medication I'm on and there was a
8  particular time when I was on that medication I was
9  taking it.
10      Q.  Okay.  Let me ask it a different way.  Did
11  you-- had you been diagnosed with anxiety disorder
12  during the entirety of the time that you worked at Nova?
13      A.  Yes.
14      Q.  Okay.  And did you take medication for that
15  anxiety disorder during the entirety of the time that
16  you worked at Nova?
17      A.  I took medications that were probably
18  effective for the anxiety disorder.  Let me just silence
19  my phone. I'm sorry.  I don't know whether -- I don't
20  recall whether or what I took that was specifically
21  prescribed for anxiety.
22      Q.  Regardless, whatever was prescribed to you for
23  anxiety you took it during that entire period?
24      A.  Yes.
25      Q.  Okay.  And so you had these symptoms

---



Silverman, Mitchell   02-19-2018

74

1  associated with the anxiety disorder despite the fact
2  that you were taking this medication?
3      A.  Yes.
4      Q.  Were there situations while you were employed
5  at November that did not involve Rebecca Rich where you
6  had symptoms of anxiety?
7      A.  Yes.
8      Q.  Can you give me a description of some of those
9  certain circumstances?
10     A.  Sure.  I proctored exams and they always made
11 me nervous.  Proctoring an exam always made me nervous.
12     Q.  Anything else?  Other situations while you
13 were employed?
14     A.  Any sort of meeting, staff meetings, that sort
15 of thing, any sort of supervisory interactions, I mean
16 to greater or lesser degrees.
17     Q.  Anything else?
18     A.  Not that I recall.
19     Q.  Did you have symptoms of anxiety during
20 interactions with patrons or users of the library?
21     A.  Yes, sometimes --
22     Q.  What types of situ -- I'm sorry.  What types
23 of situations would give rise to that type of a
24 reaction?
25     A.  Now I do recall.  Sometimes until I found a

75

1  reasonable strategy, I found working with self-
2  represented patrons very anxiety inducing or it could be
3  very anxiety inducing.
4      Q.  Just so we're both talking about the same
5  thing, you're talking about like pro se litigants?
6      A.  Right.  Yes.  I didn't want to use, I didn't
7  want to use the jargon, but yes, pro se litigants.
8      Q.  Okay.  Did you have situations with patrons or
9  users of the library that were not self represented
10 patrons that gave rise to the symptoms associated with
11 anxiety disorder while you worked at Nova?
12     A.  I don't recall.
13     Q.  Do you keep any kind of diary or a log of how
14 you react to certain situations over the course of time?
15     A.  No.
16     Q.  What was it about the self-represented
17 patrons, the pro se litigants, if you will, that caused
18 you to become symptomatic as it related to your anxiety
19 disorder?
20     A.  There's a spectrum of helping unrepresented
21 patrons, and there's a lot of discussion in the Law
22 Library and literature about this.
23         At what point are you providing legal advice
24 to them if you're not, if you're not a lawyer law
25 librarian, at what point are you establishing an

76

1  attorney/client relationship?  At what point, if you're
2  not, are you practicing law without a license?
3         And that made me unduly nervous and, you know,
4  I continued to discuss it with Ms. Rich, and eventually
5  I came up with a solution that may not have been ideal
6  on my side but seemed to work much better once I tried
7  doing it, which was to basically just say the heck with
8  it and concern myself more with -- which is consistent
9  with my, my ethos anyway and just say try to help the
10 patron as much as I could and not worry so much, because
11 there really aren't any examples of people receiving Bar
12 grievances as law librarians.  It just doesn't really
13 happen.  But it made me, it made me nervous and anxious,
14 and until I, until I did that it was more of a problem.
15     Q.  But was that, was that the cause of the
16 anxiety was that you were concerned that you would be
17 accused of representing these individuals and end up
18 with a Bar grievance?
19     A.  Yes.
20     Q.  Have you ever had a Bar grievance?
21     A.  No.
22     Q.  How much of what you do or what -- can you
23 give me an idea of the frequency of which you interacted
24 with self-represented patrons?
25     A.  How often you mean --

77

1      Q.  Yeah.
2      A.  -- or what percentage of the time?
3      Q.  Either way.
4      A.  I don't know, maybe 5 to 10 percent of the
5  patrons.  I really, I don't, I'm going to say I don't
6  recall.
7      Q.  Okay.  Is that, is that something that you
8  would encounter on a regular basis?
9      A.  Yes.
10     Q.  Is it something you would encounter on a daily
11 basis?
12     A.  Generally, no.
13     Q.  Weekly at least though; yes?
14     A.  I don't recall.
15     Q.  Okay.  When did you come up with this strategy
16 of just saying, I'm going to try to help the individual
17 and not worry about the grievance advice issue?
18     A.  Within the last couple of years I was at Nova.
19 I mean, the other side of it is I knew Nova didn't want
20 me practicing law on their premises.  That I never
21 intended to do, but it was something else that made me
22 nervous.
23     Q.  So the whole situation of the potential for
24 these -- Nova to be upset with you because you're
25 practicing, they think you're practicing law, the self-



Silverman, Mitchell   02-19-2018

78

1  represented patron upset with you because you may have
2  given them what they consider to be advice that they
3  were upset about --
4      A.   Yeah.
5      Q.   -- that created anxiety for you?
6      A.   Right.  It's not even -- I mean, the standard
7  is so, is so vague.  If they feel like I'm representing
8  them that could have been a problem as I understand it.
9      Q.   So certainly when you came up with the
10  strategy related to just trying to help them, that
11  alleviated anxiety as if related to your interaction
12  with --
13     A.   Yes.
14     Q.   -- them?
15     A.   Yes.  I always tried to help them.  I just --
16     Q.   Sure.
17     A.   -- realized that was where I needed to --
18  which was what I was, which is what I wanted to do
19  anyway.
20     Q.   Did you continue to have anxiety related to
21  your interactions with self-represented patrons as it
22  related to the Nova piece, whether you were concerned
23  that they might think you were practicing law?
24     A.   Not really.
25     Q.   Okay.  Anything else that you can recall gave

79

1  rise to symptoms of anxiety while you were working at
2  Nova --
3      A.   No.  I'm sorry.
4      Q.   -- other than what you've already told me?
5      A.   Not that I can recall.
6      Q.   Okay.  None of the interactions that you had
7  with students would give rise to anxiety?
8      A.   Actually I can think of, I can think of one,
9  and there might have been others.  I, I decided, I made
10  the general decision about a few months before I was
11  terminated by Nova that I was just going to be up front
12  with everyone about my mental health and developmental
13  disabilities.
14         And this worked really, really well until a
15  student decided to unburden herself in considerable
16  detail to me at the reference desk.  And that was -- I
17  was, I mean, I was more concerned for the student
18  really, and in retrospect I perhaps should have
19  suggested that we continue it another time or suggest
20  that she talk to, I mean, a therapist.  She wasn't
21  really asking for therapy, but that conversation made me
22  nervous.
23         I can't think of any other specific examples
24  but there may have been things along those lines.  There
25  were I think a couple of occasions where students

80

1  themselves asked me for legal advice and that made me
2  very nervous.
3      Q.   Mm-hmm.
4      A.   Of course when they did that, I declined in
5  the strongest possible terms.
6         And occasionally, actually another thing that
7  would make me nervous about self-represented litigants
8  is the only piece of legal advice I felt like I could
9  give them directly was I really, really suggest you go
10  see a lawyer.  And when somebody would have a situation
11  like that, that would make me, that would make me
12  nervous where someone was trying to handle something
13  that was the legal equivalent of dynamite.  Of course I
14  wouldn't tell them that.
15     Q.   In dealing with those scenarios though could
16  give rise to symptoms associated with anxiety; correct?
17     A.   Yes.
18     Q.   Okay.  Other than the student emburdening
19  herself, your interactions with the students, there was
20  no upset students that would come in, situations like
21  that where you would feel anxious?
22     A.   I wasn't really responsible -- I'm going to
23  take a Sucralfate.  That's one of the acid pills.
24         There were situations where students would
25  come in and complain about circulation matters or

81

1  circulation matters or other library matters and, you
2  know, if a student were or another patron were angry or
3  yelling, that would make me anxious.  I would do my best
4  to, to placate the patron and do the best job that I
5  could to help them, and if not, refer them to whoever
6  else I thought could help them.  And occasionally that
7  was public patrons or self-represented patrons and, you
8  know, conflict makes me anxious.  But it doesn't usually
9  render me non functional.
10     Q.   When you say "non functional", what do you
11  mean?
12     A.   For example, I don't think I ever had to
13  excuse myself from the reference desk, I don't think I
14  ever had to excuse myself from the reference desk
15  because I was anxious --
16     Q.   Okay.
17     A.   -- because of the patron interaction.
18     Q.   Just out of curiosity, because I've seen you
19  do it several times, you're putting drops in your eyes.
20  Is that for a condition that you have?
21     A.   Dry eye, which I suppose is related to the
22  anxiety.  It's also because I'm using caffeine to self
23  medicate which is dehydrating, but I do have dry eye,
24  yes.
25     Q.   How long have you had that?  Let me ask it



Silverman, Mitchell   02-19-2018

82

1 differently.
2     When were you first diagnosed with that?
3    A. At least 20 years ago.
4    Q. And how long have you been taking eye drops to
5 address that?
6    A. For about that long.
7    Q. Other than the feeling of dryness in your eyes
8 and having to take drops, does it have any other
9 manifestation?
10    A. The dry eye?
11    Q. Yeah.
12    A. I mean, sometimes I'll have a gritty sensation
13 in my eyes. Generally not. I mean, you know, you know,
14 they don't move around as well. They kind of get a
15 sticky feeling.
16    Q. Does it affect your ability to see?
17    A. No.
18    Q. How about the migraines, what -- give me an
19 understanding. How often do you get a migraine?
20    A. It depends. Some periods I'll wake up with
21 one every morning and they'll last much or all of the
22 day. Some days I'll wake up with no headache and I'll
23 stay pain free all day. Some days are worse than
24 others.
25    Q. Anything in -- well, we know light has an

83

1 impact on that.
2    A. Mm-hmm.
3    Q. When you're suffering from a severe migraine--
4 do you get migraines that you would consider to be
5 severe?
6    A. Yes.
7    Q. All right. Can you give me an idea of
8 frequency with respect to severe migraines? Do you get
9 them one a week, one every two weeks?
10    A. Now that I'm seeing a good neurologist and
11 better medicated, I would say severe migraine once every
12 week or two, but migraines that affect my ability to
13 function I can have one or two a week and not
14 necessarily knock me out all day. It depends.
15    Q. Okay. So let's talk about the period of time
16 while you were at Nova. And I've forgotten when you
17 started seeing this new neurologist. When was that?
18    A. While I was at Nova but I don't recall exactly
19 when.
20    Q. Okay. Even having seen this new neurologist,
21 although he has been able to through medication
22 positively impact the frequency and severity of your
23 migraines, you would still have migraines once or twice
24 a week that would impact your ability to work?
25    A. Not that frequent. Impact, yes. Prevent, no.

84

1    Q. Okay. Well, when you say "impact", what type
2 of affect would it have on your ability to work?
3    A. Well, pain makes me work a little bit more
4 slowly.
5    Q. Okay.
6    A. Makes it a little bit harder to concentrate.
7    Q. Okay. Does it make you irritable?
8    A. Sometimes, yes.
9    Q. And this happens whether you're taking the
10 medication or not; correct?
11    A. The Botox is only administered once every
12 three months. I take Tylenol pretty much every day but
13 the frequency varies depending on how much my head
14 hurts.
15    Q. You find over the counter Tylenol effective
16 with regard to migraines?
17    A. With everything else, yes. You know, I'll
18 take a Naproxen in the morning if I have a really bad
19 headache. I didn't take one this morning, but I'm
20 seriously thinking about getting one out of my backpack
21 now, so... In fact, I'm going to do that.
22    Q. Do you feel a migraine coming on?
23    A. I have atypical migraines. They're not --
24    Q. There's no aura or anything like that?
25    A. No, no, no. But, I mean, they do meet the

85

1 definition for a chronic migraine headache. So what I
2 do -- I mean, you asked earlier about whether I have a
3 physician managing all of these medications. Nobody
4 told me to try using breathing medication to help with
5 the migraines. I figured that out myself. It's
6 helping.
7    Q. But that breathing medication is prescription?
8    A. Mm-hmm.
9    Q. Yes?
10    A. Yes. I already had -- sorry. I already had
11 the inhaler because I have had problems with it in the
12 past. I tried using the inhalers before I went to
13 sleep, inhaler before I went to sleep and it helped, so
14 I went to see my pulmonologist. I'd been seeing him
15 already because he was also my sleep medicine physician.
16    Q. So while at work when symptoms related to a
17 migraine begin to develop or you have them full blown,
18 what do you have to do to try to alleviate them?
19    A. Naproxen, Tylenol, caffeine, sometimes deep
20 breathing helps. I mean, there are days when some or
21 all of this helps. There are days when some or all of
22 this doesn't help.
23    Q. Okay. And when some or all of it doesn't help
24 you need to retreat?
25    A. Yes, or when I was at Nova, call in sick or



Silverman, Mitchell   02-19-2018

86

1  during the period when I was first really trying to
2  figure this out rely on Intermittent Family and Medical
3  Leave Act leave.
4      Q.  Okay.  And you said that the light had an
5  adverse impact on your migraine condition.
6      A.  Yes.
7      Q.  And when you're at the reference desk there's
8  light.
9      A.  Yes.
10     Q.  You could go back to your office and turn the
11 lights out; correct?
12     A.  Yes.
13     Q.  And did you do that on occasion?
14     A.  When I was at the desk there were a few days
15 when I asked for permission to and received permission
16 to do reference from my desk, and I believe I was
17 actually given that as an accommodation.  I did do it
18 occasionally.  But what I found was --
19     Q.  I'm sorry.  You did do it occasionally?
20     A.  I did do it occasionally as an accommodation
21 for the migraines.
22         What I found though was that the high
23 intensity lighting that had been installed over the
24 reference desk was a problem, and when I was able to
25 replace it with sort of lower intensity lighting or

87

1  indirect lighting that that worked much better.
2      Q.  And that was something that was done for you?
3      A.  Sometimes occasionally; not in any kind of,
4  not in any kind of uniform way, no.
5      Q.  Well, when you say it went from high intensity
6  to low intensity, are you talking about a dimmer switch
7  or are you talking about actually changing out the light
8  source?
9      A.  Dimmer switch, a table lamp, changing out the
10 light source, but there were days when I would get to
11 the reference desk and the lights, the bulbs had been
12 put back in the fixtures over the reference desk whether
13 they were supposed to be or not.  There was at least one
14 occasion when a student assistant actually, without me
15 telling him to do this and kind of with me telling him
16 not to, I wouldn't have let him do it in the first
17 place, changed the light bulbs, took the light bulbs out
18 because he knew it bothered me.  I did not tell him to
19 do this.
20     Q.  So when the symptoms associated with a
21 migraine presented themselves, depending on the
22 severity, if it was in the morning you would utilize,
23 potentially utilize your FMLA leave, take a day off, a
24 sick day, whatever was available to you?
25     A.  Mm-hmm.

88

1      Q.  Yes?
2      A.  Yes.
3      Q.  If it occurred during the time while you were
4  at work what would you do?
5      A.  Very seldom do migraine, have migraine
6  symptoms to me presented them during the day in such a
7  way that I needed to go home.  But if -- or go to my
8  office and turn down the lights; that was more likely.
9  But I would, you know, I would try and sit in a lower
10 light situation, you know.
11         There were times when I was at the reference
12 desk and my head would start to hurt after I was given
13 permission to do it or even before I would just ask, I
14 would -- I never went to my office because the lights
15 were bothering me without asking or checking or getting
16 permission or telling somebody that I would do it, but
17 there were times when I did that, yes.
18     Q.  And I think you said atypical migraines?
19     A.  That's what I've been told.  There's no aura.
20 They're usually not so bad I have to sit in a dark room.
21 That does occasionally happen.  They're usually not so
22 bad that I get nauseated, although that does happen.
23     Q.  And there's no way to predict when you're
24 going to have one?
25     A.  There are times -- for example, if you'll

89

1  notice it's getting cloudy outside.  The air pressure
2  change may be what just caused this headache.  I don't
3  know.  So there are things that give me an indication,
4  but no, not really.
5      Q.  Does the onset of a migraine have an impact on
6  your ability to perform the type of work that you were
7  doing at Nova?
8      A.  Sometimes, yes.
9      Q.  In what way?
10     A.  Again, you know, pain makes it harder for me
11 to function.  If I was at the reference desk it would be
12 easier for me to play hurt as it were, because if I was
13 enjoying what I was doing or if I was working on a task
14 that I was getting into more, it would be easier for me
15 to keep working.  But especially there were some tasks,
16 it wasn't even a question of whether I liked them, but
17 it's very hard to copy data from a spreadsheet into a
18 word processor document or off the web into a document
19 when your head hurts.  It's just, it's very hard to
20 concentrate.
21     Q.  Well, that's something you didn't really care
22 to do anyway; right?
23     A.  That's correct.
24     Q.  Are there other tasks that you had to do
25 regularly at Nova that you didn't really care to do that



Silverman, Mitchell   02-19-2018

90

1 you'd put in a category of not fun?
2    A.   Sometimes, yes.  I was sometimes assigned to
3 do things for other departments, for example.
4    Q.   Such as?
5    A.   The career center.
6    Q.   What would you do, what types of things did
7 you do for the career center that you would put into
8 this category of not fun?
9    A.   We were asked, the library was asked to
10 develop a set of career guides for various sub groups of
11 lawyers, various sort of career paths.
12    Q.   Okay.  Other types of tasks that you did while
13 at Nova that would fall into that same type of category?
14    A.   The --
15    Q.   And I mean the not fun, the stuff that would
16 be harder to do when you weren't feeling well.
17    A.   Right  Just the more, the more manipulative,
18 the more kind of spreadsheety (sic), if you will, and
19 the less like really engaging with legal knowledge,
20 although at one point for some sort of presentation the
21 dean was doing I was asked to write short biographies of
22 three judges.  And that's, you know, completely sort of
23 out of my usual -- I guess it's not really, but that was
24 something I quite enjoyed.  I don't think that I had a
25 headache when I was trying to do that, but it was still,

91

1 you know, I found, I found my engagement with my job
2 where I found it not, you know, whether something was a
3 library task.
4        MR. BEAUCHAMP:  Okay.  Why don't we take a few
5    minutes?
6        MR. SILVERMAN:  Sounds good to me.
7        (Off the record 4:33 p.m.)
8        (On the record 4:38 p.m.)
9 BY MR. BEAUCHAMP:
10    Q.   Okay.  So --
11    A.   May I clarify something, Counselor?
12    Q.   Of course you can.
13    A.   You know, you use the word "fun", and it's not
14 a question of fun.  It's a question of compensating for
15 an attention deficit.  I'm not, I'm not, I'm not being
16 arbitrary, and if I'm given a task that I don't engage
17 with, I'll try as hard as I can.  I just, just I don't
18 really like -- and, again, I'm not, this is not directed
19 at you.  I don't like the use of the word "fun".  It's
20 not really.
21    Q.   Let's use a different word.  I'm easy with
22 that.
23    A.   An engagement.
24    Q.   So when you say compensating for an attention
25 deficit, it's something that holds your interest.

92

1    A.   Engagement is what is the word I would use.
2    Q.   That's the same thing though, is it not?
3    A.   True.  I'm not -- yes, I'm splitting hairs.
4 Holds my attention, engages my attention, yes.
5    Q.   Something you're interested in?
6    A.   Yes.
7    Q.   Okay.  If you're not interested in it, it
8 makes it more difficult for you to do it.
9    A.   Yes.
10    Q.   All right.  So let's talk about, let's talk
11 about the IBS.  What, if any, impact does that have on
12 your ability to work?
13    A.   When I had to go, I really had to go.  And
14 there were times when I was told, even after making it
15 clear that I would need to leave the desk, that I would,
16 you know, I would have to go to the restroom from the
17 reference desk.  And I would try to make those, I would
18 try to make those breaks as short as possible, and I
19 would let my colleagues at the reference desk or my
20 colleagues at circulation when the desks were separate
21 know that I was going to the restroom and I would return
22 as quickly as possible.
23    Q.   So what is your workday at Nova?  What time do
24 you start in the morning generally; what time do you
25 leave in the evening?

93

1    A.   Towards the end of my time at Nova I would
2 start at 9:45 in the morning, and I don't recall the
3 details.  My schedule would vary in the evening as to
4 when I left.
5        For example, on Tuesdays for most of that time
6 I left at - trying to remember - 2:45 supposedly.  I
7 didn't always get out in time because I've always, I've
8 had a 2:40 -- pardon me -- a 3:30 Tuesday appointment
9 with Dr. Gotthelf as long as I've been seeing her.
10    Q.   Mm-hmm.  So your, towards the end anyway, your
11 general workday was 9:45 to 2:45?
12    A.   No, just on Tuesdays.
13    Q.   Okay.  What about Monday, Wednesday, and
14 Friday?
15    A.   It changed and I don't recall the details.
16    Q.   You don't recall?
17    A.   No.
18    Q.   Okay.  So were you permitted a lunch break?
19    A.   Usually.
20    Q.   Okay.  And how long was your lunch break
21 usually?
22    A.   Between a half an hour and an hour.
23    Q.   Was the majority of the time that you worked
24 at Nova towards the end seated at the reference desk?
25 Was that --



Silverman, Mitchell   02-19-2018

94

1    A.  The majority of the time, no.
2    Q.  Okay.  You would take shifts at the reference
3  desk?
4    A.  Yes.
5    Q.  And how long were those shifts generally?
6    A.  Generally two hours.
7    Q.  And how often would you say the IBS caused you
8  to have to leave the reference desk?
9    A.  Sometimes twice a shift.
10    Q.  And for how long would you generally be gone?
11    A.  No more than five minutes usually, but I guess
12  up until as much as ten minutes.  I don't even recall
13  exactly.
14    Q.  Were there times where you were gone 20
15  minutes?
16    A.  If there were, it was because I got, that a
17  patron came up to me before I got back to the reference
18  desk.  In terms of my bowel habits, I would say no.
19    Q.  Okay.  So if you were gone for 20 minutes,
20  it's because you got sidetracked on the way back?
21    A.  Well, sidetracked by part of my job, but yes,
22  you know, if you're on the reference desk and a patron
23  starts talking to you, and that happened pretty often.
24    Q.  So the major impact of the IBS on your ability
25  to work was your availability during these times when

95

1  you needed to go to the bathroom?
2    A.  Yes.
3    Q.  And during the course of a two-hour shift
4  generally you would have to go a couple of times and you
5  would be gone somewhere between five and ten minutes?
6    A.  I wouldn't say generally.  I would say
7  sometimes there were two-hour shifts when I didn't have
8  to go at all.
9    Q.  Okay.  Were there two-hour shifts when you had
10  to go more than twice?
11    A.  Possibly.  I don't recall.  I mean, there's
12  some interaction between IBS and anxiety, so if I were
13  more anxious I might have had to go more often.
14    Q.  Okay.  So, again, this is not something that's
15  working on a clock.  You don't know when this is going
16  to happen; correct?
17    A.  Right.  Yes.
18    Q.  So you could be at the reference desk and all
19  of a sudden you've got to go?
20    A.  Mm-hmm.
21    Q.  Yes?
22    A.  Yes.  I'm sorry.  Yes.
23    Q.  And the frequency of that is such that there's
24  no way really to predict it?
25    A.  The frequency during the day and, I mean,

96

1  there were certain patterns.  Very seldom did I have to
2  go to the restroom for more than twice a shift, and that
3  was pretty seldom.  And morning shifts or shifts before
4  lunch were worse than afternoon shifts.  It has an
5  interaction with caffeine consumption which was there
6  was more of it in the morning.
7    Q.  So but you use the caffeine to self medicate
8  but then it has the adverse effect of sending you off to
9  the bathroom?
10    A.  What am I going to do?  I mean, I'm answering
11  yes to your question, but yeah.
12    Q.  The answer is yes?
13    A.  Yes.  It's complicated.
14    Q.  It is.  Your diabetes does not have any impact
15  on your ability to work, does it?
16    A.  I mean, I need to eat regularly and I need to-
17  - I need to eat regularly.  That's it.  And there were
18  times when that was an issue, but it was usually
19  manageable.  I kept snacks in my office.
20    Q.  But you say there were times when it was an
21  issue meaning that you didn't have a snack or you needed
22  to go someplace to get something to eat?
23    A.  Yeah.  Exactly.
24    Q.  Okay.  We've been here for almost three hours,
25  and I think we've covered your disabilities and the

97

1  impact that those disabilities had on your ability to
2  work.  Did I miss anything?
3      Is there anything jumping out at you saying
4  you didn't -- I didn't tell you about this, I didn't
5  tell you about that?  And I'm really focused on your
6  conditions, your disabilities and the impact that they
7  have on your ability to work.
8    A.  Nothing's jumping out at me and I can't recall
9  anything else.
10    Q.  Okay.  If something does come to you, I want
11  you to feel free to tell me if we have missed a
12  condition or we've missed some impact and it comes to
13  mind at some point I want you to let me know.  All
14  right?
15    A.  Sure.
16    Q.  Okay.  Now, I think the last thing I want to
17  do today because it's ten minutes to 5 and I'm going to
18  have to run, I have here the transcript --
19      MR. BEAUCHAMP:  Is this my copy?
20      MR. HORTON:  It's the original.  I have a copy
21  for you.
22      MR. BEAUCHAMP:  I'm going to mark this as
23  Exhibit 1 and screw you up big time.  How about if
24  I make it Exhibit 0?
25      MR. HORTON:  One works fine.  It's not going

Silverman, Mitchell  02-19-2018

98

1    to screw us up.
2        MR. BEAUCHAMP: All right.
3        (Defendant's Exhibit 1, Transcript, was marked
4        for identification.)
5    BY MR. BEAUCHAMP:
6        Q.  Okay.  So here's what I want.  It won't take
7    very long I don't think, because I'm looking at -- you
8    were involved in a grievance hearing; correct?
9        A.  Termination grievance hearing?
10       Q.  Yeah, grievance hearing through the process at
11   Nova --
12       A.  Yeah.
13       Q.  -- after your separation.
14       A.  Yes.
15       Q.  Right?
16       A.  Yes.  Yes.
17       Q.  Okay.  And you testified at that grievance
18   hearing or you spoke, you gave oral statements.  I want
19   you to take a look at just pages 294 and on and tell me
20   -- you can write on this if your lawyer lets you -- tell
21   me if there is anything that you said in response to the
22   questions that were asked of you by Ms. McDonald that
23   was not true.  Okay?  So I preface this by saying or
24   asking you whether or not you were truthful during the
25   course of the grievance hearing.

99

1        A.  You're asking that as a question?
2        Q.  Yes, I am.
3        A.  Yes, I was.
4        Q.  Okay.  So what I would like you to do, because
5    this was not under oath as I understand it, I'd like you
6    to take five minutes, it's really not that much, and go
7    through it and just tell me whether or not any of the
8    answers that you gave to the questions that she asked
9    you were not true.  Okay?  Now I'll take my five-minute
10   break while you do that.
11       A.  Starting with 294?
12       Q.  Starting where it says "By Ms. McDonald" on
13   page 294, line --
14       A.  Okay.  So the cross examination.
15       Q.  Correct, line, what is it 10?  No.  I'm sorry.
16   It's 15.
17       MS. GOODWIN: 15.
18       A.  I don't want to mark on this.  Could you --
19   BY MR. BEAUCHAMP:
20       Q.  Oh, you could mark on it all you want.
21       It's your exhibit.  I'd rather not mark on it.
22       Q.  It's actually the Court's exhibit at this
23   point, but --
24       A.  Right, but you'll be presenting it to the
25   Court, won't you?

100

1        Q.  Perhaps.
2        A.  It's not admitted yet so it's not the Court's
3    exhibit yet.  Am I not supposed to be doing that,
4    Counsel, giving you a hard time?
5        Q.  You could try to give me a hard time all you
6    want.  All right.  I'll be back in a moment.
7        (Off the record 4:50 p.m.)
8        (On the record 4:59 p.m.)
9        A.  Okay.  Counselor, can we go through this?  I
10   don't have a lot of comments or questions, but I do have
11   a few.
12   BY MR. BEAUCHAMP:
13       Q.  All right.  Give me page and line.
14       A.  Okay.  On page 294, line 20, I'm pretty sure -
15   and this is more from context than anything - I would
16   not have said that.  I might have said "it seems to me",
17   but I don't recall directly.
18       Q.  Okay.
19       A.  On page 300, line 22, there's a reference to
20   an exhibit, and I don't have that exhibit and won't
21   opine as to whether -- whatever I said was truthful.
22       MR. BEAUCHAMP:  Do you have Exhibit 54?
23       MR. HORTON:  You could actually use that.
24       A.  Counselor, I'm sure the answer was truthful.
25   I just don't know what I was looking at.

101

1        MR. BEAUCHAMP:  Okay.  So just hold off, Jay.
2    BY MR. BEAUCHAMP:
3        Q.  You don't have any doubt that the answer you
4    gave is a truthful answer?
5        A.  That's correct.
6        Q.  Okay.  That's all I'm really asking.
7        A.  I understand.  I just wanted to put that on
8    the record.
9        Q.  Sure.
10       A.  And the same is true with respect to page 301,
11   line 10, Exhibit Number 82.
12       Q.  10, Exhibit 82.  Okay.  All right.  Again, you
13   have no issue with your answer being truthful?
14       A.  No.
15       Q.  All right.  Next.
16       A.  Page 303, line 18.
17       Q.  Line 18, yes.
18       A.  I didn't make that statement, but I don't
19   think the word was eluded with an E.  It would have been
20   alluded with an A.  That's picayune, but that's how my
21   mind works.
22       Q.  Fine.
23       A.  There is a forest and the trees thing with
24   ADHD.
25       Q.  The answer is accurate though using the word



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

Silverman, Mitchell   02-19-2018

102

1  alluded, not eluded?
2     A.  Yes, yes, yes, yes.  That's it.  Everything
3  else, everything else was -- no, no, sorry  Everything
4  I said was true, yes.
5     Q.  Perfect.  That's what I needed to know.  Thank
6  you very much.
7        MR. BEAUCHAMP:  All right.  I think we're done
8  for today.  It's after 5.  I've got to run.  We
9  will convene again on Monday.
10        MR. SILVERMAN:  At 2.
11        MR. BEAUCHAMP:  If you can -- yeah.  If it's
12  possible to start at 1 that's great.  If you can't
13  do till 2 that's fine, and we'll keep going till we
14  get it done.
15        MR. SILVERMAN:  Are we off the record?
16        MR. BEAUCHAMP:  We're off the record now.
17        (Whereupon, the foregoing Deposition was
18        adjourned at 5:04 p.m.)
19
20
21
22
23
24
25

104

1            CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5     I, VICTORIA SUAREZ, the undersigned authority,
6  certify that MITCHELL SILVERMAN, personally appeared
7  before me and was duly sworn on the 19th day of
8  February, 2018.
9
10     Witness my hand this 2ND day of March, 2018.
11
12
13
14
15
16
17  _____
    VICTORIA SUAREZ, COURT REPORTER
18  NOTARY PUBLIC, STATE OF FLORIDA
    Commission No.:  GG 064806
19  Commission Exp:  February 24, 2021
20
21
22
23
24
25

103

1            CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5     I, VICTORIA SUAREZ, Court Reporter and Notary
6  Public for the State of Florida, do hereby certify that
7  I was authorized to and did stenographically report and
8  transcribe the foregoing proceedings, and that the
9  transcript is a true and complete record of my notes.
10     I further certify that I am not a relative,
11  employee, attorney or counsel of any of the parties, nor
12  am I a relative or employee of any of the parties'
13  attorneys or counsel connected with the action, nor am I
14  financially interested in the action.
15
16
       Witness my hand this 2ND day of March, 2018.
17
18
19
20
21
22
23
   _____
24  VICTORIA SUAREZ, COURT REPORTER
    NOTARY PUBLIC, STATE OF FLORIDA
25

**$**

$350 65:17

**0**

0 97:24

064806 104:18

**1**

1 4:3 97:23 98:3
102:12

10 64:20 68:23 77:4
99:15 101:11,12

15 68:23 99:16,17

17-62005-CIV-
MORENO 1:2

18 6:16 101:16,17

19 1:15 5:2

1970 7:7,9

1983 7:17

1994 7:23

1998 8:4 13:24 15:3

1999 28:6 56:4,11

19th 104:7

**2**

2 18:14 19:6,23
102:10,13

2:11 1:16

2:40 93:8

2:45 93:6,11

20 64:20 82:3
94:14,19 100:14

200 12:23

2000 7:1 9:21 12:22
13:23

2006/2007 26:19,20

2008 8:6

2009 17:12,14

2009/2010 56:14

2010 17:12,15

2018 1:15 5:2
103:16 104:8,10

2021 104:19

21st 36:19

22 100:19

24 104:19

2400 2:9

294 98:19 99:11,13
100:14

2ND 103:16 104:10

**3**

3:07 40:4

3:22 40:5

3:30 93:8

30 63:21

300 100:19

301 6:14 101:10

303 101:16

33301 1:18

33308 2:10

33770 2:5

**4**

4:33 91:7

4:38 91:8

4:50 100:7

4:59 100:8

45 43:11 44:6

**5**

5 3:3 63:22 77:4
97:17 102:8

5:04 1:16 102:18

508 1:17

54 100:22

**7**

705 2:4

727.316.5333 2:5

7th 7:1

**8**

801 2:4

82 101:11,12

888 1:17

**9**

9:45 93:2,11

905 2:10

954.390.0100 2:11

98 4:3

**A**

ability 18:9 21:8
36:11 38:11,19
40:9,14 43:7
47:23 49:1
57:15,18,23,24
58:6,16 62:14
63:11 82:16
83:12,24 84:2
89:6 92:12 94:24
96:15 97:1,7

able 18:20 43:13
50:8,18 52:21
60:18 65:21 83:21
86:24

Absolutely 40:21
46:22

accessible 64:5

accident 5:17 73:5

accidentally 39:19

accommodation
25:17,19 39:1
65:16 86:17,20

accommodations
25:9,12 50:19,24

accompanied 18:18

accomplish 47:24
63:12,15

According 36:1

accurate 101:25

accused 76:17

Acetaminophen
32:24 37:16 42:6

acid 33:4 80:23

act 47:8 86:3

acting 41:22

action 103:13,14

actually 41:20 58:8
79:8 80:6 86:17
87:7,14 99:22
100:23

ADA 12:25

addition 33:9 46:21

additional 48:19

address 30:19,23
82:5

addressed 35:19

ADHD 18:19,21
19:8 30:24 31:4
33:23,25
34:2,4,6,10,12,18,
22,25 38:13
40:15,18
41:10,12,16,24
42:6 48:2,6
49:2,22 51:25
57:21,22 58:7,9
59:12 60:3 61:12
63:9,10 66:4
70:6,10,11,14,18,
20 101:24

adjourned 102:18

administered 38:1



Silverman, Mitchell   02-19-2018    Page 2 of 20

84:11

administering 38:5

administratively
10:3,8,11

admitted 100:2

advance 61:2

advanced 22:20,21

adverse 62:14
63:11 70:25 86:5
96:8

advice 27:8,12,13
75:23 77:17 78:2
80:1,8

advised 27:9,10

affect 82:16 83:12
84:2

affected 29:14

affecting 51:13

afternoon 96:4

against 5:23 18:7

agitated 41:19
49:23

agitation 42:20
44:15 46:3 47:22
71:10

agitation/irritation
62:23

ago 5:20 23:22,23
82:3

agreeing 60:15

ahead 6:10 61:21

air 89:1

akin 35:9

alertness 42:3

alleges 18:8

alleviate 85:18

alleviated 78:11

allowed 20:23

alluded 101:20
102:1

already 32:16 39:21
42:5 48:13 57:15
79:4 85:10,15

am 8:11 16:9 18:14
37:18 41:16 52:13
96:10 99:2 100:3
103:10,12,13

amongst 62:10

amount 51:10 57:4
69:19

amounts 21:15

angry 81:2

annoyed 53:4,5

answer 6:3 21:19
43:1 57:8 96:12
100:24
101:3,4,13,25

answering 96:10

answers 99:8

antacid 33:4

anti-anxiety 31:12

anxiety 19:11 30:24
31:4 35:5,6,10,20
40:20 59:4 70:23
71:3,5,17,25
72:19
73:2,11,15,18,21,
23 74:1,6,19
75:2,3,11,18
76:16 78:5,11,20
79:1,7 80:16
81:22 95:12

anxious 76:13
80:21 81:3,8,15
95:13

anyone 23:13 25:23
34:24 51:16 52:19

anything 19:12

29:9,13 32:15
38:17 58:23
62:12,20 65:15
70:15 73:6
74:12,17 78:25
82:25 84:24
97:2,3,9 98:21
100:15

anyway 76:9 78:19
89:22 93:10

anywhere 51:16

apart 38:5

apologize 14:16
37:1 52:16

appearance 8:22

appearances 2:1
39:8

appeared 104:6

appellate 11:3

applied 40:22 41:3

appointment 93:8

appreciate 21:5

appropriate 21:21
25:17

approximately 5:19
10:10 12:2 17:12
24:22 26:18 37:10
72:14

approximation
21:12,18

APRIL 2:3

arbitrary 91:16

area 26:13 64:5
65:12

areas 11:4

aren't 76:11

arguing 39:11

Arnold 26:5

arrange 50:18

Asperger 18:16,18

Asperger's 19:8
28:5

assigned 90:2

assignment 42:12

assistant 87:14

associate 13:18
16:16,21 42:19
51:21 57:14

associated 35:19
71:25 73:2 74:1
75:10 80:16 87:20

assume 9:11

asthma 35:25

atomic 50:10 51:1

attempt
15:6,14,21,25

attempting 21:22
22:1

attention 91:15,24
92:4

attorney 9:12,13
10:23 11:3
13:18,23 30:7
103:11

attorney/client 76:1

attorneys 8:20 11:5
103:13

attorney's 13:6

attribute 41:24
62:13,24

atypical 84:23
88:18

audio 66:5

aura 84:24 88:19

Austin 17:22

authority 104:5

authorized 103:7



Silverman, Mitchell    02-19-2018    Page 3 of 20

**Autism** 18:15,18
  19:7 28:4,13
  29:10,18 30:17,22
  34:3,6,8 51:20,21
  52:6,24 55:4,5,20
  56:11
  57:2,14,19,20
  58:5,8,15 59:21
  60:3 61:12 62:13

**auto** 5:17

**automatic**
  63:16,17,19

**availability** 94:25

**available** 87:24

**avoid** 61:15,19,22

**awake** 42:8

**aware** 34:5 41:16

─────── B ───────

**BA** 7:24,25

**Bachelor's** 7:19,22

**background** 7:12

**backpack** 84:20

**bad** 18:19 84:18
  88:20,22

**Bar** 8:11,12 13:25
  14:2
  15:6,15,22,25
  16:5,9,11
  76:11,18,20

**basically** 10:2 11:6
  67:5 68:24 76:7

**basis** 11:7
  12:13,19,25 14:15
  17:10 19:14 34:21
  36:22 77:8,11

**bathroom** 95:1 96:9

**Bay** 2:4

**Beach** 26:14

**Beauchamp** 2:8 3:3

5:8 22:4 28:16,20
  30:15 40:6 91:4,9
  97:19,22 98:2,5
  99:19 100:12,22
  101:1,2
  102:7,11,16

**became** 13:22 17:14
  27:3

**Becky** 6:21,22

**become** 55:11 75:18

**becoming** 71:17

**bed** 43:10,12 44:6

**begin** 43:13 85:17

**BEHALF** 1:15
  2:2,7

**behavioral** 23:2
  45:23

**behind** 30:8

**Beilly** 17:21,24

**B-E-I-L-L-Y** 17:21

**belief** 44:1

**believe** 8:25 12:10
  13:4 15:16 17:13
  22:8,10 24:18
  25:7 26:16 31:15
  32:12 34:21
  35:3,19,21
  36:17,18,22 39:3
  43:19 46:20 55:1
  57:1 63:9 86:16

**Bernstein-Goff**
  20:8

**besides** 7:8
  11:15,19 12:4
  25:5,19 38:18,21
  62:16

**best** 30:21 31:18
  59:15 81:3,4

**better** 32:13 52:12
  76:6 83:11 87:1

**beyond** 35:17 52:20
  62:22

**biggest** 51:6,22 54:3

**biographies** 90:21

**Bipolar** 18:14,19
  19:6,23 20:1,7,19
  22:7,9,11
  23:6,14,17
  25:1,6,24 31:9,25
  41:13 42:15,19
  44:16 45:7,11
  46:10,21,24 47:1
  48:1,6,14,20
  49:2,22 55:23
  56:20 57:2,10
  59:4,13 60:2
  61:11 62:21,25
  63:5 71:1

**bit** 12:1 14:24 42:5
  46:14 54:12
  84:3,6

**bite** 28:21

**Blaya** 38:1

**B-L-A-Y-A** 38:2

**blinds** 65:24

**block** 66:10

**blown** 85:17

**bothered** 87:18

**bothering** 88:15

**Botox** 32:21
  37:16,23 38:1,6
  84:11

**bottle** 72:3

**Boulevard** 1:17 2:9

**bounce** 43:10

**bowel** 36:15,24
  94:18

**box** 30:8

**Bradford** 17:20

**break** 6:9,11 40:1,3

46:7 50:7
  54:10,14 60:5
  72:5 93:18,20
  99:10

**breaking** 66:5

**breaks** 64:2 65:6
  92:18

**breathing** 37:18
  46:5 49:24
  85:4,7,20

**bring** 50:12

**bronchodilator**
  35:24

**brother-in** 27:14

**brother-in-law**
  27:11

**brought** 5:23 50:15

**Broward** 7:6,8
  26:15 103:3 104:3

**bulb** 46:16

**bulbs** 87:11,17

**business**
  10:2,9,14,15,17,1
  9 12:4,11

**butt** 43:11 44:6

**buy** 65:17

─────── C ───────

**caffeine** 41:11,21
  42:4 81:22 85:19
  96:5,7

**canceling** 61:25
  65:23

**Carafate** 32:25

**Carbonate**
  31:10,22

**care** 89:21,25

**career** 90:5,7,10,11

**C-A-R-F-A-T-E**



32:25 33:3

carry-over 62:10

case 1:2 5:18
8:23,24 9:1 10:21
18:18 22:3 40:16
44:8

cases 5:16 10:25
11:5

category 90:1,8,13

cause 55:4,5 76:15

caused 48:21 49:22
50:21 58:23 75:17
89:2 94:7

causing 48:10

center 23:2 71:19
90:5,7

central 26:15

century 36:19

certain 74:9 75:14
96:1

certainly 28:23
30:10 38:13 78:9

CERTIFICATE
103:1 104:1

certificates 8:9

certify 103:6,10
104:6

change 6:23 10:4
45:14 50:7 89:2

changed 18:17
45:10 87:17 93:15

changing 87:7,9

check 9:19 47:8

checking 69:6
88:15

Cheryl 23:7,9,11,17
33:24

children 7:4

chronic 32:21 85:1

chronology 15:11
26:1

circulation 80:25
81:1 92:20

circumstances 74:9

city 23:21

clarification
21:24,25 22:9,12
28:17,24 56:1

clarify 14:9 60:16
91:11

clear 33:25 57:7,22
92:15

clerk 14:4 15:2,24
16:5,15

clerking 15:20

client 5:23

clients 14:12

clinical 20:14 23:7
56:2 57:3

clinically
56:4,10,17

clinicians 35:4

clock 95:15

close 65:1

closed 10:2,7,11
26:25

cloudy 89:1

coats 33:4

cognitive 45:22
49:25

cold 71:11 72:4,5

colleague 8:23

colleagues 92:19,20

College
7:18,19,20,21
8:3,5

combination 48:2

comes 59:5,6 63:20
97:12

coming 53:5 84:22

comment 41:5

comments 100:10

Commercial 2:9

Commission
104:18,19

communicate 55:17

communicating
58:25

communication
58:21

compensating
91:14,24

complain 80:25

complaint 24:17

complete 103:9

completely 6:23
73:4 90:22

complexity 68:19

compliant 73:5

complicated 20:3
38:24 96:13

compound 52:15

conceivably 69:8

concentrate 67:5
84:6 89:20

concentration 64:3
65:6 66:5 67:1

concern 76:8

concerned 51:5
58:21 76:16 78:22
79:17

condition 27:22
28:10 37:12 44:17
48:22 51:21 81:20

86:5 97:12

conditions 19:1,17
20:4 36:9 38:20
39:15 40:13 51:2
62:12 97:6

confirmed 20:11

conflict 59:8 81:8

connected 70:23
103:13

connection 50:25

consider 27:24
36:10,12 78:2
83:4

considerable 79:15

consistent 76:8

construction
51:11,13,17
65:13,17

consultation
12:12,16,19
14:14,21

consultations 11:1
12:24

consumption 96:5

context 100:15

continue 15:5 25:23
28:9 78:20 79:19

continued 16:15
76:4

contract 8:20 11:7
12:13,19,25
14:11,15,21

contractor 14:13
17:10,18

contrariwise 63:25

convene 102:9

conversation 58:22
79:21

COPD 36:3



Silverman, Mitchell    02-19-2018    Page 5 of 20

copy 89:17 97:19,20

corporation 10:3 12:10

corporations 12:8

correct 9:7,24 14:16 16:22 19:9 20:18 24:8,21 27:16,18 33:11 45:8 47:20 50:2 51:3 55:23 56:12,15 57:19 58:17 59:22,25 64:24 65:23 67:2,15,23 69:9,20 70:6 80:16 84:10 86:11 89:23 95:16 98:8 99:15 101:5

correction 47:13

counsel 2:1 100:4 103:11,13

Counselor 20:2,24 21:22 22:12 29:14 30:5 38:14 52:16 66:21 73:4 91:11 100:9,24

counter 32:23,24 84:15

County 7:6,9 17:25 26:15,16 103:3 104:3

couple 39:20 41:18 54:19 70:16 77:18 79:25 95:4

course 46:24 75:14 80:4,13 91:12 95:3 98:25

court 1:1,17,24 39:8 99:25 103:5,24 104:17

Court's 99:22 100:2

covered 96:25

crappy 53:20 54:6

create 67:10

created 78:5

cross 66:2 99:14

Crum 34:14,15,24 56:6

C-R-U-M 34:14

cues 51:24 52:3,23

cure 63:6

curiosity 49:17 81:18

curious 49:8

current 13:14 37:25

currently 6:13 8:16 9:9 11:15 22:17 31:17 32:15 35:18 36:21 47:19

curve 72:23

cut 18:23

Cymbalta 22:14 31:9,20 32:1 33:16 70:21

_____

D

daily 19:14 34:21 36:22 42:25 43:2 70:3 77:10

Dania 23:20

dark 88:20

data 68:10 89:17

date 50:24

dates 15:9

Davie 7:15

day 64:20 65:3 82:22,23 83:14 84:12 87:23,24 88:6 95:25 103:16 104:7,10

days 43:4,5,9,12,13

44:5 82:22,23 85:20,21 86:14 87:10

deadline 64:2

deadlines 62:2

deal 45:20,21 46:4 47:1 50:6 53:25 58:16 61:14

dealing 58:7,23 59:1,7,8 80:15

deals 67:13

dean 90:21

December 8:3

decided 79:9,15

decision 79:10

declined 80:4

deep 46:5 49:24 85:19

Defendant 1:9,15 2:7

Defendant's 98:3

defense 17:4

deficit 91:15,25

definitely 53:16

definition 85:1

degree 7:13,19 8:2 13:24 42:8

degrees 8:7 74:16

dehydrating 81:23

delve 19:1 50:23

departments 90:3

depended 68:3

depending 63:22 68:18 84:13 87:21

depends 43:8 82:20 83:14

deposition 1:14

5:1,11 102:17

depressed 42:21 45:1,19 50:5 62:23

depression 30:24 31:5,6,11 43:14 46:1

described 39:15 45:15 46:11 52:21 55:12 57:16 62:18,22 72:23

description 4:2 74:8

descriptive 53:1

desk 50:10,13,14,17,21 51:1,3 63:16,20 64:9,13,18 65:25 67:4 69:19 79:16 81:13,14 86:7,14,16,24 87:11,12 88:12 89:11 92:15,17,19 93:24 94:3,8,18,22 95:18

desks 92:20

despite 74:1

detail 72:20 79:16

details 93:3,15

determine 52:21

develop 85:17 90:10

developmental 79:12

diabetes 36:12 96:14

diagnose 34:18 35:14

diagnosed 18:15,16 19:17,18,24



20:1,4,5,7 25:1,4
28:5,7 33:25
34:2,7,8,10,12,25
35:6,7 36:16,18
37:3,5 55:19
56:3,10 57:2
73:6,11 82:2

**diagnoses** 34:6
59:19

**diagnosis** 18:17
28:13 34:5 37:10
56:2,3,17,22
57:3,9 58:8

**diary** 75:13

**difference** 48:5,8,25
49:14 56:2 68:4

**different** 11:4
17:9,19 63:4
73:10 91:21

**differently** 82:1

**difficult** 29:15,16
92:8

**difficulties** 39:13
51:2 62:25

**difficulty** 52:23

**dig** 14:23

**dimmer** 87:6,9

**direct** 3:3 5:7 57:8

**directed** 91:18

**directly** 14:12
29:11 70:10 80:9
100:17

**director** 12:7

**disabilities** 18:9,12
19:3,10,14 25:5
36:10 38:10 79:13
96:25 97:1,6

**disability** 29:25
36:13 40:23,25
41:3

**disciplinary** 18:2

**disclose** 36:13

**discuss** 76:4

**discussed** 35:3
36:23 38:22

**discussing** 27:23

**discussion** 75:21

**disease** 34:3

**disorder** 18:14,20
19:6,11,23
20:1,7,20
22:7,9,11
23:6,14,18
25:1,6,24 31:25
35:5,6,8,10,15,20
40:20 41:13
42:15,19 44:16
45:7,12
46:10,21,24 47:1
48:2,6,14,20
49:22 55:23 56:20
57:3,10 59:4 60:2
62:21,25
71:3,5,17,25
72:19
73:3,11,15,18
74:1 75:11,19

**distinction** 58:9

**District** 1:1 8:12,13

**doctor** 19:21,24
20:11 24:3,6
47:12

**doctors** 20:4

**document** 68:12
89:18

**done** 14:20 39:20
43:14 87:2
102:7,14

**door** 63:17 64:2
65:1,10,22
66:3,9,11,13
69:24

**dosage** 41:22

**doubt** 101:3

**Dr** 24:1,3,9
26:3,11,14,15,17,
20,24 27:6,19,20
28:8,9,10,12
29:5,8,9 34:15,24
35:7,14 37:21
47:10,14 56:3,6
93:9

**drafting** 68:5

**drag** 43:11

**draw** 49:5

**Drive** 2:4

**drops** 6:17 30:9
81:19 82:4,8

**dry** 72:4 81:21,23
82:10

**dryness** 82:7

**duly** 5:6 104:7

**Dunwoody** 6:14

**during** 9:25 12:2
25:20 51:11
72:12,25
73:12,15,23 74:19
86:1 88:3,6 94:25
95:3,25 98:24

**dynamite** 80:13

---

**E**

**earlier** 33:10 85:2

**early** 36:19

**easier** 30:9 69:16
89:12,14

**easily** 55:6

**East** 1:17 2:9

**easy** 67:6 68:16
91:21

**eat** 96:16,17,22

**Edison** 23:20
24:1,4,10 26:3,11
27:20 28:2,9

**education** 8:1

**educational** 7:12

**effect** 31:11 58:14
62:2 96:8

**effective** 73:18
84:15

**either** 22:5 35:20
48:6 54:9 55:13
64:3 77:3

**elaborate** 41:5

**elevated** 42:20
44:24 62:23

**else** 7:8 19:12 23:13
34:24 38:17 53:5
62:12 74:12,17
77:21 78:25 81:6
84:17 97:9 102:3

**eluded** 101:19
102:1

**emburdening** 80:18

**Emotion** 52:25

**emotional** 58:17

**emotionally** 24:13
58:24 59:1,7

**emotions** 53:10

**employ** 15:5
20:12,14 61:10
72:1

**employed** 14:4 16:5
32:7,10 44:11,17
45:17 74:4,13

**employee** 17:14
103:11,12

**employer** 20:13

**employment** 8:16
12:13 13:21 17:11



encounter 77:8,10

engage 91:16

engagement 91:1,23 92:1

engages 92:4

engaging 90:19

enjoyed 90:24

enjoying 89:13

enter 8:22

entire 51:14 55:20,25 73:23

entirety 32:10 54:25 56:17,24 57:10 72:13,25 73:12,15

environment 50:16

equivalent 80:13

especially 89:15

Esquire 2:3,8

essentially 41:9

establishing 75:25

ethos 76:9

evening 92:25 93:3

events 40:10,14 65:5

eventually 76:4

everybody 6:6 11:11

everyone 79:12

everything 21:1 49:16 68:22 84:17 102:2,3

evolved 14:11

exactly 35:4 72:7 83:18 94:13 96:23

exam 74:11

examination 3:1,3

---

5:7 99:14

example 53:3 54:5 60:5 61:5 68:7,10,12,16 81:12 88:25 90:3 93:5

examples 52:2 53:6 63:14 68:6 76:11 79:23

exams 25:13,20 74:10

excellent 40:2

except 73:5

excuse 81:13,14

exhibit 4:2 97:23,24 98:3 99:21,22 100:3,20,22 101:11,12

EXHIBITS 4:1

exist 13:12

exists 13:13

Exp 104:19

expect 11:2

expected 63:15

experience 42:7,24 43:2,16,18 44:2,15,20 46:9 50:4 56:18 71:6,9,14 72:4,17

experienced 40:12 44:10 45:5,16 47:22 51:1

experiencing 30:22 39:13 41:23 45:19 71:8

explain 19:19 24:14

extent 43:19 44:12

extra 25:13,19

extremities 71:12

---

72:4

eye 6:17 30:9 81:21,23 82:4,10

eyes 81:19 82:7,13

---

**F**

faced 65:25

facetious 10:14 46:5

fact 74:1 84:21

faculty 64:6,10

fair 16:9 18:10 51:10 57:4 69:4

fairly 18:19 41:19,22 46:15

fall 90:13

Family 86:2

fashion 6:1 43:15

fast 41:22

February 1:15 5:2 104:8,19

Federal 8:13

feedback 27:23

feel 39:19 46:12 50:11 71:4 78:7 80:21 84:22 97:11

feeling 42:11,21 43:9 49:23 82:7,15 90:16

feet 66:11

fellow 30:7

fellowship 38:3

felt 24:11,15 61:11,13 62:4 80:8

field 17:3

Fifty-two 36:8

figure 36:4 38:16

---

52:7,13,18 68:14 86:2

figured 85:5

figuring 52:18

file 11:21

filed 18:7

financially 10:20 103:14

fine 16:19 42:12 57:3 58:9 97:25 101:22 102:13

finish 43:24

firm 2:3 8:18 9:6,22 10:4 13:4,12,13 14:25 15:11

firms 17:9,19

first 5:5 13:6,25 15:6,11,14,21 18:25 23:23 25:1 26:4 28:5 29:8 35:5 72:17 82:2 86:1 87:16

fit 24:11 60:21

five 37:11 72:11,12,13,14 94:11 95:5 99:6

five-minute 99:9

five-year 72:25

fixtures 87:12

fleece 72:3

Florida 1:1,18,25 2:5,10 6:14 7:10,11,15,20,21 8:2,5,11,12,13 25:23 26:4 103:2,6,24 104:2,18

fluid 46:9

FMLA 87:23

---



focused 97:5

focuses 57:18

focusing 71:14

foot 45:24

foregoing 102:17 103:8

forest 101:23

forget 42:14

forgive 13:20 24:19 55:19

forgot 38:13 40:17

forgotten 38:17 83:16

formal 34:4

formally 34:8,10,12,17 35:1

formerly 28:4

Fort 1:18 2:10 17:24

forth 16:12 21:20

free 39:19 82:23 97:11

frequency 54:23 71:23 76:23 83:8,22 84:13 95:23,25

frequent 83:25

frequently 64:4 66:17 69:13,14 70:1

Friday 93:14

friend 9:4

friends 45:22

front 45:24 63:17 66:9,12 69:25 79:11

frustrated 55:5

Frye 17:22,25

F-R-Y-E 17:22

FSU 13:25 14:5 15:3

full 5:9 85:17

fun 90:1,8,15 91:13,14,19

function 18:10 43:7 83:13 89:11

functional 81:9,10

---

**G**

gastroenterologist 36:20

general 7:25 51:7 52:14 53:4 63:14 79:10 93:11

generally 12:20 51:9 65:11 77:12 82:13 92:24 94:5,6,10 95:4,6

getting 6:16 21:24 53:14,16,24 59:9 66:4 84:20 88:15 89:1,14

GG 104:18

given 43:9 78:2 86:17 88:12 91:16

giving 27:23 62:3 69:15 100:4

gone 94:10,14,19 95:5

GOODWIN 2:3 21:24 28:14,19 99:17

goodwinlawoffices @gmail.com 2:6

Gotthelf 23:7,9,11,17 33:24 47:10,14

93:9

G-O-T-T-H-E-L-F 23:10

government 27:5

graduate 7:16

graduated 15:8,12

graduating 14:5

graduation 15:3

great 39:25 102:12

greater 42:7 74:16

Greenstein 33:22

G-R-E-E-N-S-T-E-I-N 33:22

grievance 76:18,20 77:17 98:8,9,10,17,25

grievances 76:12

gritty 82:12

groove 42:12

groups 90:10

guess 21:15,17 31:3 49:17 60:21 67:13 90:23 94:11

guessing 16:10 21:11,19

guides 90:10

---

**H**

habits 36:24 94:18

hairs 92:3

half 25:14 42:1 93:22

hand 30:7 72:24 103:16 104:10

handle 80:12

Hankin 13:5,11 14:8,24 17:1

H-A-N-K-I-N 17:1

happen 53:19 60:12,19 64:20,23 66:13 69:3,5,11,13 76:13 88:21,22 95:16

happened 14:13 54:22 55:1 64:3,11 66:17 69:14 70:1 94:23

happens 39:23 65:6 84:9

happy 43:4

hard 46:17,18 47:24,25 49:4 52:4 53:3 59:14 63:12,23 70:23 89:17,19 91:17 100:4,5

harder 55:17 84:6 89:10 90:16

Hartman 26:5,14,18,24 27:19 28:1,8,10 29:9 35:7,14 56:3

having 5:5 47:6 53:5 62:3 82:8 83:20

head 6:4 63:18 68:4 84:13 88:12 89:19

headache 32:21 38:2 42:5 82:22 84:19 85:1 89:2 90:25

headaches 38:3

headachy 37:18

headphones 65:18,23

health 23:2 79:12

healthcare 23:5 26:1



hear 65:21

hearing 39:11
98:8,9,10,18,25

heck 76:7

help 11:4 65:20
70:16,19 76:9
77:16 78:10,15
81:5,6 85:4,22,23

helped 46:25 49:18
85:13

helping 36:4 50:10
75:20 85:6

helps 36:6
41:10,11,21 46:20
49:18 70:22
85:20,21

hereby 103:6

here's 98:6

herself 79:15 80:19

he's 21:24 24:5,6
34:16

high 7:13,14,15
86:22 87:5

hold 101:1

holds 91:25 92:4

Hollywood 6:14
13:9 14:25 17:23
23:1,12,20 26:12
34:16 38:4

home 88:7

hopefully 5:25

HORTON 2:8
30:13 97:20,25
100:23

hour 42:1 43:11
93:22

hours 94:6 96:24

hurt 88:12 89:12

hurts 84:14 89:19

hyperverbality
42:20 44:19 62:22

## I

IBS 36:15,21,23
38:12,18 40:16
92:11 94:7,24
95:12

I'd 19:3 21:11
85:14 99:5,21

idea 58:25 71:23
76:23 83:7

ideal 76:5

identification 98:4

identify 16:23

I'll 5:25 6:6 11:12
21:6 26:8 39:24
43:9,12 58:13
63:13 82:12,20,22
84:17 91:17 99:9
100:6

I'm 5:21 6:16
8:11,19 12:15
15:19 16:4 18:20
20:2,23 21:22
22:1 23:20
28:23,25
29:14,16,20 30:9
33:2 36:2,4
37:18,19
38:15,16,23 40:18
42:3,4,8 43:4,5
45:13 49:3,6,8,15
50:8,24 52:5,7,17
53:5 54:6 57:7,22
58:12,20 60:15,16
61:22 62:6,16
63:25 64:1
66:16,19 67:18
68:5,25 70:8
71:13 73:7,19
74:22 77:5,16
78:7 79:3 80:22
81:22 83:10

84:19,21 86:19
91:15,16,18,21
92:3 95:22 96:10
97:5,17,22 98:7
99:15 100:14,24
101:6

imagine 21:8

immediately 43:13

impact 18:9 36:10
38:19 40:9,14
43:6 47:22 49:1
53:7,10 57:14,24
62:3,14 63:11
65:19 70:25
83:1,22,24,25
84:1 86:5 89:5
92:11 94:24 96:14
97:1,6,12

impacting 38:11

impacts 19:1

impossible 48:1
49:4 65:15 67:5

improvement 46:23

inability 52:3 58:6

INC 1:8

include 7:13 12:13
28:1

including 51:4

income 11:14,17,21

incompatible 34:6

incomplete
35:8,15,20

incorrect 15:19
22:2

increased 71:10,11

increasingly 24:11

independent 14:13
17:10,18

INDEX 3:1 4:1

indicated 34:20

indication 89:3

indirect 87:1

Indirectly 29:12

individual 77:16

individuals 26:12
27:19 53:8 76:17

inducing 75:2,3

Informally 35:2

information 8:4,6
68:3,11

inhaler 32:20 36:3
85:11,13

inhalers 37:17
85:12

initial 9:14,15

injections 32:21

insight 47:3

installed 86:23

instances 54:13

insurance 40:25
41:4

intend 14:17

intended 36:6 77:21

intending 38:13

intensity 42:9
86:23,25 87:5,6

interact 53:7,11
57:19 58:16

interacted 72:19
76:23

interaction 53:23
55:13 62:24 78:11
81:17 95:12 96:5

interactions 51:25
55:9 60:4 62:17
66:25 71:20,24
72:15 74:15,20



78:21 79:6 80:19

**interest** 91:25

**interested** 92:5,7
103:14

**interesting** 40:7

**interests** 12:4

**interfere** 58:6

**intermittent** 86:2

**interrelate** 30:1,2

**interrogation** 29:23

**interrogatory** 8:17
21:6

**interrupted** 63:13

**interruption** 68:19
69:8

**interruptions** 66:16
67:21 68:1
69:14,20,23

**intestinal** 36:14

**intricacies** 18:22

**intuitive** 52:8

**intuitively** 52:10

**involve** 12:25 39:10
74:5

**involved** 98:8

**irritable** 36:15 84:7

**irritated** 49:23

**irritation** 42:21
44:16 46:3 47:22

**Islon** 37:6,8

**isn't** 52:6 60:14

**issue** 51:7,8
60:23,25 77:17
96:18,21 101:13

**issues** 11:5 12:25
30:1 36:14
51:6,22 52:20
58:21 63:6 67:11

**iteration** 9:22
13:13,14

**it's** 9:9 12:10 29:23
31:13 33:3 35:24
36:23 38:24 40:7
41:20,22 43:5
44:1 46:16,17,18
49:4,21 52:8 53:3
55:11 58:9,22
59:14 60:2,3
61:11,12 63:22,23
64:23 68:13 70:23
78:6 81:22 85:5
89:1,17,19 90:23
91:13,14,19,25
94:20 96:13
97:17,20,25
99:6,16,21,22
100:2 102:8,11

**IV** 2:8

**I've** 14:20 18:15
19:6 21:17 32:16
35:21 36:23 37:1
40:12 41:17 46:25
73:4 81:18 83:16
88:19 93:7,9
102:8

---

**J**

**Jaime** 26:7

**J-A-I-M-E** 26:8

**JAMES** 2:8

**jargon** 75:7

**Jay** 30:13,14 101:1

**JD** 14:5 15:12

**jerk** 63:18

**JFS** 8:25

**jhorton@panzama
urer.com** 2:12

**job** 13:3 15:20,24
81:4 91:1 94:21

**Joe** 17:1

**Jointly** 11:23

**judges** 90:22

**jumping** 97:3,8

---

**K**

**Katz** 6:21,22
13:5,11,15
14:8,24
15:15,20,25
16:8,25 17:2,17
38:25

**kitchen** 42:13

**knew** 56:7 77:19
87:18

**knock** 65:9 83:14

**knocking** 65:22
69:24

**knocks** 64:2

**knowledge** 90:19

**known** 7:20 28:4

---

**L**

**label** 31:14
70:13,15,17

**Lamotrigine** 22:14
31:25 33:12

**lamp** 87:9

**Lane** 6:14

**large** 56:8

**Largo** 2:5

**LAS** 1:17

**last** 12:17 13:3
23:16 32:1 34:19
37:11 41:18,19
42:1 77:18 82:21
97:16

**later** 21:3 22:9,11
50:24 62:7

**Latuda** 22:14 32:2

33:16 35:21 70:22

**Lauderdale** 1:18
2:10 17:24

**law** 8:2,3,14,18
9:6,12,13,22 10:4
11:4 12:14
13:4,24 14:11
15:9 17:9,19 18:1
25:3,5,9,20,22
27:15 68:5
75:21,24 76:2,12
77:20,25 78:23

**Lawrence** 5:10 9:16

**lawsuit** 5:22 18:7

**lawyer** 17:20,21
28:22 75:24 80:10
98:20

**lawyers** 17:9,23
64:6 90:11

**lay** 61:8

**laying** 54:20

**lead** 43:14

**leading** 13:21 17:11

**learned** 16:2

**least** 47:13 54:24
65:25 77:13 82:3
87:13

**leave** 17:2 86:3
87:23 92:15,25
94:8

**legal** 6:21,22 9:3,4
11:1,5
12:12,16,19,24
75:23 80:1,8,13
90:19

**less** 12:1 13:17
16:21 90:19

**lessen** 44:2

**lesser** 42:8 43:19
74:16



Silverman, Mitchell  02-19-2018     Page 11 of 20

lets 98:20

let's 8:16 12:17
  42:15 53:22 54:11
  58:11 71:3 83:15
  91:21 92:10

Levalbuterol 32:20
  35:23 36:5

librarian 49:18
  75:25

librarians 76:12

library
  51:8,12,14,16,17
  63:17 64:6 74:20
  75:9,22 81:1 90:9
  91:3

license 18:1 76:2

licensed 22:19 24:7

licenses 8:10

life 18:10 30:9
  49:18

lifestyle 17:5

light 46:16 50:17
  51:6 66:10 82:25
  86:4,8 87:7,10,17
  88:10

lighting 50:21 66:1
  67:14 86:23,25
  87:1

lights 54:17 86:11
  87:11 88:8,14

likely 88:8

limited 27:4

line 49:5 99:13,15
  100:13,14,19
  101:11,16,17

lines 54:5 79:24

linguistic 52:14

list 21:2,6 22:2

literature 75:22

Lithium 31:10,22

litigants 75:5,7,17
  80:7

litigation 11:2 17:3

little 12:1 14:24
  42:5 46:14
  54:12,17 84:3,6

live 6:18 19:13

lived 6:15 7:6,8

located 13:8 17:23
  22:25 23:11,21
  34:15

log 75:13

long 6:15,25 7:6
  9:17 11:25 12:18
  13:16 21:10 24:1
  26:17 31:19 32:4
  47:12 51:11 58:22
  63:22 72:6 81:25
  82:4,6 93:9,20
  94:5,10 98:7

longer 24:9 54:9,13
  55:16

losing 53:14

loss 67:1

lot 11:3,4 20:24
  33:20 72:22 75:21
  100:10

loud 13:10

low 66:1 87:6

lower 86:25 88:9

lunch 50:7 61:6,24
  93:18,20 96:4

lying
  52:5,11,17,19,22

———— M ————

Maike 38:1,8

maintain 18:5

major 94:24

majority 93:23 94:1

malpractice 9:2,4

manage 10:17,19

manageable 96:19

management 10:21

manager 10:2,14,15

manages 33:18

managing 85:3

manifest 55:8

manifestation 82:9

manipulating 68:10

manipulative 90:17

Marc 33:22

M-A-R-C 33:22

March 103:16
  104:10

mark 97:22
  99:18,20,21

marked 98:3

married 6:24,25 7:2

Master 8:4

mat 54:19 61:8

matriculation
  25:9,20

matter 49:19,20
  58:10

matters 80:25 81:1

MAURER 2:9

may 30:5,18 38:18
  41:5 60:4,6 76:5
  78:1 79:24 89:2
  91:11

maybe 32:13 58:9
  69:23 70:22 77:4

MAYNARD 2:9

MBA 10:16

McDonald 98:22
  99:12

mean 12:11 18:23
  19:19 29:1 42:11
  46:15,16,17 49:15
  60:20 62:6 64:17
  65:14,25 67:4
  68:22 69:3,18
  70:1 74:15 76:25
  77:19 78:6
  79:17,20 81:11
  82:12,13 84:25
  85:2,20 90:15
  95:11,25 96:10,16

meaning 96:21

means 66:20

medical 19:21,24
  20:4,11 24:6
  39:14 86:2

medicate 73:2
  81:23 96:7

medicated 83:11

medicating 40:8

medication 20:19
  27:8 29:2,9
  31:5,9,12 37:12
  38:21 41:8,9,15
  43:17,20 44:1,4,7
  45:7,10,15 46:21
  48:13,19 59:24
  63:4,5 70:5,9
  73:1,5,7,8,14 74:2
  83:21 84:10
  85:4,7

medications 18:20
  20:24 21:12
  22:6,8,10,17
  30:2,18,23
  31:2,16,24
  32:6,9,14 33:7,19
  34:20 35:18 40:8
  41:12 70:16,19
  73:17 85:3



**UNIVERSAL**
COURT REPORTING

877.291.3376
www.UCRinc.com

Silverman, Mitchell   02-19-2018     Page 12 of 20

medicine 85:15
meds 33:10
meet 84:25
meeting 61:25
  74:14
meetings 74:14
member 8:11,12
  64:10
memo 68:8
memorandum 68:5
Memorial 23:1
mental 79:12
mention 39:17
mentioned 31:24
  32:16 33:10 39:5
  40:7
merge 49:4
met 72:2
Metamucil 36:22
Metformin
  32:17,19
Miami-Dade 17:25
middle 9:14,15
migraine 32:21
  82:19 83:3,11
  84:22 85:1,17
  86:5 87:21 88:5
  89:5
migraines 36:25
  37:3,5 38:6,12,18
  40:16 41:11 42:4
  50:12,15 51:4,5
  66:2 67:14 82:18
  83:4,8,12,23
  84:16,23 85:5
  86:21 88:18
mind 97:13 101:21
minutes 43:11 44:6
  54:21 63:22 91:5

94:11,12,15,19
95:5 97:17 99:6
mislead 14:17
  38:14
misremember 21:1
misrepresenting
  70:8
miss 97:2
missed 97:11,12
missing 52:7
misstate 15:17
Mitchell 1:5,14 3:2
  5:1,4,10 9:10,11
  104:6
Mm-hmm 11:8
  15:1 16:13 19:2
  20:25 22:13 30:6
  34:9 56:5 58:4,18
  60:8 61:17 62:11
  67:8,16 68:21
  69:21 80:3 83:2
  85:8 87:25 93:10
  95:20
Modiano 8:25
moment 8:19 11:1
  22:15 33:8 39:25
  41:16,25 42:16,23
  43:9 46:18 47:5
  48:7,11,25 50:20
  100:6
Monday 93:13
  102:9
monthly 42:25
months 23:21,23
  79:10 84:12
mood 29:14
  42:20,21 44:24
  45:1,20 50:5
  62:23
morning 82:21
  84:18,19 87:22

92:24 93:2 96:3,6
mouth 72:4
move 61:1 82:14
myriad 29:25
myself 41:22 54:2
  76:8 81:13,14
  85:5

――――――――
            N
――――――――
Naproxen 32:22
  37:16,23 38:1
  84:18 85:19
nature 49:17
nauseated 88:22
necessarily 83:14
Neil 23:20 24:1,4
nervous 40:19
  74:11 76:3,13
  77:22 79:22
  80:2,7,12
Nervousness 71:10
neurologist 37:6
  38:2,3
  83:10,17,20
neutralizes 33:4
Nobody 85:3
Nods 6:3
noise 51:6,8,18
  65:10,17,22
noise-canceling
  65:18
noisy 65:12
non 41:15 52:14
  81:9,10
None 34:23 49:3
  79:6
nor 66:24 103:11,13
normal 43:5

northern 17:25
Notary 1:25
  103:5,24 104:18
note 8:22
notes 20:23 103:9
nothing 29:11
  62:15 70:11
Nothing's 97:8
notice 89:1
noticed 46:23,25
Nova 1:8 5:23 7:15
  11:18,25 12:3
  13:2,3,21 14:19
  17:12,13,17 18:7
  26:23 32:7,10
  36:13
  44:9,11,17,22
  45:6,7,11,17
  47:11,14,18,21
  53:23 54:23
  55:1,21,25
  56:9,13,18,25
  57:11 71:17 72:1
  73:12,16 75:11
  77:18,19,24 78:22
  79:2,11 83:16,18
  85:25 89:7,25
  90:13 92:23
  93:1,24 98:11
Nova's 65:16
November 12:22,23
  13:23 74:5
NSU 41:19
nurse 22:20,22,23
  23:4,17

――――――――
            O
――――――――
oath 99:5 104:1
obtain 25:8
obtuse 36:4
obviously 7:13



14:17

occasion 86:13
87:14

occasionally 69:3,5
80:6 81:6
86:18,19,20 87:3
88:21

occasions 39:20
54:24 55:2 60:24
79:25

occurred 88:3

offer 21:5

office 23:21
54:16,19 61:8,24
63:25 64:5,8
65:8,11 66:1,7,9
67:3,6,8,14 69:22
72:2 86:10
88:8,14 96:19

officer 12:7,9

oh 20:2 23:11 39:22
99:20

Ohio 7:10

okay 5:21
6:4,7,13,18 8:21
9:25 10:17,25
12:23 13:24
14:4,23
15:10,14,17 16:4
17:16 18:1,12
19:13,23
20:1,10,15
21:10,15 22:5,16
23:11,23 24:19
26:6,10,17,20
27:6,13 28:21
29:8,18,20
30:3,16 31:2
32:13 33:6,9,23
34:4,12 39:10,13
44:15 45:5,19
48:24 49:21
53:13,19 54:8,18

56:13 57:18
59:9,12,15,18,24
60:11,16,24 61:17
62:2,7,9,20 65:5,8
66:19 67:13 71:21
72:12 73:10,14,25
75:8 77:7,15
78:25 79:6 80:18
81:16 83:15,20
84:1,5,7 85:23
86:4 90:12
91:4,10 92:7
93:13,18,20
94:2,19 95:9,14
96:24 97:10,16
98:6,17,23
99:4,9,14
100:9,14,18
101:1,6,12

OLAS 1:17

old 36:7

ones 32:16 38:21

onset 41:23 42:6
89:5

onsets 72:18

open 63:17 65:1,24

operated 9:17

operation 10:4

opine 100:21

oral 98:18

order 50:6

original 48:24
97:20

originally 18:16
20:7

others 22:15 57:24
67:4 79:9 82:24

ought 68:25

Outpatient 23:2

outside 12:3 65:10

66:13 89:1

over-the-counter
41:8

overwhelmed 45:25

_____

**P**

P.A 2:9

p.m 1:16 40:4,5
91:7,8 100:7,8
102:18

PA 9:8,20,23
10:7,11 12:5,11

page 3:2 4:2 99:13
100:13,14,19
101:10,16

pages 98:19

pain 82:23 84:3
89:10

pair 65:17

Palm 26:14

panic 35:8,15,20

PANZA 2:9

paper 56:7,9

pardon 22:19 38:2
93:8

particular 41:12
48:11 73:8

parties 62:25
103:11,12

pass 13:25 14:2

passive 11:15,18

past 66:6,8 85:12

paths 90:11

patient 29:20,22

patron 63:20 76:10
78:1 81:2,4,17
94:17,22

patrons 64:7 74:20
75:2,8,10,17,21

76:24 77:5 78:21
81:7

patterns 46:19
60:21 96:1

Pembroke 37:9

people 50:10 51:24
52:9,10,12,13
53:11,14 55:6
58:7,16
59:1,8,9,10
64:17,18 67:19
69:24 76:11

percent 77:4

percentage 77:2

perfect 16:17 52:19
102:5

perfectly 42:11

perform 18:9 47:23
67:2 89:6

performed 12:25

perhaps 70:21
79:18 100:1

period 9:25 16:8
51:11 73:1,23
83:15 86:1

periods 82:20

permanent 17:14

permission 86:15
88:13,16

permitted 93:18

person 16:24 24:16
53:25 55:15

personally 104:6

persons 57:19

ph 8:25

Ph.D 34:16

pharmacological
27:14 30:17

pharmacologically



| 29:19 | 27:4 | 36:23 37:25 | 27:9,10 30:25 |
|---|---|---|---|
| **phone** 67:8 69:24 73:19 | **practicing** 76:2 77:20,25 78:23 | **private** 26:25 | **psychologist** 23:8 34:16,17 |
| **physician** 24:3 33:18 85:3,15 | **practitioner** 22:20,22,23 23:4 | **pro** 75:5,7,17 | **psychologists** 20:5 |
| **PI** 17:3 39:5 | **precise** 21:2,6 22:1 68:13 | **probably** 6:22 21:6 55:10 68:6,10 70:16 73:17 | **psychopharmacolo gical** 27:12 |
| **picayune** 101:20 | **predict** 46:12 60:11,18,20 64:14,15,22 67:20 88:23 95:24 | **problem** 22:16 47:25 50:22 68:12 76:14 78:8 86:24 | **psychotherapy** 27:21,24 29:3 |
| **piece** 56:7 78:22 80:8 |  |  | **public** 1:25 81:7 103:6,24 104:18 |
| **pills** 80:23 | **preface** 98:23 | **problems** 58:7,23 59:7 63:7 85:11 | **publicly** 64:5 |
| **Pines** 37:9 | **prejudices** 22:3 | **proceedings** 18:3 103:8 | **pulmonologist** 36:1 37:20 85:14 |
| **Pioglitazone** 32:19 | **premises** 77:20 | **process** 39:18 98:10 | **pulse** 71:10 |
| **PIP** 17:4 39:5 | **preparing** 39:10 | **processor** 68:12 89:18 | **punched** 16:6 |
| **Pizza** 8:25 | **prescribe** 29:2,9 41:13 | **proctored** 74:10 | **purpose** 66:20 |
| **placate** 81:4 |  |  | **Purposeful** 66:22 |
| **Plaintiff** 1:6 2:2 | **prescribed** 29:13 30:18 31:13 70:11,17 73:21,22 | **Proctoring** 74:11 | **putting** 30:9 45:24 81:19 |
| **play** 89:12 |  | **professional** 9:2 12:10 23:5 |  |
| **please** 5:9,25 | **prescribes** 22:17 37:23,25 | **professionals** 26:2 | **Q** |
| **Plus** 63:20 | **prescription** 32:22 85:7 | **progression** 72:21 | **question** 5:24 21:19 28:18,24 29:5 32:14 34:1 37:2 38:16 43:1 48:24 53:20 54:6 57:8 63:21 89:16 91:14 96:11 99:1 |
| **point** 47:14 65:16 66:1 75:23,25 76:1 90:20 97:13 99:23 | **presentation** 90:20 | **project** 64:1 |  |
| **pointing** 40:21 | **presented** 87:21 88:6 | **pronouncing** 66:16 | **questions** 5:22 6:2 20:3 49:19,20 64:18 98:22 99:8 100:10 |
| **poor** 27:8 | **presenting** 99:24 | **proportions** 47:17 |  |
| **poorly** 55:14,15 | **pressure** 89:1 | **proprietorship** 9:9,18,20 11:15,19 12:4 |  |
| **positive** 45:23 65:19 | **presume** 65:9 | **propulsive** 66:15 | **quickly** 92:22 |
| **positively** 83:22 | **pretty** 21:2 66:17 73:4 84:12 94:23 96:3 100:14 | **protective** 31:11 | **quiet** 54:16 |
| **possible** 61:17 80:5 92:18,22 102:12 |  | **provide** 12:13 29:2 56:9 | **quite** 90:24 |
| **Possibly** 95:11 | **Prevent** 83:25 | **providing** 12:18 75:23 | **R** |
| **postgraduate** 8:1 | **previous** 35:3 | **psychiatrist** 23:19 24:5,7 26:5,7 27:11 56:2 | **rang** 67:10 |
| **potential** 77:23 | **previously** 62:21 |  | **rapid** 46:15 |
| **potentially** 87:23 | **primarily** 57:18 71:14 | **psychiatrists** |  |
| **practice** 8:14 14:11 20:12,13,14 26:25 | **primary** 33:20,21 |  |  |



877.291.3376
www.UCRinc.com

Silverman, Mitchell  02-19-2018          Page 15 of 20

rate 71:10,11

rather 21:2 99:21

rbeauchamp@pan
zamaurer.com
2:11

react 75:14

reaction 58:17
72:15 74:24

reactions 63:18

reality 47:8

realize 55:15

realized 78:17

really 17:4 21:20
29:18 36:4
41:14,20 43:15
51:7 57:1,6 68:15
72:20,22 76:11,12
77:5 78:24
79:14,18,21
80:9,22 84:18
86:1 89:4,21,25
90:19,23 91:18,20
92:13 95:24 97:5
99:6 101:6

reason 6:10 10:7
16:4 17:6 37:19

reasonable
21:12,18 50:20
75:1

Rebecca 71:22,24
74:5

recall 5:16,17 10:1
11:20 12:6 13:7
15:7,9,13 16:3
17:19 19:11
20:12,16,23 22:15
24:22
25:7,15,18,21
26:22
31:11,18,21,23
32:5 35:4,13,17
36:20 38:23 39:16

41:5 47:5,16,17
52:1 55:3 57:17
58:22 62:19
72:7,20 73:20
74:18,25 75:12
77:6,14 78:25
79:5 83:18
93:2,15,16 94:12
95:11 97:8 100:17

receive 7:22 25:12
32:20 38:21 47:9

received 8:3,6
13:24 86:15

receiving 27:20
30:23 76:11

record 40:4,5 57:7
91:7,8 100:7,8
101:8 102:15,16
103:9

records 9:19

refer 81:5

reference
50:9,13,14,16,21
51:1,3 63:16
64:9,12,18 67:4
69:19 79:16
81:13,14
86:7,16,24
87:11,12 88:11
89:11 92:17,19
93:24
94:2,8,17,22
95:18 100:19

referred 19:7

refreshed 43:10

regard 84:16

regardless 45:14
49:21 63:3 65:21
66:25 73:22

regime 73:5

registered 22:20

regular 32:20 72:18

73:1 77:8

regularizes 36:24

regularly 43:3 73:2
89:25 96:16,17

rehabilitation
34:17

Rejtman 26:8,15,20
27:6,20 28:1,12
29:6

R-E-J-T-M-A-N
26:9

related 23:13 25:9
29:5 30:22 63:6
75:18
78:10,11,20,22
81:21 85:16

relates 58:15

relating 63:10

relationship 37:17
76:1

relative 103:10,12

rely 33:20 86:2

remember 10:10
16:11,18 21:8,13
22:6 31:10 33:7
40:10,14 93:6

remembered 42:13

remind 6:6 11:12

reminder 5:21

remove 54:2,14

render 81:9

replace 86:25

report 68:8 103:7

reported 1:24 16:24

Reporter 1:24
103:1,5,24 104:17

REPORTING 1:17

represent 14:12

represented 75:2,9
78:1

representing 76:17
78:7

request 50:23

require 60:5

reschedule 62:5

Rescheduling 61:25

rescue 35:24

research 68:8

reside 6:13

resort 54:20

respect 18:1 25:24
30:1,2 45:11 51:2
52:21 83:8 101:10

respiration 71:11

response 60:2 98:21

responses 6:2 8:17
60:4 62:4

responsible 80:22

rest 47:5

restate 5:25

restroom 92:16,21
96:2

result 39:14 44:16
52:24 53:13 67:1
69:8

resulted 53:13

resulting 71:24

results 15:21
16:2,5,9,11

retire 27:1

retreat 85:24

retrospect 79:18

return 92:21

returns 11:21

Rich 71:22,24 74:5



76:4
**RICHARD** 2:8
rise 62:3 71:17
74:23 75:10
79:1,7 80:16
role 10:22
room 88:20
run 19:3 97:18
102:8

**S**

sad 43:4
sadness 42:21
45:3,20 46:1 50:5
62:24
Sarasota 7:10,21
saw 23:16
47:13,17,18
scenarios 80:15
schedule 93:3
school 7:13,14,15
15:9
25:2,3,5,10,20,22
Schwartz 22:19
23:5,17 33:24
Science 8:4
scores 65:3
screw 97:23 98:1
se 75:5,7,17
seated 93:24
second 14:2 15:25
58:11
seconds 63:22
68:23
Security 40:23
seeing 26:24 27:7
37:19 47:14
83:10,17 85:14
93:9

seek 25:8,12
seemed 50:12,19
71:19 76:6
seems 36:3 37:17
51:22 100:16
seen 37:1 47:7
81:18 83:20
seldom 88:5 96:1,3
self 40:7 45:23,24
75:1,9 77:25
81:22 96:7
self-medicating
41:6
self-represented
64:7 75:16 76:24
78:21 80:7 81:7
Seliger 37:6,8,21
S-E-L-I-G-E-R
37:7
senate 28:15
send 21:6 64:9,12
sending 96:8
sensation 82:12
sense 10:22 24:12
46:14
separate 61:1 92:20
separation 11:18
45:11 98:13
September 7:1
series 5:22 20:3
seriously 84:20
serves 44:2
services
12:12,16,19
14:14,21
seven 12:1,2
Seventeen 6:16
several 17:18

24:2,20 81:19
severe 83:3,5,8,11
severity 43:8 83:22
87:22
shadow 66:2
Sheli 20:8
She's 10:23
shift 94:9 95:3 96:2
shifts 94:2,5 95:7,9
96:3,4
short 53:2,17,25
55:11,16 59:10
90:21 92:18
shorter 54:10
sic 32:25 33:3 90:18
sick 85:25 87:24
sidetracked
94:20,21
significance 68:19
significant 8:9
69:19
silence 73:18
Silverman 1:5,14
3:2 5:1,4,10,11
6:23 9:10,11
30:12,14 40:9
91:6 102:10,15
104:6
similar 55:12
Similarly 50:4
simply 66:5 69:18
single 33:18
Singulair 32:20
sit 22:5 43:13 54:16
88:9,20
situ 74:22
situation 54:2,14
61:1,13,15,20,23

77:23 80:10 88:10
situational 60:1,4
situations 58:17,24
59:2 71:13,16
74:4,12,23
75:8,14 80:20,24
six 37:11
sleep 85:13,15
slowly 84:4
snack 96:21
snacks 96:19
social 20:8 40:22
51:24,25 52:3,23
62:17
sole 9:9,17,20
11:15,19 12:4
solely 27:12,13
solution 76:5
somebody 65:22
66:8,10,11 69:6
80:10 88:16
someone 23:16 47:6
52:4,5,15,22
53:2,5,24 55:11
64:2 66:6,14
80:12
someone's 52:11
someplace 96:22
somewhat 36:24
somewhere 95:5
sorry 11:10 12:15
20:2 21:22 28:8
33:2,3,17 43:25
53:21 54:6
61:21,22 62:16
67:18 73:19 74:22
79:3 85:10 86:19
95:22 99:15 102:3
sort 47:8,9 52:14
63:14 64:1



877.291.3376
www.UCRinc.com

74:14,15 86:25 90:11,20,22

**sounds** 66:6 91:6

**source** 87:8,10

**sources** 11:14,17

**south** 7:20 25:23 26:4,14

**Southeastern** 1:8 5:23 11:18,25 12:3 13:2 32:7,11

**Southern** 1:1 8:12,13

**speaking** 51:9

**specialist** 19:18,20

**specific** 79:23

**specifically** 39:4 54:15 73:20

**spectrum** 18:15 19:7 28:4 29:10 34:3 51:20,21,23 52:6,24 55:5,20 56:8,11 57:14,20 58:15 59:22 60:3 61:12 62:13 68:18 75:20

**spell** 13:6 26:8

**Spiriva** 32:19

**splitting** 92:3

**spoke** 98:18

**spreadsheet** 68:11 89:17

**spreadsheety** 90:18

**Springs** 7:10

**staff** 74:14

**standard** 78:6

**standing** 66:11

**start** 68:24 88:12 92:24 93:2 102:12

**started** 14:19 15:7

16:14 17:13,17 39:17 83:17

**starting** 42:4 99:11,12

**starts** 94:23

**state** 1:25 5:9 8:2,5 103:2,6,24 104:2,18

**statement** 50:25 52:16 101:18

**statements** 49:8 98:18

**STATES** 1:1

**status** 69:7,15

**stay** 82:23

**stenographically** 103:7

**step** 49:23 55:16 62:5

**sticky** 82:15

**stimulant** 18:20 41:12,15

**stimulants** 70:6

**stomach** 33:5

**stood** 66:9

**stop** 26:24 27:6 48:18 66:13

**stopping** 69:25

**strategies** 49:25 61:10

**strategy** 75:1 77:15 78:10

**Strattera** 41:17

**S-T-R-A-T-T-E-R-A** 41:17

**strength** 36:3

**strike** 10:18 12:17 23:3 28:10 48:18

**strongest** 80:5

**student** 79:15,17 80:18 81:2 87:14

**students** 64:6 79:7,25 80:19,20,24

**studies** 7:25 8:5

**stuff** 43:14 90:15

**stupid** 37:2

**style** 17:5

**SUAREZ** 1:24 103:5,24 104:5,17

**sub** 90:10

**subject** 18:2 22:9,11

**subjected** 51:17

**Sucralfate** 32:25 80:23

**sudden** 95:19

**sued** 9:4

**suffer** 19:10 38:20 40:13 72:18

**suffered** 63:10

**suffering** 57:10 83:3

**suggest** 38:15 79:19 80:9

**suggested** 25:16 50:19 79:19

**suggestion** 65:16

**suit** 17:4

**Suite** 1:17 2:4,10

**Sunrise** 26:16

**super** 65:12

**supervisor** 16:24 71:20 72:6,14

**supervisory** 74:15

**supply** 21:2,5

**supplying** 22:2

**support** 11:2

**suppose** 81:21

**supposed** 41:20 87:13 100:3

**supposedly** 41:15 93:6

**sure** 14:10 19:5 21:9 23:20 39:6 40:22 41:7 42:11,17 45:13 48:4 50:1,3 56:8 57:5,8 58:12 59:17 60:7,17,20 62:6,8 66:19 67:3 68:25 69:1 71:15 74:10 78:16 97:15 100:14,24 101:9

**suspect** 29:23

**Svetlana** 22:19 23:4 33:24

**sweat** 72:5

**sweatiness** 71:11

**switch** 27:9,10 87:6,9

**sworn** 5:6 16:14,16 104:7

**symptomatic** 71:18 75:18

**symptomatically** 30:17

**symptomatology** 41:24 46:24 48:21

**symptoms** 18:19,21 24:15 29:19 30:19,21,24 34:2,11,13,18,22, 25 35:19 41:10 42:7,9,18,24 43:2,7,8,16,18



Silverman, Mitchell   02-19-2018      Page 18 of 20

44:2 45:15,16
46:11 49:3 51:20
52:1 57:13,21,23
58:5,8,14 59:20
63:9 70:10,11
71:1,6,7,8,25
72:18 73:2,25
74:6,19 75:10
79:1 80:16 85:16
87:20 88:6

**syndrome** 18:17,18
36:15

_____
      T
**table** 87:9

**taking** 29:16
31:16,19
32:4,6,9,15 42:3
45:6 46:7 48:13
61:23,24 71:2
73:9 74:2 82:4
84:9

**talk** 8:16 42:15
45:22,23,24 58:11
62:7 66:14 71:3
79:20 83:15 92:10

**talked** 32:1 47:4
50:2 58:14 64:10

**talking** 19:16
27:14,17,22 58:24
61:23 75:4,5
87:6,7 94:23

**Tallahassee** 7:11
20:9,17

**task** 47:25
67:2,5,25 68:2,20
69:7,9,16,17
89:13 91:3,16

**tasks** 63:12,15
89:15,24 90:12

**tax** 11:21

**techniques** 45:23
47:3

**temper** 53:14

**temporary** 17:13

**ten** 94:12 95:5
97:17

**tense** 55:10

**terminated** 44:9
79:11

**Termination** 98:9

**terms** 46:9,10 49:1
80:5 94:18

**test** 36:2

**testified** 5:6 98:17

**testing** 21:8 56:3
57:2

**Thank** 6:6,8,12
11:13 22:12 29:21
30:11,14 40:21
102:5

**that's** 6:21 11:11
14:20 16:18,19
18:24 19:13 21:16
30:8 31:13 38:9
40:18 44:8 46:19
49:15,17 54:3,6
59:12 60:12,19
66:23 67:19
70:11,13,23 80:23
88:19 89:21,23
90:22 92:2 95:14
96:17 101:5,6,20
102:2,5,12,13

**themselves** 80:1
87:21

**therapist** 46:19
79:20

**therapy** 46:20,25
47:9,12 79:21

**there's** 10:20 30:16
34:4 38:17 53:23
59:24 60:11 62:9
64:22 68:4
75:20,21 84:24

86:7 88:19,23
95:11,23 100:19

**Thereupon** 5:3

**they'll** 82:21

**they're** 53:4 70:17
84:23 88:20,21

**third** 57:19 62:25

**Thirty** 5:20

**Thomas** 34:14

**thus** 38:22

**Tiagabine** 22:14
31:12,25 33:13
35:22 70:21

**Tiagamine** 33:12

**ticket** 16:6

**till** 102:13

**timely** 43:15

**tissues** 30:8

**titrate** 41:21

**today** 18:5 29:24
39:15 97:17 102:8

**Tolgyesi** 13:5,11
14:8,24
15:15,20,25
16:8,25 17:2,17
38:25

**top** 24:6

**towards** 14:11 72:1
93:1,10,24

**track** 68:23

**trade** 32:25

**trained** 38:3

**training** 8:9

**transcribe** 103:8

**transcript** 4:3
97:18 98:3 103:9

**transitions** 46:15

**Transposing** 68:11

**treat** 18:21 24:25
25:23 26:17
28:9,12 29:1
30:25 36:6,21
37:21 38:5,21

**treated** 24:1,20
26:2,4,7 29:18

**treating** 23:19
24:15,23 35:16
38:6

**treatment** 30:17

**trees** 101:23

**tried** 30:25 41:17
76:6 78:15 85:12

**trigger** 66:4

**trouble** 53:5 58:25

**true** 51:15,19 65:24
92:3 98:23 99:9
101:10 102:4
103:9

**truth** 52:22

**truthful** 98:24
100:21,24
101:4,13

**try** 13:25 14:2 30:3
41:14 47:5
54:2,6,11 55:15
58:13 61:3,15,22
76:9 77:16
85:4,18 88:9
91:17 92:17,18
100:5

**trying** 29:14
38:15,16 78:10
80:12 86:1 90:25
93:6

**Tuesday** 93:8

**Tuesdays** 93:5,12

**turn** 86:10 88:8



turned 64:7

twice 5:15 41:17
47:18 83:23 94:9
95:10 96:2

two-hour 95:3,7,9

Tylenol 32:22
84:12,15 85:19

type 9:1 18:14
19:6,23 24:3 25:8
39:1,4 47:12
51:17 59:10 63:7
67:11 72:15 74:23
84:1 89:6 90:13

types 10:25 12:18
42:18 61:10,24
62:4 66:25 69:25
71:8,13,16 74:22
90:6,12

**U**

uh-huh's 6:4

uh-uh's 6:4

unburden 79:15

undersigned 104:5

understand 5:24
8:17 15:18 28:24
29:17,25 35:9
43:23 46:6,8
48:6,9,10 52:3
55:18 57:1,4,6
58:2,12 78:8 99:5
101:7

understandable 6:1

understanding
30:16 51:24 62:9
82:19

understands 47:6

understood 31:19
48:21 49:16

unduly 76:3

uniform 87:4

UNITED 1:1

UNIVERSAL 1:17

University 1:8 5:23
7:20 8:3,5

unrepresented
75:20

unsuccessful 15:6

unwind 30:3

upset 53:14,16,24
59:9 77:24 78:1,3
80:20

useful 46:7

users 74:20 75:9

usual 90:23

usually 9:13 31:13
46:16 50:10 65:24
81:8 88:20,21
93:19,21 94:11
96:18

utilize 87:22,23

**V**

vague 78:7

varies 43:23 84:13

various 18:8
90:10,11

vary 42:9 93:3

verbal 6:2,3

verbally 53:3

vernacular 44:5

versus 8:25 49:2
66:11

vest 72:3

VICTORIA 1:24
103:5,24 104:5,17

voice 24:17

vs 1:7

**W**

waiting 15:21

wake 37:19 43:9
82:20,22

walk 42:13 50:7
61:4,23

walking 66:6,8

walks 66:11

warm 72:3

wasn't 10:9 14:14
24:11 38:13
50:9,18 67:7
79:20 80:22 89:16

water 72:3

ways 68:9

web 89:18

Wednesday 93:13

week
47:10,11,17,18,19
83:9,12,13,24

weekly 42:25 77:13

weeks 83:9

we'll 6:10 29:22
50:23 59:15 62:7
102:13

we're 28:14 30:2
31:3 75:4
102:7,16

West 2:4

western 26:15

we've 38:22 45:15
47:4 58:14 62:17
96:24,25 97:12

whatever 6:3,10
39:22 41:21 67:1
73:22 87:24
100:21

whatsoever 41:1

Whereupon 102:17

whether 43:16 48:1
49:21 53:4 60:2,3
61:11,12 63:3,21
69:18 73:19,20
78:22 84:9 85:2
87:12 89:16 91:2
98:24 99:7 100:21

whoever 81:5

whole 57:4 77:23

who's 23:7 27:11

whose 20:12,16
36:20

wife 6:19 10:2,13
11:23

wife's 12:9

wind 54:11

window 65:25
69:25

wise 29:10

wish 49:15,16

withdraw 60:25

witness 3:2 5:5
103:16 104:10

work 8:20 11:5,25
13:3,16 14:12
17:5,8 29:22,24
36:11 38:11,19
39:1,4 43:13
45:23 47:23,25
49:1 50:6,20
56:17 57:15 58:6
61:11 62:14 63:11
67:5 71:14 76:6
83:24 84:2,3
85:16 88:4 89:6
92:12 94:25 96:15
97:2,7

workday 92:23
93:11

worked 12:3



| | | | |
|---|---|---|---|
| 15:2,12 16:8,20<br>17:18 56:24 57:11<br>73:12,16 75:11<br>79:14 87:1 93:23 | 57:15 70:5 79:4<br>95:19 | | |

**worker** 20:8

**working** 14:19
  15:7,15 16:14,15
  18:10 26:22 27:4
  38:25 41:18 42:12
  47:21
  50:9,13,14,25
  51:3 53:23 55:1
  56:13 63:24,25
  64:1,17 68:20
  69:7,16 75:1 79:1
  89:13,15 95:15

**works** 23:1 72:24
  97:25 101:21

**worry** 76:10 77:17

**worse** 67:3
  72:16,21,22 82:23
  96:4

**worst** 52:1 68:9,10

**wound** 64:7

**write** 90:21 98:20

**writing** 68:8

_____
         Y
**yelling** 81:3

**Yellow** 7:10

**yet** 44:4 50:12
  100:2,3

**yoga** 54:19 61:8

**you'll** 88:25 99:24

**yourself** 45:25
  53:22,24 54:14
  61:1 68:2,23

**you've** 21:16 34:20
  38:17 39:15,20
  46:11 50:2 52:20
  54:13 56:16,22





SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

262

1         DIRECT EXAMINATION
2    BY MS. GOODWIN:
3         Q.  Good afternoon.  Could you please state your
4    name.
5         A.  Mitchell Silverman.
6         Q.  And are you a former employee of Nova
7    Southeastern University?
8         A.  Yes.
9         Q.  Do you remember the date you were hired?
10        A.  As a full-time employee, May 17th, 2010, if
11   I'm correct.
12        Q.  Are you part-time before that?
13        A.  I was full-time temporary.  I was hired as a
14   full-time permanent employee on that date.
15        Q.  When did you become a full-time temporary?
16        A.  November 4th, 2009.
17        Q.  Okay.  And did your position change or was
18   it just your status?
19        A.  When I was hired I was immediately referred
20   to and treated as if I was a referenced librarian.  I
21   had the qualifications for the permanent position.
22        Q.  And what were your duties?
23        A.  Assisting patrons at the reference desk,
24   faculty, students, staff and other patrons, as well.
25   Assisting faculty with more involved projects and

263

1    librarian project work as assigned.
2         There's more to it, but that's my recollection of
3    the job duties.  I think that covers everything.
4         Q.  Those are the general duties.
5         And who was your supervisor when you were first
6    hired?
7         A.  Carol Yncles, Y-n-c-l-e-s.
8         Q.  And how long was she your supervisor?
9         A.  I don't recall and I don't want to guess.
10        Q.  Okay.  And after that?
11        A.  I was supervised directly by Eric Young.
12        Q.  And how long was Eric Young your supervisor?
13        A.  Less than a year, I can't really remember.
14        Q.  And after Eric Young?
15        A.  Rebecca Rich.
16        Q.  And when were you terminated?
17        A.  February 22nd, 2017.
18        Q.  And was Ms. Rich your supervisor at that
19   time?
20        A.  Yes.
21        Q.  And there's been some talk here about
22   disabilities that you have.  What disabilities do you
23   have that you had made the university aware of?
24        A.  I was diagnosed with Bipolar disorder in my
25   first year of law school, which would have been about

284

1    1996.  I was diagnosed with Asperger Syndrome, which
2    is now called autism, on the autism spectrum in 1999
3    after I graduated from law school.  And informally by
4    psychiatrist I was diagnosed with comorbid anxiety.
5    I don't think it was until I started to see my
6    current therapist that that was classified as a
7    separate disorder, but I know that I had the symptoms
8    as far back as 1999.  They're generally associated
9    with people on the spectrum.
10        Q.  And were you also diagnosed with ADHD at one
11   point?
12        A   I have the symptoms of ADHD, which you can't
13   diagnose someone with both ADHD and autism.  The
14   symptoms overlap.  I don't exactly understand the
15   interaction, but I have the same symptoms as someone
16   who has ADHD.  I think I may have referred to it that
17   way before because I'm not really -- I wasn't really
18   -- I had a neuropsychological evaluation late in 2016
19   and it wasn't until I talked to my neuropsychologist,
20   Dr. Thomas Crum, C-r-u-m that I understood some of
21   these technicalities, but I have made Ms. Rich aware
22   of all of these issues very early in the period
23   during which she supervised me.  She never --
24        Q.  Okay.  Well, let me ask a question.
25        A.  I apologize.

285

1         Q.  What about migraines have been mentioned, as
2    well?
3         A.  I believe they started around the turn of
4    the year.  November/December 2014/January 2015.  I
5    really don't remember exactly.
6         Q.  But that's another issue that you let the
7    university know?
8         A.  Absolutely.
9         Q.  Okay.  And at what point did you make the
10   university aware of your, whether you call it ADHD or
11   autism, when did you do that?
12        A   I don't remember exactly, but I think it was
13   within the first year or two that Becka was
14   supervising me.
15        Q.  Okay.
16        A.  I had debated whether I wanted to disclose
17   that.  Eventually I decided I had to.
18        Q.  Why did you decide you had to?
19        A.  Because I was having trouble with the
20   interrupt driven nature of the job I was asked to do.
21   I can sit down and work on a project.  I can't sit
22   down and work on a product while I wind up getting
23   interrupted every 15 minutes or half an hour.  And I
24   certainly can't do it while I'm sitting at the
25   reference desk and I'm being interrupted every 10

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

**286**

1 minutes, five minutes.

2 Q. And by interrupted, you mean interrupted to

3 do another task for your job?

4 A. To help a patron, which from what I

5 understood for the most part is the most important

6 part of my job.

7 Q. You requested accommodations regarding your

8 ADHD or autism. Do you recall the first time that

9 was?

10 A. There was an informal accommodation request

11 that I made sometime around the time that I disclosed

12 to Ms. Rich that I had ADHD symptoms. What I --

13 actually, come to think of it, it wasn't all that

14 long after Becka took over as my supervisor. She

15 said that she had talked to Carol Yeclee and Carol

16 suggested the idea that my -- that it would be better

17 to have a librarian to spend more time on the

18 reference desk and prioritize that. And Becka

19 mentioned it to me and I said that would be

20 wonderful.

21 And somewhere around there if you look at the

22 reference desk schedules you'll discover that I go

23 from eight hours a week on the reference desk to 12.

24 I don't remember those numbers exactly. And as I

25 wound up on the reference desk more, I was able to --

**287**

1 I felt as I was able to help people better. I felt

2 as if I was spending my time more productively. I

3 guess one of the things about the way my ADHD works

4 is I can, you know, do 15-minute questions for two or

5 four hours in a row and it doesn't really phase me

6 even if it's very busy. I mean, I get exhausted, but

7 who wouldn't.

8 Q. But that's something you're able to do?

9 A. Yes.

10 Q. And if you can look in there, Grievant

11 Exhibit Number 3. Have you seen that before?

12 A. Yes.

13 Q. And what is that?

14 A. It is the front page paperwork for a

15 disability accommodation request that I made in -- I

16 would have to check back through my paperwork or look

17 at the file dates to tell, but I'm guessing this was

18 in 2014. Actually, I could probably look at my

19 letter from Dr. Gotthelf and determine.

20 Q. Page number 4 I think that is.

21 A. I dated it with my signature or -- no, I

22 didn't date it.

23 Q. Page number 9.

24 A. Oh, actually page number 5. Oh, 9 in your

25 numbering, right.

**288**

1 I submitted on or around July 21st, 2015

2 Q. Okay. And it might have been before that

3 maybe you supplemental it?

4 A. Right. I think that was -- I think that

5 letter was written perhaps two weeks before I

6 submitted the request for accommodation.

7 Q. And what were you requesting? From what

8 disability were you requesting accommodation?

9 A. Primarily for ADHD, but I think at that

10 point -- I don't think at that point my anxiety had

11 become as much of a problem. I was just having

12 trouble, you know, meeting deadlines for tasks and

13 being expected to take care of them in between shifts

14 on the reference desk, in between students coming to

15 my office, which happened frequently, in between

16 requests from faculty, which happened often.

17 Q. And did you -- Number 9 of that is -- or

18 page 9 -- I'm sorry -- that exhibit. Was that

19 your --

20 A. Cheryl Gotthelf, yes, my current

21 psychotherapist.

22 Q. Okay. And at the time, as well?

23 A. Correct.

24 Q. And what were the -- of the things she list

25 that are under -- well, under all of them, but

**289**

1 Bipolar disorder, Attention-Deficit/Hyperactivity

2 Disorder, what were you having problems with, as far

3 as your own assessment? I should say problems with

4 that at work.

5 A. Okay. Sure. It's been a while since I have

6 seen this. You'll have to excuse me.

7 I would say it's -- well, not even. Leave seat

8 in situations where remaining seated is expected.

9 You know, am I allowed to refer to other testimony?

10 I mean, we heard Ms. Rich talk about me being absent

11 from the reference desk when I was being looked for.

12 If I'm on the desk for two hours I need to go to the

13 bathroom. And actually Ms. Emery had said that

14 bio-breaks were available as needed. I tried to be

15 responsible. I tried to let people know when I would

16 be away from the reference desk, but perfect

17 adherence was not necessarily possible, so I'd say

18 all of them really.

19 Q. Okay. And as result of this request if we

20 go to Exhibit Number 4. If this the memorandum you

21 received as result of the accommodation request

22 Exhibit Number 3?

23 A. Bear with me one second. Yes.

24 Q. And if we can turn to page 3. At the bottom

25 of page 3 stated your supervisor, Becka Rich, and you

BRICKELL, GOMBERG & ASSOCIATES, INC.
954.522.0067          bgsupport@aol.com          305.949.5814

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

---

**270**

1  met to discuss this issue.  Do you recall that
2  meeting?
3      A.  Not specifically, no.
4      Q.  Okay.  Do you recall discussing, prior to
5  these accommodations being implemented, do you recall
6  discussing them with Ms. Rich or anyone else at the
7  University?
8      A.  You mean, which accommodations were going to
9  be offered to me?
10     Q.  Correct.
11     A.  No.
12     Q.  Okay.  Did you recall other than your
13  accommodation request, do you recall any
14  conversations about how to implement any of these?
15     A.  Only in meetings with Ms. Rich and not --
16  not that I felt was a substantially useful kind of a
17  way.
18     Q.  And I wonder if do you recall if that was
19  before or after this August --
20     A.  I mean, the recommendations.  The discussion
21  I've had about the stuff would have been afterwards.
22  There was no discussion of accommodations that I
23  recall prior to my submitting a request.  There were
24  some informal discussions as I said, but --
25     Q.  No, no.  I'm sorry.  After submitting your

---

**271**

1  requests were there any discussions?
2      A.  I mean, Becka would give me advice and try
3  to help me with suggestions, but as far as actually
4  implementing these accommodations, no.
5      Q.  I guess, the reason I'm asking is it says
6  you met to discuss the issues and agreed on the
7  following.  Do you recall agreeing to these specific
8  things at the bottom of page 3 and top of page 4?
9      A.  I don't recall.
10     Q.  Okay.
11     A.  I mean, I have no reason to think this is
12  not an accurate summary, but I don't recall it.
13     Q.  Were there any other discussions about other
14  ways to possibly assist you in meeting deadlines?
15     A.  I'm not sure what you mean.
16     Q.  At this time in 2015, Summer of 2015, other
17  than what you had requested, did anyone offer any
18  thing else up?
19     A.  No.
20     Q.  Okay.  And then how did your -- how do you
21  feel you did with meeting deadlines after those
22  accommodations were made?
23     A.  I feel as if I improved somewhat, but I
24  still continued to have problems.  Again, because my
25  responsibilities were so divided it was never made

---

**272**

1  clear to me how they were to be balanced.
2      May I give an example?
3      Q.  Please.
4      A.  Ms. Rich testified that I had failed to
5  complete putting together a list of books, the
6  Florida Practice series from West, if I recall
7  correctly.  What she didn't tell you is that I was on
8  the reference desk from the time -- I don't remember
9  exactly.  It seems to me that I was on the desk
10  basically as long as I had to work on that
11  assignment.  That may not be the case.
12     And during that period of time I had a reference
13  interaction with a graduating student in excess of an
14  hour who was talking to me about an open book final
15  exam.  I made sure that she was permitted to talk to
16  me and a close with a very difficult professor,
17  Michael Dale, family law I think or maybe children's
18  law, where she was having a lot of trouble getting
19  purchase, you know, trying to grasp -- not to
20  understand what she needed to do, but in order to
21  actually accomplish the assignment given, for
22  example, that she know the fact pattern and the key
23  words.
24     So I spent a lot of time with her and I was able
25  to help her get that assignment done on time.  I

---

**273**

1  believe I checked back with her and she actually done
2  pretty well on it.  You know, I'm still in touch with
3  that student.  She's very happy of what she
4  accomplished.  I'm sure she feels very well-disposed
5  towards NSU as a result of that because she was in a
6  bind.
7      Frequently students don't wait, you know, wait
8  until the last minute, just as I would sometimes do.
9  So I mean, that's one example that I can remember
10  about which I was disciplined.  Ms. Rich gave me the
11  assignment while I was standing at the reference desk
12  and expected me to complete, in essence, while I was
13  at the desk.
14     Q.  Okay.  And you were scheduled to be on the
15  desk at that point?
16     A.  Yes.  To the best of my recollection.  I
17  wasn't filling in for anyone.
18     Q.  Okay.  If you can look to the University's
19  Exhibit Number 91.
20     A.  Give me one second.
21     Q.  And do you recall seeing that before?
22     A.  Yes.
23     Q.  And what is that document?
24     A.  It is a memorandum from Diane Emery
25  responding to a number of accommodation requests that

---

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

274

1  I submitted.

2  Q.  Okay. The date of that is July 25th, 2016?

3  A.  25th.

4  Q.  Okay. And if you could go to down on page

5  3, Number 7 there. And what is that? If you could

6  read that to yourself and let me know is that an

7  accurate reflection of what you had requested, at

8  least to your recollection?

9  A.  Yes. To the best of my recollection.

10  Q.  Okay. And then if you can go then to page

11  4. The bulk of the rest of Number 7 there is telling

12  you the accommodations that were granted. Is that

13  your understanding of that?

14  A.  Yes.

15  Q.  And it says you and your supervisor met to

16  discuss and agreed on the following. So for this

17  request do you recall a meeting?

18  A.  Not specifically, no.

19  Q.  Okay. And did you agree, A through G there,

20  did you agree to those?

21  A.  I mean, I don't recall at the time objecting

22  to them. I don't recall whether we did agree to them

23  or not.

24  Q.  Did you feel that you had a choose but to

25  agree to them?

275

1  A.  No.

2  Q.  Okay. And at this point July 2016 you would

3  have received your written warning letter in December

4  of 2015, right?

5  A.  Correct. Yes.

6  Q.  Did you feel your job was at jeopardy at

7  that point after receiving the warning letter?

8  A.  Yes.

9  Q.  What effect did that have on you receiving

10  the warning letter and feeling like your job was in

11  jeopardy?

12  A.  Well, I had been having increasing problems

13  with anxiety especially in terms of dealing with

14  Becke. And the reason -- Ms. Rich. And the reason I

15  say that is because anxiety in dealing with Ms. Rich,

16  anxiety in dealing with the deadlines, and the affect

17  of that anxiety had on my ability to get deadlines

18  done was all combined, but certainly as -- after I

19  received the written warning the anxiety increased.

20  Q.  How did that affect your migraines?

21  A.  I believe that the migraines were triggered

22  by job stress and there's, I mean, not to -- well, I

23  believe, and I think there's justification to that,

24  that the migraines were actually triggered, brought

25  on as a chronic condition by work stress.

276

1  Q.  Okay. And at some point you got FMLA leave

2  for your migraines; is that right?

3  A.  Correct. Yes.

4  Q.  And you requested ADA leave for that, as

5  well?

6  A.  I did.

7  Q.  But once you were granted FMLA leave was

8  there any need for the ADA leave for that?

9  A.  No.

10  Q.  So is that why you didn't provide any of

11  that documentation?

12  A.  Correct.

13  Q.  We'll look at Exhibit Number 6.

14  A.  Ours or theirs?

15  Q.  Ours. Have you seen this before?

16  A.  Yes.

17  Q.  And what is that document?

18  A.  It is, I believe, the first of four formal

19  complaints that I submitted to HR in this case

20  through Joshua Metz, our former HR former, the law

21  school's former administrative general. I basically

22  spell out -- I took the written warning and went

23  through it very carefully and spelled out not only

24  how I felt that Becke had treated me inappropriately,

25  but chapter and versus about which NSU policies she

277

1  had violated, including --

2  MS. MACDONALD:  I'm just going to stop for a

3  second and object. I believe that the policies

4  that he's referencing and that his alleged

5  violations of those policies are beyond the scope

6  of this grievance hearing. The purpose of the

7  hearing is to determine whether or not Mr.

8  Silverman violated a NSU policy. It's not to

9  determine whether or not Ms. Rich violated a NSU

10  policy.

11  MS. GOODWIN:  That's not what we're -- we're

12  seeking to determine whether or not Ms. Rich did.

13  We're determining to lay the ground work or

14  further establish the relationship between the

15  supervisor and the employee and also the -- goes

16  to the stress, which he just testified, goes to

17  his ability to do his job.

18  I'm not going to have him read them all

19  either if that helps.

20  MS. SOLTAU:  We understand the nature of the

21  relationship. We understand it was contentious

22  and I don't think we need to go through each and

23  every bit of it. We do understand it was

24  contentious, so if you want to --

25  MS. GOODWIN:  Okay.

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

**278**

```
1   BY MS. GOODWIN:
2      Q.  So you made complaints, formal complaints
3   about Ms. Rich?
4      A.  That's correct.
5      Q.  Okay.  And you made three of those
6   complaints in 2016?
7      A.  Correct.
8      Q.  Okay.  And that's, you know, the last one in
9   2016 was June 6th, 2016?
10     A.  I believe so.
11     Q.  Exhibit Number 8, so look at the date wise
12  is all I'm asking.
13     A.  Correct.  Yes.
14     Q.  Okay.  And those speak for themselves?
15     A.  Yes.
16     Q.  Prior to 2016 what were your performance
17  evaluations like?
18     A.  Generally pretty good.
19     Q.  You heard testimony before there was an
20  issue with deadlines?
21     A.  Yes.
22     Q.  You don't disagree with that?
23     A.  Not at all.
24     Q.  Okay.  And your performance evaluation that
25  was done a few weeks after your last complaint about
```

**279**

```
1   Ms. Rich was June 30, 2016?
2      A.  Yeah.
3      Q.  Okay.  And your last 2016 complaint I should
4   say.
5      And how was that performance evaluation?
6      A.  Let me take a look at it.
7      Q.  It's Exhibit 9 of ours.
8      A.  Yeah, I know.  I'm here.
9      Q.  We have a record, as well.
10     A.  It's poor.  It's also not reflective of my
11  actual job performance.
12     Q.  And that was my next question for you.  You
13  disagreed with that, didn't you?
14     A.  Correct.  May I give an example?
15     Q.  Yes.  That's my next question.  You're ahead
16  of me.
17     A.  Sorry.
18     Q.  Let's say for the examples for where she
19  gave you an unsatisfactory contribution.  Where do
20  you disagree with that?
21     A.  The reference, for example.
22     Q.  Yes.
23     A.  If I'm reading this right.
24  Well, first of all, I never refused to help a pro
25  se patron.  What I would do is -- I found it very
```

**280**

```
1   hard and I discussed it, and we did
2   actually -- I should say I was able to come up with a
3   way of helping them.  There's risk of giving them
4   legal advice or establishing an attorney-client
5   relationship with them.  That made me very reluctant
6   to help them too much.
7      Q.  And you are an attorney?
8      A.  That's correct.  Yes.  And when Becka
9   pointed that out to me when she discussed it with me
10  I had not been aware that it was a problem until she
11  talked to me about it.  I was able to come up with an
12  alternative of dealing with them.  And as Ms. Rich
13  said earlier, my performance with respect to pro se
14  patrons improved.
15     Q.  Were you made aware of it prior to this
16  review that that was an issue?
17     A.  I don't believe so or if I was it was -- I
18  think the review reflects the whole period.  I may
19  have been made aware of it.  She may not have seen
20  the improvement in time.  I'm not entirely sure.
21     Q.  Okay.  Any other issues were you --
22     A.  Sure.
23     Q.  Yes.
24     A.  Mitch been hard to find during the
25  reference shift particularly during on-call shifts,
```

**281**

```
1   plural.  When I spoke with Ms. Rich about that she
2   informed me -- she did actually counsel me about that
3   and I do recall this.  I recall this because I think
4   I'm still incredulous about the fact that she rated
5   me as unsatisfactory because of this.  She only
6   mentioned one time when I had been impossible to find
7   on an on-call shift.  And our policy had never been
8   that you needed to be rooted to your office when you
9   were on call.  There are other librarians available.
10  You know, you can go to the bathroom even for an
11  extended period of time when you're on an on-call
12  reference shift.  You know, if I had -- if I was
13  particularly indisposed that day -- and again, I was
14  only apprised on one occasion when that happened, but
15  apparently it multiplied.
16     Q.  When you say "apparently it multiplied"
17  you're -- are you being kind of sarcastic in that
18  remark?
19     A.  Just a bit, yes.  I'm sorry I shouldn't do
20  that.
21     Q.  All right.  Any other issues in this review?
22     A.  Let me look.
23     MS. SOLTAU:  May I ask a question?
24     Can you please explain, give us a little
25  information about how the reference desk shifts
```

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

282

1  work, because we hear sitting at the reference
2  desk, we hear about people sitting in their
3  offices.  I don't think I'm really clear as to how
4  that works over at the law library.
5      THE WITNESS:  My experience was that I would
6  be scheduled -- when we were providing reference
7  desk services at the desk, which we did not do all
8  of the time, I would be scheduled for two hours on
9  the reference desk and one or two hours off.  And,
10  you know, the whole day or the whole day except
11  for a lunch back would be staffed by librarians
12  that way.  When classes were out we would
13  typically use on-call reference, where people would
14  expected to be in their offices during their
15  shift, but not necessarily -- not necessarily, but
16  not at the desk.
17      MS. BOLTAU:  Okay.  Thank you.
18      THE WITNESS:  You're welcome.
19  BY MS. GOODWIN:
20      Q.  Any other issues --
21      A.  Let me just look at that, please.
22      Q.  -- of the review?
23      A.  I'm looking.  I'm looking.
24      You know, her comments about I will be seen as a
25  better co-worker, I don't remember certainly the

283

1  degree of complaints that she's addressing.  I know
2  that -- I know that -- I mean, first of all, there's
3  -- I am sometimes perceived as talking down to
4  people, because I use a lot of big words.  What's a
5  very effective strategy for me is to basically throw
6  myself under the bus to make fun of myself.  Usually
7  that works.  It worked with my colleagues.  I'm not
8  sure where some of this is coming from.
9      You know, the other thing is I'm being evaluated
10  by someone whose personal style -- where our personal
11  styles are very, very different.  I have often felt
12  talked down to by Ms. Rich, so that causes me to look
13  at this and say, I really don't know what to make of
14  it.
15      Q.  You feel that it is subjective?
16      A.  Yes, to say the least.
17      Q.  Okay.  Any other issues with this?
18      A.  In her narrative on page 5 of 9.  Page 5 on
19  your Bates numbering.  Books said that I did not like
20  over the circulation desk when asked so students can
21  perform an emergency cleaning project.  I think there
22  was a miscommunication there if I recall correctly.
23  Either I was -- I don't really recall.  My
24  recollection of the facts is, and I remember reading
25  this when I read the evaluation, was that I didn't

284

1  fail, I didn't refuse.  Someone was unclear in terms
2  of how they had communicated what needed to be done
3  to me.  I know that I never would have refused to sit
4  at the reference desk -- at the circulation desk.  I
5  don't -- I'm not proud about that.  I know how to
6  work the circulation computer, so I don't remember
7  the details, but I do remember that this is not what
8  I recall happening.
9      Q.  Okay.  Any other issues?
10      A.  As far as the unprofessional inappropriate
11  behavior towards my supervisor, I do not recall -- if
12  I blocked Ms. Rich's office door it was while I was
13  standing there and she was at her desk.  I just,
14  again, I think this is, you know, as with the rest of
15  her narrative is very self-serving and subjective.
16      You know, I think -- you know, when you combine
17  that with the fact that I do not have the best feel
18  for people's emotions, because I do suffer from
19  autism and I've never had a good working relationship
20  with Ms. Rich, you know, I found it necessary, and I
21  told her this, to bring a fleece and a bottle of
22  water into her office every time I would go in there.
23  My mouth would get dry and my hands would get cold.
24  Fight or flight symptoms.  I was that anxious.
25      You know, there were days -- she explains in here

285

1  somewhere about me insulting on leaving her office in
2  the middle of a meeting.  That was because I was, not
3  exactly having a panic attack, but somewhere in that
4  neighborhood.  I needed to remove myself from the
5  situation in order to just ameliorate my symptoms.  I
6  mean, I wasn't doing it to be disrespectful or
7  insubordinate.  I just needed to get out.
8      Q.  That wasn't the whole time you worked for
9  her.  Was that after your job became in jeopardy?
10      A.  No.  No.  And I should point out that I told
11  her that that was what was going on and I think that
12  is part of how you ask -- I mean, you don't have to
13  necessarily say I want an accommodation that I can
14  leave your office when I'm freaking out.
15      Q.  Okay.
16      A.  That's what I told her.  I want to be able
17  to leave your office when I'm freaking out.
18      Q.  Okay.  You heard some discussions and saw
19  some e-mails regarding behavior with students?
20      A.  Uh-huh.
21      Q.  Do you recall being talked to about that?
22      A.  Yes.
23      Q.  Okay.  If you look at the exhibits we're
24  talking about here, are the University's Exhibits
25  basically 26 through at least 30.  So if you look at

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

286

```
1    26. If you go back to your e-mail on page 2.
2        A.  Uh-huh.
3        Q.  That's in response -- it says minutes from
4    our meeting, so that's in response from a meeting
5    that you had with her?
6        A.  Correct.
7        Q.  And when -- your word in here, in our
8    meeting just now you instructed me to list those
9    things.
10   Is that an acknowledgement that anything untoward
11   or wrong happened?
12       A.  No.
13       Q.  Okay.  That's just you stating this is what
14   you told me?
15       A.  Sure.
16       Q.  Then if you look at Exhibit Number 27 then.
17   is this -- did you ever hear from this -- about this
18   complaint from Mr. Ayala before?
19       A.  No.
20       Q.  Before seeing it in the exhibit?
21       A.  No.
22       Q.  When Ms. Rich addressed that with you on
23   November 19th, 2015, what did she tell you about what
24   she had learned or heard or saw?
25       A.  That she was worried that I might have had
```

287

```
1    or continue to have inappropriate and/or -- let's
2    just say inappropriate physical contact with
3    students.
4        Q.  Did she tell you people are telling me
5    things, I heard from Ray or from Maggie or anything?
6        A.  I don't believe she was that specific, no.
7        Q.  Okay.  Do you recall if you were told any
8    specific such and such date this is what somebody
9    saw?
10       A.  No.
11       Q.  Do you recall doing these things?
12       A.  Not as they described, no.
13       Q.  What do you recall?
14       A.  I recall, for example, that I might have
15   said to a student you look sad, is everything okay.
16   I would never, for example, say to a student you
17   should smile more.  I'm well aware of the difference.
18       Q.  What about a neck massage.  Have you ever
19   given a student a neck massage?
20       A.  No. No and never and never.
21       Q.  Okay.  When is the first time you heard you
22   that that might -- that you were accused of doing
23   that?
24       A.  I believe that was at our meeting.  What was
25   it, the 15th of May?
```

288

```
1        Q.  For the pre-hearing conference?
2        A.  What date was that?
3        Q.  The 10th.
4        A.  The 10th of May.  Actually, not even.  I
5    think you told me about it since or I noticed it
6    since that, I had no idea that I had been accused of
7    that.
8        Q.  Nobody ever addressed that with you
9    specifically?
10       A.  No.
11       Q.  Would you recall that?
12       A.  Yes.
13       Q.  Okay.  You're aware that's highly
14   inappropriate?
15       A.  Yes.
16       Q.  What about hugging a student?
17       A.  Consensually when I had a reasonable idea
18   that it was consensual.  You know, if I had attempted
19   to hug a student and I had any indication that it
20   would be non consensual, and I have a decent, or
21   maybe I don't, but, I mean, I'm sure I hugged
22   students.  In fact, after I had this conversation
23   with Becka I resolved to follow her instructions to
24   the letter.
25       I had a student hug me.  I kept my arms at my
```

289

```
1    sides.  I did not reciprocate at all.  And the first
2    thing I did was I sat down and wrote Becka an e-mail
3    explaining exactly what had happened and when.  I
4    think I may have mentioned the student's name, I was
5    freaked out.
6        Q.  That you can get in trouble?
7        A.  Absolutely.  My job was in jeopardy as you
8    -- you know, it's clear.
9        Q.  And the one other issue that was brought up
10   was that there was a problem with getting a book for
11   a professor?
12       A.  Oh yes.
13       Q.  What do you know about that?
14       A.  Well, I had ordered a book for Professor
15   Duhart and, I believe, I e-mailed her the day that it
16   came in.  I didn't respond to the paraprofessional's
17   e-mail and perhaps that was discourteous.  It didn't
18   seem to require a response.  I knew it was in the
19   box.  I was going to take care of it.  I let
20   Professor Duhart know about it.  I believe what she
21   told me was that I could get it to her later.  I
22   think I saw her, she was teaching a class in the
23   basement of the library, the first floor, and either
24   I had been working with her or I knew she was going
25   to be down there, so when I met up with her down
```

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

290

1  there I said I can get you the book right now, and
2  she said, no, please, I don't want to have to carry
3  it around, bring it in me later.  And I never got a
4  chance to meet with her.
5       Should I have put it in her mailbox, sure.  Did
6  she need it, no.  Did she ever -- she could have
7  called me and said, bring it over right now.  She
8  could have e-mailed.  You know, she never -- I think
9  she did want to talk to me about it.  I don't really
10 even recall.  All I know is I was following her
11 instructions by not giving it to her and even if I
12 opted not to have left it in the mailbox.
13      Q.  If you look at the University's Exhibit
14 Number 18 and this is the exhibit that was brought
15 up.
16      A.  Yes.
17      Q.  Okay.  You were -- that e-mail is to you?
18      A.  Yes.
19      Q.  And granted this is going on over a year and
20 a half ago, do you recall responding to that e-mail?
21      A.  I do.
22      Q.  Do you recall what your response was?
23      A.  I explained what I just told you and I said
24 that I had been following Professor Duhart's
25 instructions.

291

1       Q.  And what happened after that, as far as this
2  issue goes?
3       A.  I believe Dean Young sent me another e-mail
4  copying other people in which he probably said -- he
5  said something along the lines of I trust that this
6  is correct, which I thought was interesting language,
7  but I made it clear to Dean Young that I had been
8  following her instructions.
9       Q.  Have you talked to Professor Duhart since
10 this time about since, you know, October 2015 about
11 this issue?
12      A.  I believe I have mentioned it to her, yes.
13      Q.  Okay.  Was she surprised it was an issue?
14      A.  Yes.
15      Q.  Did she recall it?
16      A.  No.
17      Q.  If you could look at our Exhibit 12.  That's
18 the performance plan.  Do you recall it being -- do
19 you recall being given this?
20      A.  Yes.
21      Q.  Okay.  And as a result of this what kind of
22 stress did this cause you?
23      A.  Considerable.  At this point, you know, I
24 knew something about the way NSU's disciplinary
25 process worked.  You know, I mean, from then on I was

292

1  consciously -- I was constantly anxious.  I was
2  consumed with worry about what the next -- what was
3  going to be the next shoe to drop.
4       Q.  This was in November, early November of
5  2016?
6       A.  Yes.
7       Q.  And what kind of physical effects did you
8  have from this?
9       A.  The migraines both cause and are caused by
10 stress.  You know, they may have been when I was
11 between Botox doses and I was just, you know, having
12 a miserable time all the way around.  Stress,
13 anxiety, depression, migraines.
14      Q.  And this performance plan in the Action Plan
15 was it your understanding that this Action Plan, was
16 it your understanding were all the things you were
17 meant to do?
18      A.  Yes.
19      Q.  Okay.  And not accommodations you were given
20 by the University?
21      A.  That's correct.
22      Q.  And not assistance from Ms. Rich?
23      A.  Correct.
24      Q.  You have heard testimony from Ms. Rich that
25 she gave you substantially less projects to work on

293

1  then your co-workers?
2       A.  Yes.
3       Q.  Is that your understanding that that was
4  true?
5       A.  I don't know about substantially less.  I
6  know that she was attempting to assist me with that.
7       Q.  Were there other things that you did more of
8  in return?
9       A.  Working the reference desk, helping people
10 with -- you know, I would make it a point if I were
11 available and if I didn't have anything pressing
12 going on, if someone needed to go in and do something
13 I would cover the reference desk for half an hour.
14 If someone was going to be out -- if I knew in
15 advance that somebody was going to be out and if I
16 possibly could I would cover the reference desk for
17 them.
18      Q.  And that was your way of helping your
19 co-workers?
20      A.  I mean, it helps that I really like it, but,
21 yes, of course.  I was trying to be proactive and do
22 absolutely whatever I could for my co-workers, yes.
23      Q.  And I'm going to wrap this up here.
24      You heard testimony, too, that you really, that
25 you mentioned to the Dean that you really liked

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

**294**

1 working with students?
2  A.  Very much.
3  Q.  And if there had been a transfer of a
4 position where you worked with students would you
5 have been open to at least considering that?
6  A.  I would have been open to considering and
7 discussing any transfer that I had been offered, but
8 if it were an opportunity to work with students more
9 than, yes, definitely.
10  Q.  Okay.
11  MS. GOODWIN:  I don't have anything further.
12  MS. PINTO:  Cross examination.
13  MS. MACDONALD:  I have a few questions.
14  CROSS EXAMINATION
15 BY MS MACDONALD:
16  Q.  Good afternoon, Mr. Silverman.
17 If you can turn to University Exhibit 1. Is that
18 a copy of the acknowledgement of NSU policies signed
19 by you?
20  A.  It seems to me that I don't recall directly.  *BUT*
21  Q.  Did you agree to abide by the university
22 policy?
23  A.  Yes.
24  Q.  Okay. If you could turn to Exhibit Number
25 3. Is that a copy of your job description?

**296**

1  A.  Correct.
2  Q.  And would you agree that working the
3 reference desk was not your only duty and
4 responsibility?
5  A.  Sure.
6  Q.  And you also had duties and responsibilities
7 related to project work, correct?
8  A.  Yes.
9  Q.  And do you admit that you did not complete
10 the projects in a timely fashion?
11  A.  Yes.
12  Q.  And you repeatedly failed to complete these
13 projects in a timely fashion. Would you agree with
14 that?
15  A.  Yes.
16  Q.  And that spanned over the course of your
17 employment at NSU?
18  A.  Yes.
19  Q.  And, ultimately, prior to your termination
20 you were unable to complete any of the projects that
21 were assigned to you?
22  A.  Yes.
23  Q.  You mentioned an informal accommodation
24 request related to participating longer hours on the
25 reference desk?

**295**

1  A.  Yes.
2  Q.  Does that outline your duties and
3 responsibilities generally?
4  A.  No.
5  Q.  It does not outline them?
6  A.  No. It outlines some of what I was expected
7 to do. Not necessarily the way that it played out.
8 It's not an accurate summary of what I did on a
9 day-to-day basis.
10 If I took it and had -- I could write a narrative
11 description of what I did and there would be a
12 relationship between the two things, but, no, I don't
13 think that's particular accurate.
14  Q.  So your job description is not accurate?
15  A.  That's correct.
16  Q.  Okay You testified that you were hired as
17 a full-time reference librarian May 17th, 2010?
18  A.  That's correct, yes.
19  Q.  And you testified that your duties and
20 responsibilities included assisting faculty, working
21 on projects as assigned and working the reference
22 desk?
23  A.  Correct.
24  Q.  You testified that you enjoyed working the
25 reference desk?

**297**

1  A.  Yes.
2  Q.  That wasn't a disability accommodation
3 request, correct?
4  A.  Absolutely it was.
5  Q.  Did you go to the Office of Disability
6 Services to obtain that?
7  A.  No. I wasn't asked to.
8  Q.  Who gave you that accommodation?
9  A.  I think it was Rebecca. Pardon. Ms. Rich
10 in that conversation. Dean Young may have been
11 involved in it. I don't recall.
12  Q.  And why do you believe that was a disability
13 accommodation?
14  A.  Because Becka was aware of my issues and
15 Eric was, as well, aware of my issues in dealing with
16 deadlines and -- I don't remember exact what she
17 said, but I remember pretty clearly that she said
18 you're better at this than you are at that, so we're
19 going to have you do more of this.
20  Q.  Okay. So Becka told you they were going to
21 put you at the reference desk for longer periods of
22 time because you were better at that?
23  A.  Correct. But it was --
24  Q.  She didn't say that it was an accommodation
25 due to a disability, did she?

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

298

1   A.  We did discuss it, yes.  She didn't have to
2   followup and say that because she had said -- she
3   understood -- I had told her about the accommodation
4   about the disability and that it would help, that
5   being on the reference desk helped me and it was as a
6   result of that and that conversation that I was
7   placed on the reference desk more
8   Q.  Would it surprise you that Ms. Rich and Mr.
9   Young had a conversation regarding all of their
10  librarians and decided that they would divvy up tasks
11  based upon the strengths of those librarians?
12  A.  Yes, it would.
13  Q.  And your strength would be in reference,
14  correct?
15  A.  Yes.
16  Q.  So it would make sense that they would put
17  you at the reference desk?
18  A.  Yes.
19  Q.  Do you admit that you participated in weekly
20  meeting with Ms. Rich?
21  A.  Yes.
22  Q.  And do you acknowledge that you're required
23  to submit a written agenda to Ms. Rich prior to the
24  meetings?
25  A.  Yes.

299

1   Q.  And Ms. Rich would add comments to that
2   agenda and send it back to you, correct?
3   A.  Ms. Rich would sometimes send me comments on
4   what we had talked about  She never, to the best of
5   my knowledge, look the agenda from a meeting, made
6   comments on it and sent it back to me, no.  I never
7   got that kind of comprehensive feedback about what we
8   discussed at a meeting.
9   Q.  But you would acknowledge that Ms. Rich
10  reviewed the agenda that you had sent prior to the
11  meeting, correct?
12  A.  Yes.
13  Q.  And she responded to you that she had
14  received the agenda?
15  A.  She didn't respond all the time.  She often
16  did.  I mean, it was clear that I sent it and she
17  received when I did send it or received it.
18  Q.  And there were times when you didn't send
19  it?
20  A.  Correct.
21  Q.  And by receiving the agenda you knew what
22  was going to be discussed in the meeting, correct?
23  A.  Yes.
24  Q.  So you would have an opportunity to speak
25  with Becka to clarify any issues that you have

300

1   regarding any of your assignments?
2   A.  I had an opportunity to do so, but that's
3   not to say that I was able -- I was always able to
4   take advantages of that opportunity.
5   Q.  And why were you not able to speak with
6   Becka regarding concerns you had related to the
7   project during that weekly meeting?
8   A.  I wasn't able to discuss them in a
9   meaningful or useful way because of the issues in the
10  complaints that I drafted and submitted, because of
11  the interpersonal problems that we have, have had and
12  because of the stress, anxiety and depression, et
13  cetera that I have experienced as a result of dealing
14  with Ms. Rich, not receiving what seems like
15  appropriate or useful accommodations and not getting
16  tasks done as result of the stress.
17  Q.  Ms. Rich provided you with in-depth
18  instructions regarding the projects she assigned; is
19  that correct?
20  A.  She provided me with instructions.  I
21  wouldn't necessarily say they were in-depth.
22  Q.  If you could turn to Exhibit Number 54
23  Take a look at that exhibit.  Does this
24  demonstrate that Ms. Rich was providing you with an
25  instruction related to these projects?

301

1   A.  Okay  It demonstrates that Ms. Rich
2   provided me with instructions about one set of
3   projects on a day not even three months before I was
4   fired.  That's all it demonstrates.
5   Q.  Okay.  If you could flip to Exhibit Number
6   57.  Isn't it true that Becka provided you with
7   additional instruction?
8   A.  Again, with respect to the last set of
9   projects that I worked on before I was fired.
10  Q.  And Exhibit Number 92.
11  Once again, did Ms. Rich provide you with
12  additional instruction?
13  A.  Yes, but, again, only in respect to that one
14  bunch of projects.
15  Q.  Mr. Silverman, one of the complaints that
16  you made is that Ms. Rich was not giving you your
17  disability accommodations that you were approved for,
18  as far as additional instructions and breaking down
19  tasks; is that correct?
20  A.  Yes.
21  Q.  Well, isn't it true that prior to the
22  termination she was, in fact, giving you those
23  accommodations?
24  A.  On one set of projects shortly before I was
25  fired.

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

302

```
1    Q. And despite the fact that she was giving you
2    those accommodations you were not able to complete
3    them?
4    A. On one set of projects -- well, not
5    responsive.
6    Again, because of the stress, anxiety,
7    depression, et cetera that I was functioning under at
8    that point, no, I was not able to complete that
9    project.
10   Q. So you weren't able to complete that project
11   with the approved accommodations you were receiving?
12   A. With the approved accommodations, yes.
13   Q. And in addition you requested additional
14   accommodations of extended deadlines, correct?
15   A. Yes.
16   Q. And even with those extended deadlines you
17   weren't able to complete the projects?
18   A. Correct.
19   Q. And than you requested extended deadlines
20   for all projects currently working on and all
21   projects into the future?
22   A. Yes. I had also requested that any problems
23   with Ms. Rich be ameliorated without any success. If
24   that had been -- if I'd been able to deal with that
25   issue, perhaps I wouldn't have had as much of a
```

304

```
1    take and when.
2    Q. Isn't it true that she told you that you can
3    take bathroom breaks, but if you're going to be gone
4    for a long period of time you need to find coverage
5    so that the reference desk doesn't sit there with no
6    one at the reference desk?
7    A. I don't recall her ever saying that I can
8    take extended reference -- any kind of extended
9    bathroom breaks while I was on the reference desk at
10   all.
11   Q. So you were not able to take restroom breaks
12   at the reference desk?
13   A. I believe -- I think I may have been
14   permitted to take them, but not if they were going to
15   be extended. Sometimes it takes a little bit longer
16   to defecate than it is to urinate. And if I felt
17   while I was on the reference desk if I felt that I
18   had to defecate, I was going to have a problem.
19   Q. And isn't it true that Ms. Rich told you
20   that you can go ahead and use the restroom just after
21   you're done using the restroom come back to the
22   reference desk? Don't dilly-dally, don't talk to
23   students, just return back to the reference desk?
24   A. She may have said that, but she was also --
25   she also had given me conflicting instructions about
```

303

```
1    problem working on projects.
2    Q. You mentioned that you weren't offered an
3    opportunity to advance for another position?
4    A. Correct.
5    Q. Did you ever request a transfer for another
6    position?
7    A. I don't believe so.
8    Q. Did you ever apply for another position at
9    the university?
10   A. I don't believe so.
11   Q. Did you ever take any steps to obtain a
12   different position at the university?
13   A. No.
14   Q. Okay. You stated an issue related to you
15   being on the reference desk and needing to take
16   bathroom breaks; is that correct?
17   A. Yes.
18   Q. And you stated that Becke had an issue with   ✳
19   you taking bathroom breaks?
20   A. Yes.
21   Q. Isn't it true that Becke told you you can
22   take bathroom breaks if you need to?
23   A. She may have said that at one point, but at
24   one point she -- I don't remember the details. It
25   was very restrictive in terms of what breaks I can
```

305

```
1    what I could and could not do, as far as restroom
2    breaks on the reference desk.
3    Q. Isn't it true that the reference desk shifts
4    were in two-hour blocks?
5    A. Yes.
6    Q. Okay. And how many times would you need to
7    use the restroom within a two-hour period?
8    A. Sometimes twice I think.
9    Q. And how long would you take when you would
10   need to take a restroom break twice in a two-hour
11   period?
12   A. Hopefully -- I mean, honestly -- I would
13   assume that if I had to urinate I could be back at
14   the desk in no more than about five minutes. If I
15   needed to defecate it might take my longer. I don't
16   recall exactly how long it takes. I don't recall the
17   facts well enough to discuss what I did or did not
18   do.
19   Q. You also stated with respect to the
20   disability accommodation memorandum that was provided
21   by Diane Emery dated August 14th, 2015, and I'll
22   refer to your exhibits. I should be able to find it
23   quicker.
24   A. Could you tell us what our exhibit number is
25   on that?
```

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

306

1    Q.  Just one second.  It looks like it's Exhibit
2    Number 4.
3        Your attorney had asked if you were provided any
4    other alternative accommodations other than those
5    that you requested and you said that you weren't; is
6    that correct?
7        A.  If I did say that I may have misspoken.  I
8    don't recall.  I mean, it's entirely possible that I
9    was granted some of the stuff and hadn't requested
10   it.  If I said otherwise I've misspoken.
11       Q.  Well, in this memorandum there are number of
12   accommodations that are approved for you.  There are
13   also a number of accommodations that are suggested to
14   you which you decline, as well as a number of
15   accommodations you may have requested one specific
16   accommodation and an alternative one was provided.
17   Would you agree with that statement?
18       A.  May, yes.
19       Q.  You mentioned the Faculty Practice series
20   and you were unable to complete that project because
21   you were at the reference desk; is that correct?
22       A.  Yes.
23       Q.  If you can flip to our Exhibit Number 24.
24   In this e-mail, which starts on page 2, Becks sent
25   you an e-mail November 12th, 2015 at 12:09 p.m.

307

1    "Mitch, so you have it in writing," which was one of
2    the things she was supposed to do, "here's the
3    assignment.  Before you leave today, 11/12/15.
4    Please create an Excel spreadsheet with the following
5    columns:  Please populate this table with the titles
6    for the West Florida Practice series, both those that
7    we own and for those that we don't put "Acquire" in
8    the location column and a link to the place where to
9    acquire in the Catalog Link column."  And you say --
10   you responded 12:09.  I'm sorry.  You respond at
11   12:47, "Becks, I'll do my best to meet your
12   deadline.  I've already started."  Then you --
13   there's an e-mail at 12:53.  "Hi Becks, There are
14   multiple editions of the West Florida Practice Series
15   title.  I will only provide information for the last
16   edition.  Please let me know if that's correct.  Yes.
17   I see no reason to acquire older versions and you can
18   probably weed them."  And then at 3:44 you respond,
19   "Hi Becks, I plan to finish the assignment tomorrow",
20   is that correct?
21       A.  Yes.
22       Q.  And this was the same situation that you
23   told you weren't able to get to it because you were
24   at the reference desk?
25       A.  Yes.  I was also scheduled to leave -- i

308

1    don't recall exactly.  I wasn't -- when I sent her
2    the e-mail at 3:44 I think I was about to leave as
3    scheduled and Becks had either thought that -- she
4    said as much, that she thought that I'd either would
5    be working either another half hour or that I would
6    actually be working until 5:00, but between the other
7    distractions and that how long reference interaction
8    that I told you about with the student, I wasn't able
9    to complete it.
10       Q.  You were also provided an accommodation that
11   you were allowed to do reference in your office,
12   correct?
13       A.  Yes.
14       Q.  And that was to alleviate the distractions?
15       A.  I don't know that I was allowed to -- the
16   accommodation to perform reference in my office, I
17   think, was granted as a result of my migraines.  I
18   don't think as of November of 2015 I was able to do
19   that.
20       Q.  You had referenced a complaint that you
21   submitted June 8th, 2016, and that is in your
22   exhibits.  And this was right before your performance
23   improvement plan?
24       MS. GOODWIN:  It's Exhibit Number 8.
25   BY MS. MACDONALD:

309

1    Q.  Exhibit Number 8.
2    Do you have any evidence that this was ever
3    submitted to NSU?
4        A.  I don't have access to my NSU e-mail.
5        Q.  How would you have sent this document?
6        A.  As a PDF attachment to an e-mail.
7        Q.  So if there's no e-mail sent from you
8    referencing this document, it wasn't sent?
9        A.  It may have been sent depending on when I
10   did this from my private e-mail, but I would assume
11   so.  Are telling me you didn't find an e-mail?
12       Q.  No.  I'm was asking you.
13       A.  I would guess that I would have sent it as a
14   PDF attachment.
15       Q.  And would you have sent it from your NSU
16   e-mail?
17       A.  I might have.  I'm not sure.  Usually.
18       Q.  And you had admitted that you hugged
19   students, but only when it was consensual?
20       A.  Yes.  And appropriate.
21       Q.  And appropriate.  How would you know it was
22   consensual and appropriate?
23       A.  Affect.  I mean, it's hard to know
24   definitely.  I mean, I think I was always really
25   obvious about it, too.  I didn't -- I tried to make

BRICKELL, GOMBERG & ASSOCIATES, INC.
954.522.0067          bgsupport@aol.com          305.949.5814

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

310

1 it obvious what I was about to do.  You know, as soon
2 as I was -- as soon as it was brought to my attention,
3 that it was inappropriate, and granted I probably
4 should have known otherwise to begin with, but as
5 soon as it was brought to my attention I stopped
6 doing it.
7    Q.  And the issue related to the book for the
8 professor, you acknowledge that you didn't respond to
9 the paraprofessional's e-mail?
10    A.  Yes.
11    Q.  And you acknowledged that you should have
12 put the book in the faculty members mailbox.
13    A.  I don't recall exactly what she wanted me to
14 do.  My recollection is I was following her
15 instructions.  She may have wanted me to bring her
16 the book myself to her office.  I don't recall.
17    Q.  You also testified that you assisted
18 co-workers by helping out assist with reference?
19    A.  Yes.
20    Q.  And that was because you liked reference?
21    A.  It was also because they needed the
22 assistance and because I know that that was the best
23 way I could contribute to the smooth running of the
24 library.
25    Q.  Did you ever assist on any other projects?

311

1    A.  As Ms. Parker testified earlier -- I mean, I
2 don't remember the details, but anytime somebody
3 would ask me to do something, usually not project
4 work, if people ask me to do something, if I possibly
5 could do it I would do it.  If someone wanted my
6 input on a project, which happened, I would be happy
7 to give it to them.
8    Q.  Isn't it true that you didn't like working
9 on projects?
10    A.  Yes.
11    MS. MACDONALD:  I don't have any other
12 questions.  Thank you, Mr. Silverman.
13    MS. GOODWIN:  I don't have any followup.
14    MS. PINTO:  Okay.  We'll go to closing
15 statements.  Ms. Goodman, you can go first.
16    MS. GOODWIN:  Thank you.
17    I'll keep this brief.  I think we've, you
18 know, all heard and there's, obviously, a lot of
19 exhibits, which I know you will have a chance to
20 look at again and review again, but the thing
21 that, you know, we want to drive home, you know,
22 from today is that Mr. Silverman was good at
23 several aspects of his job.  You heard that from,
24 not just from him, but there's the evidence there.
25 And that when things started to go south for him

312

1 he was floundering and he -- there was not a lot
2 of -- or not at least not enough that worked for
3 him to reaching out to find out what exactly
4 worked.  And, frankly, I think Ms. Rich was
5 floundering with it, as well.  And the question
6 is, you know, they were both reaching out for help
7 and not getting, you know, what they needed from
8 that.
9    Certainly Mr. Silverman has skills that are
10 useful and had, you know, not just, you know, in
11 the library, but to the university in general and
12 could have, you know, perhaps provided those on a
13 different capacity than being in this particular
14 position, but certainly, as we heard from Ms.
15 Parker, he was very helpful.  She had no issues
16 with him.
17    And it seems to be that it was, again, this
18 relationship between the two of them that they
19 both needed some help with.  And I think if that
20 can be done in a way that we can get them some,
21 then I think he can return to being, you know, the
22 person he was and the employee he was prior to all
23 of these issues.
24    Thank you.
25    MS. MACDONALD:  So what we're requesting is

313

1 that you uphold the termination and find that Mr.
2 Silverman's failure to complete tasks on time and
3 his performance issue violated NSU policy.  The
4 policies are set forth in the termination memo
5 very clearly, as far as what the policies were
6 that were violated.
7    Like I said in the beginning, it's our
8 position that he was terminated for poor
9 performance, for failing to meet deadlines, for
10 issues interacting with co-workers, for
11 unprofessional behavior, and a number of other
12 issues.  Mr. Silverman acknowledges that he wasn't
13 able to meet those deadlines.
14    We've established through the testimony of
15 Diane Emery that he did apply for accommodations.
16 He was provided accommodations and even with the
17 accommodations he wasn't able to meet the
18 essential functions of his position.
19    While Mr. Silverman and, I believe, Ms. Rich
20 acknowledged that Mr. Silverman does well at the
21 reference desk, unfortunately the duties and
22 responsibilities of that position are more than
23 just working the reference desk and Mr. Silverman
24 was not able to perform those duties and
25 responsibilities at a satisfactory level and as a

SILVERMAN MITCHELL  GRIEVANCE 05-24-2017

314

1   result he was terminated.
2       So that's our position. You have all of the
3   exhibits if you need to look through them. I
4   suggest that you take your time to look through
5   them and look and evaluate all of the issues, but
6   we're requesting that you uphold the termination.
7       MS. PINTO: Thank you. Okay.
8       This concludes the hearing. And I want to
9   express my gratitude to all of you for taking part
10  of what we believe is a very worthwhile process
11  and giving up your time the way that you all have
12  here today, so thank you very much.
13      And I will just briefly meet with the three
14  of you to determine when you would like to meet
15  again to review the documents and have the
16  opportunity to just discuss the merits of what you
17  heard today.
18      And, again, just want to remind you that the
19  confidentiality of what you heard today and the
20  documents that you reviewed is really of the
21  utmost importance.
22      But, again, thank you for your time everyone
23  and appreciate everything everyone contributed.
24      Thank you.
25          \\\\

315

1           CERTIFICATE
2
3   STATE OF FLORIDA :
4   COUNTY OF BROWARD:
5
6       I, KATHIE JO BEFUMO, Professional
7   Reporter, certify that I was authorized to and
8   did stenographically report the foregoing
9   proceedings and that the transcript is a true
10  record of my stenographic notes.
11      Dated this 31th day of October, 2017.
12
13
14
15
16  _____
17  KATHIE JO BEFUMO
18  Professional Reporter
19
20
21
22
23
24
25

316

1       (Thereupon, the grievance hearing concluded
2   at 5:27 p.m.)
3           . . . . .
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25