UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:   17-62005-CIV-MORENO

MITCHELL SILVERMAN,

     Plaintiff,

vs.

NOVA SOUTHEASTERN UNIVERSITY, INC.,

     Defendant.
_____/

CONTINUATION OF DEPOSITION OF MITCHELL SILVERMAN

TAKEN ON BEHALF OF THE DEFENDANT
MARCH 5, 2018
11:24 A.M. TO 2:55 P.M.

UNIVERSAL COURT REPORTING
888 EAST LAS OLAS BOULEVARD, SUITE 508
FORT LAUDERDALE, FLORIDA 33301

REPORTED BY:
VICTORIA SUAREZ, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



877.291.3376
www.UCRinc.com

Silverman, Mitchell   03-05-2018

**2**

1        APPEARANCES OF COUNSEL
2  ON BEHALF OF THE PLAINTIFF:
3      APRIL S. GOODWIN, Esquire
        THE GOODWIN FIRM
4      801 West Bay Drive
        Suite 705
5      Largo, Florida 33770
        727.316.5333
6      goodwinlawoffices@gmail.com
7  ON BEHALF OF THE DEFENDANT:
8      RICHARD A. BEAUCHAMP, Esquire
        JAMES. H. HORTON, IV, Esquire
9      PANZA, MAURER & MAYNARD, P.A.
        2400 East Commercial Boulevard
10     Suite 905
        Fort Lauderdale, Florida 33308
11     954.390.0100
        rbeauchamp@panzamaurer.com
12     jhorton@panzamaurer.com
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1        INDEX OF EXHIBITS
2  EXHIBIT      DESCRIPTION         PAGE
3     1    Medication list            7
4     2    Job Posting               19
5     3    Job Posting               19
6     4    Acknowledgement           27
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1        INDEX OF EXAMINATION
2  WITNESS:  MITCHELL SILVERMAN
                          PAGE
3  DIRECT EXAMINATION
     By Mr. Beauchamp              5
4
   CROSS EXAMINATION
5     By Ms. Goodwin              94
6  REDIRECT EXAMINATION
     By Mr. Beauchamp             97
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1        DEPOSITION OF MITCHELL SILVERMAN
2                  MARCH 5, 2018
3  Thereupon:
4            MITCHELL SILVERMAN
5  was called as a witness, and after having been first
6  duly sworn, testified as follows:
7            DIRECT EXAMINATION
8  BY MR. BEAUCHAMP:
9      Q.  I'm going to acknowledge that you're still
10 under oath --
11     A.  Affirmation.
12     Q.  -- or affirmed.
13     A.  Absolutely.
14     Q.  All right.  So Mr. Silverman, we have a lot of
15 ground to cover today --
16     A.  Sure.
17     Q.  -- so I would appreciate it, if you could, to
18 the extent possible, listen to the question that I ask
19 you.  Try to answer just that question.  Obviously if
20 you feel there's additional information that you want to
21 impart, I'm not going to try to stop you, but the more
22 rabbit holes we go down, the longer this is going to
23 take.
24     A.  Understood.
25     Q.  Okay.  Great.  So --



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

Silverman, Mitchell   03-05-2018

**6**

1    A.  May I, may I start with something we had
2    talked about last --
3    Q.  You want to start off with the medication
4    list?
5    A.  Well, we had talked about it.
6    Q.  Sure.
7    A.  And something else.  This is related to that.
8        The reason this list exists, the reason it's
9    in a little drive where I can get to it from my phone
10   and actually e-mail it to a clinician from my phone is
11   it's a coping strategy, and I make a point of coming up
12   with coping strategies whenever I can.
13       I came up with or tried to come up with some
14   at work, but I didn't get any help in doing that.
15   Q.  Okay.  So we're going to start right out going
16   down a rabbit hole.  Let's do this.  Let's mark that
17   list --
18   A.  Okay.
19   Q.  -- as Exhibit 1 for today.
20   A.  Okay.  Also you'll note that I get
21   testosterone, and I was wondering if you would wonder
22   why.  It's because I have hypogonadotropic hypogonadism,
23   and I spelled that out for you.
24       MS. GOODWIN:  Okay.  Well, give him that and
25       if he has questions he can ask you.

**7**

1        MR. SILVERMAN:  I understand.
2    A.  I just wanted to put that on the record
3    because it's hard to spell.
4        (Defendant's Exhibit 1, Medication list, was
5        marked for identification.)
6    BY MR. BEAUCHAMP:
7    Q.  Okay.  So we have, for today's date we have
8    marked Exhibit 1, and this is a complete list of all of
9    the medications that you're currently taking?  Is that
10   what I understand?
11   A.  To the best of my knowledge.  To the best of
12   my ability.
13   Q.  Okay.  All right.  Now, as I look at this
14   list, the only thing that I see of any import that you
15   did not mention to me earlier was, in fact, the
16   testosterone?
17   A.  Hypogonadotropic hypogonadism, the signalling-
18   - sorry.
19   Q.  Please wait for a question.
20   A.  I apologize.
21   Q.  All right.  So my question to you is you've
22   identified the condition for which you take it.  What
23   are the symptoms of that condition as you understand
24   them?
25   A.  They relate to my personal life with my, with

**8**

1    my wife and my libido.  I'd rather not go any further.
2    They also improve metabolic function, but just very
3    generally.
4    Q.  Outside of your relationship with your wife,
5    in terms of how you interact with other people other
6    than your wife, does the testosterone have any impact on
7    that?
8    A.  Not to the best of my knowledge.
9    Q.  All right.  So let's start.  I want to ask you
10   some questions about damages.  The position that you
11   held at Nova at the time of your termination, how much
12   were you making?
13   A.  I don't really know.  I'm going to say I don't
14   recall.
15   Q.  Can you give me a range?
16   A.  I don't want to guess, Counselor, and that's
17   in the records, so I'd really just rather not guess.
18   Q.  Is the reason that you can't provide me with
19   the information about how much you make on an annual
20   basis because of all of the deducts for FMLA leave,
21   unpaid leave, things of that nature?
22   A.  It's because I don't recall.  You're asking me
23   for a specific number, and I don't want to guess.
24   Q.  Okay.  What benefits did you have in addition
25   to whatever salary you earned at the time of your

**9**

1    termination?
2    A.  As I recall, health insurance, some retirement
3    benefits, vision and dental, which were optional I
4    believe, and I don't recall whether I had elected them
5    for my last year at NSU.  In some ways the biggest
6    benefit for me was the generic medications were free at
7    the NSU pharmacy and I took a great deal of advantage of
8    that.  Those are the only benefits I can recall.
9    Q.  Okay.  Did you participate in the retirement
10   program?
11   A.  I did.
12   Q.  Okay.  To what extent?  You made a monthly
13   contribution?  A per paycheck contribution?
14   A.  Per paycheck, and I don't know how much, but I
15   know I took advantage of it.
16   Q.  Okay.  Since your termination you indicated to
17   me that you have a private law practice that you engage
18   in; correct?  Yes?
19   A.  Yes.  I'm sorry.  Yes.  Yes.
20   Q.  And any other sources of income that are not
21   passive besides law practice?
22   A.  No.
23   Q.  All right.  And so in the last 12 months,
24   however you want to break it down, tell me what you've
25   been able to earn in your law practice.



Silverman, Mitchell   03-05-2018

**10**

1    A.  Less than $2,000.
2    Q.  Total?
3    A.  Mm-hmm.
4    Q.  Yes?
5    A.  I mean, to the best, yes, to the best of my
6  recollection.  You're asking me a number of questions
7  and I'm not good with numbers.
8    Q.  What efforts have you made to find alternative
9  employment since your termination?
10    A.  I've applied for at least three librarian
11  positions and I've been turned down for all three.
12    Q.  Where did you apply?
13    A.  At the county.  All three positions were at
14  the county.
15    Q.  What positions did you apply for?
16    A.  A full time entry level librarian position and
17  two part time entry level librarian positions.  I
18  believe they were entry level because I believe Broward
19  County only hires at the entry level.
20    Q.  Do you have any idea how much either any of
21  those three positions paid?
22    A.  No.
23    Q.  Did they give you a reason for turning you
24  down?
25    A.  No.

**11**

1    Q.  Did you apply online?
2    A.  Yes.
3    Q.  Did you keep copies of the applications?
4    A.  Yes.
5    Q.  Other than those three applications, have you
6  applied for any other position of employment?
7    A.  No.
8    Q.  Have you looked outside of those three
9  positions for any other type of employment, besides
10  actually making application?
11    A.  Yes.
12    Q.  What else have you done?
13    A.  I'm on a number of librarian mailing lists, e-
14  mail mailing lists, and I review those regularly.  I
15  haven't seen any other positions that seemed worth
16  applying for, but I have been looking at and considering
17  and at least one occasion getting some of the
18  documentation that I would have needed to apply,
19  although I did not apply.
20    Q.  Okay.  What are these librarian e-mail
21  websites?
22    A.  One is called, one is called Law Lib.  It's a
23  mailing list.
24    Q.  Okay.
25    A.  I'm on the jobs mailing list for the American

**12**

1  Association of Law Libraries which I'm a member of.
2    Q.  Okay.
3    A.  I'm on the mailing list for jobs I believe of
4  the American Library Association which I believe I'm
5  still a member of.
6    Q.  Okay.
7    A.  I'm on the Florida Bar's jobs listing website.
8  I do review these e-mails.  I can't recall any others.
9    Q.  Okay.  I believe you said that you had not, in
10  reviewing those job listings for those lists that you've
11  just identified, that you didn't see anything that you
12  thought was worth applying for.  What do you mean by
13  that?
14    A.  Law librarianship is a relatively small --
15  there are only about 200 law schools in the United
16  States, and I didn't particularly feel like applying to
17  relocate.
18        My mother-in-law is getting on in years and my
19  wife is very close to her and she feels like she can't
20  relocate because of that.  My mother is 88 years old,
21  and for an 88-year old is doing pretty well, but I'm her
22  only child and her, I have her Medical Power of
23  Attorney.  I have all of her documents in my safe at
24  home.  I'm her Medical Power of Attorney and I have I
25  think an active POA for her.

**13**

1    Q.  Mm-hmm.
2    A.  So just based on my mother's residence and
3  condition, I can't relocate.  And I think I've seen one
4  law librarian job open in south Florida and it's at an
5  academic institution that I just, I've heard some things
6  about and decided that I would not apply for.
7    Q.  Which would be?
8    A.  St. Thomas.
9    Q.  When you say "relocate", what is the radius of
10  approximately of how far you would be able to drive to
11  fulfill a full time position at another law library?
12    A.  One reason I didn't apply for the position at
13  St. Thomas is that, in my opinion - and I have discussed
14  this with my psychotherapist - the commute would be
15  problematic.  That would be probably 45 minutes a day,
16  45 minutes almost each way a day, traffic in south
17  Florida being what it is.  And that would, that would
18  cause a problem in terms of, in terms of mood, in terms
19  of stress, and the amount of time that would take out of
20  my life.  So --
21    Q.  So the St. Thomas is the closest law school to
22  where we are right now in Broward County; right?
23    A.  Right, and even that, as I say, is marginal in
24  terms of travel time.
25    Q.  Right.  So what's the next closest to your



Silverman, Mitchell   03-05-2018

14

1 understanding?
2      A.   I don't know.  I think FIU is closer than
3 Miami but I'm not sure.  Either FIU or Miami.
4      Q.   But that would be too far as well; correct?
5      A.   I would say so.
6      Q.   All right.  And the reasoning for not
7 relocating are personal reasons, i.e. your mother and
8 your mother-in-law's health?
9      A.   Health and general situation.  You know,
10 assuming that we could even relocate both relatives, my
11 mother-in-law is a Latin and is very, very comfortable
12 down here, and my mom has lived down here since 1970, as
13 long as I have.  So, you know, there are all kinds of
14 factors that -- you know, we can't relocate them.
15      Q.   Personal?
16      A.   Right -- and we can't relocate ourselves while
17 they're -- but yes, personal.  Sorry.
18      Q.   So those personal factors plus the commute
19 time --
20      A.   Yes.
21      Q.   -- would be the reasoning beyond or behind
22 going outside of that radius, if you will, to try to
23 find new employment?
24      A.   Correct.
25      Q.   All right.  Do you undergo psychotherapy?

15

1      A.   I do.
2      Q.   Okay.  How often do you undergo psychotherapy
3 now?
4      A.   Once a week.  Because of our misunderstanding
5 last week I actually had to miss my appointment last
6 Tuesday.
7      Q.   And how long have you been seeing a
8 psychotherapist on a weekly basis?
9      A.   There was a period of time, I don't remember
10 how long, before I started seeing my current therapist
11 when I was between therapists and I wasn't seeing
12 anyone.  I don't know how long that was.  Before that
13 period of time I was seeing a psychotherapist weekly,
14 and since that time I've been seeing one.  I've been
15 seeing my current therapist for three or four years.  I
16 don't even know for sure.
17      Q.   Okay.  What's the name of the current
18 psychotherapist again?
19      A.   Cheryl Gotthelf.  Do you want me to spell her
20 last name?
21      Q.   No.  You don't need to.
22      A.   Okay.
23      Q.   So Cheryl Gotthelf you had been seeing for
24 approximately three to four years.
25      A.   Mm-hmm.

16

1      Q.   So you would have been seeing her with that
2 same frequency before the termination at Nova; correct?
3      A.   At one point during that period I was seeing
4 her twice a week.
5      Q.   For how long?
6      A.   I don't recall for how long and I don't recall
7 how long ago.
8      Q.   How long now have you been seeing her for just
9 once a week?
10      A.   I don't recall.
11      Q.   In any event, you have returned to the once-a-
12 week routine of seeing the psychotherapist; correct?
13      A.   Yes.
14      Q.   All right.  Was there any change in your
15 medications that was, in your estimation, precipitated
16 or caused by the termination of your employment by Nova?
17      A.   I don't recall.  I don't think so, but I don't
18 recall for sure.
19      Q.   If we look at Exhibit 1, are any of the
20 medications listed on Exhibit 1 medications that you did
21 not take before the termination?
22      A.   The Spiriva inhaler is very recent.  I don't
23 want to guess.  I don't recall.
24      Q.   What do you take the Spiriva inhaler for?
25      A.   My pulmonologist isn't sure, but it seems to

17

1 help my breathing.  The better oxygenation seems to help
2 my migraines.  I'm taking it empirically and I'm taking
3 it at a higher dose than I would if I just had asthma,
4 which I don't.
5           MS. GOODWIN:  Mitch, just please just answer
6      the questions.
7           MR. SILVERMAN:  Sorry.  But he asked why.
8           MS. GOODWIN:  No, he asked why.  That's two
9      words?
10          MR. SILVERMAN:  Sorry.
11      A.   I don't know.
12 BY MR. BEAUCHAMP:
13      Q.   You were taking something for your breathing
14 before the Spiriva, were you not?
15      A.   The Flonase or Nasonex?
16      Q.   I think so.
17      A.   That's more of a nasal decongestant really.
18      Q.   It helps your breathing; right?
19      A.   Yes.  I'm still taking it.
20      Q.   Is there some new symptom that arose that
21 gave-- for which you are taking the Spiriva now?
22      A.   I have to give you a narrative.
23           I discovered using the rescue inhaler that I
24 had, which is the Levalbuterol, at night that I had less
25 headaches, fewer headaches in the morning when I used

**UNIVERSAL COURT REPORTING**

877.291.3376
www.UCRinc.com

Silverman, Mitchell  03-05-2018

18

1  it. So I went to my pulmonologist and I said let's try
2  something. He put me on a lower dose of the Spriva, it
3  helped. He put me on a higher dose of Spiriva and it
4  helped more.
5      Q.  Okay. So it addresses your migraines?
6      A.  It helps with them, yes.
7      Q.  Okay. And that's a condition that you
8  suffered with before your termination at Nova, the
9  migraines?
10     A.  Yes.
11     Q.  Okay. So let's get to I think the more
12  substantive portions of this.
13     A.  Sure.
14     Q.  I want to talk about, because we've already
15  talked about your disabilities, your medications, your
16  impact of the disabilities on your ability to work. We
17  did that in the last session; right?
18     A.  Yes.
19     Q.  Okay. So what I want to talk about right now
20  are accommodations.
21         I think part of what you've alleged in your
22  complaint is that Nova denied you which you consider to
23  be reasonable accommodations that would have assisted
24  you in the essential functions of your work; correct?
25     A.  Yes.

20

1      A.  Mm-hmm.
2      Q.  Yes?
3      A.  Yes. I'm sorry. Yes.
4      Q.  -- was as an Emerging Technologies and
5  Reference and Instructional Services Librarian; correct?
6      A.  I don't recall that being my job title
7  throughout that period of time.
8      Q.  Do you deny that that was your job title
9  during that period of time?
10     A.  I deny that it was, I deny that it was my
11  formal job title, yes. Sorry. I deny that it was the
12  job title that I used on a regular basis, yes.
13     Q.  That you used on a regular basis?
14     A.  That everyone used on a regular basis.
15     Q.  Well, what did you call yourself? What did
16  you -- strike that.
17         What did you consider to be your job title
18  during the period of time leading up to your signature
19  in 2015 on Exhibit 3?
20     A.  Reference librarian. And I used that title
21  throughout my period at Nova.
22     Q.  Sure. It's an informal title?
23     A.  Yes.
24     Q.  All right. Did you have a business card?
25     A.  Yes.

19

1      Q.  All right. So let's talk about first
2  essential functions.
3         (Defendant's Exhibits 2 and 3, Job postings,
4         were marked for Identification.)
5  BY MR. BEAUCHAMP:
6      Q.  I'm going to show you what we've marked as
7  Exhibits 2 and 3 for today's date, there's the exhibit--
8  that's for your lawyer. Okay. So you have in front of
9  you Exhibits 2 and 3 for today's date. Do you recognize
10 either exhibit?
11     A.  I don't recognize Exhibit 2. I don't
12 recognize Exhibit 3.
13     Q.  So take a look at Exhibit 3 again, the last
14 page of it.
15     A.  Mm-hmm.
16     Q.  Does it bear your signature?
17     A.  It does. It appears to, yes.
18     Q.  All right. Do you have any reason to believe
19 that that's not your signature?
20     A.  No. No.
21     Q.  All right. And what is it dated?
22     A.  7/29/2015.
23     Q.  Okay. So your employment at Nova Southeastern
24 from inception to the date of that document, Exhibit 3--
25 7/29/2015 was it?

21

1      Q.  Okay. Did it identify what your title was?
2      A.  It did.
3      Q.  And did it say Emerging Technologies and
4  Reference and Instructional Services Librarian?
5      A.  It did.
6      Q.  And after July of 2015 did you -- did you get
7  new business cards?
8      A.  Yes.
9      Q.  And did those business cards say Reference and
10 Patron Services Librarian?
11     A.  Yes.
12     Q.  Okay.
13     A.  And that title I used.
14     Q.  Okay. That's fine. Understanding that
15 Emerging Technologies and Reference and Instructional
16 Services Librarian is a mouthful; correct?
17     A.  Right. Exactly.
18     Q.  It would be hard to identify yourself on a
19 day-to-day basis as this is who I am.
20     A.  Right.
21     Q.  Right?
22         So did you take -- I would like you to take a
23 look at page 2 of Exhibit 2, which is the job
24 description for the initial position of Emerging
25 Technologies and Reference and Instructional Services



Silverman, Mitchell  03-05-2018

**22**

1 Librarian, and you'll see beginning on page 2 and going
2 over to page 3 what are listed as essential job
3 functions.  Take a look at that for me, would you?
4    A.  Yes.
5    Q.  Okay.  Have you had a chance to look at that?
6    A.  Yes.
7    Q.  Okay.  Those are the job functions that are
8 listed on the job description --
9    A.  Yes.
10    Q.  -- posting, Exhibit 2, which are considered by
11 Nova to be essential job functions; correct?
12    A.  Yes.
13    Q.  Okay.  Did you perform those functions, with
14 or without accommodation?
15    A.  No.
16    Q.  Okay.  Did you perform any of those functions?
17    A.  Yes.
18    Q.  All right.  Were there some of those job
19 functions that you were not able to perform with or
20 without accommodation or you're just saying that wasn't
21 part of your daily routine?
22    A.  The latter.
23    Q.  The latter.  Okay.
24       Of the job functions that you were -- that you
25 considered to be part of your daily routine, were you

**23**

1 able to perform all of those without accommodation?
2    A.  I did the best I could.
3    Q.  So you tried?
4    A.  Yes.
5    Q.  Okay.  Were you able to perform those
6 functions without accommodation?
7    A.  I'm going to go back to I don't recall.
8    Q.  You don't know?
9    A.  Not that I -- I don't recall.
10    Q.  Don't recall.  Okay.
11       So take a look at Exhibit 3 now, page 2 of
12 Exhibit 3.  And you'll see a listing on, you'll see a
13 listing of essential job functions for the Reference and
14 Patron Services Librarian position.  Do you see that?
15    A.  Yes.
16    Q.  All right.  Take a look at those, if you
17 would.
18    A.  Okay.
19    Q.  Okay.  So this Exhibit 3 you executed on July
20 29 of 2015 -- and we have no reason to believe that
21 that's not your signature; correct?
22    A.  Correct.  Yes.
23    Q.  And as to your best knowledge and belief your
24 position title became Reference and Patron Services
25 Librarian on or about July 29th of 2015; correct?

**24**

1    A.  Yes.  Yes.
2    Q.  Okay.  All right.  Now, of the essential job
3 functions that were listed in Exhibit 3, were you able
4 to perform all of those without accommodation?
5    A.  I don't recall.
6    Q.  Okay.  I take it you do recall that you have,
7 during the course of your employment with NSU, requested
8 disability accommodations?
9    A.  Yes.
10    Q.  Okay.  Can you tell me what disability
11 accommodations you requested during your tenure at NSU?
12    A.  The only one I remember for sure is that I had
13 asked to be able to work at home.  Oh, I had asked for a
14 new computer because my computer was very slow and I
15 relied on it for as a, as a coping tool.
16    Q.  Okay.  In terms of your recollection, that's
17 it?
18    A.  I know there were more.  I just can't remember
18 them.
20    Q.  Can't remember.  Okay.
21       So how about we do it this way.  How about you
22 tell me what disability accommodations that you
23 requested from NSU that you did not receive and needed
24 in order to perform your essential job functions.
25    A.  I don't recall.

**25**

1    Q.  Don't recall.  You did mention that you asked
2 to be able to work from home.
3    A.  Yes.
4    Q.  Okay.  Were you granted that accommodation?
5    A.  I was not.
6    Q.  Okay.  Did they tell you why?
7    A.  They did tell me why.
8    Q.  But you don't recall why?
9    A.  That's correct.
10    Q.  Okay.  Your position, when you asked to be
11 able to work at home, was it the Reference and Patron
12 Service Librarian?
13    A.  I don't recall.
14    Q.  Whether it was the prior position or the
15 current position, part of your duties and
16 responsibilities was to work as a reference librarian;
17 correct?
18    A.  Correct.
19    Q.  Which is to do what?
20    A.  To sit at a reference desk or to sit in my
21 office and answer questions.
22    Q.  From whom?
23    A.  Faculty, staff, students, attorneys in the
24 community, public patrons, anyone who came in the door
25 prioritized as necessary but without discriminating



877.291.3376
www.UCRinc.com

Silverman, Mitchell   03-05-2018

26

1  against anyone.
2      Q.  Right.  So would you be able -- and that's an
3  essential function of the position; correct?
4      A.  Right.
5      Q.  So would you be able to perform that function
6  if you were at home?
7      A.  No.
8      Q.  Okay.  You've also indicated -- well, strike
9  that.  Let's go back.
10         Were you having problems with being able to
11  perform your job duties and functions through the course
12  of your time at NSU?
13     A.  Yes.
14     Q.  What types of problems were you having?
15     A.  Scheduling and deadlines, juggling various
16  different tasks, prioritizing faculty work versus other
17  types of work which I felt, I never really had
18  contradicted was -- that's not true.  I was occasionally
19  told that faculty work was not as important, but I
20  always assumed that it was the most important.  I was
21  never really told otherwise in general.
22     Q.  Any other issues or problems that you can
23  recall during your course of time?
24     A.  Not that I can recall, no.
25     Q.  Did you attribute the difficulties that you do

27

1  recall - the scheduling, the deadlines, the juggling
2  tasks, and prioritizing work - did you consider those to
3  be problematic as a result of the disabilities that you
4  suffer from?
5      A.  Yes.
6      Q.  All right.  Did you ask for any particular
7  accommodations related to being able to perform those
8  tasks?
9      A.  I don't recall.
10     Q.  Do you recall that you had problems with
11  scheduling deadlines, juggling tasks and prioritizing
12  work throughout the period of time that you worked at
13  Nova Southeastern?
14     A.  Yes.
15     Q.  Did you recall, especially with respect to
16  deadlines, that you had difficulties meeting deadlines
17  throughout the time that you worked at Nova
18  Southeastern?
19     A.  As I recall, yes.
20         (Defendant's Exhibit 4, Acknowledgement, was
21         marked for identification.)
22  BY MR. BEAUCHAMP:
23     Q.  Let me show you what I've marked as Exhibit 4
24  for today's date.  Have you had a chance to look at it?
25     A.  Yes.

28

1      Q.  Have you seen it before?
2      A.  I don't recall.
3      Q.  Okay.  Does it bear your signature?
4      A.  Yes.
5      Q.  Is that your printing, Mitchell L. Silverman,
6  at the top?
7      A.  It is.
8      Q.  Okay.  And what is it dated?
9      A.  November 4th, 2009.
10     Q.  Okay.  And it's an acknowledgment of your
11  receipt of NSU policies?
12     A.  Yes.
13     Q.  Okay.  Including the rights and
14  responsibilities under FMLA leave?
15     A.  Yes.
16     Q.  All right.  Conflicts of interest, sexual
17  harassment, computer use, copyright and patent policies,
18  drug-free work place, alcohol and drugs policy; right?
19     A.  The form says that, yes.
20     Q.  Okay.  All right.  You were generally familiar
21  with the policies at Nova Southeastern, were you not?
22     A.  I would say no.
23     Q.  Okay.  Did you have the ability to familiarize
24  yourself with the policies?
25     A.  Yes.

29

1      Q.  Okay.  In fact, if you had a question, all you
2  had was go to a website?
3      A.  Yes.
4      Q.  All right.  And then the policy would be right
5  there?
6      A.  Yes.
7      Q.  And you did that sometimes during the course
8  of your employment at NSU; correct?
9      A.  I believe so.
10     Q.  Part of your lawsuit against Nova is that you
11  claim that you were being retaliated against by virtue
12  of having sought and received ADA accommodations;
13  correct?
14     A.  Yes.
15     Q.  And part of your claim against Nova is based
16  upon your claim that you were retaliated against on the
17  basis of the fact that you had exercised FMLA leave
18  rights; correct?
19     A.  Yes.
20     Q.  Okay.  So let's talk about the retaliation as
21  it relates to your ADA accommodations.  What retaliation
22  did you suffer?
23     A.  Counselor, could you give me a second?  I just
24  need to take some pills.
25     Q.  Sure.  And since we're on the record, what



Silverman, Mitchell  03-05-2018

30

1 specifically are we going to be taking?
2     A.  I'm going to take 1000 milligrams of
3 Acetaminophen for my headache, migraines do respond to
4 that; I'm going to take 1000 milligrams of Sucralfate,
5 which is an acid protectant, not exactly an antacid; and
6 I'm going to take 500 milligrams of Naproxen, which the
7 headaches also respond to.
8     Q.  Okay.  And you don't believe that your taking
9 any of those medications will have any impact on your
10 ability to remember or testify truthfully; right?
11     A.  Not at all.
12     Q.  All right.  Go right ahead, please.  We'll go
13 off the record.
14     (Off the record 12:00 p.m.)
15     (On the record 12:07 p.m.)
16 BY MR. BEAUCHAMP:
17     Q.  Have you taken the medication you need to
18 take?
19     A.  I have.
20     Q.  Okay.  During the course of this break did you
21 consult with your attorney?
22     A.  Absolutely.
23     Q.  Okay.  What did you talk about?
24     MS. GOODWIN:  Object.
25     MR. BEAUCHAMP:  Are you instructing him not to

31

1     answer?
2     MS. GOODWIN:  I'm not instructing him not to
3 answer.  I'm just objecting.
4 BY MR. BEAUCHAMP:
5     Q.  What did you talk about?
6     MR. SILVERMAN:  How does this work?
7     MS. GOODWIN:  Just answer the question.
8 BY MR. BEAUCHAMP:
9     Q.  Answer the question.
10     MS. GOODWIN:  You don't have to say quotes,
11 but he's asking what did we talk about.
12     A.  We talked about the nature of my failure to
13 recollect the answers to the questions you were asking.
14     Q.  Mm-hmm.  What do you mean the nature?
15     A.  Why I was having trouble answering the
16 questions you were asking.
17     Q.  I see.  And why are you having trouble
18 answering these questions, Mr. Silverman?
19     A.  Because I'm extremely anxious.  I'm actually
20 experiencing fight or flight symptoms.  My hands are
21 cold.  My core body is pretty warm.  Fight or flight
22 symptoms, as I said.
23     Q.  Have I been aggressive with my questioning of
24 you?
25     A.  You've been very nice, but it's still very

32

1 stressful.
2     Q.  Okay.  So sitting down across the table from
3 me and having me ask you questions about your lawsuit
4 has stressed you to the point where you are reaching a
5 fight or flight response?
6     A.  I wouldn't say reaching.  I'm saying I'm
7 having one of the symptoms of one.  I'm not about to
8 dash out of here, if that's what you mean.
9     Q.  Okay.  So this is really my opportunity to
10 take discovery of your claim.
11     A.  Yes.
12     Q.  And you're telling me that you're unable to
13 provide me with answers to the questions that I'm asking
14 you because you're too anxious?
15     A.  No.
16     Q.  All right.  Or you're unable to remember
17 things because you're too anxious?
18     A.  No.
19     Q.  What are you telling me?
20     A.  As I was discussing with my attorney, I was
21 answering very precisely the questions you were asking.
22 I can go into a little bit more detail, and as a blanket
23 statement I will tell you that I was answering very
24 specifically and probably too lawyerly the questions you
25 were asking.

33

1     I can say, for example, that with respect to
2 requesting accommodations that Eric and then Becca knew
3 about my need for accommodations very early in my employ
4 at Nova by virtue of my telling them about my
5 disabilities.  I was very open with them about them.
6     Q.  So let's go back to where we were before --
7     A.  Please.
8     Q.  -- and let's start over again.  All right?
9     A.  You needn't start with the job descriptions.
10 That I can't help you with.
11     Q.  So, Mr. Silverman, as much as you'd like to
12 control the whole situation and tell me what I can and
13 can't do, I'm going to ask you questions.  Okay?
14     A.  Go right ahead, sir.
15     Q.  If you can answer those questions, please do
16 so.  If you can't answer them, just tell me so.
17     I would like to know what accommodations you
18 requested during your tenure at Nova Southeastern
19 University to assist you with performing the essential
20 requirements of your job.
21     A.  I don't recall in specific.  I do recall, for
22 example, asking for extensions on deadlines, help with
23 projects, and that's all I remember.  I don't remember
24 what help.  I don't remember which projects.  I remember
25 asking for a lot of accommodations with respect to my



Silverman, Mitchell   03-05-2018

34

1  migraines. I recall asking for a lot of accommodations,
2  but just in very general terms. I don't remember the
3  details.
4      Q.   Okay. Was the testimony that you gave me
5  earlier that the request for the ability to be able to
6  work at home as an accommodation, was that the only
7  accommodation that you requested of Nova which was
8  denied?
9      A.   I believe there were others. I don't remember
10  the details. There was a long list that I submitted. I
11  believe a memorandum from my psychotherapist was
12  provided as documentation.
13      Q.   But as you sit here today you cannot recall
14  what they were?
15      A.   That's correct.
16      Q.   So a lot of this took place in 2016 and 2017.
17  It's not like we're going back six, seven years of your
18  employment.
19          You're unable to recall the facts that support
20  the lawsuit that you filed in federal court against my
21  client as it relates to accommodations requested and
22  accommodations denied?
23      A.   That's correct.
24      Q.   How about what we were talking about just
25  before the break, which was the claim of retaliation

35

1  related to your requests for accommodations, do you
2  recall how you were retaliated against?
3      A.   I recall my relationship with Ms. Rich souring
4  around the time I asked for those, that list of
5  accommodations, and I recall her being consistently
6  unpleasant to me, doing things like upgrading me at the
7  reference desk in front of colleagues and on at least
8  one occasion in front of a faculty member.
9      Q.   Okay. Did anyone else besides Ms. Rich
10  retaliate against you for asking for accommodations?
11      A.   I don't believe so.
12      Q.   Okay. How about the FMLA leave retaliation
13  claims. Who retaliated against you and how did they do
14  so?
15      A.   Well, I was terminated not even two months
16  after I requested a leave, and who knows -- no. Sorry.
17  Strike that.
18      Q.   Why do you believe that the termination was
19  retaliation for your exercise of your FMLA leave rights?
20      A.   Because I was assigned, the project that I was
21  assigned that apparently was the basis for my
22  termination was assigned to me while I was on leave, and
23  I wasn't able to accomplish it. And I would say I
24  didn't have enough time while I was at work to
25  accomplish it.

36

1      Q.   What dates were you on FMLA leave?
2      A.   I don't recall the exact dates, but it was the
3  end of 2016.
4      Q.   And which project was this?
5      A.   I don't recall exactly, but I do know that it
6  was the project or projects that are listed on the
7  termination memo.
8      Q.   Do you recall any of those?
9      A.   There was some sort of lib guide was I believe
10  being done for career services. I think that was the
11  core of it. I don't remember the details, no.
12      Q.   Was this a project that you asked repeatedly
13  for extensions on and were granted before the
14  termination?
15      A.   I believe I asked for some extensions. I
16  don't know that they were all granted.
17      Q.   Okay. Is the basis of your claim, factual
18  basis of your claim that you were retaliated against for
19  taking the FMLA leave the fact that you were terminated?
20      A.   There may be other reasons, but at least that.
21      Q.   Well, what are the other reasons?
22      A.   I don't recall.
23      Q.   You don't recall. All right.
24          Did anyone ever say to you, Mr. Silverman, I'm
25  going to terminate you because you took FMLA leave?

37

1      A.   Not to the best of my recollection.
2      Q.   Did anyone say to you, Mr. Silverman, I am
3  going to do X or Y to you because you took FMLA leave?
4      A.   Not to the best of my recollection.
5      Q.   Okay. How about the same, do you believe you
6  were terminated because of retaliation for utilizing ADA
7  accommodations?
8      A.   I believe so.
9      Q.   Okay. Did anybody say to you, Mr. Silverman,
10  I'm terminating you or we're terminating you because you
11  exercised your ADA rights?
12      A.   Not to the best of my recollection, no.
13      Q.   During the course of your employment at NSU,
14  did anybody - supervisor, dean - anybody say to you, Mr.
15  Silverman, I'm going to do X or Y to you because you've
16  asked for accommodations in terms of an adverse
17  employment action?
18      A.   Not to the best of my recollection.
19      Q.   So your basis of claiming that you were
20  discriminated on as we sit here today, discriminated for
21  taking FMLA leave was because you were terminated?
22          MS. GOODWIN:  Object to the form of the
23      question. You can answer.
24  BY MR. BEAUCHAMP:
25      Q.   That's the factual basis as we sit here right



Silverman, Mitchell   03-05-2018

38

1  now.
2      A.  I'm sorry.  Could you repeat it?
3      Q.  Sure.  You're unable to tell me any other act
4  or action on the part of Nova Southeastern which you
5  believe constituted FMLA leave retaliation other than
6  the fact that you were terminated?
7      A.  Yes.
8      Q.  What else --
9      A.  Can we take a break while you're not in the
10  middle of a question?  I did not get an opportunity to
11  go to the restroom because my attorney advised me that
12  we were in the middle of a question and you were
13  permitted to continue and so forth and so on.
14      Q.  So did you answer that question?
15      A.  I believe I did.
16          MR. SILVERMAN:  Could you read the question
17  and the answer back, and if he has, then no
18  problem.  But I do want an answer to that question.
19          (The requested portion of the record was read
20          back by the court reporter.)
21  BY MR. BEAUCHAMP:
22      Q.  As you sit here today, you're not able to tell
23  me any other act or action on the part of NSU which you
24  considered to be retaliatory for taking FMLA leave other
25  than your termination; correct?

39

1          MS. GOODWIN:  Object to the form.
2      A.  That's correct.
3          MR. BEAUCHAMP:  Okay.  Please.
4          (Off the record 12:18 p.m.)
5          (On the record 12:29 p.m.)
6          MR. BEAUCHAMP:  Okay.  Back on the record.
7  BY MR. BEAUCHAMP:
8      Q.  So I've asked you about the basis of the FMLA
9  leave retaliation claim and you've answered that
10  question.  I want to talk to you more about the ADA
11  retaliation that you claim that you experienced at Nova.
12          You've told me that per your recollection
13  Becca Rich is the individual who was retaliating against
14  you; correct?
15      A.  Yes, as far as I remember.
16      Q.  Okay.  And you indicated some things about the
17  relationship having soured and that she had upgraded you
18  at the reference desk.
19      A.  Correct.
20      Q.  Okay.  Before we go further, any other
21  instances of retaliation against you which you believe
22  were the result of exercising ADA accommodations besides
23  your relationship with her souring and her upgrading you
24  at the reference desk?
25      A.  Her continual treatment of me.

40

1      Q.  In what respect?
2      A.  Becca has experience with mental health and
3  exceptionality issues.  As I understand, she was a
4  special education teacher in California I think.  She
5  was or should have been well aware that anxiety and
6  depression and bipolar disorder and Autism all hang
7  together.  And she made our relationship as unpleasant
8  and she possibly could from my perspective.
9      Q.  From your perspective.  What did she do to
10  make the relationship as unpleasant as she possibly
11  could?
12      A.  Criticizing me on a regular basis and not
13  compliment me.  I got a number of complimentary e-mails
14  during my time working for her, and I don't think in
15  that period she ever praised me for the help that those
16  complimentary e-mails resulted from.
17      Q.  Okay.  How else did she make your relationship
18  with her as unpleasant as possible?
19      A.  I don't recall the details, but I submitted
20  four written complaints - I refer to them as formal
21  complaints - against Ms. Rich, and I was extremely
22  detailed in those complaints.
23          I don't remember the details, but I know that
24  in the first complaint there was some sort of incident
25  where she, in my opinion, outed me - and I don't

41

1  remember the details - to my colleagues as suffering
2  from a mental health problem, and I detailed the facts
3  of the complaint, including I believe some e-mails that
4  were involved and chapter and verse in Nova's conduct
5  policies.  I don't remember the details, but I do know
6  they're in that complaint.
7      Q.  Okay.
8      A.  And there were three other complaints and they
9  were all about her.
10      Q.  So this complaint that you do recall about the
11  outing?
12      A.  I don't recall the details, but yes.
13      Q.  Okay.  Do you recall approximately when that
14  was made?
15      A.  No.
16      Q.  Were you -- strike that.
17          Did you share with your co-workers and
18  employees aspects of your physical and mental conditions
19  during the course of your employment there?
20      A.  Yes, but I don't recall the details.  I know
21  that I shared the details with Eric and Becca in some
22  detail.
23      Q.  Mm-hmm.
24      A.  But the rest of my --
25      Q.  And other co-workers, too?



Silverman, Mitchell    03-05-2018

42

1    A. I don't recall exactly. I was, I was
2 relatively open with them. I think I did talk with them
3 about it. I wasn't completely open with them until a
4 few months before I was terminated. I decided that I
5 was going to be completely open about everything, and at
6 that point I don't know who I told, but I didn't make a
7 secret of any of it.
8    Q. Do you know whether the complaint that you
9 were referring to about having been outed was before or
10 after the last couple of months?
11    A. It was before.
12    Q. Before. Okay. Can you tell me that the
13 information that you alleged that she imparted was
14 information that you yourself had not shared with
15 others?
16    A. Yes.
17    Q. Okay. So what -- to whom did you impart this
18 information?
19    A. To a room full of my colleagues at a
20 librarians' meeting.
21    Q. Where did that take place?
22    A. In the library conference room.
23    Q. And how many of your colleagues were there?
24    A. I don't recall.
25    Q. Okay. I've been in that conference room. It

43

1 probably seats 12 people?
2    A. I don't recall exactly, but that makes sense.
3    Q. Okay. Was it standing room only or was
4 everybody sitting?
5    A. As I recall, most of my colleagues were there.
6 I don't recall exactly.
7    Q. I'm not asking you exactly.
8    A. Right.
9    Q. I'm trying to find the extent of what you
10 claim to be outing, so --
11    A. I also wasn't at the meeting at the time she
12 did it.
13    Q. Oh, okay. So any information you have about
14 what was said at that meeting comes from another source?
15    A. Yes.
16    Q. Who?
17    A. I received an e-mail from Eric Young detailing
18 basically -- what happened was I had had a very
19 unpleasant interaction with Ms. Rich at the reference
20 desk, and in talking to her as a result of it I said
21 could I go to lunch and skip the meeting because I was
22 anxious probably. I don't remember exactly what I said.
23 She said yes, and I did. And while I was at lunch in
24 another building I got an e-mail from Eric who was in
25 the meeting at the time --

44

1    Q. Mm-hmm.
2    A. -- saying being upset is not an excuse for not
3 being at the meeting, please return immediately.
4    Q. Okay. And that was, that was the basis of you
5 saying that she outed you because you were upset?
6    A. My understanding -- I apologize.
7    Q. Yeah, we can't talk at the same time.
8    A. Sorry. Do you want to finish the question?
9    Q. I did.
10    A. Okay. My understanding is that she said more
11 from talking to other colleagues. I don't remember the
12 details.
13    Q. Okay. Do you remember who the other
14 colleagues were?
15    A. I know Rob was at the meeting, and I'm pretty
16 sure I talked to him about it. Other than that, I don't
17 recall.
18    Q. Mm-hmm. Okay. But you weren't at the
19 meeting?
20    A. At the time she made the comment, no. I did
21 return to the meeting after I got that e-mail.
22    Q. Okay. So you did not - let's make it clear as
23 a bell for the record - you were not there when the
24 alleged incident of outing you, as you referred to it,
25 took place?

45

1    A. Correct.
2    Q. Okay. And your information concerning that
3 issue came from other persons who were there?
4    A. Correct.
5    Q. And from an e-mail exchange that you had with
6 Rob?
7    A. No. The e-mail was with Eric. Sorry.
8    Q. With Eric.
9    A. Yes. Yes, correct.
10    Q. Right. The berating you at the reference
11 desk, is this associated with that event in terms of
12 time? Because you mentioned that you had an unpleasant
13 exchange with her at the reference desk that led you to
14 asking to go to lunch rather than --
15    A. Yes.
16    Q. -- attend the meeting.
17    A. Yes.
18    Q. Was that the incident where you say she
19 berated you at the desk?
20    A. One of a number.
21    Q. Okay. So how many different times did she
22 berate you that you can recall?
23    A. I can't recall a number.
24    Q. Okay. Can you describe what you mean when you
25 use the word "berate"?



Silverman, Mitchell  03-05-2018

46

1    A.  Well, I recall one instance when Professor
2  Johnny Burris was near the desk and she came up and
3  criticized me for doing or not doing something - I don't
4  remember - loudly enough and specifically enough that
5  Professor Burris turned and walked away, and I don't
6  think that was a coincidence.
7    Q.  Okay.  But you don't know what was in
8  Professor Burris' mind when he turned and walked away;
9  correct?
10    A.  No.
11    Q.  Okay.  He didn't come back to you later and
12  say, I walked away because of what was going on at the
13  reference desk; correct?
14    A.  No.
15    Q.  All right.  So you're speculating as to why
16  Professor Burris walked away; correct?
17    A.  Stating my opinion.
18    Q.  Speculating?  Guessing?
19    A.  Inference.
20    Q.  Okay.  You have no basis for that inference
21  other than your own opinion; correct?
22    A.  Yes.
23    Q.  Okay.  That's correct, yes.
24      What was she berating you about?
25    A.  I don't recall.

47

1    Q.  And you said she was criticizing you?
2    A.  Yeah.
3    Q.  For something that she perceived to, that she
4  perceived you had done incorrectly or not done that you
5  were supposed to?
6    A.  I don't recall the details.
7    Q.  Okay.  Did she scream at you?
8    A.  She raised her voice.
9    Q.  What does that mean "raised her voice"?
10    A.  Speaking in an inappropriate and
11  unprofessional manner.
12    Q.  Okay.  Did you ever speak to her in an
13  inappropriate and unprofessional manner?
14    A.  Not in public.
15    Q.  Not in public?
16    A.  No.
17    Q.  Just to her face?
18    A.  Probably.  I don't recall the details, but
19  probably.
20    Q.  Did you speak to other patrons in an
21  unprofessional manner --
22    A.  Not --
23    Q.  -- during the course of your employment at
24  NSU?
25    A.  Not that I recall.

48

1    Q.  Okay.  Did you act inappropriately with
2  patrons of the library during the course of your
3  employment at
4  NSU?
5    A.  I don't recall.
6    Q.  Isn't that, in fact, one of the things that
7  pops up regularly on your performance evaluations is
8  your interactions with co-workers and patrons?
9    A.  I don't recall the details, but I believe so.
10    Q.  Yeah.  And the minor -- the major broad brush
11  stroke detail is that you were acting inappropriately
12  with your co-workers and you were acting inappropriately
13  with the patrons; correct?
14    A.  I don't recall the details, but yes.
15    Q.  Okay.  Do you recall hugging female students
16  and they complained about that?  Do you recall that?
17    A.  I recall hugging female students.  I don't
18  recall the complaints.
19    Q.  Do you consider that to be appropriate?
20    A.  I never did it when I inferred that it would
21  not have been consensual.  And as soon as I was
22  counseled to stop I did.
23    Q.  Let's get back to your relationship with Ms.
24  Rich.  She was your supervisor for about how long?
25    A.  Five years perhaps.

49

1    Q.  The very first performance review that you had
2  identified the same types of issues:  inability to meet
3  deadlines, interactions with co-workers and patrons;
4  correct?
5    A.  I believe so, but I don't recall the details.
6    Q.  That was before she became your supervisor;
7  correct?
8    A.  I believe so, but I don't recall the details,
9  Counselor.
10    Q.  Isn't it a fact that every single performance
11  evaluation that you had at Nova identified those same
12  two categories, sometimes other things, too, but
13  identified those same two categories of performance and
14  behavioral problems throughout your tenure there?
15    A.  I don't recall the details.  I mean, you have
16  a stack of paper.
17    Q.  I do.  I'm asking you about your recollection
18  of what transpired at Nova Southeastern.
19    A.  I believe that to be the case, but I don't
20  remember the details.
21    Q.  Okay.  Okay.  So on one occasion at the
22  reference desk Ms. Rich raised her voice and criticized
23  you in front of Dr. Burris; correct?
24    A.  Professor Burris, yes.
25    Q.  It is doctor, isn't it?



877.291.3376
www.UCRinc.com

Silverman, Mitchell   03-05-2018

50

1    A. He had a law degree.
2    Q. All right. You said that there were several
3  occasions of her upgrading you.
4    A. Yes.
5    Q. What are the other ones?
6    A. I don't recall the details.
7    Q. Do you recall anything about them?
8    A. They were always about -- I do recall one
9  other one now that you mention it. She asked me to do
10  some task on a day when I was at the reference desk
11  until I was leaving, and I was unable to do it in a
12  timely manner in part because I had an extended
13  reference interaction at the reference desk.
14      So I e-mailed her before I was leaving to let
15  her know that I wouldn't be able to accomplish it and
16  why, and she came out of her office immediately and gave
17  me a hard time in the vernacular about not being able to
18  do it. She also thought I was leaving an hour later
19  than my schedule called me for me to leave. That was on
20  a Tuesday when I had an appointment, a Tuesday or a
21  Thursday. That may have been a week when I had two
22  appointments with my psychotherapist.
23      So, you know, I couldn't do it. I had a good
24  reason I couldn't do it. She came and gave me a hard
25  time in public anyway.

51

1    Q. Okay. What do you mean gave you a hard time?
2    A. Same sort of behavior, you know.
3    Q. Raised her voice?
4    A. Raised her voice.
5    Q. Criticized you?
6    A. Yeah. Spoken in an unprofessional and really
7  socially inappropriate manner.
8    Q. Well, if you're going to use those terms to
9  describe it, I'm going to need to know what she did and
10  said. So what was socially inappropriate about it
11  besides the fact that she was criticizing you with a
12  raised voice?
13    A. That's sufficient I think. That's what I'm
14  referring to.
15    Q. Well, that's what I need to know.
16    A. Okay.
17    Q. So what she did that you found to be
18  retaliatory was she criticized you at the reference desk
19  in front of others for what she perceived to be a
20  shortcoming in your performance; correct?
21    A. She also criticized me in her office and just
22  --
23    Q. Can we stay on one topic at a time? We'll go
24  back to -- we're going to talk about Rebecca a lot
25  today.

52

1    A. Okay.
2    Q. Okay. So let's stay on one incident at a
3  time.
4    A. Sure.
5    Q. And then once we mind that one we'll move on
6  to the next one. Okay.
7      So I want to talk about the incidents at the
8  reference desk. You told me about the one with
9  Professor Burris. Now you're telling me about another
10  one where you e-mailed her and said, I didn't get what
11  you wanted me to get done today because I had an
12  extended reference interaction, and she came out and
13  criticized you; correct?
14    A. Yes.
15    Q. All right. And you said it was in an
16  unprofessional and socially inappropriate manner;
17  correct?
18    A. Yes.
19    Q. And what I'm understanding by virtue of what
20  that means to you is that she did it with a raised voice
21  and she was criticizing you.
22    A. I don't recall the details. What I recall is
23  my reaction, and I remember it being an extremely
24  unpleasant experience, as well she knew that I had
25  anxiety issues and she was doing what she could to make

53

1  me feel anxious is my perception.
2    Q. Your perception?
3    A. Correct.
4    Q. Okay. Again, she never came out and told you,
5  I'm going to do these things to you to make you feel
6  more anxious?
7    A. No.
8    Q. Okay. So you and she, this interaction
9  between the two of you was initiated by virtue of the
10  fact that she had given you a task to perform that day
11  and you e-mailed her as you were getting ready to leave
12  saying, I had an extended reference interaction so I
13  didn't get to it, and so she came out to talk to you
14  about it?
15    A. Well, before I left, but yes, 45 minutes I
16  think before I was scheduled to leave.
17    Q. Was that sufficient time for you to have
18  completed the task that she wanted you to do?
19    A. I didn't believe so at the time, as I recall,
20  which is the reason I e-mailed her.
21    Q. Okay. So she came out and addressed it in a
22  which you considered to be a raised voice and she
23  criticized you?
24    A. Correct.
25    Q. Okay. And that's what you mean when you say



Silverman, Mitchell   03-05-2018

54

1 in a socially inappropriate and unprofessional --
2     A. I am --
3     Q. -- in that instance?
4     A. I apologize, Counselor, for cutting you off.
5         My inference, I remember how I felt. I don't
6 remember exactly what she said.
7     Q. So let's explore that a little bit.
8         Your, your testimony about these events is
9 based upon your reaction to what she did rather than
10 what she actually did. That's why you feel it was
11 socially inappropriate and unprofessional, because you
12 reacted to it in that way; right?
13    A. Yes.
14    Q. Okay. Any other instances at the reference
15 desk that we can talk about that you can recall?
16    A. Not that I can recall, no.
17    Q. Okay. Instances, you started to talk about
18 her not being nice to you in her office. I mean, I
19 believe there was at one point you requested an
20 accommodation that she not be permitted to meet with you
21 unless there was someone else present; right?
22    A. Correct.
23    Q. Okay. Because you felt that she was being
24 mean to you?
25    A. More to the point, because she would say

55

1 things to me, not necessarily in a mean sense, and then
2 say other things to other people. I didn't trust her.
3     Q. Did you not have an ongoing relationship where
4 you would meet, then you would prepare the agenda, and
5 then submit it to her? Was that not part of the process
6 of how you interacted with her?
7     A. It was supposed to happen. It did not always
8 happen.
9     Q. Okay. Why did it not always happen?
10    A. Because I sometimes wasn't sure when we would
11 be meeting. It was scheduled but I didn't know, for
12 example, that she would be available. There were at
13 least a couple of occasions --
14    Q. So --
15    A. Sorry, Counselor -- there were at least a
16 couple of occasions when we were supposed to meet where
17 I waited for her in the anteroom to her office for
18 awhile and then had to leave.
19    Q. I saw an e-mail where you waited 30 minutes
20 and then said I'm not waiting anymore, I'm going to
21 lunch. Do you recall that?
22    A. I do.
23    Q. Okay.
24    A. I also have diabetes, so it's not a question
25 of me being, you know, arrogant or unpleasant.

56

1     Q. So throughout these interactions I keep seeing
2 language from you that says, I don't want you to take
3 this as being insubordinate. It's my Asperger's and my
4 other conditions, I don't relate well with other people.
5 So if it seems like I'm being insubordinate I'm really
6 not. Is that something that happened a lot during your
7 interactions with Ms. Rich?
8     A. I would say that characterizes our
9 relationship pretty well.
10    Q. Okay. So, so you would say things that I
11 think at least part of you recognized were being
12 insubordinate, but you said you can't help it because of
13 your Asperger's?
14        MS. GOODWIN: Object to the form.
15 BY MR. BEAUCHAMP:
16    Q. True or not?
17    A. What I would say is that I would say or e-mail
18 things that I thought Becca would consider to be
19 insubordinate but that, no, I didn't actually consider
20 would be insubordinate. I was trying to manage my
21 manager, if you will.
22    Q. I see. I see.
23        So on all of those occasions where I see that
24 language - and often-times it seems to be cut and pasted
25 from previous e-mails - it's just you trying to manage

57

1 Becca?
2     A. Manage our relationship.
3     Q. Okay. So what other aspects -- you started to
4 tell me about interactions in the office where she was
5 being critical of you?
6     A. One example is insubordination. She would use
7 that a lot of the time when I was essentially trying to
8 explain to her why I couldn't get stuff done.
9     Q. Okay.
10    A. I don't, I don't feel it's insubordinate to
11 talk to your manager about a problem and basically tell
12 your manager, I'm sorry, that's not a reasonable
13 expectation.
14        My impression was she seemed to think that I
15 can't do that in the way or on the time schedule you
16 want it done, and that's, that's a general example. I
17 can't point to an example where that happened. That
18 seemed to be the nature of our interaction. She would
19 give me an assignment and she wouldn't care what I
20 thought about whether I could get it done.
21    Q. You all met multiple times when you're talking
22 about these agendas and set deadlines and reset
23 deadlines and set deadlines again for things that you
24 were originally assigned, couldn't get done, reset a
25 deadline. That was not an uncommon occurrence during



Silverman, Mitchell   03-05-2018

58

1 your tenure there with Becca Rich as your supervisor;
2 correct?
3    A.  Yes.
4    Q.  Okay.  And so when deadlines were left unmet
5 and unmet and unmet and she said, what's going on, why
6 can't you meet this deadline, you considered that to be
7 retaliatory?
8    A.  Given that she also knew that what seemed to
9 me my primary responsibility was responding to
10 information requests either at the desk or otherwise.
11 And if you look through my e-mails, you'll also see that
12 I'm busy doing a lot of stuff for faculty, for students,
13 for practitioners.  Again, I received a lot of
14 complimentary e-mails.  And honestly I saw my, I saw,
15 unless I'm mistaken from the job description, you know,
16 helping patrons is at the top of the list.
17    Q.  So there were also meetings with her, Ms.
18 Rich, where you were inquiring and you were discussing
19 prioritizing tasks.  You seem to come into this equation
20 with the interactions with the patrons and the requests
21 from the faculty being your number one priority; right?
22 That's how --
23    A.  Correct.  Yes.
24    Q.  -- you looked at it; right?  Even when your
25 supervisor was telling you you had other things that

59

1 were more important to her at that particular point in
2 time; correct?
3    A.  Correct.
4    Q.  And you didn't agree?
5    A.  I have ADHD.  When somebody asks me a
6 question, I get derailed.  Frequently I get -- it's
7 like, oh, I can finish that in 15 minutes.  Two hours
8 later it's finished.  So I never did that deliberately.
9 I mean, I would tell her, I'm not going to be able to
10 get this done.
11    Q.  So, so what did you need in order to be able
12 to successfully accomplish those tasks?  More time?
13    A.  I don't know.  I'm not an expert on
14 accommodations.
15    Q.  Well, you're the one whose responsibility it
16 is to ask for an accommodation if you feel that you need
17 it; correct?
18    A.  I think that you're asking me for a conclusion
19 of law.
20    Q.  I'm not.  I'm asking you for your opinion, for
21 your belief as you interacted with an issue over the
22 course of time.  Did you expect them to come to you and
23 say, here's an accommodation, you didn't ask for it but
24 we think you need it?
25       MS. GOODWIN:  Object to the form.  You can

60

1 answer if you know.
2    A.  I told NSU about my problems and I told NSU
3 that I was having specific problems in work because of
4 them.  Beyond that I think you are asking me to make a
5 conclusion, a statement of law, who's responsible for
6 coming up with an accommodation, and I'm not going to
7 answer that.
8 BY MR. BEAUCHAMP:
9    Q.  You're refusing to answer a question?
10    A.  That particular --
11       MS. GOODWIN:  Well, no, if you know the
12 answer.  If you don't know it --
13    A.  I think the answer is no.
14 BY MR. BEAUCHAMP:
15    Q.  The answer is no.  So you believe, as you sit
16 there today, you believe that it was up to NSU to come
17 to you and offer you accommodations whether you ask for
18 them or not?
19       MS. GOODWIN:  Object to the form.
20    A.  I didn't say that, no.
21 BY MR. BEAUCHAMP:
22    Q.  Okay.  So you tell me -- there's a process
23 through which individuals who believe that they are
24 disabled can obtain disability accommodations at NSU;
25 correct?

61

1    A.  Correct.
2    Q.  Okay.  You were fully aware of that process;
3 correct?
4    A.  Correct.
5    Q.  Okay.  And sometimes you used it and sometimes
6 you didn't; correct?
7    A.  I don't recall the details.  I know I used it
8 sometimes.
9    Q.  You used it sometimes.  Okay.
10       Sometimes you made formal applications, you're
11 aware that it was required to have medical documentation
12 to support the request for accommodations, and those
13 were processed, correct, by NSU?
14    A.  You asked me a compound question that I can't
15 answer the way you asked it.  I'm sorry.
16    Q.  Okay.  Were you aware that there was a
17 process?  I think you already answered that yes; correct?
18    A.  Yes.
19    Q.  You were aware that you needed to submit
20 paperwork to the disability office, correct, to obtain a
21 formal accommodation; correct?
22    A.  No.
23    Q.  No.  You think you could do it some other way?
24    A.  No.
25    Q.  No?  So how else?



Silverman, Mitchell   03-05-2018

---

**62**

1   A.   What I understand is -- and, again, I believe
2   this is a matter of law and not a fact -- is that once I
3   let Nova know that I have a disability and that I need
4   accommodations, that the process is supposed to be
5   collaborative, not on me, and that I'm not necessarily
6   supposed to ask for a specific accommodation, but that
7   Nova is supposed to look into it and say and go to an
8   outside expert if they need to.
9       Q.   If they need to.
10      A.   And I was never told whether they considered
11  that as an option.  I don't know.
12      Q.   So the requests that you do recall making for
13  disability accommodations, was there any medical
14  documentation that you obtained to support the request
15  or did you identify a doctor from which Nova could
16  obtain medical documentation?
17      A.   I identified my psychotherapist and I provided
18  some documentation from my psychotherapist.  I got
19  myself evaluated at some point in 19 -- in 2016, I
20  believe.  And I don't know whether I submitted that
21  documentation to NSU, but I am pretty sure, to the best
22  of my recollection, that I told Becca I had had the
23  evaluation done and asked her if it would be useful.  It
24  was an extensive evaluation.
25      Q.   Okay.  What did she say?

---

**63**

1       A.   I don't recall.
2       Q.   Okay.  Did you ever provide that evaluation to
3   Diane Emery?
4       A.   I was never asked to.
5       Q.   You knew who Diane Emery was; correct?
6       A.   Yes.
7       Q.   Was this done at a point in time where you
8   thought that you needed additional accommodations that
9   you were not receiving?
10      A.   Yes.
11      Q.   Okay.  Did your doctor identify what
12  additional accommodations you might need?
13      A.   No.
14      Q.   So you mentioned it to Becca?
15      A.   Correct.
16      Q.   Said you had this comprehensive evaluation and
17  asked her if she thought it might be helpful?
18      A.   Correct.
19      Q.   And her response was you don't recall?
20      A.   I don't recall.
21      Q.   Okay.
22      A.   I may not have asked her if she thought it
23  would be helpful, but I did tell her I had it done.
24      Q.   Okay.  So let's get to the retaliation.
25          Were you ever suspended before you were

---

**64**

1   terminated?
2       A.   No.
3       Q.   Did they ever demote you?
4       A.   No.
5       Q.   Did they ever fine you or dock you pay as a
6   result of taking ADA accommodations?
7       A.   No.
8       Q.   What adverse employment action did Nova -
9   anybody at Nova, but I presume it's primarily Rebecca
10  Rich - what adverse employment action did she do to you
11  that you think was the result of the ADA accommodations
12  that you sought?
13      A.   I don't recall any.
14      Q.   Any other instances where you feel as though
15  she treated you in a harsh or -- what was the
16  phraseology -- unprofessional manner besides what you've
17  described for me?
18      A.   I don't recall the details, but I recall it
19  happening in virtually every meeting we had.  She seemed
20  to use the word "insubordination" as a plub (ph).
21      Q.   And yet up until the time that you received a
22  written warning, there had been no adverse employment
23  action; correct?
24      A.   I believe I received a verbal warning.  I know
25  I received a verbal warning and I know it was -- there's

---

**65**

1   an example of -- I guess this counts as an adverse
2   employment action.  She gave me a verbal warning as I
3   was leaving on vacation at the end of the year.  I don't
4   recall.  I think it was the end of 2015.
5       Q.   What was the verbal warning about?
6       A.   I don't recall exactly.
7       Q.   Do you recall at all?
8       A.   It was I think primarily -- I think it was
9   work issues.  I don't think it was inappropriate
10  conduct.
11      Q.   And she also engaged in verbal counseling with
12  you on multiple occasions; correct?
13      A.   She criticized me about various things that I
14  had done.  I wouldn't call any of it counseling.
15      Q.   So I want to know what you mean by criticism.
16  You say it as though it's a pejorative.  I think that's
17  the way you intend to mean it here; correct?
18      A.   In her case, yes.
19      Q.   In her case.  Okay.  Because of how you
20  believe she interprets your interaction with her;
21  correct?
22      A.   I'm sorry.  Can you repeat that, Counselor?
23      Q.   Yeah.  Sure.
24          You believe that when Becca Rich criticizes
25  you she's doing it in a pejorative way as opposed to

---



Silverman, Mitchell   03-05-2018

66

1  what others would consider constructive criticism?
2      A.  Correct.
3      Q.  Okay.  And by the way, that's something that
4  pops up pretty regularly on your performance
5  evaluations, too, right, the fact that you have
6  difficulty with constructive criticism?  Do you take
7  criticism well just as a general proposition?
8      A.  That's a compound question and I'd like to
9  answer it --
10     Q.  Let me ask it one question at a time.  Okay?
11     A.  Please.
12     Q.  First of all, are you aware that the
13 performance evaluations pretty regularly say that you
14 have difficulty accepting constructive criticism; you're
15 aware of that?
16     A.  It sounds accurate but I don't recall the
17 details.
18     Q.  Okay.  Do you have a problem with accepting
19 constructive criticism?
20     A.  I don't think I do, no.
21     Q.  When it comes from Rebecca Rich, you
22 don't think it's constructive, you just think it's
23 criticism; correct?
24     A.  I don't recall her giving me what I would call
25 constructive criticism ever.

67

1      Q.  Okay.
2      A.  I shouldn't, I apologize, Your Honor -- great.
3  Strike that.
4          There were instances where her feedback was
5  more or less constructive, but it's hard for me to look
6  at that in an even-handed way because of our
7  relationship.
8      Q.  So you've arrived at a point as you sit here
9  today where everything she said and did is pejorative
10 now; correct?
11     A.  I would say that she and our interactions was
12 a trigger for my anxiety, so it's very hard for me to
13 separate her attempts at constructive criticism such as
14 they were --
15     Q.  Okay.
16     A.  -- from, from any constructive criticism she
17 may have been giving me.
18     Q.  Okay.  So, so because she became a trigger for
19 your anxiety, interactions which might otherwise just be
20 constructive criticism were interpreted as being
21 something more than that, something pejorative?
22     A.  But there's a basis for that.  May I?
23     Q.  First answer the question.  Is that true and
24 then you can explain.
25     A.  Okay.  Can you ask me again?  I'm sorry.

68

1      Q.  So because you considered her to be a trigger
2  for your anxiety, you may well have interpreted many
3  occasions of constructive criticism being offered by her
4  as being something that was not constructive but simply
5  mean; true or false?
6      A.  Maybe.
7      Q.  Okay.
8      A.  You asked it as a main question.
9      Q.  You don't know the answer?
10     A.  Maybe.
11     Q.  Well, maybe is not an answer.
12     A.  You asked it as a maybe question, Counselor.
13 Counselor, it's about lunch time I think.
14     Q.  Well, we've gone a whole 30 minutes since our
15 last break.  Did you need a lunch break now?
16         MS. GOODWIN:  If we can go maybe till 1:30 or
17 2.
18         MR. SILVERMAN:  Not 2:00.  Sorry.  1:30?
19         MS. GOODWIN:  1:30, take a short lunch.
20         MR. BEAUCHAMP:  If you need a break, I'm not
21 going to stop you.  I don't want to be criticized
22 later on for having interfered with anything.
23         MS. GOODWIN:  That's true.
24         MR. BEAUCHAMP:  But we're going to, so go
25 ahead and take your break now.

69

1          MR. SILVERMAN:  Do you want to go to lunch now
2  or do you want to take a short break or just
3  continue to 1:30?
4          MS. GOODWIN:  If we're going to take a break
5  why don't we just make it a lunch break.
6          MR. BEAUCHAMP:  Make it a lunch break and do
7  it to 1:30.
8          MR. SILVERMAN:  Well, we may be longer than
9  that.  I don't think a half an hour --
10         MR. BEAUCHAMP:  I would hope.
11         MS. GOODWIN:  Not much.  If we are 5, 10
12 minutes.
13         MR. SILVERMAN:  Sorry, Counselor.  I want to
14 be up front with you.
15         (Off the record 1:02 p.m.)
16         (On the record 1:53 p.m.)
17 BY MR. BEAUCHAMP:
18     Q.  There was one thing I wanted to touch
19 on before we move forward, and it was something you said
20 about, I think it was about the assignments that you
21 were given leading up to your termination that the
22 failure of which, the failure of you to complete them
23 was part of the termination, and you said that they were
24 given to you while you were on FMLA leave; right?
25     A.  I believe so.



Silverman, Mitchell   03-05-2018

70

1    Q. Okay. You say you believe so. I just want to
2    clarify so we all understand what you're talking about.
3    You took - I guess for lack of a better phrase -
4    intermittent FMLA leave.
5    A. Correct.
6    Q. So if you missed a couple of hours here, it
7    was put in the FMLA leave category. You didn't take a
8    large block of weeks or months where you were out of
9    work; correct?
10    A. I would take a day at a time usually.
11    Q. Okay.
12    A. Or more than one day at a time.
13    Q. I'm sorry. What was the last?
14    A. In day-long blocks, multiple in a row if
15    necessary. I don't remember the details.
16    Q. Do you remember taking multiple in a row day-
17    long blocks?
18    A. I don't recall.
19    Q. Do you have a recollection of that?
20    A. I do not.
21    Q. Okay. Were there times where you took a
22    couple of hours and it was categorized as the
23    intermittent FMLA leave?
24    A. I don't believe so.
25    Q. Did you use that -- and I don't mean this in a

71

1    pejorative way. Did you use the FMLA leave as kind of a
2    bank to cover times when you weren't physically able to
3    be at work? Did you draw from it?
4    A. Yeah.
5    Q. Okay.
6    A. Yes.
7    Q. And you did that intermittently?
8    A. Correct.
9    Q. So when you say that you received these
10    assignments, you believe while you were on FMLA leave,
11    it wasn't a situation where you were on a month-long
12    leave and they came to you while you were on leave?
13    A. That's correct.
14    Q. So you believe that the initial assignment of
15    some of these projects took place on a day when you
16    weren't there?
17    A. No.
18    Q. But you're not sure?
19    A. I don't, I don't believe so, no.
20    Q. No? Okay. You believe that you were there
21    when they were assigned to you?
22    A. I believe so, yes.
23    Q. Okay. All right.
24        There came a time when you received a written
25    warning; yes?

72

1    A. Yes.
2    Q. All right. Do you remember approximately when
3    that was?
4    A. No.
5    Q. Do you remember what the stated basis for the
6    written warning was?
7    A. Part of it was behavioral and part of it was
8    assignments that I worked on, deadline problems.
9    Q. Deadline problems. Okay. And what do you
10    recall about the behavioral issues?
11    A. Inappropriate behavior. I really don't recall
12    the details.
13    Q. Okay. Did they also provide at that point in
14    time a performance improvement plan?
15    A. I don't recall.
16    Q. Okay. Do you recall meeting regularly with
17    anyone after the performance and improvement plan was
18    put into effect?
19    A. I don't recall when the performance
20    improvement plan was put into effect. I did meet
21    relatively regularly with Becca.
22    Q. Okay. Do you recall any issues with your
23    performance or behavior that took place after the
24    performance improvement plan was put into effect?
25    A. I know that I didn't accomplish the

73

1    assignments that I was given in late 2016 by the
2    deadlines I was given.
3    Q. Okay. How about behavioral?
4    A. I don't recall.
5    Q. You don't recall. Okay.
6        Do you recall being made aware of complaints
7    that were being made against you by other library
8    employees --
9    A. I --
10    Q. -- during that period? I'm sorry.
11    A. During the period when I was on a performance
12    plan?
13    Q. Yeah.
14    A. I know that there were complaints. I don't
15    remember when they were.
16    Q. Do you remember what they were?
17    A. I believe one of them was about my outing ▮
18    to a student, or I should allegedly outing ▮ to a
19    student.
20    Q. Well, in response to that complaint, didn't
21    you admit doing it?
22    A. The only reason I'm splitting hairs is ▮,
23    ▮ sort of outedness (sic) was very, it's like he was
24    out to some people, he wasn't out to other people. It
25    was never -- I did, I did basically disclose to a



Silverman, Mitchell   03-05-2018

**74**

1 student that he was gay. What I'm saying is I don't
2 know whether I like outed him outed him. I did disclose
3 to a student that he was gay, if that's what, if that
4 answers your question.
5     Q.   Do you know who ▮▮▮▮▮▮(ph) is?
6     A.   That's ▮ That's who I'm referring to.
7     Q.   Okay. Were there any other complaints from
8 ▮▮▮ besides that that you're aware of --
9     A.   No.
10     Q.   -- that you can recall? Anything associated
11 with the deaccession project?
12     A.   Ah. I don't recall any complaints and I don't
13 recall being informed of any complaints.
14     Q.   Okay. Was there a project that you were
15 assigned that you said was beneath you and a waste of
16 your time?
17     A.   No.
18     Q.   No?
19     Carolyn Brown, do you know her?
20     A.   Yes.
21     Q.   Were you aware of complaints that she made
22 about you?
23     A.   I know we didn't get along. I don't know of
24 any complaints and I don't recall being informed of any
25 complaints.

**75**

1     Q.   You don't recall being informed of any
2 complaints, but do you recall writing an e-mail to Becca
3 Rich saying that you apologized to Carolyn Brown and you
4 guys were okay now?
5     A.   I'm just saying I don't recall. I'm not
6 saying it didn't happen.
7     Q.   So you just don't remember?
8     A.   Correct.
9     Q.   During this period of time after the written
10 warning was given to you, did you continue to have
11 difficulty meeting work assignment deadlines?
12     A.   Yes.
13     Q.   Were there occasions where you requested an
14 extension and still couldn't make the deadline?
15     A.   I don't recall, but I don't deny that it
16 happened either.
17     Q.   Okay. Were there occasions where you
18 requested multiple extensions and still couldn't make
19 the deadline?
20     A.   I don't recall, but I don't deny that it
21 happened.
22     Q.   Did you wait until just shortly before
23 something was due to start working on it as a general
24 practice?
25     A.   I tried not to, and certainly not as a general

**76**

1 practice.
2     Q.   It did take place though; yes?
3     A.   I don't recall, but I don't deny that it
4 happened.
5     Q.   You were ultimately terminated in February of
6 2017; correct?
7     A.   Correct.
8     Q.   Do you remember what the grounds for your
9 termination were?
10     A.   Aside from a mention of unprofessional conduct
11 being part of my written warning, it was all assignments
12 that hadn't been accomplished relatively shortly before
13 I was terminated, and I don't remember -- there's a list
14 in the termination memo. I don't remember the list.
15     Q.   And those are projects that had been assigned
16 to you that you did not complete; correct?
17     A.   I don't recall, but I don't deny that it
18 happened.
19     Q.   Did there come a time when you asked for
20 automatic extensions of any deadline given on any
21 project in the future?
22     A.   I don't recall, but I don't deny that I asked.
23     Q.   Do you think that that's a reasonable
24 accommodation?
25     A.   Counselor, I was grasping at straws.

**77**

1     Q.   So does that mean that you do think it's a
2 reasonable accommodation or you don't think it's a
3 reasonable accommodation?
4     A.   I mean, it seemed like a reasonable
5 accommodation to ask for. Is it a reasonable
6 accommodation as far as Nova is concerned? I can't
7 answer that question.
8     Q.   Were there occasions in the last say three,
9 four months of your employment with Nova where other
10 individuals would have to complete projects that you
11 were unable to complete?
12     A.   I don't recall. I don't deny that that
13 happened.
14     Q.   Do you remember when it was that you requested
15 that you not be required to meet face to face with
16 Rebecca Rich without someone else being present?
17     A.   No.
18     Q.   If I told you that that didn't take place
19 until January 9 of 2017, would you deny it?
20     A.   No.
21     Q.   As far as the projects that you were -- the
22 basis of the termination, if you will, was the creation
23 of an NSU Clinics Library Guide one of the projects you
24 were supposed to complete?
25     A.   The practice clinics? I don't remember. That



Silverman, Mitchell  03-05-2018

78

1  sounds about right, but can you, can you --
2      Q.  NSU Clinics Library Guide.
3      A.  I believe so.
4      Q.  Critical Skills Program Library Guide?
5      A.  I believe so.
6      Q.  Judicial Contact List Project?
7      A.  I don't recall that project.
8      Q.  Update the Career Pathways Library Guide?
9      A.  I believe so.
10     Q.  Compile one to two-page list of career/job
11  search resources?
12     A.  I believe so.
13     Q.  Give Database of the Month slides?
14     A.  I believe so.
15     Q.  Did you complete any of those?
16     A.  The Database of the Month project, yes, and I
17  made what I think of as considerable significant
18  progress on the rest of them.
19     Q.  Do you remember your termination date?
20     A.  I believe it was the 22nd of February.
21     Q.  2017?
22     A.  Correct.
23     Q.  There's an indication in the termination
24  letter that Rebecca Rich counseled you on six occasions
25  between August of 2015 and November 2015 regarding

79

1  completion of work assignments by established dates.
2  Did that happen?
3      A.  I don't recall, but I don't deny that it
4  happened.
5      Q.  Do you recognize that when you're assigned
6  work and you don't complete it, that that has an impact
7  on the other people that you work with?
8      A.  Yes, I do.
9      Q.  An adverse impact; yes?
10     A.  Yes.
11     Q.  Do you know who made the decision to terminate
12  you?
13     A.  No.
14     Q.  Who is -- I'm not going to pronounce this
15  correctly.  Is it Vicenc Feliu?  Is that how you
16  pronounce his first name?
17     MR. HORTON:  Vicenc.
18  BY MR. BEAUCHAMP:
19     Q.  Vicenc Feliu, do you know who that is?
20     A.  Yes.
21     Q.  Who is that?
22     A.  He was during the last bit of my employment at
23  Nova the Law Library director.
24     Q.  Okay.  Do you know whether or not he did a
25  review of all of the Law Library employees when he came

80

1  on board with an issue?
2      A.  I do not know that, no.
3      Q.  Do you know whether he was the one who made
4  the decision to terminate your employment?
5      A.  I do not.
6      Q.  With respect to the projects that I read to
7  you from the termination letter, the ones that were not
8  completed with one exception --
9      A.  Yes.
10     Q.  You said you made substantial progress on one
11  of them -- was there some accommodation that you believe
12  that you could have used to complete those on time?
13     A.  Counselor, if I may, I said I made substantial
14  progress on the other assignments that I recall being
15  assigned, not just one of them.
16     Q.  Okay.  Leaving that aside for a moment, was
17  there some accommodation -- those assignments deadlines
18  had been moved multiple times; correct?
19     A.  I don't recall.
20     Q.  You don't recall.  Okay.
21     So other than just continuing to move the
22  deadline for those assignments until such time as you
23  were able to complete them, is there any other
24  accommodation that you could have been given that would
25  have allowed you to complete them on time?

81

1      MS. GOODWIN:  Object to the form.  You can
2  answer if you know.
3      A.  I don't know.
4  BY MR. BEAUCHAMP:
5      Q.  Fair enough.
6      Do you believe that your termination was
7  retaliation for taking -- for asking for and receiving
8  ADA accommodations?
9      A.  Yes.
10     Q.  Okay.  Do you believe that your termination
11  was in retaliation for having utilized FMLA leave?
12     A.  Yes.
13     Q.  When was the first time approximately that you
14  requested disability accommodations from Nova?
15     A.  I don't recall when I first requested
16  accommodations formerly, but I do know that Eric was
17  aware of my issues and that around the time Becca became
18  my supervisor there was discussion about reassigning me
19  in such a way that I spent more time on the reference
20  desk and less time doing task work.
21     Q.  So this would have encompassed the period
22  we're going way back to 2010, 2011, 2012; right?
23     A.  Yes.
24     Q.  Okay.  And so you acknowledge there was
25  discussion about doing things to assist you with your



Silverman, Mitchell   03-05-2018

82

1 problems maybe informally at that period of time; right?
2     A.   There was discussion.
3     Q.   Okay.  And then would you disagree with me if
4 I told you that your first disability accommodation
5 request began around 2012?
6     A.   I would, I would say no, I disagree with you.
7     Q.   You do.  Okay.  You think it was later?
8     A.   My understanding is - I'm not trying to be
9 difficult -that as soon as I let Eric know that I had
10 issues, as soon as I let Becca know --
11    Q.   Right.
12    A.   And at that time I said I could use some help.
13 I don't remember exactly what I said -- that it doesn't
14 matter when I put that stuff in writing.
15    Q.   Okay.  So when I use the word "formal", just
16 for purposes of this deposition, I'm talking about you
17 actually filling out paperwork and sending it to the
18 disability office rather than having a conversation with
19 your supervisor.
20    A.   Sure.  What was that date then?
21    Q.   2012.
22    A.   Okay.  I don't recall but I don't deny that it
23 happened.
24    Q.   Okay.  So using what we're talking about in
25 terms of a formal request, there were discussions before

83

1 that that you've just testified to.
2     A.   Discussions and requests, verbal.
3     Q.   Okay.  All right.  And the first formal
4 request as we've defined it here --
5     A.   Sure.
6     Q.   -- in 2012 --
7     A.   Sure.
8     Q.   When were you terminated?
9     A.   2017 February.
10    Q.   Did you make multiple accommodation requests
11 in 2015?
12    A.   I don't recall, but I don't deny that it
13 happened.  I don't recall the dates.
14    Q.   Okay.  You weren't fired in 2015; right?
15    A.   No.
16    Q.   As a matter of fact, you made, beginning in
17 2015, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 separate written
18 accommodation requests before the end of 2016.
19    A.   I don't recall, but I don't deny that it
20 happened.
21    Q.   Did you get fired in 2016?
22    A.   No.
23    Q.   When did you first start using FMLA leave?
24    A.   I don't recall.  I think actually I had
25 requested FMLA leave when my mom had a car accident in

84

1 2014 maybe.  I don't recall the dates.
2     Q.   Okay.
3     A.   As for when I started using it for my own
4 medical purposes, I don't recall, but I'm not going to
5 deny whatever is in the record.
6     Q.   Okay.  So 2014 approximately your mom was in a
7 car accident, you took some FMLA leave to take care of
8 her?
9     A.   Correct.
10    Q.   Okay.  And you'll agree with me -- were there
11 any other large blocks of FMLA leave or was it more this
12 intermittent use?
13    A.   No.  Around the time I developed the chronic
14 migraines I was on FMLA leave for quite some time.
15    Q.   How long was that approximately?
16    A.   Months.  I don't remember how many.
17    Q.   You were out for months?
18    A.   Yes.
19    Q.   Okay.  Do you remember approximately when that
20 was?
21    A.   No.
22    Q.   Was it in -- can you tell me was it in 2015?
23       2016?
24    A.   I really don't recall.
25    Q.   You don't recall what year it was?

85

1     A.   No, I don't.  I'm not going to deny that it
2 happened however.
3     Q.   You came back from that FMLA leave regarding
4 the migraines and returned to work; correct?
5     A.   Correct.
6     Q.   And was it after that that you began using the
7 FMLA leave intermittently?
8     A.   Yes.
9     Q.   Okay.  So it's fair to say that you've been
10 using the FMLA leave intermittently for at least a
11 couple of years before you were terminated?
12    A.   I don't recall, but I don't deny that it
13 happened.  I don't remember the dates.
14    Q.   Well, certainly when you came back from the
15 FMLA leave that you took when your mom was injured in
16 the car accident you weren't terminated then; right?
17    A.   Correct.
18    Q.   And when you came back from the FMLA leave
19 which you took when you experienced the migraines, you
20 weren't immediately terminated; correct?
21    A.   Correct.
22    Q.   Okay.  And when you say that you were
23 terminated within two months of having utilized FMLA
24 leave, you're talking about the last time that you
25 utilized intermittent FMLA leave before your



Silverman, Mitchell   03-05-2018

86

1  termination?
2      A.  The last time I used FMLA leave intermittently
3  after using FMLA leave continuously and intermittently
4  for a very long time.
5      Q.  Okay.  I'm sorry I didn't understand that
6  answer.
7      A.  I used FMLA leave continuously and
8  intermittently for a very long time --
9      Q.  Mm-hmm.
10     A.  -- and was terminated less than two months
11 after the last time that I used it.
12     Q.  Okay.  The last time that you used it was
13 intermittent; correct?
14     A.  Correct.
15     Q.  As a matter of fact, you had been using it
16 intermittently rather than in blocks for months before
17 your termination?
18     A.  Intermittently as opposed to continuously.
19     Q.  Correct.
20     A.  Yes.
21     Q.  Can you identify a single week for me during
22 the entirety of the last, say, three years of your
23 employment at NSU where you actually worked more than 40
24 hours?
25     A.  No.

87

1      Q.  While you were at Nova, and focusing on the
2  last three years, you were a salaried employee?
3      A.  Correct.
4      Q.  And the primary duties of your position
5  required some form of advanced knowledge, would you say?
6  Law degree?
7      A.  Oh, I'm sorry.  I didn't know what you meant.
8  Yes.
9      Q.  Yeah; right?
10     A.  Yes.
11     Q.  Your position as a law librarian was primarily
12 of an intellectual nature, was it not?
13     A.  I would say it was all intellectual.
14     Q.  Okay.
15     A.  There was some shlepping but really wasn't --
16     Q.  We all got to shlep sometimes; right?
17     A.  It's true.  Counselor, can I just go grab a
18 couple bottles of water?
19     Q.  Sure.
20     A.  I don't want to keep you, but figured I'd do
21 it now than during a break.
22         (Off the record 2:20 p.m.)
23         (On the record 2:43 p.m.)
24 BY MR. BEAUCHAMP:
25     Q.  Okay.  So at or near the time of your

88

1  employment -- I'm sorry.  At or near the time of your
2  termination from NSU, did you approach the dean about
3  alternate positions within the university?
4      A.  I believe so.
5      Q.  Do you know whether or not you did?
6      A.  I recall talking to him.  I don't recall the
7  substance of the conversation there.  You described what
8  I remember.
9      Q.  Okay.  Well, let me just read you some, a
10 passage from the grievance testimony that you gave.
11     A.  Okay.
12     Q.  Okay?  This will be on page 303 of this
13 grievance.  You were asked, "Did you ever request a
14 transfer to another position?  Answer:  I don't believe
15 so.  Did you ever apply for another position at the
16 university?  Answer:  I don't believe so.  Did you ever
17 take any steps to obtain a different position at the
18 university?  Answer:  No."
19         Was that accurate or inaccurate?
20     A.  I was being more specific than perhaps I
21 should have been.  I never applied for a position, for
22 example, over at the main library.
23         What I was talking with Dean Fellu about, as I
24 recall, was some sort of transfer or adjustment of my
25 position within the Law Library.

89

1      Q.  So redefining your position basically?
2      A.  Sure.  And if he had come back to me and said,
3  why don't we talk about transferring, I would have been
4  willing to consider that.  It never occurred to me to
5  ask.
6      Q.  So were you aware of any position that was
7  available at the law library that would have encompassed
8  what it was that you were looking for in terms of
9  alternate employment?
10     A.  No, but I also knew that sort of thing was
11 mutable.
12     Q.  Oh, so he could just create one?
13     A.  It wouldn't have been that easy, but something
14 could have been arranged, yes.
15     Q.  Did you understand what the process is at NSU
16 for creating a new position?
17     A.  Formally, yes.
18     Q.  What is the process for creating a new
19 position at NSU?
20     A.  There's something called a Position Review
21 Committee that you have to go through, but that's not
22 what I'm talking about.
23     Q.  Well, what are you talking about?
24     A.  The dean has control of what his employees do
25 and when and how.  And my experience at Nova was that



Silverman, Mitchell   03-05-2018

90

1 formal job descriptions and formal job positions had
2 little or nothing to do with what people actually did.
3    Q.  No, but the job description that you actually
4 performed during the course of your work there contained
5 components that went far beyond what it was you've just
6 described to me as what you were looking for.  You just
7 wanted to interface with the students.
8    A.  But things could have been moved around so
9 that I was doing a lot more of that and a lot less
10 project work, just for example.
11    Q.  Go ahead.
12    A.  I'm done.  That was all I had as a response.
13    Q.  So first of all, you're not aware that a
14 position existed of the nature that you wanted to have?
15    A.  I'm not aware of that, no.
16    Q.  Okay.  You told us in the grievance committee
17 testimony that you did not take any steps to obtain a
18 different position at the university, so you didn't
19 apply -- did you look on the website?
20    A.  I don't recall.  I may have.  I think I
21 probably did.  No.
22    Q.  I don't want you to guess.  This is a good
23 time not to guess.
24    A.  Okay.
25    Q.  So did you?

91

1    A.  I don't recall.
2    Q.  Okay.  All right.  You're aware that one
3 existed; right?
4    A.  At the Sherman Library?
5    Q.  That there's an online NSU resource for
6 employment job postings for all over the university.
7    A.  I'm sorry.  I thought you meant a position as
8 opposed to the search engine.  I did know that existed,
9 yes.
10    Q.  Yeah.  Did you use that as a resource at or
11 about the time you were terminated?
12    A.  No.
13    Q.  Did you look for another job?
14    A.  No.
15    Q.  Or before you were terminated in terms of your
16 inability to perform certain aspects of the job and your
17 desire to work at a position that was different?
18    A.  I didn't want to have to apply for another
19 job, so I didn't do that.
20    Q.  Okay.
21    A.  I was more interested in an accommodation.
22    Q.  And the accommodation being that the job would
23 be what you wanted it to be?
24    A.  Not necessarily.
25    Q.  Well, I mean, that's pretty much what we're

92

1 saying, isn't it?  I mean, not to be argumentative with
2 you, but what you're looking for is a job where you
3 could come when you wanted to, go when you wanted to, do
4 what you wanted to do?
5    A.  Counselor, a transfer doesn't require a job
6 application.
7    Q.  And your point?
8    A.  I wasn't aware of anything that could have
9 been transferred to.  But, again, my experience at Nova
10 was that the relationship between jobs in that database
11 and what people actually did was not much, so my
12 understanding was that when I went to my bosses and said
13 help me, informally or formally, that they would help me
14 and they never did.
15    Q.  They never did.  They never granted any of
16 your accommodation requests over the course of five
17 years there, six years there?
18    A.  They granted a few.  It didn't seem to help.
19    Q.  Seriously a few?  Under oath you're going to
20 say a few?  Scores of accommodation requests, scores of
21 requests that you made over the course of time.
22    A.  I don't recall, Counselor.
23    Q.  Okay.  You don't recall.
24        Have you seen, other than your psychologist,
25 your therapist, have you seen anyone else with respect

93

1 to any damage or injury that you claim befell you as a
2 result of the events that you complain of in your
3 lawsuit?
4    A.  We went over a number of clinicians that I've
5 seen.  You're asking me to sort of parcel out whether I
6 saw anyone else as a result of the exacerbation of my
7 symptoms?  I think the answer is no.
8    Q.  Did you see any of these professionals more
9 frequently?
10    A.  I couldn't afford to.  I might have if I could
11 have been able to afford it, but no.
12    Q.  But you didn't?
13    A.  Correct.
14    Q.  And with respect to the medications you were
15 taking, with the exception of the Spiriva --
16    A.  Correct.
17    Q.  -- is there anything else different --
18    A.  No.
19    Q.  -- before versus after?
20    A.  No.
21        MR. BEAUCHAMP:  That's all I've got.  Thank
22 you very much.
23        MR. SILVERMAN:  You're welcome.  Thank you,
24 Counselor.
25        MS. GOODWIN:  I just have a couple clarifying.



Silverman, Mitchell   03-05-2018

94

1    MR. BEAUCHAMP: So it may be that I have more.
2    MS. GOODWIN: I'm going to keep it short, so
3  hopefully you won't. I had them written down.
4          CROSS EXAMINATION
5  BY MS. GOODWIN:
6    Q. Was the vast majority of your requests for
7  accommodations in writing, whether it's e-mail, memos,
8  whatever they may have been, at Nova?
9    A. The vast majority of my specific requests,
10  yes.
11    Q. Okay. And as far as any issues you had with
12  Ms. Rich, you mentioned formal complaints, when you said
13  formal those were in writing?
14    A. Correct.
15    Q. Would those e-mails, memos, formal complaints
16  be a better reflection of the actual facts or would your
17  memory be?
18    MR. BEAUCHAMP: Form.
19  BY MS. GOODWIN:
20    Q. Go ahead. Answer if you can.
21    A. The record is a better reflection of what
22  happened than my memory.
23    Q. Okay. And as far as the factual basis for
24  your, why we're here, the Complaint, would the actual
25  complaint itself be a better reflection of those facts

95

1  or would your memory here today be?
2    MR. BEAUCHAMP: Form.
3    A. The complaint.
4  BY MS. GOODWIN:
5    Q. Did you review the Complaint before it's
6  filed?
7    A. Yes.
8    Q. How about the First Amended Complaint, did you
9  review that before it was filed?
10    A. Yes.
11    Q. How about the Second Amended Complaint?
12    A. Yes.
13    Q. Did you advise me of any issues that were in
14  that, if there were any?
15    A. Yes.
16    Q. Okay. If any accommodations other than
17  extending deadlines had been offered to you, would you
18  have been receptive to any other suggestions?
19    MR. BEAUCHAMP: Form.
20    A. Absolutely.
21  BY MS. GOODWIN:
22    Q. Did your doctors ever suggest anything to you
23  besides extending deadlines?
24    A. Not that I recall.
25    Q. If they had, would you have taken those to

96

1  Nova or somebody there to help you?
2    A. Yes.
3    MR. BEAUCHAMP: Form.
4    A. Yes. Sorry.
5  BY MS. GOODWIN:
6    Q. And when you first came here today, you were
7  testifying a lot that you don't recall. Does your
8  Autism make you take things more literally?
9    A. Yes.
10    Q. And in your professional opinion -- not
11  opinion. I'm sorry. But as an attorney, does it make
12  you feel you take things more literally as part of being
13  an attorney?
14    MR. BEAUCHAMP: Form.
15    A. Yes, and the combination is.
16  BY MS. GOODWIN:
17    Q. That was my next question. What's the
18  combination?
19    A. It can be a real problem.
20    Q. In what way?
21    A. Well, I, when I would try and prepare for
22  hearings, the combination of my desire to over-prepare,
23  to know the facts backwards and forwards, and the
24  limitations on the time that I had available to do that
25  produced a very, a lot of anxiety, a lot of stress, a

97

1  big conflict.
2    Q. Okay. So I'm asking about like the
3  literalness, yeah.
4    A. Well, I have this tendency to sometimes,
5  especially when I'm under stress, to miss nuance. I
6  have to kind of step my way through that.
7    Q. Okay. And so earlier when, getting back to
8  the day when you were saying you didn't recall, you were
9  saying that more earlier than later; is that part of the
10  literalism as why?
11    MR. BEAUCHAMP: Form.
12  BY MS. GOODWIN:
13    Q. Yeah.
14    A. Absolutely. I was behaving like an autistic
15  lawyer. I saw myself doing it.
16    MS. GOODWIN: I don't have any further.
17          REDIRECT EXAMINATION
18  BY MR. BEAUCHAMP:
19    Q. So did you testify inaccurately under oath
20  this morning?
21    A. Not at all.
22    Q. Okay. So I can rely on the answers to the
23  questions that you gave me as being your sworn testimony
24  today?
25    A. Yes. Yes.



Silverman, Mitchell   03-05-2018

98

1    Q.  You're not backing off of anything you said
2  earlier today, are you?
3    A.  No.
4    Q.  Does your Autism prevent you from being able
5  to be honest?
6    A.  No.
7    Q.  What documents did you look at before you came
8  to your deposition today?
9    A.  The termination memo.
10   Q.  Anything else?
11   A.  I mean, my medication list and the notice, and
12  I mentioned those because I printed copies and they're
13  in my backpack.  But other than that, no.
14   Q.  So I guess I'm just a little bit lost by the
15  cross examination by your own lawyer here a moment ago.
16  It seemed to suggest that we can't rely on the
17  information that you provided to us this morning.  Is
18  that the import of what I'm getting?
19   A.  No.
20   Q.  Okay.  So if I asked you a question and you
21  told me you didn't remember, it's because you honestly
22  don't remember; right?
23   A.  Correct.
24   Q.  And certainly if you had any problem with
25  either because of your condition or because of

99

1  medication, recalling things and answering honestly you
2  would have told me that; correct?
3    A.  Yes.
4    Q.  And you didn't, did you?
5    A.  That's correct.
6        MR. BEAUCHAMP:  All right.  That's all I've
7    got.  All right.  Thank you.
8        MS. GOODWIN:  No.  We'll read.
9        MR. BEAUCHAMP:  We'll order.
10       MS. GOODWIN:  And we'll take a copy.
11       FURTHER DEPONENT SAITH NOT.
12       (Whereupon, the Deposition was concluded at
13       2:55 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

100

1            CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5    I, VICTORIA SUAREZ, Court Reporter and Notary
6  Public for the State of Florida, do hereby certify that
7  I was authorized to and did stenographically report and
8  transcribe the foregoing proceedings, and that the
9  transcript is a true and complete record of my notes.
10   I further certify that I am not a relative,
11  employee, attorney or counsel of any of the parties, nor
12  am I a relative or employee of any of the parties'
13  attorneys or counsel connected with the action, nor am I
14  financially interested in the action.
15
16   Witness my hand this 20th day of March, 2018.
17
18
19
20
21
22
_____
23  VICTORIA SUAREZ, COURT REPORTER
    NOTARY PUBLIC, STATE OF FLORIDA
24
25

101

1            CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5    I, VICTORIA SUAREZ, the undersigned authority,
6  certify that MITCHELL SILVERMAN, personally appeared
7  before me and was duly sworn on the 5th day of March,
8  2017.
9
10   Witness my hand this 20th day of March, 2018.
11
12
13
14
15
16
_____
17  VICTORIA SUAREZ, COURT REPORTER
    NOTARY PUBLIC, STATE OF FLORIDA
18  Commission No.: GG 064806
    Commission Exp:  February 24, 2021
19
20
21
22
23
24
25



Silverman, Mitchell   03-05-2018

102

1  DATE:   March 20, 2018
   TO:     MITCHELL SILVERMAN
2          C/O
           APRIL S. GOODWIN, Esquire
3          THE GOODWIN FIRM
           801 West Bay Drive, Suite 705
4          Largo, Florida 33770 727.316.5333
           goodwinlawoffices@gmail.com
5  IN RE:  MITCHELL SILVERMAN v NOVA SOUTHEASTERN
   CASE NO:  17-62005-CIV-MORENO
6
   Dear Mr. Silverman,
7
       Please take notice that on March 5, 2018, you gave
8  your deposition in the above-referenced matter.  At that
   time, you did not waive signature.  It is now necessary
9  that you sign your deposition.  You may do so by
   contacting your own attorney or the attorney who took
10 your deposition and make an appointment to do so at
   their office.  You may also contact our office at the
11 below number, Monday - Friday, 9:00 AM - 5:00 PM, for
   further information and assistance.
12
       If you do not read and sign your deposition within
13 thirty (30) days, the original, which has already been
   forwarded to the ordering attorney, may be filed with
14 the Clerk of the Court.
15     If you wish to waive your signature, sign your name
   in the blank at the bottom of this letter and promptly
16 return it to us.
17 Very truly yours,
18
19 VICTORIA SUAREZ, Court Reporter
   Universal Court Reporting
20 (954)712-2800
21 I do hereby waive my signature.
22
23
24 MITCHELL SILVERMAN
   Cc: Via transcript:    Richard Beauchamp, Esquire
25                        April Goodwin, Esquire

103

1          ERRATA SHEET
2  I wish to make the following changes, for the following
   reasons:
3
   PAGE NO.  LINE NO.
4  ___  ___  CHANGE_____
5          REASON_____
6  ___  ___  CHANGE_____
7          REASON_____
8  ___  ___  CHANGE_____
9          REASON_____
10 ___  ___  CHANGE_____
11         REASON_____
12 ___  ___  CHANGE_____
13         REASON_____
14 ___  ___  CHANGE_____
15         REASON_____
16 ___  ___  CHANGE_____
17         REASON_____
18 ___  ___  CHANGE_____
19         REASON_____
20 ___  ___  CHANGE_____
21         REASON_____
22 ___  ___  CHANGE_____
23         REASON_____
24
25 SIGNATURE           DATE



| | | | |
|---|---|---|---|
| **$** | **2009** 28:9 | **33770** 2:5 102:4 | **94** 3:5 |
| **$2,000** 10:1 | **2010** 81:22 | | **954)712-2600** 102:20 |
| | **2011** 81:22 | **4** | **954.390.0100** 2:11 |
| **0** | **2012** 81:22 82:5,21 83:6 | **4** 4:6 27:20,23 83:17 | **97** 3:6 |
| **064806** 101:18 | **2014** 84:1,6 | **40** 86:23 | |
| | **2015** 20:19 21:6 23:20,25 65:4 78:25 83:11,14,17 84:22 | **45** 13:15,16 53:15 | **A** |
| **1** | | **4th** 28:9 | **A.M** 1:17 |
| **1** 4:3 6:19 7:4,8 16:19,20 83:17 | | | **ability** 7:12 18:16 28:23 30:10 34:5 |
| **1:02** 69:15 | | **5** | **able** 9:25 13:10 22:19 23:1,5 24:3,13 25:2,11 26:2,5,10 27:7 34:5 35:23 38:22 50:15,17 59:9,11 71:2 80:23 93:11 98:4 |
| **1:30** 68:16,18,19 69:3,7 | **2016** 34:16 36:3 62:19 73:1 83:18,21 84:23 | **5** 1:16 3:3 5:2 69:11 83:17 102:7 | |
| **1:53** 69:16 | | **5:00** 102:11 | |
| **10** 69:11 83:17 | **2017** 34:16 76:6 77:19 78:21 83:9 101:8 | **500** 30:6 | |
| **1000** 30:2,4 | | **508** 1:18 | |
| **11:24** 1:17 | | **5th** 101:7 | |
| **12** 9:23 43:1 | **2018** 1:16 5:2 100:16 101:10 102:1,7 | | **above-referenced** 102:8 |
| **12:00** 30:14 | | **6** | |
| **12:07** 30:15 | **2021** 101:18 | **6** 83:17 | **Absolutely** 5:13 30:22 95:20 97:14 |
| **12:18** 39:4 | **20th** 100:16 101:10 | | |
| **12:29** 39:5 | **22nd** 78:20 | **7** | **academic** 13:5 |
| **15** 59:7 | **24** 101:18 | **7** 4:3 83:17 | **accepting** 66:14,18 |
| **17-62005-CIV-MORENO** 1:2 102:5 | **2400** 2:9 | **7/29/2015** 19:22,25 | **accident** 83:25 84:7 85:16 |
| | **27** 4:6 | **705** 2:4 102:3 | **accommodation** 22:14,20 23:1,6 24:4 25:4 34:6,7 54:20 59:16,23 60:6 61:21 62:6 76:24 77:2,3,5,6 80:11,17,24 82:4 83:10,18 91:21,22 92:16,20 |
| **19** 4:4,5 62:19 | **29** 23:20 | **727.316.5333** 2:5 102:4 | |
| **1970** 14:12 | **29th** 23:25 | | |
| | | **8** | |
| **2** | **3** | **8** 83:17 | |
| **2** 4:4 19:3,7,9,11 21:23 22:1,10 23:11 68:17 83:17 | **3** 4:5 19:3,7,9,12,13,24 20:19 22:2 23:11,12,19 24:3 83:17 | **801** 2:4 102:3 | |
| | | **88** 12:20 | |
| **2:00** 68:18 | | **888** 1:18 | |
| **2:20** 87:22 | | **88-year** 12:21 | **accommodations** 18:20,23 24:8,11,22 27:7 29:12,21 33:2,3,17,25 34:1,21,22 35:1,5,10 37:7,16 |
| **2:43** 87:23 | **30** 55:19 68:14 102:13 | | |
| **2:55** 1:17 99:13 | | **9** | |
| **20** 102:1 | **303** 88:12 | **9** 77:19 83:17 | |
| **200** 12:15 | **33301** 1:19 | **9:00** 102:11 | |
| | **33308** 2:10 | **905** 2:10 | |



39:22 59:14
60:17,24 61:12
62:4,13 63:8,12
64:6,11
81:8,14,16 94:7
95:16

**accomplish**
35:23,25 50:15
59:12 72:25

**accomplished** 76:12

**accurate** 66:16
88:19

**Acetaminophen**
30:3

**acid** 30:5

**acknowledge** 5:9
81:24

**Acknowledgement**
4:6 27:20

**acknowledgment**
28:10

**across** 32:2

**act** 38:3,23 48:1

**acting** 48:11,12

**action** 37:17
38:4,23
64:8,10,23 65:2
100:13,14

**active** 12:25

**actual** 94:16,24

**actually** 6:10 11:10
15:5 31:19 54:10
56:19 82:17 83:24
86:23 90:2,3
92:11

**ADA** 29:12,21
37:6,11 39:10,22
64:6,11 81:8

**addition** 8:24

**additional** 5:20

63:8,12

**addressed** 53:21

**addresses** 18:5

**ADHD** 59:5

**adjustment** 88:24

**admit** 73:21

**advanced** 87:5

**advantage** 9:7,15

**adverse** 37:16
64:8,10,22 65:1
79:9

**advise** 95:13

**advised** 38:11

**Affirmation** 5:11

**affirmed** 5:12

**afford** 93:10,11

**against** 26:1
29:10,11,15,16
34:20 35:2,10,13
36:18 39:13,21
40:21 73:7

**agenda** 55:4

**agendas** 57:22

**aggressive** 31:23

**ago** 16:7 98:15

**Ah** 74:12

**ahead** 30:12 33:14
68:25 90:11 94:20

**alcohol** 28:18

**alleged** 18:21 42:13
44:24

**allegedly** 73:18

**allowed** 80:25

**already** 18:14 61:17
102:13

**alternate** 88:3 89:9

**alternative** 10:8

**am** 21:19 37:2 54:2
62:21
100:10,12,13
102:11

**Amended** 95:8,11

**American** 11:25
12:4

**amount** 13:19

**annual** 8:19

**answer** 5:19 17:5
25:21 31:1,3,7,9
33:15,16 37:23
38:14,17,18
60:1,7,9,12,13,15
61:15 66:9 67:23
68:9,11 77:7 81:2
86:6 88:14,16,18
93:7 94:20

**answered** 39:9
61:17

**answering** 31:15,18
32:21,23 99:1

**answers** 31:13
32:13 74:4 97:22

**antacid** 30:5

**anteroom** 55:17

**anxiety** 40:5 52:25
67:12,19 68:2
96:25

**anxious** 31:19
32:14,17 43:22
53:1,6

**anybody** 37:9,14
64:9

**anymore** 55:20

**anyone** 15:12 25:24
26:1 35:9 36:24
37:2 72:17 92:25
93:6

**anything** 12:11
50:7 68:22 74:10

92:8 93:17 95:22
98:1,10

**anyway** 50:25

**apologize** 7:20 44:6
54:4 67:2

**apologized** 75:3

**apparently** 35:21

**APPEARANCES**
2:1

**appeared** 101:6

**appears** 19:17

**application** 11:10
92:6

**applications** 11:3,5
61:10

**applied** 10:10 11:6
88:21

**apply** 10:12,15
11:1,18,19
13:6,12 88:15
90:19 91:18

**applying** 11:16
12:12,16

**appointment** 15:5
50:20 102:10

**appointments**
50:22

**appreciate** 5:17

**approach** 88:2

**appropriate** 48:19

**approximately**
13:10 15:24 41:13
72:2 81:13
84:6,15,19

**April** 2:3 102:2,25

**argumentative** 92:1

**arose** 17:20

**arranged** 89:14



arrived 67:8
arrogant 55:25
aside 76:10 80:16
aspects 41:18 57:3 91:16
Asperger's 56:3,13
assigned 35:20,21,22 57:24 71:21 74:15 76:15 79:5 80:15
assignment 57:19 71:14 75:11
assignments 69:20 71:10 72:8 73:1 76:11 79:1 80:14,17,22
assist 33:19 81:25
assistance 102:11
assisted 18:23
associated 45:11 74:10
Association 12:1,4
assumed 26:20
assuming 14:10
asthma 17:3
attempts 67:13
attend 45:16
attorney 12:23,24 30:21 32:20 38:11 96:11,13 100:11 102:9,13
attorneys 25:23 100:13
attribute 26:25
August 78:25
authority 101:5
authorized 100:7
Autism 40:6 96:8

98:4
autistic 97:14
automatic 76:20
available 55:12 89:7 96:24
aware 40:5 61:2,11,16,19 66:12,15 73:6 74:8,21 81:17 89:6 90:13,15 91:2 92:8
away 46:5,8,12,16
awhile 55:18

---

**B**

backing 98:1
backpack 98:13
backwards 96:23
bank 71:2
Bar's 12:7
based 13:2 29:15 54:9
basically 43:18 57:11 73:25 89:1
basis 8:20 15:8 20:12,13,14 21:19 29:17 35:21 36:17,18 37:19,25 39:8 40:12 44:4 46:20 67:22 72:5 77:22 94:23
Bay 2:4 102:3
bear 19:16 28:3
Beauchamp 2:8 3:3,6 5:8 7:6 17:12 19:5 27:22 30:16,25 31:4,8 37:24 38:21 39:3,6,7 56:15 60:8,14,21 68:20,24

69:6,10,17 79:18 81:4 87:24 93:21 94:1,18 95:2,19 96:3,14 97:11,18 99:6,9 102:24
became 23:24 49:6 67:18 81:17
Becca 33:2 39:13 40:2 41:21 56:18 57:1 58:1 62:22 63:14 65:24 72:21 75:2 81:17 82:10
befell 93:1
beginning 22:1 83:16
BEHALF 1:16 2:2,7
▮▮▮▮▮▮
behaving 97:14
behavior 51:2 72:11,23
behavioral 49:14 72:7,10 73:3
behind 14:21
belief 23:23 59:21
believe 9:4 10:18 12:3,4,9 19:18 23:20 29:9 30:8 34:9,11 35:11,18 36:9,15 37:5,8 38:5,15 39:21 41:3 48:9 49:5,8,19 53:19 54:19 60:15,16,23 62:1,20 64:24 65:20,24 69:25 70:1,24 71:10,14,19,20,22 73:17 78:3,5,9,12,14,20 80:11 81:6,10 88:4,14,16

bell 44:23
beneath 74:15
benefit 9:6
benefits 8:24 9:3,8
berate 45:22,25
berated 45:19
berating 45:10 46:24
besides 9:21 11:9 35:9 39:22 51:11 64:16 74:8 95:23
best 7:11 8:8 10:5 23:2,23 37:1,4,12,18 62:21
better 17:1 70:3 94:16,21,25
beyond 14:21 60:4 90:5
biggest 9:5
bipolar 40:6
bit 32:22 54:7 79:22 98:14
blank 102:15
blanket 32:22
block 70:8
blocks 70:14,17 84:11 86:16
board 80:1
body 31:21
bosses 92:12
bottles 87:18
bottom 102:15
Boulevard 1:18 2:9
break 9:24 30:20 34:25 38:9 68:15,20,25 69:2,4,5,6 87:21



breathing
17:1,13,18

broad 48:10

Broward 10:18
13:22 100:3 101:3

Brown 74:19 75:3

brush 48:10

building 43:24

Burris 46:2,5,8,16
49:23,24 52:9

business 20:24
21:7,9

busy 58:12

**C**

C/O 102:2

California 40:4

car 83:25 84:7
85:16

card 20:24

cards 21:7,9

care 57:19 84:7

career 36:10 78:8

career/job 78:10

Carolyn 74:19 75:3

case 1:2 49:19
65:18,19 102:5

categories 49:12,13

categorized 70:22

category 70:7

cause 13:18

caused 16:16

Cc 102:24

certain 91:16

certainly 75:25
85:14 98:24

**CERTIFICATE**

100:1 101:1

certify 100:6,10
101:6

chance 22:5 27:24

change 16:14
103:4,6,8,10,12,1
4,16,18,20,22

changes 103:2

chapter 41:4

characterizes 56:8

Cheryl 15:19,23

child 12:22

chronic 84:13

claim 29:11,15,16
32:10 34:25
36:17,18 39:9,11
43:10 93:1

claiming 37:19

claims 35:13

clarify 70:2

clarifying 93:25

clear 44:22

Clerk 102:14

client 34:21

clinician 6:10

clinicians 93:4

clinics 77:23,25
78:2

close 12:19

closer 14:2

closest 13:21,25

coincidence 46:6

cold 31:21

collaborative 62:5

colleagues 35:7
41:1 42:19,23
43:5 44:11,14

combination
96:15,18,22

comes 43:14 66:21

comfortable 14:11

coming 6:11 60:6

comment 44:20

Commercial 2:9

Commission 101:18

committee 89:21
90:16

community 25:24

commute 13:14
14:18

Compile 78:10

complain 93:2

complained 48:16

complaint 18:22
40:24 41:3,6,10
42:8 73:20
94:24,25
95:3,5,8,11

complaints
40:20,21,22 41:8
48:18 73:6,14
74:7,12,13,21,24,
25 75:2 94:12,15

complete 7:8 69:22
76:16 77:10,11,24
78:15 79:6
80:12,23,25 100:9

completed 53:18
80:8

completely 42:3,5

completion 79:1

compliment 40:13

complimentary
40:13,16 58:14

components 90:5

compound 61:14

66:8

comprehensive
63:16

computer 24:14
28:17

concerned 77:6

concerning 45:2

concluded 99:12

conclusion 59:18
60:5

condition 7:22,23
13:3 18:7 98:25

conditions 41:18
56:4

conduct 41:4 65:10
76:10

conference
42:22,25

conflict 97:1

Conflicts 28:16

connected 100:13

consensual 48:21

consider 18:22
20:17 27:2 48:19
56:18,19 66:1
89:4

considerable 78:17

considered
22:10,25 38:24
53:22 58:6 62:10
68:1

considering 11:16

consistently 35:5

constituted 38:5

constructive
66:1,6,14,19,22,2
5 67:5,13,16,20
68:3,4

consult 30:21



contact 78:6 102:10

contacting 102:9

contained 90:4

continual 39:25

**CONTINUATION** 1:15

continue 38:13 69:3 75:10

continuing 80:21

continuously 86:3,7,18

contradicted 26:18

contribution 9:13

control 33:12 89:24

conversation 82:18 88:7

copies 11:3 98:12

coping 6:11,12 24:15

copy 99:10

copyright 28:17

core 31:21 36:11

correct 9:18 14:4,24 16:2,12 18:24 20:5 21:16 22:11 23:21,22,25 25:9,17,18 26:3 29:8,13,18 34:15,23 38:25 39:2,14,19 45:1,4,9 46:9,13,16,21,23 48:13 49:4,7,23 51:20 52:13,17 53:3,24 54:22 58:2,23 59:2,3,17 60:25 61:1,3,4,6,13,17,2 0,21 63:5,15,18 64:23 65:12,17,21 66:2,23 67:10

70:5,9 71:8,13 75:8 76:6,7,16 78:22 80:18 84:9 85:4,5,17,20,21 86:13,14,19 87:3 93:13,16 94:14 98:23 99:2,5

correctly 79:15

counsel 2:1 100:11,13

counseled 48:22 78:24

counseling 65:11,14

**Counselor** 8:16 29:23 49:9 54:4 55:15 65:22 68:12,13 69:13 76:25 80:13 87:17 92:5,22 93:24

counts 65:1

county 10:13,14,19 13:22 100:3 101:3

couple 42:10 55:13,16 70:6,22 85:11 87:18 93:25

course 24:7 26:11,23 29:7 30:20 37:13 41:19 47:23 48:2 59:22 90:4 92:16,21

court 1:1,18,24 34:20 38:20 100:5,23 101:17 102:14,19

cover 5:15 71:2

co-workers 41:17,25 48:8,12 49:3

create 89:12

creating 89:16,18

creation 77:22

critical 57:5 78:4

criticism 65:15 66:1,6,7,14,19,23, 25 67:13,16,20 68:3

criticized 46:3 49:22 51:5,18,21 52:13 53:23 65:13 68:21

criticizes 65:24

criticizing 40:12 47:1 51:11 52:21

cross 3:4 94:4 98:15

current 15:10,15,17 25:15

currently 7:9

cut 56:24

cutting 54:4

---

**D**

daily 22:21,25

damage 93:1

damages 8:10

dash 32:8

database 78:13,16 92:10

date 7:7 19:7,9,24 27:24 78:19 82:20 102:1 103:25

dated 19:21 28:8

dates 36:1,2 79:1 83:13 84:1 85:13

day 13:15,16 50:10 53:10 70:10,12,16 71:15 97:8 100:16 101:7,10

day-long 70:14

days 102:13

day-to-day 21:19

deaccession 74:11

deadline 57:25 58:6 72:8,9 75:14,19 76:20 80:22

deadlines 26:15 27:1,11,16 33:22 49:3 57:22,23 58:4 73:2 75:11 80:17 95:17,23

deal 9:7

dean 37:14 88:2,23 89:24

**Dear** 102:6

decided 13:6 42:4

decision 79:11 80:4

decongestant 17:17

deducts 8:20

**Defendant** 1:8,16 2:7

**Defendant's** 7:4 19:3 27:20

defined 83:4

degree 50:1 87:6

deliberately 59:8

demote 64:3

denied 18:22 34:8,22

dental 9:3

deny 20:8,10,11 75:15,20 76:3,17,22 77:12,19 79:3 82:22 83:12,19 84:5 85:1,12

**DEPONENT** 99:11

deposition 1:15 5:1 82:16 98:8 99:12 102:8,9,10,12

depression 40:6



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

derailed 59:6

describe 45:24 51:9

described 64:17
88:7 90:6

description 4:2
21:24 22:8 58:15
90:3

descriptions 33:9
90:1

desire 91:17 96:22

desk 25:20 35:7
39:18,24 43:20
45:11,13,19
46:2,13 49:22
50:10,13 51:18
52:8 54:15 58:10
81:20

detail 32:22 41:22
48:11

detailed 40:22 41:2

detailing 43:17

details 34:3,10
36:11 40:19,23
41:1,5,12,20,21
44:12 47:6,18
48:9,14
49:5,8,15,20 50:6
52:22 61:7 64:18
66:17 70:15 72:12

developed 84:13

diabetes 55:24

Diane 63:3,5

different 26:16
45:21 88:17 90:18
91:17 93:17

difficult 82:9

difficulties 26:25
27:16

difficulty 66:6,14
75:11

DIRECT 3:3 5:7

director 79:23

disabilities
18:15,16 27:3
33:5

disability
24:8,10,22 60:24
61:20 62:3,13
81:14 82:4,18

disabled 60:24

disagree 82:3,6

disclose 73:25 74:2

discovered 17:23

discovery 32:10

discriminated
37:20

discriminating
25:25

discussed 13:13

discussing 32:20
58:18

discussion 81:18,25
82:2

discussions 82:25
83:2

disorder 40:6

DISTRICT 1:1

dock 64:5

doctor 49:25 62:15
63:11

doctors 95:22

document 19:24

documentation
11:18 34:12 61:11
62:14,16,18,21

documents 12:23
98:7

done 11:12 36:10
47:4 52:11

57:8,16,20,24
59:10 62:23
63:7,23 65:14
90:12

door 25:24

dose 17:3 18:2,3

Dr 49:23

draw 71:3

drive 2:4 6:9 13:10
102:3

drug-free 28:18

drugs 28:18

due 75:23

duly 5:6 101:7

during 16:3 20:9,18
24:7,11 26:23
29:7 30:20 33:18
37:13 40:14 41:19
47:23 48:2 56:6
57:25 73:10,11
75:9 79:22 86:21
87:21 90:4

duties 25:15 26:11
87:4

E

earlier 7:15 34:5
97:7,9 98:2

early 33:3

earn 9:25

earned 8:25

East 1:18 2:9

easy 89:13

education 40:4

effect 72:18,20,24

efforts 10:8

either 10:20 14:3
19:10 58:10 75:16
98:25

elected 9:4

else 6:7 11:12 35:9
38:8 40:17 54:21
61:25 77:16 92:25
93:6,17 98:10

e-mail 6:10 11:20
43:17,24 44:21
45:5,7 55:19
56:17 75:2 94:7

e-mailed 50:14
52:10 53:11,20

e-mails 12:8
40:13,16 41:3
56:25 58:11,14
94:15

Emerging 20:4
21:3,15,24

Emery 63:3,5

empirically 17:2

employ 33:3

employee 87:2
100:11,12

employees 41:18
73:8 79:25 89:24

employment 10:9
11:6,9 14:23
16:16 19:23 24:7
29:8 34:18
37:13,17 41:19
47:23 48:3
64:8,10,22 65:2
77:9 79:22 80:4
86:23 88:1 89:9
91:6

encompassed 81:21
89:7

engage 9:17

engaged 65:11

engine 91:8

entirety 86:22

entry



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

10:16,17,18,19

equation 58:19

Eric 33:2 41:21 43:17,24 45:7,8 81:16 82:9

ERRATA 103:1

especially 27:15 97:5

Esquire 2:3,8 102:2,24,25

essential 18:24 19:2 22:2,11 23:13 24:2,24 26:3 33:19

essentially 57:7

established 79:1

estimation 16:15

evaluated 62:19

evaluation 49:11 62:23,24 63:2,16

evaluations 48:7 66:5,13

even-handed 67:6

event 16:11 45:11

events 54:8 93:2

everybody 43:4

everyone 20:14

everything 42:5 67:9

exacerbation 93:6

exact 36:2

exactly 21:17 30:5 36:5 42:1 43:2,6,7,22 54:6 65:6 82:13

examination 3:1,3,4,6 5:7 94:4 97:17 98:15

example 33:1,22

55:12 57:6,16,17 65:1 88:22 90:10

exception 80:8 93:15

exceptionality 40:3

exchange 45:5,13

excuse 44:2

executed 23:19

exercise 35:19

exercised 29:17 37:11

exercising 39:22

exhibit 4:2 6:19 7:4,8 16:19,20 19:7,10,11,12,13, 24 20:19 21:23 22:10 23:11,12,19 24:3 27:20,23

Exhibits 4:1 19:3,7,9

existed 90:14 91:3,8

exists 6:8

Exp 101:18

expect 59:22

expectation 57:13

experience 40:2 52:24 89:25 92:9

experienced 39:11 85:19

experiencing 31:20

expert 59:13 62:8

explain 57:8 67:24

explore 54:7

extended 50:12 52:12 53:12

extending 95:17,23

extension 75:14

extensions 33:22

36:13,15 75:18 76:20

extensive 62:24

extent 5:18 9:12 43:9

extremely 31:19 40:21 52:23

―――――――

F

face 47:17 77:15

fact 7:15 29:1,17 36:19 38:6 48:6 49:10 51:11 53:10 62:2 66:5 83:16 86:15

factors 14:14,18

facts 34:19 41:2 94:16,25 96:23

factual 36:17 37:25 94:23

faculty 25:23 26:16,19 35:8 58:12,21

failure 31:12 69:22

fair 81:5 85:9

false 68:5

familiar 28:20

familiarize 28:23

February 76:5 78:20 83:9 101:18

federal 34:20

feedback 67:4

feel 5:20 12:16 53:1,5 54:10 57:10 59:16 64:14 96:12

feels 12:19

Feliu 79:15,19 88:23

felt 26:17 54:5,23

female 48:15,17

fewer 17:25

fight 31:20,21 32:5

figured 87:20

filed 34:20 95:6,9 102:13

filling 82:17

financially 100:14

fine 21:14 64:5

finish 44:8 59:7

finished 59:8

fired 83:14,21

FIRM 2:3 102:3

first 5:5 19:1 40:24 49:1 66:12 67:23 79:16 81:13,15 82:4 83:3,23 90:13 95:8 96:6

FIU 14:2,3

five 48:25 92:16

flight 31:20,21 32:5

Flonase 17:15

Florida 1:1,19,25 2:5,10 12:7 13:4,17 100:2,6,23 101:2,17 102:4

FMLA 8:20 28:14 29:17 35:12,19 36:1,19,25 37:3,21 38:5,24 39:8 69:24 70:4,7,23 71:1,10 81:11 83:23,25 84:7,11,14 85:3,7,10,15,18,2 3,25 86:2,3,7

focusing 87:1



**foregoing** 100:8

**form** 28:19 37:22 39:1 56:14 59:25 60:19 81:1 87:5 94:18 95:2,19 96:3,14 97:11

**formal** 20:11 40:20 61:10,21 82:15,25 83:3 90:1 94:12,13,15

**formally** 89:17 92:13

**formerly** 81:16

**Fort** 1:19 2:10

**forth** 38:13

**forward** 69:19

**forwarded** 102:13

**forwards** 96:23

**free** 9:6

**frequency** 16:2

**frequently** 59:6 93:9

**Friday** 102:11

**front** 19:8 35:7,8 49:23 51:19 69:14

**fulfill** 13:11

**full** 10:16 13:11 42:19

**fully** 61:2

**function** 8:2 26:3,5

**functions** 18:24 19:2 22:3,7,11,13,16,1 9,24 23:6,13 24:3,24 26:11

**future** 76:21

_____
G
_____

**gay** 74:1,3

**general** 14:9 26:21 34:2 57:16 66:7 75:23,25

**generally** 8:3 28:20

**generic** 9:6

**getting** 11:17 12:18 53:11 97:7 98:18

**GG** 101:18

**given** 53:10 58:8 69:21,24 73:1,2 75:10 76:20 80:24

**giving** 66:24 67:17

**gone** 68:14

**Goodwin** 2:3 3:5 6:24 17:5,8 30:24 31:2,7,10 37:22 39:1 56:14 59:25 60:11,19 68:16,19,23 69:4,11 81:1 93:25 94:2,5,19 95:4,21 96:5,16 97:12,16 99:8,10 102:2,3,25

**goodwinlawoffices @gmail.com** 2:6 102:4

**Gotthelf** 15:19,23

**grab** 87:17

**granted** 25:4 36:13,16 92:15,18

**grasping** 76:25

**great** 5:25 9:7 67:2

**grievance** 88:10,13 90:16

**ground** 5:15

**grounds** 76:8

**guess** 8:16,17,23 16:23 65:1 70:3 90:22,23 98:14

**Guessing** 46:18

**guide** 36:9 77:23 78:2,4,8

**guys** 75:4

_____
H
_____

**hairs** 73:22

**half** 69:9

**hand** 100:16 101:10

**hands** 31:20

**hang** 40:6

**happen** 55:7,8,9 75:6 79:2

**happened** 43:18 56:6 57:17 75:16,21 76:4,18 77:13 79:4 82:23 83:13,20 85:2,13 94:22

**harassment** 28:17

**hard** 7:3 21:18 50:17,24 51:1 67:5,12

**harsh** 64:15

**haven't** 11:15

**having** 5:5 26:10,14 29:12 31:15,17 32:3,7 39:17 42:9 60:3 68:22 81:11 82:18 85:23

**headache** 30:3

**headaches** 17:25 30:7

**health** 9:2 14:8,9 40:2 41:2

**heard** 13:5

**hearings** 96:22

**held** 8:11

**help** 6:14 17:1

33:10,22,24 40:15 56:12 82:12 92:13,18 96:1

**helped** 18:3,4

**helpful** 63:17,23

**helping** 58:16

**helps** 17:18 18:6

**hereby** 100:6 102:21

**here's** 59:23

**he's** 31:11

**higher** 17:3 18:3

**hires** 10:19

**hole** 6:16

**holes** 5:22

**home** 12:24 24:13 25:2,11 26:6 34:6

**honest** 98:5

**honestly** 58:14 98:21 99:1

**Honor** 67:2

**hope** 69:10

**hopefully** 94:3

**HORTON** 2:8 79:17

**hour** 50:18 69:9

**hours** 59:7 70:6,22 86:24

**hugging** 48:15,17

**hypogonadism** 6:22 7:17

**hypogonadotropic** 6:22 7:17

_____
I
_____

**i.e** 14:7

**I'd** 8:1,17 66:8 87:20



idea 10:20

identification 7:5
19:4 27:21

identified 7:22
12:11 49:2,11,13
62:17

identify 21:1,18
62:15 63:11 86:21

I'm 5:9,21 8:13
9:19 10:7
11:13,25
12:1,3,4,7,21,24
14:3 17:2,19 19:6
20:3 23:7 30:2,4,6
31:2,3,19
32:6,7,13 33:13
36:24 37:10,15
38:2 43:7,9 44:15
49:17 51:9,13
52:19 53:5 55:20
56:5 57:12
58:12,15
59:9,13,20 60:6
61:15 62:5 65:22
67:25 68:20 70:13
73:10,22 74:1,6
75:5 79:14
82:8,16 84:4 85:1
86:5 87:7 88:1
89:22 90:12,15
91:7 94:2 96:11
97:2,5 98:14,18

immediately 44:3
50:16 85:20

impact 8:6 18:16
30:9 79:6,9

impart 5:21 42:17

imparted 42:13

import 7:14 98:18

important 26:19,20
59:1

impression 57:14

improve 8:2

improvement
72:14,17,20,24

inability 49:2 91:16

inaccurate 88:19

inaccurately 97:19

inappropriate
47:10,13 51:7,10
52:16 54:1,11
65:9 72:11

inappropriately
48:1,11,12

INC 1:7

inception 19:24

incident 40:24
44:24 45:18 52:2

incidents 52:7

including 28:13
41:3

income 9:20

incorrectly 47:4

INDEX 3:1 4:1

indicated 9:16 26:8
39:16

indication 78:23

individual 39:13

individuals 60:23
77:10

inference 46:19,20
54:5

inferred 48:20

informal 20:22

informally 82:1
92:13

information 5:20
8:19 42:13,14,18
43:13 45:2 58:10
98:17 102:11

informed 74:13,24
75:1

inhaler 16:22,24
17:23

initial 21:24 71:14

initiated 53:9

injured 85:15

injury 93:1

inquiring 58:18

instance 46:1 54:3

instances 39:21
54:14,17 64:14
67:4

institution 13:5

instructing 30:25
31:2

Instructional 20:5
21:4,15,25

insubordinate
56:3,5,12,19,20
57:10

insubordination
57:6 64:20

insurance 9:2

intellectual
87:12,13

intend 65:17

interact 8:5

interacted 55:6
59:21

interaction 43:19
50:13 52:12
53:8,12 57:18
65:20

interactions 48:8
49:3 56:1,7 57:4
58:20 67:11,19

interest 28:16

interested 91:21

100:14

interface 90:7

interfered 68:22

intermittent
70:4,23 84:12
85:25 86:13

intermittently 71:7
85:7,10
86:2,3,8,16,18

interpreted 67:20
68:2

interprets 65:20

involved 41:4

isn't 16:25 48:6
49:10,25 92:1

issue 45:3 59:21
80:1

issues 26:22 40:3
49:2 52:25 65:9
72:10,22 81:17
82:10 94:11 95:13

it's 6:8,11,22 7:3
8:22 11:22 13:4
20:22 28:10 31:25
34:17 55:24
56:3,25 57:10
59:6,8 64:9 65:16
66:22 67:5,12
68:13 73:23
77:1,2 85:9 87:17
94:7 95:5 98:21

IV 2:8

I've 10:10,11 13:3,5
15:14 27:23 39:8
42:25 93:4,21
99:6

J

JAMES 2:8

January 77:19

jhorton@panzama



**urer.com** 2:12

**job** 4:4,5 12:10 13:4
19:3
20:6,8,11,12,17
21:23
22:2,7,8,11,18,24
23:13 24:2,24
26:11 33:9,20
58:15 90:1,3
91:6,13,16,19,22
92:2,5

**jobs** 11:25 12:3,7
92:10

**Johnny** 46:2

**Judicial** 78:6

**juggling** 26:15
27:1,11

**July** 21:6 23:19,25

---
K
---
**kinds** 14:13

**knew** 33:2 52:24
58:8 63:5 89:10

**knowledge** 7:11 8:8
23:23 87:5

---
L
---
**lack** 70:3

**language** 56:2,24

**large** 70:8 84:11

**Largo** 2:5 102:4

**LAS** 1:18

**last** 6:2 9:5,23
15:5,20 18:17
19:13 42:10 68:15
70:13 77:8 79:22
85:24
86:2,11,12,22
87:2

**late** 73:1

**later** 46:11 50:18

59:8 68:22 82:7
97:9

**Latin** 14:11

**latter** 22:22,23

**Lauderdale** 1:19
2:10

**law** 9:17,21,25
11:22 12:1,14,15
13:4,11,21 50:1
59:19 60:5 62:2
79:23,25 87:6,11
88:25 89:7

**lawsuit** 29:10 32:3
34:20 93:3

**lawyer** 19:8 97:15
98:15

**lawyerly** 32:24

**leading** 20:18 69:21

**least** 10:10 11:17
35:7 36:20
55:13,15 56:11
85:10

**leave** 8:20,21 28:14
29:17
35:12,16,19,22
36:1,19,25
37:3,21 38:5,24
39:9 50:19
53:11,16 55:18
69:24 70:4,7,23
71:1,10,12 81:11
83:23,25
84:7,11,14
85:3,7,10,15,18,2
4,25 86:2,3,7

**leaving** 50:11,14,18
65:3 80:16

**led** 45:13

**less** 10:1 17:24 67:5
81:20 86:10 90:9

**let's** 6:16 8:9
18:1,11 19:1 26:9

29:20 33:6,8
44:22 48:23 52:2
54:7 63:24

**letter** 78:24 80:7
102:15

**Levalbuterol** 17:24

**level** 10:16,17,18,19

**lib** 11:22 36:9

**libido** 8:1

**librarian**
10:10,16,17
11:13,20 13:4
20:5,20
21:4,10,16 22:1
23:14,25 25:12,16
87:11

**librarians** 42:20

**librarianship** 12:14

**Libraries** 12:1

**library** 12:4 13:11
42:22 48:2 73:7
77:23 78:2,4,8
79:23,25 88:22,25
89:7 91:4

**life** 7:25 13:20

**limitations** 96:24

**LINE** 103:3

**list** 4:3 6:4,8,17
7:4,8,14 11:23,25
12:3 34:10 35:4
58:16 76:13,14
78:6,10 98:11

**listed** 16:20 22:2,8
24:3 36:6

**listen** 5:18

**listing** 12:7
23:12,13

**listings** 12:10

**lists** 11:13,14 12:10

**literalism** 97:10

**literally** 96:8,12

**literalness** 97:3

**little** 6:9 32:22 54:7
90:2 98:14

**lived** 14:12

**long** 14:13
15:7,10,12
16:5,6,7,8 34:10
48:24 70:17 84:15
86:4,8

**longer** 5:22 69:8

**lost** 98:14

**lot** 5:14 33:25
34:1,16 51:24
56:6 57:7
58:12,13 90:9
96:7,25

**loudly** 46:4

**lower** 18:2

**lunch** 43:21,23
45:14 55:21
68:13,15,19
69:1,5,6

---
M
---
**mail** 11:14

**mailing**
11:13,14,23,25
12:3

**main** 68:8 88:22

**major** 48:10

**majority** 94:6,9

**manage** 56:20,25
57:2

**manager** 56:21
57:11,12

**manner**
47:11,13,21 50:12
51:7 52:16 64:16



**March** 1:16 5:2
100:16 101:7,10
102:1,7

**marginal** 13:23

**mark** 6:16

**marked** 7:5,8
19:4,6 27:21,23

**matter** 62:2 82:14
83:16 86:15 102:8

**MAURER** 2:9

**may** 6:1 36:20
50:21 63:22
67:17,22 68:2
69:8 80:13 90:20
94:1,8
102:9,10,13

**maybe**
68:6,10,11,12,16
82:1 84:1

**MAYNARD** 2:9

**mean** 10:5 12:12
31:14 32:8 45:24
47:9 49:15 51:1
53:25 54:18,24
55:1 59:9
65:15,17 68:5
70:25 77:1,4
91:25 92:1 98:11

**means** 52:20

**meant** 87:7 91:7

**medical** 12:22,24
61:11 62:13,16
84:4

**medication** 4:3 6:3
7:4 10:17 98:11
99:1

**medications** 7:9 9:6
16:15,20 18:15
30:9 93:14

**meet** 49:2 54:20
55:4,16 58:6

72:20 77:15

**meeting** 27:16
42:20
43:11,14,21,25
44:3,15,19,21
45:16 55:11 64:19
72:16 75:11

**meetings** 58:17

**member** 12:1,5
35:8

**memo** 36:7 76:14
98:9

**memorandum**
34:11

**memory** 94:17,22
95:1

**memos** 94:7,15

**mental** 40:2 41:2,18

**mention** 7:15 25:1
50:9 76:10

**mentioned** 45:12
63:14 94:12 98:12

**met** 57:21

**metabolic** 8:2

**Miami** 14:3

**middle** 38:10,12

**migraines** 17:2
18:5,9 30:3 34:1
84:14 85:4,19

**milligrams** 30:2,4,6

**mind** 46:8 52:5

**minor** 48:10

**minutes** 13:15,16
53:15 55:19 59:7
68:14 69:12

**miss** 15:5 97:5

**missed** 70:6

**mistaken** 58:15

**misunderstanding**

15:4

**Mitch** 17:5

**Mitchell** 1:4,15 3:2
5:1,4 28:5 101:6
102:1,5,24

**Mm-hmm** 10:3
13:1 15:25 19:15
20:1 31:14 41:23
44:1,18 86:9

**mom** 14:12 83:25
84:6 85:15

**moment** 80:16
98:15

**Monday** 102:11

**Month** 78:13,16

**month-long** 71:11

**monthly** 9:12

**months** 9:23 35:15
42:4,10 70:8 77:9
84:16,17 85:23
86:10,16

**mood** 13:18

**morning** 17:25
97:20 98:17

**mother** 12:20 14:7

**mother-in-law**
12:18 14:11

**mother-in-law's**
14:8

**mother's** 13:2

**mouthful** 21:16

**move** 52:5 69:19
80:21

**moved** 80:18 90:8

**multiple** 57:21
65:12 70:14,16
75:18 80:18 83:10

**mutable** 89:11

**myself** 62:19 97:15

---
N
---

**Naproxen** 30:6

**narrative** 17:22

**nasal** 17:17

**Nasonex** 17:15

**nature** 8:21
31:12,14 57:18
87:12 90:14

**necessarily** 55:1
62:5 91:24

**necessary** 25:25
70:15 102:8

**needn't** 33:9

**nice** 31:25 54:18

**night** 17:24

**nor** 100:11,13

**Notary** 1:25
100:5,23 101:17

**note** 6:20

**notes** 100:9

**nothing** 90:2

**notice** 98:11 102:7

**Nova** 1:7 8:11
16:2,16 18:8,22
19:23 20:21 22:11
27:13,17 28:21
29:10,15 33:4,18
34:7 38:4 39:11
49:11,18
62:3,7,15 64:8,9
77:6,9 79:23
81:14 87:1 89:25
92:9 94:8 96:1
102:5

**Nova's** 41:4

**November** 28:9
78:25

**NSU** 9:5,7
24:7,11,23 26:12



877.291.3376
www.UCRinc.com

Silverman, Mitchell   03-05-2018   Page 12 of 19

| | | | |
|---|---|---|---|
| 28:11 29:8 37:13<br>38:23 47:24 48:4<br>60:2,16,24 61:13<br>62:21 77:23 78:2<br>86:23 88:2<br>89:15,19 91:5<br>**nuance** 97:5 | 7:7,13 8:24<br>9:9,12,16<br>11:20,24 12:2,6,9<br>15:2,17,22<br>18:5,7,11,19<br>19:8,23<br>21:1,12,14<br>22:5,7,13,16,23<br>23:5,10,18,19 | 87:14,25<br>88:9,11,12<br>90:16,24 91:2,20<br>92:23 94:11,23<br>95:16 97:2,7,22<br>98:20<br>**OLAS** 1:18<br>**old** 12:20,21 | 14:22 62:8<br>**over-prepare** 96:22<br>**oxygenation** 17:1<br><br>—————— P ——————<br>**P.A** 2:9 |
| —————— O ——————<br>**oath** 5:10 92:19<br>97:19 101:1<br>**Object** 30:24 37:22<br>39:1 56:14 59:25<br>60:19 81:1<br>**objecting** 31:3<br>**obtain** 60:24 61:20<br>62:16 88:17 90:17<br>**obtained** 62:14<br>**Obviously** 5:19<br>**occasion** 11:17 35:8<br>49:21<br>**occasionally** 26:18<br>**occasions** 50:3<br>55:13,16 56:23<br>65:12 68:3<br>75:13,17 77:8<br>78:24<br>**occurred** 89:4<br>**occurrence** 57:25<br>**offer** 60:17<br>**offered** 68:3 95:17<br>**office** 25:21 50:16<br>51:21 54:18 55:17<br>57:4 61:20 82:18<br>102:10<br>**often-times** 56:24<br>**oh** 24:13 43:13 59:7<br>87:7 89:12<br>**okay** 5:25<br>6:15,18,20,24 | 24:2,6,10,16,20<br>25:4,6,10 26:8<br>28:3,8,10,13,20,2<br>3 29:1,20<br>30:8,20,23 32:2,9<br>33:13 34:4<br>35:9,12 36:17<br>37:5,9<br>39:3,6,16,20<br>40:17 41:7,13<br>42:12,17,21,25<br>43:3,13<br>44:4,10,13,18,22<br>45:2,21,24<br>46:7,11,20,23<br>47:7,12 48:1,15<br>49:21 51:1,16<br>52:1,2,6<br>53:4,8,21,25<br>54:14,17,23<br>55:9,23 56:10<br>57:3,9 58:4 60:22<br>61:2,5,9,16 62:25<br>63:2,11,21,24<br>65:19<br>66:3,10,18,21<br>67:1,15,18,25<br>68:7 69:18<br>70:1,11,21<br>71:5,20,23<br>72:9,13,16,22<br>73:3,5 74:7,14<br>75:4,17 79:24<br>80:16,20 81:10,24<br>82:3,7,15,22,24<br>83:3,14<br>84:2,6,10,19<br>85:9,22 86:5,12 | **once-a** 16:11<br>**ones** 50:5 80:7<br>**ongoing** 55:3<br>**online** 11:1 91:5<br>**open** 13:4 33:5<br>42:2,3,5<br>**opinion** 13:13 40:25<br>46:17,21 59:20<br>96:10,11<br>**opportunity** 32:9<br>38:10<br>**opposed** 65:25<br>86:18 91:8<br>**option** 62:11<br>**optional** 9:3<br>**order** 24:24 59:11<br>99:9<br>**ordering** 102:13<br>**original** 102:13<br>**originally** 57:24<br>**others** 12:8 34:9<br>42:15 51:19 66:1<br>**otherwise** 26:21<br>58:10 67:19<br>**ourselves** 14:16<br>**outed** 40:25 42:9<br>44:5 74:2<br>**outedness** 73:23<br>**outing** 41:11 43:10<br>44:24 73:17,18<br>**outside** 8:4 11:8 | **p.m** 1:17 30:14,15<br>39:4,5 69:15,16<br>87:22,23 99:13<br>**page** 3:2 4:2 19:14<br>21:23 22:1,2<br>23:11 88:12 103:3<br>**paid** 10:21<br>**PANZA** 2:9<br>**paper** 49:16<br>**paperwork** 61:20<br>82:17<br>**parcel** 93:5<br>**participate** 9:9<br>**particular** 27:6<br>59:1 60:10<br>**particularly** 12:16<br>**parties** 100:11,12<br>**passage** 88:10<br>**passive** 9:21<br>**pasted** 56:24<br>**patent** 28:17<br>**Pathways** 78:8<br>**Patron** 21:10<br>23:14,24 25:11<br>**patrons** 25:24<br>47:20 48:2,8,13<br>49:3 58:16,20<br>**pay** 64:5<br>**paycheck** 9:13,14<br>**pejorative** 65:16,25<br>67:9,21 71:1<br>**people** 8:5 43:1 |



| | | | |
|---|---|---|---|
| 55:2 56:4 73:24 79:7 90:2 92:11 | pills 29:24 | Power 12:22,24 | proceedings 100:8 |
| per 9:13,14 39:12 | Plaintiff 1:5 2:2 | practice 9:17,21,25 75:24 76:1 77:25 | process 55:5 60:22 61:2,17 62:4 89:15,18 |
| perceived 47:3,4 51:19 | plan 72:14,17,20,24 73:12 | practitioners 58:13 | processed 61:13 |
| perception 53:1,2 | please 7:19 17:5 30:12 33:7,15 39:3 44:3 66:11 102:7 | praised 40:15 | produced 96:25 |
| perform 22:13,16,19 23:1,5 24:4,24 26:5,11 27:7 53:10 91:16 | | precipitated 16:15 | professional 96:10 |
| | | precisely 32:21 | professionals 93:8 |
| | plub 64:20 | prepare 55:4 96:21 | Professor 46:1,5,8,16 49:24 52:9 |
| | plus 14:18 | present 54:21 77:16 | |
| | PM 102:11 | presume 64:9 | program 9:10 78:4 |
| performance 48:7 49:1,10,13 51:20 66:4,13 72:14,17,19,23,24 73:11 | POA 12:25 | pretty 12:21 31:21 44:15 56:9 62:21 66:4,13 91:25 | progress 78:18 80:10,14 |
| | point 6:11 16:3 32:4 42:6 54:19,25 57:17 59:1 62:19 63:7 67:8 72:13 92:7 | | project 35:20 36:4,6,12 74:11,14 76:21 78:6,7,16 90:10 |
| | | prevent 98:4 | |
| performed 90:4 | | previous 56:25 | |
| performing 33:19 | | primarily 64:9 65:8 87:11 | projects 33:23,24 36:6 71:15 76:15 77:10,21,23 80:6 |
| perhaps 48:25 88:20 | policies 28:11,17,21,24 41:5 | primary 58:9 87:4 | |
| period 15:9,13 16:3 20:7,9,18,21 27:12 40:15 73:10,11 75:9 81:21 82:1 | policy 28:18 29:4 | printed 98:12 | promptly 102:15 |
| | pops 48:7 66:4 | printing 28:5 | pronounce 79:14,16 |
| | portion 38:19 | prior 25:14 | proposition 66:7 |
| | portions 18:12 | prioritized 25:25 | protectant 30:5 |
| permitted 38:13 54:20 | position 8:10 10:16 11:6 13:11,12 21:24 23:14,24 25:10,14,15 26:3 87:4,11 88:14,15,17,21,25 89:1,6,16,19,20 90:14,18 91:7,17 | prioritizing 26:16 27:2,11 58:19 | provide 8:18 32:13 63:2 72:13 |
| personal 7:25 14:7,15,17,18 | | priority 58:21 | provided 34:12 62:17 98:17 |
| personally 101:6 | | private 9:17 | |
| persons 45:3 | | probably 13:15 32:24 43:1,22 47:18,19 90:21 | psychologist 92:24 |
| perspective 40:8,9 | | | psychotherapist 13:14 15:8,13,18 16:12 34:11 50:22 62:17,18 |
| ph 64:20 74:5 | positions 10:11,13,15,17,21 11:9,15 88:3 90:1 | problem 13:18 38:18 41:2 57:11 66:18 96:19 98:24 | |
| pharmacy 9:7 | | | psychotherapy 14:25 15:2 |
| phone 6:9,10 | possible 5:18 40:18 | problematic 13:15 27:3 | public 1:25 25:24 47:14,15 50:25 |
| phrase 70:3 | possibly 40:8,10 | problems 26:10,14,22 27:10 49:14 60:2,3 72:8,9 82:1 | |
| phraseology 64:16 | posting 4:4,5 22:10 | | |
| physical 41:18 | postings 19:3 91:6 | | |
| physically 71:2 | | | |


100:6,23 101:17

**pulmonologist** 16:25 18:1

**purposes** 82:16 84:4

---

**Q**

**question** 5:18,19 7:19,21 29:1 31:7,9 37:23 38:10,12,14,16,18 39:10 44:8 55:24 59:6 60:9 61:14 66:8,10 67:23 68:8,12 74:4 77:7 96:17 98:20

**questioning** 31:23

**questions** 6:25 8:10 10:6 17:6 25:21 31:13,16,18 32:3,13,21,24 33:13,15 97:23

**quite** 84:14

**quotes** 31:10

---

**R**

**rabbit** 5:22 6:16

**radius** 13:9 14:22

**raised** 47:8,9 49:22 51:3,4,12 52:20 53:22

**range** 8:15

**rather** 8:1,17 45:14 54:9 82:18 86:16

**rbeauchamp@pan zamaurer.com** 2:11

**RE** 102:5

**reaching** 32:4,6

**reacted** 54:12

**reaction** 52:23 54:9

**ready** 53:11

**real** 96:19

**really** 8:13,17 17:17 26:17,21 32:9 51:6 56:5 72:11 84:24 87:15

**reason** 6:8 8:18 10:23 13:12 19:18 23:20 50:24 53:20 73:22 103:5,7,9,11,13,1 5,17,19,21,23

**reasonable** 18:23 57:12 76:23 77:2,3,4,5

**reasoning** 14:6,21

**reasons** 14:7 36:20,21 103:2

**reassigning** 81:18

**Rebecca** 51:24 64:9 66:21 77:16 78:24

**recall** 8:14,22 9:2,4,8 12:8 16:6,10,17,18,23 20:6 23:7,9,10 24:5,6,25 25:1,8,13 26:23,24 27:1,9,10,15,19 28:2 33:21 34:1,13,19 35:2,3,5 36:2,5,8,22,23 40:19 41:10,12,13,20 42:1,24 43:2,5,6 44:17 45:22,23 46:1,25 47:6,18,25 48:5,9,14,15,16,1 7,18 49:5,8,15 50:6,7,8 52:22 53:19 54:15,16 55:21 61:7 62:12

63:1,19,20 64:13,18 65:4,6,7 66:16,24 70:18 72:10,11,15,16,19 ,22 73:4,5,6 74:10,12,13,24 75:1,2,5,15,20 76:3,17,22 77:12 78:7 79:3 80:14,19,20 81:15 82:22 83:12,13,19,24 84:1,4,24,25 85:12 88:6,24 90:20 91:1 92:22,23 95:24 96:7 97:8

**recalling** 99:1

**receipt** 28:11

**receive** 24:23

**received** 29:12 43:17 58:13 64:21,24,25 71:9,24

**receiving** 63:9 81:7

**recent** 16:22

**receptive** 95:18

**recognize** 19:9,11,12 79:5

**recognized** 56:11

**recollect** 31:13

**recollection** 10:6 24:16 37:1,4,12,18 39:12 49:17 62:22 70:19

**record** 7:2 29:25 30:13,14,15 38:19 39:4,5,6 44:23 69:15,16 84:5 87:22,23 94:21 100:9

**records** 8:17

**redefining** 89:1

**REDIRECT** 3:6 97:17

**refer** 40:20

**reference** 20:5,20 21:4,9,15,25 23:13,24 25:11,16,20 35:7 39:18,24 43:19 45:10,13 46:13 49:22 50:10,13 51:18 52:8,12 53:12 54:14 81:19

**referred** 44:24

**referring** 42:9 51:14 74:6

**reflection** 94:16,21,25

**refusing** 60:9

**regarding** 78:25 85:3

**regular** 20:12,13,14 40:12

**regularly** 11:14 48:7 66:4,13 72:16,21

**relate** 7:25 56:4

**related** 6:7 27:7 35:1

**relates** 29:21 34:21

**relationship** 8:4 35:3 39:17,23 40:7,10,17 48:23 55:3 56:9 57:2 67:7 92:10

**relative** 100:10,12

**relatively** 12:14 42:2 72:21 76:12

**relatives** 14:10



relied 24:15

relocate 12:17,20
  13:3,9
  14:10,14,16

relocating 14:7

rely 97:22 98:16

remember 15:9
  24:12,18,20 30:10
  32:16 33:23,24
  34:2,9 36:11
  39:15 40:23
  41:1,5 43:22
  44:11,13 46:4
  49:20 52:23
  54:5,6 70:15,16
  72:2,5 73:15,16
  75:7 76:8,13,14
  77:14,25 78:19
  82:13 84:16,19
  85:13 88:8
  98:21,22

repeat 38:2 65:22

repeatedly 36:12

report 100:7

REPORTED 1:24

reporter 1:24 38:20
  100:1,5,23 101:17
  102:19

Reporting 1:18
  102:19

request 34:5 61:12
  62:14 82:5,25
  83:4 88:13

requested
  24:7,11,23 33:18
  34:7,21 35:16
  38:19 54:19
  75:13,18 77:14
  81:14,15 83:25

requesting 33:2

requests 35:1
  58:10,20 62:12

83:2,10,18
  92:16,20,21
  94:6,9

require 92:5

required 61:11
  77:15 87:5

requirements 33:20

rescue 17:23

reset 57:22,24

residence 13:2

resource 91:5,10

resources 78:11

respect 27:15
  33:1,25 40:1 80:6
  92:25 93:14

respond 30:3,7

responding 58:9

response 32:5 63:19
  73:20 90:12

responsibilities
  25:16 28:14

responsibility 58:9
  59:15

responsible 60:5

rest 41:24 78:18

restroom 38:11

result 27:3 39:22
  43:20 64:6,11
  93:2,6

resulted 40:16

retaliate 35:10

retaliated 29:11,16
  35:2,13 36:18

retaliating 39:13

retaliation 29:20,21
  34:25 35:12,19
  37:6 38:5
  39:9,11,21 63:24

81:7,11

retaliatory 38:24
  51:18 58:7

retirement 9:2,9

return 44:3,21
  102:16

returned 16:11
  85:4

review 11:14 12:8
  49:1 79:25 89:20
  95:5,9

reviewing 12:10

Rich 35:3,9 39:13
  40:21 43:19 48:24
  49:22 56:7
  58:1,18 64:10
  65:24 66:21 75:3
  77:16 78:24 94:12

Richard 2:8 102:24

rights 28:13 29:18
  35:19 37:11

room 42:19,22,25
  43:3

routine 16:12
  22:21,25

row 70:14,16

---

**S**

safe 12:23

SAITH 99:11

salaried 87:2

salary 8:25

saw 55:19 58:14
  93:6 97:15

schedule 50:19
  57:15

scheduled 53:16
  55:11

scheduling 26:15
  27:1,11

school 13:21

schools 12:15

scores 92:20

scream 47:7

search 78:11 91:8

seats 43:1

second 29:23 95:11

secret 42:7

seeing
  15:7,10,11,13,14,
  15,23 16:1,3,8,12
  56:1

seem 58:19 92:18

seemed 11:15
  57:14,18 58:8
  64:19 77:4 98:16

seems 16:25 17:1
  56:5,24

seen 11:15 13:3
  28:1 92:24,25
  93:5

sending 82:17

sense 43:2 55:1

separate 67:13
  83:17

Seriously 92:19

Service 25:12

services 20:5
  21:4,10,16,25
  23:14,24 36:10

session 18:17

seven 34:17



several 50:2

sexual 28:16

share 41:17

shared 41:21 42:14

SHEET 103:1

Sherman 91:4

she's 65:25

shlep 87:16

shlepping 87:15

short 68:19 69:2
94:2

shortcoming 51:20

shortly 75:22 76:12

sic 73:23

sign 102:9,12,15

signalling 7:17

signature 19:16,19
20:18 23:21 28:3
102:8,15,21
103:25

significant 78:17

Silverman 1:4,15
3:2 5:1,4,14 7:1
17:7,10 28:5
31:6,18 33:11
36:24 37:2,9,15
38:16 68:18
69:1,8,13 93:23
101:6
102:1,5,6,24

simply 68:4

single 49:10 86:21

sir 33:14

sit 25:20 34:13
37:20,25 38:22
60:15 67:8

sitting 32:2 43:4

situation 14:9 33:12

71:11

six 34:17 78:24
92:17

Skills 78:4

skip 43:21

slides 78:13

slow 24:14

small 12:14

socially 51:7,10
52:16 54:1,11

somebody 59:5
96:1

someone 54:21
77:16

sorry 7:18 9:19
14:17 17:7,10
20:3,11 35:16
38:2 44:8 45:7
55:15 57:12 61:15
65:22 67:25 68:18
69:13 70:13 73:10
86:5 87:7 88:1
91:7 96:4,11

sort 36:9 40:24 51:2
73:23 88:24 89:10
93:5

sought 29:12 64:12

sounds 66:16 78:1

source 43:14

sources 9:20

soured 39:17

souring 35:3 39:23

south 13:4,16

Southeastern 1:7
19:23 27:13,18
28:21 33:18 38:4
49:18 102:5

SOUTHERN 1:1

speak 47:12,20

Speaking 47:10

special 40:4

specific 8:23 33:21
60:3 62:6 88:20
94:9

specifically 30:1
32:24 46:4

speculating
46:15,18

spell 7:3 15:19

spelled 6:23

spent 81:19

Spiriva 16:22,24
17:14,21 18:2,3
93:15

splitting 73:22

Spoken 51:6

St 13:8,13,21

stack 49:16

staff 25:23

standing 43:3

start 6:1,3,15 8:9
33:8,9 75:23
83:23

started 15:10 54:17
57:3 84:3

State 1:25
100:2,6,23
101:2,17

stated 72:5

statement 32:23
60:5

States 1:1 12:16

Stating 46:17

stay 51:23 52:2

stenographically
100:7

step 97:6

steps 88:17 90:17

stop 5:21 48:22
68:21

strategies 6:12

strategy 6:11

straws 76:25

stress 13:19 96:25
97:5

stressed 32:4

stressful 32:1

strike 20:16 26:8
35:17 41:16 67:3

stroke 48:11

student 73:18,19
74:1,3

students 25:23
48:15,17 58:12
90:7

stuff 57:8 58:12
82:14

SUAREZ 1:24
100:5,23 101:5,17
102:19

submit 55:5 61:19

submitted 34:10
40:19 62:20

substance 88:7

substantial
80:10,13

substantive 18:12

successfully 59:12

Sucralfate 30:4

suffer 27:4 29:22

suffered 18:8

suffering 41:1

sufficient 51:13
53:17

suggest 95:22 98:16



suggestions 95:18

Suite 1:18 2:4,10
102:3

supervisor 37:14
48:24 49:6
58:1,25 81:18
82:19

support 34:19
61:12 62:14

supposed 47:5
55:7,16 62:4,6,7
77:24

sure 5:16 6:6 14:3
15:16 16:18,25
18:13 20:22 24:12
29:25 38:3 44:16
52:4 55:10 62:21
65:23 71:18 82:20
83:5,7 87:19 89:2

suspended 63:25

sworn 5:6 97:23
101:7

symptom 17:20

symptoms 7:23
31:20,22 32:7
93:7

― T ―

table 32:2

taking 7:9
17:2,13,19,21
30:1,8 36:19
37:21 38:24 64:6
70:16 81:7 93:15

talk 18:14,19 19:1
29:20 30:23
31:5,11 39:10
42:2 44:7 51:24
52:7 53:13
54:15,17 57:11
89:3

talked 6:2,5 18:15

31:12 44:16

talking 34:24 43:20
44:11 57:21 70:2
82:16,24 85:24
88:6,23 89:22,23

task 50:10 53:10,18
81:20

tasks 26:16
27:2,8,11 58:19
59:12

teacher 40:4

Technologies 20:4
21:3,15,25

tendency 97:4

tenure 24:11 33:18
49:14 58:1

terminate 36:25
79:11 80:4

terminated 35:15
36:19 37:6,21
38:6 42:4 64:1
76:5,13 83:8
85:11,16,20,23
86:10 91:11,15

terminating 37:10

termination 8:11
9:1,16 10:9
16:2,16,21 18:8
35:18,22 36:7,14
38:25 69:21,23
76:9,14 77:22
78:19,23 80:7
81:6,10 86:1,17
88:2 98:9

terms 8:5 13:18,24
24:16 34:2 37:16
45:11 51:8 82:25
89:8 91:15

testified 5:6 83:1

testify 30:10 97:19

testifying 96:7

testimony 34:4 54:8
88:10 90:17 97:23

testosterone 6:21
7:16 8:6

Thank 93:21,23
99:7

that's 8:16 17:8,17
18:7 19:8,19
21:14 23:21 24:16
25:9 26:2,18 32:8
33:23 34:15,23
37:25 39:2 46:23
51:13,15 53:25
54:10 57:12,16
58:22 65:16
66:3,8 68:23
71:13 74:3,6
76:23 89:21 91:25
93:21 99:5,6

therapist 15:10,15
92:25

therapists 15:11

there's 5:20 19:7
60:22 64:25 67:22
76:13 78:23 89:20
91:5

Thereupon 5:3

they're 14:17 41:6
98:12

thirty 102:13

Thomas 13:8,13,21

throughout 20:7,21
27:12,17 49:14
56:1

Thursday 50:21

till 68:16

timely 50:12

title
20:6,8,11,12,17,2
0,22 21:1,13
23:24

today 5:15 6:19
34:13 37:20 38:22
51:25 52:11 60:16
67:9 95:1 96:6
97:24 98:2,8

today's 7:7 19:7,9
27:24

tool 24:15

top 28:6 58:16

topic 51:23

Total 10:2

touch 69:18

traffic 13:16

transcribe 100:8

transcript 100:9
102:24

transfer 88:14,24
92:5

transferred 92:9

transferring 89:3

transpired 49:18

travel 13:24

treated 64:15

treatment 39:25

tried 6:13 23:3
75:25

trigger 67:12,18
68:1

trouble 31:15,17

true 26:18 56:16
67:23 68:5,23
87:17 100:9

truly 102:17

trust 55:2

truthfully 30:10

try 5:19,21 14:22
18:1 96:21

trying 43:9



877.291.3376
www.UCRinc.com

56:20,25 57:7
82:8
**Tuesday** 15:6 50:20
**turned** 10:11 46:5,8
**turning** 10:23
**twice** 16:4
**two-page** 78:10
**type** 11:9
**types** 26:14,17 49:2

**U**

**ultimately** 76:5
**unable** 32:12,16
34:19 38:3 50:11
77:11
**uncommon** 57:25
**undergo** 14:25 15:2
**undersigned** 101:5
**understand**
7:1,10,23 40:3
62:1 70:2 86:5
89:15
**understanding** 14:1
21:14 44:6,10
52:19 82:8 92:12
**Understood** 5:24
**United** 1:1 12:15
**Universal** 1:18
102:19
**university** 1:7
33:19 88:3,16,18
90:18 91:6
**unless** 54:21 58:15
**unmet** 58:4,5
**unpaid** 8:21
**unpleasant** 35:6
40:7,10,18 43:19
45:12 52:24 55:25
**unprofessional**

47:11,13,21 51:6
52:16 54:1,11
64:16 76:10
**Update** 78:8
**upgraded** 39:17
**upgrading** 35:6
39:23 50:3
**upon** 29:16 54:9
**upset** 44:2,5
**useful** 62:23
**usually** 70:10
**utilized** 81:11
85:23,25
**utilizing** 37:6

**V**

**vacation** 65:3
**various** 26:15 65:13
**vast** 94:6,9
**verbal** 64:24,25
65:2,5,11 83:2
**vernacular** 50:17
**verse** 41:4
**versus** 26:16 93:19
**Via** 102:24
**Vicenc** 79:15,17,19
**VICTORIA** 1:24
100:5,23 101:5,17
102:19
**virtually** 64:19
**virtue** 29:11 33:4
52:19 53:9
**vision** 9:3
**voice** 47:8,9 49:22
51:3,4,12 52:20
53:22
**vs** 1:6

**W**

**wait** 7:19 75:22
**waited** 55:17,19
**waiting** 55:20
**waive** 102:8,15,21
**walked**
46:5,8,12,16
**warm** 31:21
**warning**
64:22,24,25
65:2,5 71:25 72:6
75:10 76:11
**wasn't** 15:11 22:20
35:23 42:3 43:11
55:10 71:11 73:24
87:15 92:8
**waste** 74:15
**water** 87:18
**ways** 9:5
**website** 12:7 29:2
90:19
**websites** 11:21
**week** 15:4,5
16:4,9,12 50:21
86:21
**weekly** 15:8,13
**weeks** 70:8
**welcome** 93:23
**we'll** 30:12 51:23
52:5 99:8,9,10
**we're** 6:15 29:25
34:17 37:10 51:24
68:24 69:4 81:22
82:24 91:25 94:24
**West** 2:4 102:3
**we've** 18:14 19:6
68:14 83:4
**whatever** 8:25 84:5

94:8
**whenever** 6:12
**Whereupon** 99:12
**whether** 9:4 25:14
42:8 57:20 60:17
62:10,20 74:2
79:24 80:3 88:5
93:5 94:7
**whole** 33:12 68:14
**whom** 25:22 42:17
**who's** 60:5
**whose** 59:15
**wife** 8:1,4,6 12:19
**willing** 89:4
**wish** 102:15 103:2
**witness** 3:2 5:5
100:16 101:10
**wonder** 6:21
**wondering** 6:21
**work** 6:14 18:16,24
24:13 25:2,11,16
26:16,17,19
27:2,12 28:18
31:6 34:6 35:24
60:3 65:9 70:9
71:3 75:11
79:1,6,7 81:20
85:4 90:4,10
91:17
**worked** 27:12,17
72:8 86:23
**working** 40:14
75:23
**worth** 11:15 12:12
**writing** 75:2 82:14
94:7,13
**written** 40:20 64:22
71:24 72:6 75:9
76:11 83:17 94:3



Silverman, Mitchell   03-05-2018     Page 19 of 19

| Y | | | |
|---|---|---|---|
| **yet** 64:21 | | | |
| **you'll** 6:20 22:1 <br> 23:12 58:11 84:10 | | | |
| **Young** 43:17 | | | |
| **yours** 102:17 | | | |
| **yourself** 20:15 <br> 21:18 28:24 42:14 | | | |
| **you've** 7:21 9:24 <br> 12:10 18:21 26:8 <br> 31:25 37:15 <br> 39:9,12 64:16 <br> 67:8 83:1 85:9 <br> 90:5 | | | |


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

Mitchell L. Silverman – Medication List 2018-02-27

**Prescription:**

Latuda: 40mg with bedtime
Lamictal: 200mg with breakfast, 600mg at bedtime
Tiagabine: 2mg with breakfast
Lithium carbonate ER: 450mg at breakfast
Duloxetine: 60mg with breakfast
Pioglitazone: 30mg with breakfast
Metformin: 1000mg twice a day with food
Pravastatin: 20mg at bedtime
Naproxen 500mg twice a day as necessary
Nasonex--2 sprays/nostril at bedtime
Levalbuterol inhaler (as necessary)
Omeprazole 80mg am
Sucralfate 1000mg four times a day (being taken 2/day and PRN in between, per my primary)
Testosterone cypionate 400mg IM every month
Botox every 3 months, for chronic migraine headaches.
Spiriva inhaler, 2.5mcg
Voltaren topical gel (as necessary)

**Over the Counter:**

Caffeine (as coffee); approx. 600-800mg/day
Tylenol: 1000mg, no more than 4 times a day, and no more often than every 4 hours.
Metamucil/Benefiber
Fexofenadine (Allegra) (antihistamine)
Mucinex extended-release (guaifenesin) (as necessary)
Vitamin D
Baby aspirin
Lubricating eyedrops (Refresh, Systane)
Arnica topical (as necessary)





# View/Edit Posting – Emerging Technologies & Reference & Instructional Services Librarian**Internal to Department Only**

| | |
|---|---|
| View Active Applicants Only? | |
| Position Title | Emerging Technologies & Reference & Instructional Services Librarian**Internal to Department Only** |
| | (Hiring for this position is contingent on the availability of funding) |
| Position Number | 998881 |
| Requisition Number | 05841 |
| Center | The Panza Maurer Law Library |
| Location | Main Campus, Fort Lauderdale, FL 33314 |
| Job Open Date | 04-30-2010 |
| Job Close Date | 05-05-2010 |
| Responsible Hiring Manager | Azpiri, Dina |
| Job Category | Exempt |
| Job Group | 306-Librarians |
| Hiring Range: | Commensurate with Experience |
| Pay Basis | Annually |
| Subject to Grant Funding?: | No |
| Job Grade/level: | 87 |
| Type of Shift | Non-Faculty Full time |
| Benefits Eligible | Reg FT w/Benefits |
| Reports to: (TITLE) | Associate for Information Services |
| Primary Purpose:<br><br>*Enter the PRIMARY PURPOSE of this position.* | The primary purpose of this position is to explore and evaluate software, web applications, web 2.0 tools and other technologies for potential library and law school use, assisting law faculty with using these tools to enhance the classroom learning experience. |

{00489184.DOCX. 1 }

This position will provide individual training on Web 2.0 tools and other information resources for Law Center faculty, students and staff. It will also work with other law library departments to create library podcasts and library web site design. This position will be responsible for updating the law library blog as well as working with other Law Center departments to create and develop their own blogs. The position will monitor law library, legal, library and technology blogs and news. Develop and maintain Law Library presence on social networking sites and virtual worlds. Represent the law library on university wide technology committees such as the Academic Computing Committee and the Library Technology Committee.

1. The first priority of all members of the Law Library team is to serve the Law Library & Law Center's faculty, students and patrons. Therefore, team members will not be limited by this job description in an effort to assist Law Center constituents. Team members will be readily available, visible and accessible to faculty, students and patrons. Every effort will be made to answer patron inquiries. If unable to answer an inquiry, the team member will direct the patron to the appropriate Law Library & Technology Center staff member.

2. Explore and evaluate software, web applications, web 2.0 tools and other technologies for potential library and law school use, assisting law faculty with using these tools to enhance the classroom learning experience.

3. Provide individual training on Web 2.0 tools and other information resources for Law Center faculty, students and staff.

**Essential Job Functions:**

**Click here** for instructions.

4. Work with other Law Library departments to create law library podcasts.

5. Update and manage administrative accounts for Law Library blog and wiki as well as training other Law Center departments and faculty and students to create and develop blogs and wikis.

6. Develop and maintain Law Library presence on social networking sites and virtual worlds.

7. Teach instructional legal research classes to various Law Center and University classes.

8. Provide reference and technology responses to Law Center & University constituents, alumni, the practicing Bar, and the public's queries at the Reference Desk or via the telephone or email.

9. Create and maintain the Ask a Librarian service, training Law Center constituents on the service.

10. Work with Law Library departments to design, support and maintain the Law Library & Technology Center's web site.

11. Provide instructional legal research sessions to Law Center

faculty, staff and students in the Glad You Asked and Faculty Inform workshop series.

12. Work closely the Law Center acquisitions librarian and the University Systems Librarian at the Sherman Library to maintain IP vendor addresses that allow remote access to Law Library & Technology center electronic databases via the WAM and EZ Proxy servers.

13. Serve as the liaison to the faculty, assisting with their research, teaching and scholarship projects.

14. Prepare subject bibliographies, research guides, articles for Law Center newsletters, Tydbytes, and the Book Docket.

15. Assist Information System Administrator with Law Center's web activities.

16. Retrieves information requests in various formats, including computer, print, and micro.

17. Create, support and maintain the Law Center's web site for Special Legal Bulletins.

18. Tests and evaluates new applications and software for potential use by Law Center faculty and students.

19. Assist and coordinate training processes for all legal related software and databases.

20. Develop and manage appropriate databases and web related projects.

21. Write and speak in the area of Web 2.0, promoting the University throughout the country at local, regional, and national law library conferences.

22. Participate on University library and technology committees, including the Academic Computing Committee and Library & Technology Committee.

**Marginal Job Functions:**

1. Prepares statistical and other reports as assigned.

2. Handles other tasks as assigned.

**Required Knowledge, Skills and Abilities:**

1. Ability to work effectively with others.

2. Demonstrated teaching, advising and public speaking skills, including the ability to communicate with non-technical users.

3. Demonstrated experience with Web 2.0 tools, virtual worlds, social networking sites, and law library software and databases.

4. Knowledge of Westlaw, Lexis, and other legal research databases.

|  | 5. Facility with HTML, CSS, RSS and AV editing software. |
|---|---|
| Job Description | |
| Job Requirements | |
| Required Certifications/Licensures: | |
| Required Education | Master's Degree |
| Major (if required): | Library Science (M.L.S) |
| | 1. Master's of Library Science (M.L.S.) Degree AND Three (3) years Law Library experience |
| Required Experience:<br>**Click here** for instructions. | -OR- |
| | 1. Juris Doctorate (J.D.) Degree AND Master's of Library Science (M.L.S) Degree. (If M.L.S. not yet confirmed, degree must be conferred within one year of Hire Date) |
| Preferred Qualifications:<br>**Click here** for instructions. | 1. Juris Doctorate from ABA Accredited Law School. |
| Is this a safety sensitive position (are applicants potentially subject to drug testing)?<br>**Safety Sensitive Policy.** | No |
| Does this position require a criminal background screening?<br>**Click here** for instructions. | Yes |
| Pre-Employment Conditions | |
| Sensitivity Disclaimer | |
| | Thank you for your interest in Nova Southeastern University. We are currently in the process of reviewing your credentials to determine if your education, experience and interest are compatible with the requirements for the position for which you have applied. |
| Pass Message | Only those candidates we wish to interview will be contacted. We appreciate having the opportunity to consider you for employment and wish you every success in the pursuit of your career goals. Should you see additional positions which interest you, please reapply. Once again, thank you for considering Nova Southeastern University as your future place of employment. |
| Fail Message | Thank you for your interest in employment opportunities with Nova Southeastern University. It appears from your responses that you do not meet one or more of the minimum requirements of this position. If you feel you answered one of these questions in error, |

please contact the Office of Human Resources at (954) 262-4748.

We sincerely appreciate the time and effort you invested as an applicant. Nova Southeastern University is a dynamic and changing organization with new opportunities presenting themselves every day. We hope you will continue to keep NSU in mind as you consider your career options, and we wish you the best in your employment endeavors.

| App Types Accepted | Application |
| --- | --- |
| Documents that must be associated with this posting | |
| Documents which can be associated with this posting | Resume/CV Cover Letter Other Doc |
| Quick Link: | www.nsujobs.com/applicants/Central?quickFind=74067 |



# Nova Southeastern University
## Position Description

### Employee Details

| | |
|---|---|
| Employee First Name: | Mitchell |
| Employee Last Name: | Silverman |

### Position Information

| | |
|---|---|
| Position Title | Reference & Patron Services Librarian |
| Position Number | 998881 |
| Job Category: | Exempt |
| Job Group: | 306-Librarians |
| Center/Department | Shepard Broad Law Center - Library |
| Location | Main Campus, Fort Lauderdale, FL 33314 |
| Job Grade/Level: | 87 |
| Type of Shift: | Non-Faculty Full time |
| Benefits Eligible: | Reg FT w/Benefits |
| Pay Basis: | Annually |
| Reports to: (TITLE) | Senior Associate Director |
| Reports to: (POSITION NUMBER) | 997771 |

**Click here** for instructions.

**Primary Purpose:**

*Enter the PRIMARY PURPOSE of this position.*

To be a viable productive member of the Law Center and the Law Library teams, and as an important member of the team, perform whatever task or function is required to meet the needs of the faculty, students, and patrons. Provide reference and research support to law school faculty, staff, students, and the public.

The first priority of all members of the Law Library team is to serve the Law Library & Law Center's faculty, students and patrons. Therefore, team members will not be limited by this job description in an effort to assist Law Center constituents. Team members will be readily available, visible and accessible to faculty, students and patrons. Every

|  | effort will be made to answer patron inquiries. If unable to answer an inquiry, the team member will direct the patron to the appropriate Law Library staff member. |
|  | 1. Serves as primary point of contact for providing reference and information services to faculty, staff, students, and the public. |
|  | 2. Assists students and staff with computer database searches (Westlaw, Lexis, NSU electronic databases) and technology responses to Law Center & University constituents, alumni, the practicing Bar, and the public's queries at the Reference Desk or via the telephone or email. |
| Essential Job Functions: | 3. Retrieves information requests in various formats, including computer, print, and micro. |
| Click here for instructions. | 4. Prepares statistical and other reports as assigned. |
|  | 5. Serves as a faculty liaison to a limited number of faculty as part of the faculty liaison program, assisting with their research, teaching and scholarship projects, as assigned. |
|  | 6. Provides instructional legal research sessions to Law Center faculty, staff and students in cooperation with the Outreach Department. |
|  | 7. Performs other duties as assigned. |
| Marginal Job Functions: | 1. Teaches instructional legal research classes |
|  | 1. Ability to work effectively with others. |
| Required Knowledge, Skills and Abilities: | 2. Demonstrated experience with web tools, social networking sites and law library software databases. |
|  | 3. Knowledge of Westlaw, Lexis and other legal research databases. |
| Required Certifications/Licensures: |  |
| Required Education: | Master's Degree |
| Major (if required): | Library Science (M.L.S) |
|  | 1. Master's of Library Science (M.L.S,) Degree and three (3) years Law Library experience |
| Required Experience: | -OR- |
| Click here for instructions. | 1. Juris Doctorate (J.D.) Degree and Master's of Library Science (M.L.S) Degree, (If M.L.S not yet confirmed, degree must be conferred within one year of Hire Date) |

| | |
|---|---|
| Preferred Qualifications: | 1. Juris Doctorate from ABA Accredited Law School. |
| **Click here** for instructions. | |
| Is this a safety sensitive position (are applicants potentially subject to drug testing)? **Safety Sensitive Policy**. | No |
| Does this position require a criminal background screening? **Click here** for instructions. | No |
| **BUDGET INFORMATION** | |
| Budget Year: | Current Year |
| Job Description Disclaimer | These statements are intended to describe the general nature and level of work being performed. They are not intended to be construed as an exhaustive list of all responsibilities, duties and skills required. |
| Commitment Principles: | NSU employees whose centers report directly to the Office of the Executive Vice President/COO are expected to perform their work according to and consistent with the definitions and standards, and to hold each other responsible for adhering to the **General Administration Engagement Commitment Principles.** |
| | Click here for the complete list of General Administration Engagement Commitment Principles. |
| ADA Addendum | Nova Southeastern University is in full compliance with the Americans with Disabilities Act (ADA) and does not discriminate with regard to applicants or employees with disabilities, and will make reasonable accommodation when necessary. |

2015/07/29 _____   MITCHELL L. SILVERMAN
Date   Signature of Employee   Print Name

7/29/2015 _____   Rebecca A. Rich - Senior Associate Director
Date   Signature of Supervisor   Print Name and Title







## NOVA SOUTHEASTERN UNIVERSITY

### Acknowledgment of NSU Policies

*(Please print clearly)*

My signature below acknowledges my understanding that I am subject to all terms and conditions of employment as set forth in the NSU Employee Policy Manual and/or the NSU Faculty Policy Manual. My signature also acknowledges I have reviewed the following policies and indicates my willingness to review and abide by ALL policies and procedures of the university including, but not limited to, those specifically identified below and all policies available online.

- ☒ Conflicts of Interest Policy *(Not required for Adjunct Faculty)*
- ☒ Sexual Harassment Policy
- ☒ Computer Use Policy
- ☒ Copyright and Patent Policy
- ☒ Drug-free Workplace Policy
- ☒ Alcohol and Other Drugs Policy
- ☒ Rights and responsibilities under the Family and Medical Leave Act

In addition, I acknowledge the availability of all policies for review online in the NSU Employee Policy Manual at www.nova.edu and/or the NSU Faculty Policy Manual at www.nova.edu. I further understand that the university reserves the right to modify its policies at any time and will provide notice of any revisions when possible. I understand further that the most up-to-date policy may appear on the online policy manuals.

Name: MITCHELL L. SILVERMAN

NSU ID: _____

Department: Law Library

Signature: _____

Date: 11/4/2009



POLICY-Pol/Acknowl