**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No: 17-62005-CIV-MORENO

MITCHELL SILVERMAN,

        Plaintiff,

**v.**

NOVA SOUTHEASTERN UNIVERSITY, INC.,

        Defendant.

**DEFENDANT'S STATEMENT OF MATERIAL FACT TO WHICH NO GENUINE
ISSUE EXISTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Nova Southeastern University ("NSU") hereby submits its Statement of Material Fact as to which No Genuine Issue Exists.[1]

1.   Plaintiff was employed, generally, as a reference librarian in the law library of the NSU Shepard Broad College of Law from 2009 to 2017. **(Silverman Depo. Vol. II Ex. 2, 3; p. 20, l. 15-19; p. 75, l. 18-20)** [2] **(Silverman Depo. Vol I p. 56, l. 13-15)**

2.   Upon hire, Plaintiff acknowledged receipt of NSU's employee policies and procedures, and was aware that said policies and procedures were available at all times on the NSU website. **(Silverman Depo. Vol. II Ex. 4; p. 27, l. 17 to p. 29, l. 6)**.

3.   Plaintiff was paid over $455 per week on a salary basis. **(Silverman Depo. Vol II p. 86, l. 15) (Emery Aff. ¶ 4)**

4.   The primary duty of Plaintiff's position was "intellectual in nature." The minimum qualifications of Plaintiff's positions a master's of library science degree and three years of law library experience, or a master's of library science degree *and* a juris doctorate degree. **(Silverman Depo. Vol. II Ex. 2, 3; p. 86, l. 16-25) (Rich Aff. ¶ 5)**

5.   Plaintiff's position required advanced knowledge with respect to the law, legal research/reference materials, and library sciences. Such knowledge is that which is typically acquired through the advance specialized academic training afforded by these degrees, and is not customarily obtained through experience in the field. **(Silverman Depo. Vol I p. 13, l. 24 to p.**

---

[1] To the extent that NSU relies upon Plaintiff's articulation of the facts, NSU does so solely for the purposes of its Summary Judgment Motion.

[2] Citations to depositions are denominated by deponent name, volume (where applicable), and relevant page, line, and/or exhibit of the deposition (i.e. Name Depo. p. X, l. Y). Citations to affidavits are by deponent name and paragraph or exhibit of affidavit (i.e. Name Aff. ¶ X).

**14, l. 6) (Silverman Depo. Vol. II Ex. 2, 3; p. 86, l. 16-25) (Rich Aff. ¶ 5) (Feliu Aff. ¶¶ 5-6)**

6.   Plaintiff's position's primary duty involved providing reference services, both directly and indirectly, to Law Library patrons, which included assisting College of Law faculty members and students with legal research and related projects, and assisting pro se patrons with reference services. **(Silverman Depo. Vol. I p. 75, l. 16 to p. 76, l. 14) (Silverman Depo. Vol. II p. 25, l. 11 to p. 26, l. 1) (Rich Depo. p. 17, l. 14-22) (Rich Aff. ¶ 7) (Feliu Aff. ¶ 8)**

7.   Plaintiff's position description states, "[t]o be a viable productive member of the Law Center and Law Library teams, and as an important member of the team, perform whatever task or function is required to meet the needs of the faculty, students and patrons … [p]rovide reference and research support to law school faculty, staff, students, and the public." **(Silverman Depo. Vol. II Ex. 3).**

8.   Plaintiff directly interacted with patrons daily, on a one-on-one basis, providing reference services and library guidance which consistently required the exercise of discretion and judgment as to how carry out such reference interactions. **(Silverman Depo. Vol. II p. 25, l. 11 to p. 26, l. 1) (Rich Depo. p. 42, l. 16 to p. 43 l. 5) (Rich Aff. ¶ 7).**

9.   The first priority of all members of the Law Library team is to serve the Law Library and Law Center's faculty, students, and patrons. **(Silverman Depo. Vol. II Ex. 2, 3) (Rich Aff. ¶ 6).**

10.  Plaintiff is unable to identify a single workweek in the last three years of his employment where he worked more than forty hours. **(Silverman Depo. Vol. II p. 86, l. 8-12)**

11.  Plaintiff was never suspended or demoted while employed at NSU. **(Silverman Depo. Vol. II p. 63, l. 13 to p. 64, l. 3)**.

12.  The essential functions of Plaintiff's position included, but were not limited to, project work for the library and faculty, providing services at the reference desk, and other tasks as assigned - all of which serve to meet the needs of faculty, students, and patrons. **(Silverman Depo. Vol. II Ex. 2, 3) (Rich Depo. p. 17, l. 14 to p. 19, l. 3) (Feliu Depo. p. 53, l. 10-15)**

13.  Plaintiff continuously had problems performing his essential job duties and functions, including those related to scheduling and deadlines, task management, and prioritizing work. **(Silverman Depo. Vol. II p. 26, l. 7-18; p. 27, l. 7-16) (Rich Depo. Ex. 2, 3, 4, 5, 6, 7, 10; p. 23, l. 17-24; p. 25, l. 4-16; p. 68, . 21 to p. 69, l. 2; p. 113, l. 13-21; p. 127, l. 21-23; p. 141, l. 5-9) (Rich Aff. Ex. A; ¶¶ 8-19, 26, 28-30)**

14.  On July 6, 2015, he was instructed to complete a "loose-leafing" project by August 28,

2015. Despite multiple reminders, he failed to timely complete the project. **(Rich Depo. Ex. 10; p. 105, l. 13 to p. 106, l. 11) (Rich Aff. Ex. B; ¶ 10)**

15. On September 25, 2015, Plaintiff received notice that he was to deliver a book to a faculty member. Despite multiple notices that the book was ready for delivery, Plaintiff had to be told by the Assistant Dean for Library Services on October 5, 2015 to deliver the book immediately. **(Rich Depo. Ex. 10; p. 108, l. 14 to p. 109, l. 8) (Rich Aff. Ex C; ¶ 11) (Complaint Ex. E pp. 15-17)**

16. On November 9, 2015, Plaintiff failed to complete his library walkthrough assignment. **(Rich Depo. – p. 93, l. 13 to p. 94, l. 12) (Complaint Ex. E pp. 17-18)**

17. On November 12, 2015, Plaintiff failed to timely complete an assignment relating to the creation of a spreadsheet concerning the West Florida Practice Series. The assignment had to be reassigned to another employee. **(Rich Depo. Ex. 10; p. 109, l. 16-22) (Rich Aff. Ex. D; ¶ 12)**

18. Plaintiff failed to turn in weekly meeting agendas, write up action items from his weekly meetings with his supervisor, update the reference and faculty logs, or turn in his biweekly reports on time. **(Rich Depo. Ex. 10; p. 95, l. 2 to p. 98, l. 15) (Rich Aff. Ex. E; ¶ 13)**

19. Ms. Rich counseled Plaintiff on November 19, 2015 after two female students complained that Plaintiff gave them unsolicited hugs. She had personally observed this behavior and received complaints from students and others regarding same. **(Complaint Ex. E, p. 20) (Rich Depo. Ex. 10; p.111, l. 15 to 112, l. 22) (Rich Aff. Ex. F; ¶ 14)**

20. Plaintiff's poor work performance and conduct issues ultimately led to the issuance of a written warning on December 10, 2015, which detailed the issues and the NSU policies and core values his performance and conduct violated. **(Rich Depo. Ex. 10; p. 100, l. 13-19; p. 101, l. 20 to p. 2012, l. 7; p. 114, l. 18-20) (Rich Aff. ¶ 15) (Waryjas Aff. ¶¶ 6-7)**

21. Plaintiff's performance issues continued into 2016, including failing to complete a time sensitive deaccessioning project, failing to complete an assigned faculty support newsletter, failing to timely submit agendas, and failing to complete the "career pathfinder assignment" **(Rich Depo. p. 85, l. 19 to p. 90, l. 8; p. 154, l. 4-5) (Rich Aff. Ex. A, G, H, I; ¶¶ 17-19)**

22. In 2016, multiple employees submitted complaints concerning Plaintiff relating to his performance, and inappropriate and unprofessional conduct. **(Silverman Depo. p. 72, l. 19 to p. 73, l. 17) (Rich Depo. p. 142, l. 6-14; p. 148, l. 15 to p. 149, l. 10) (Rich Aff. Ex. H; ¶ 18)**

23. On November 9, 2016, Plaintiff received an overall rating of "unsatisfactory

contribution" on his annual performance evaluation. **(Rich Aff. Ex. A; ¶ 9)**

24. Any review with an overall rating of unsuccessful contributor must also include a performance improvement plan. **(Rich Aff. Ex. A) (Rich Depo. p. 126, l. 5-10)**.

25. Plaintiff was placed on a performance plan detailing his work expectations, performance gaps, and action plans to meet expectations. **(Rich Depo. Ex. 12; p. 125, l. 17 to p. 129, l. 10).**

26. Plaintiff repeatedly failed to report to work on time, or timely notify his supervisor that he would be late or out due to illness. **(Rich Aff. Ex. I; ¶ 19)**

27. On November 26, 2016, Plaintiff was assigned five assignments due on December 23, 2016 – to create three "libguides," move the Law Library's legal aids page from one website to another, and to strengthen, reorganize and update the student writing opportunities guide to be more useful. Ms. Rich broke down the tasks into subtasks, arranged them by priority, and provided sufficient detail to where any law librarian could have completed the assignments. Plaintiff noted that he felt he could balance his priorities, that he had no questions, and thanked Ms. Rich for the level of detail provided. **(Rich Aff. Ex. J; ¶¶ 20-21)**

28. On November 27, 2016, Plaintiff contacted NSU's ADA Coordinator (Diane Emery) to request extended deadlines for either the final deadline or the intermediate deadlines for the projects assigned by Ms. Rich as an accommodation for his ADHD. **(Emery Aff. Ex. B; ¶ 11)**

29. On November 28, 2016, Ms. Emery responded and requested additional information as to Plaintiff's request. Plaintiff responded the following day, advising that while he was making "good progress," he did not know how much additional time he would need, so he requested an additional 1-2 days per individual deadline and 1-2 weeks at the end of the project, noting he would only use the time if necessary. **(Emery Aff. Ex. C; ¶ 12)**

30. Ms. Emery reviewed Plaintiff's request determined that Plaintiff had more than enough time to meet the overall deadlines and did not need preemptive deadline extensions. She granted Plaintiff's request for an extension for the deadlines related to sub-tasks so that he had more flexibility manage his time and workload. **(Emery Aff. ¶ 13)**

31. Ms. Emery replied to Plaintiff that day, advising she would approve an additional 1-2 days per individual deadline, but he would still have to meet the overall deadline for the projects. Plaintiff replied the next day, stating that Ms. Emery's response had no basis in fact, and that it made no sense to give him extensions to the sub-deadlines without extensions to the project as whole, and advised that he was forwarding her e-mails to his attorney. **(Emery Aff. ¶ 14)**

32. On December 5, 2016, Plaintiff thanked Ms. Rich for her "clear, detailed instructions" and asked for additional instruction concerning the LibGuides projects, which she provided to Plaintiff, in writing, within the hour. **(Rich Aff. Ex. K; ¶ 22)**

33. Also on December 5, 2016, Ms. Rich removed two of the library guides from Plaintiff's tasks due to the operational needs of the library, and assigned one new library guide with the same December 23, 2016 deadline, which reduced his workload. Ms. Rich provided a breakdown of the tasks involved and proposed intermediate deadlines for each. **(Rich Aff. Ex. L; ¶ 23).**

34. On December 6, 2016, Ms. Emery provided updated accommodated deadlines for Plaintiff's newly assigned LibGuide. **(Emery Aff. Ex. E; ¶ 15)**

35. The CSP Libguide was intended to be a resource for students studying for the February 2017 offering of the Florida bar exam. As such, its timely completion was critical to its value to students and Plaintiff was aware of this. **(Rich Aff. ¶ 24).**

36. The same day, Plaintiff asked Ms. Rich for an extended deadline for the LibGuides project until January 9, 2017, noting that he would "not be surprised if [his] final deliverables for a particular LibGuide are deemed unacceptable and need to be redone." Ms. Rich responded that his extension request was not possible as she had already promised the individuals who requested the LibGuides that they would be completed by January 3, 2017. **(Rich Aff. Ex. M; ¶ 25)**

37. On December 22, 2016, Plaintiff stated that he would be unable to timely complete the CSP LibGuide, but he could "attempt" to have it finished by January 6, 2017. He stated that "it might be better if [Ms. Rich] were to take on the NSU Law Critical Skills Program LibGuide," and that he would be "substantially finished" with the Law Clinic LibGuide by the deadline. He noted that Ms. Rich would likely have to take on some of his work, and alleged that he did not meet the deadline because she did not give him sufficient instruction about the project, and that he missed a "considerable amount" of work due to his disabilities which was "a result of dealing with Becka,[3] and NSU's attitude towards [his] rights under the ADA."**(Rich Aff. Ex. N; ¶ 26)**

38. On December 23, 2016, Plaintiff advised that he had finished a "substantial draft" of the NSU Law Clinic LibGuide, and was "unable to get to the CSP LibGuide." Thereby failing to meet the deadline for two of the three LibGuides he was responsible for. **(Rich Aff. Ex. O; ¶ 28)**

39. On January 27, 2017 Plaintiff sent an e-mail to Ms. Rich stating that he "didn't feel up to

---

[3] Ms. Rich was on FMLA leave for the bulk of the time period when the assignments were given to Plaintiff, but was available via e-mail and phone during this time. **(Rich. Aff. ¶ 27)**

meeting with [her]" but claiming that he had finished the Clinics LibGuide the previous night, over a month past its original due date. **(Rich Aff. Ex. P; ¶ 29)**

40. Plaintiff never completed the CSP LibGuide and students were deprived of a resource intended to help them prepare for the February 2017 bar exam. **(Rich Aff. ¶ 30) (Feliu Depo. p. 34, l. 2 to p. 35, l. 21)**

41. Library guides, or "libguides" are librarian-curated collections of resources designed to assist library patrons with understanding, accessing, and utilizing a variety of library and/or reference services, the creation of which requires the specialized training, knowledge, and experience of a librarian. **(Rich Depo. p. 131, l.2-4) (Rich Aff. ¶ 20)**

42. Timely completion of assigned projects and tasks, including libguides, is an essential function of all reference librarians in the Law Library. Failure to timely complete library projects and tasks has a negative impact on the Law Library and the College of Law. **(Rich Aff. ¶ 31)**

43. Plaintiff had completed LibGuides many times while employed at NSU, and had done them before the late 2016 LibGuides were assigned. **(Rich Depo. p. 131, l. 5-6)**

44. Plaintiff's failure to complete projects and tasks by assigned deadlines was a violation of NSU policy and NSU's core values. **(Rich Depo. Ex. 10) (Rich Aff. ¶ 34) (Waryjas Aff. ¶ 7)**

45. Plaintiff was terminated on February 22, 2017. He received a termination memorandum which detailed the reasons for his termination and the specific NSU policies and core values his performance and conduct violated. **(Feliu Depo. Ex. B; p. 43, l. 9-19)**

46. Plaintiff's continued inability to complete tasks by assigned deadlines was among the primary factors which led to the termination of his employment**. (Feliu Depo. Ex. B; p. 33, l. 13 to p. 35, l. 21; p. 43, l. 20-25; p. 44, l. 6 to p. 45, l. 8; Aff. ¶)**

47. The deadlines concerning Plaintiff's project and task work were reasonable and provided him with more than enough time to ensure such deadlines were met. **(Feliu Aff. ¶ 9)**

48. Plaintiff requested disability accommodations from NSU multiple times throughout his employment and was well aware of the policies relating to same. **(Silverman Depo. Vol II p. 24, l. 3-5; p. 60, l. 12-19) (Emery Depo. p. 17, l. 2-18).**

49. Each request Plaintiff submitted to NSU's ADA coordinator was evaluated in accordance with the nature of the request, the supporting medical documentation provided, the impact on his ability to carry out the essential functions of his position, and the level of burden placed upon the Law Library. The reasons why any accommodations were denied were explained to Plaintiff and

alternative accommodations were considered and offered when available. **(Emery Aff. ¶¶ 7-8)**

50. On September 28, 2012, Plaintiff received a memorandum in response to his request for several accommodations. He was denied permission to do his job from home because his position was to serve as a primary point of contact for providing reference and information services to the faculty, staff, students and the public and it was not possible for him to serve in this capacity from his home. **(Emery Aff Ex. A; ¶ 9)**

51. On May 5, 2015, Plaintiff requested eight disability accommodations, the response to which was issued on May 14, 2015. He was granted the following accommodations: (1) his office was moved; (2) he was permitted to close his door when not providing reference services to patrons; (3) he was provided with white noise machines both in and immediately outside of his office; (4) the light bulbs over the reference and circulation desks were changed, and he was provided with a lamp for his office; (5) he was permitted to bring a scent of his choice to work; (6) he was provided with a temporary part time schedule for three weeks to accommodate medical appointments; and (7) he was permitted to have other employees cover the reference desk when he was absent, but was required to reciprocate by spending more time at the desk. His request to do his job from home was denied. **(Emery Depo. Ex. 6)**

52. On July 22, 2015, Plaintiff requested an additional ten accommodations. A detailed response was provided on August 14, 2015. He was granted: (1) a regular work schedule; (2) a brand new replacement computer; (3) he was removed from the reference desk schedule for one day a week so he had sufficient time available to reciprocate time that other employees spent covering the desk on his behalf; (4) assignments would be given to him by his supervisor in writing, which he would memorialize in an e-mail to his supervisor, who would then "sign off" on the tasks during a weekly meeting; any tasks assigned outside of their weekly meetings would be assigned in writing by his supervisor; (5) as needed, his supervisor would meet with him and assist him with setting interim deadlines and breaking down tasks; (6) during his weekly meeting with his supervisor, prioritization of tasks and any needed adjustments to upcoming deadlines would be discussed and agreed upon and he would adhere to the task deadlines determined during the meeting; deviation from the deadline would require prior approval from his supervisor. The following requests were denied: (1) working from home; (2) limited reference duty shifts were unnecessary, as they were already limited to two hours; (3) flexible scheduling was unnecessary because the department already afforded him with flexible scheduling; and (4)

reduced distractions in the work area were already being provided. **(Emery Depo. Ex. 1, 2)**.

53. On November 23, 25, and 30, 2015, Plaintiff reiterated his previous request for additional leave time and asked for additional accommodations. A response memorandum was provided to him on December 3, 2015. Plaintiff was advised that (1) his request to stay home when he was not well enough to work could be evaluated according to NSU's leave policies; and (2) the offer of a "regular schedule" previously provided to him was still available. **(Emery Depo. Ex. 4)**

54. On January 6, 2016, Plaintiff requested two additional disability accommodations. On February 15, 2016, a response memorandum was provided to Plaintiff granting his request to arrive for work at 9:45 a.m. through the remainder of 2016 on a trial basis. His request for unlimited "bio-breaks" were unnecessary as they were always permitted. **(Emery Depo. Ex. 7)**

55. From May 31, 2016, to June 13, 2016, Plaintiff made a number of additional disability accommodation requests largely related to additional time off beyond his accrued time off which had already been exhausted, to use as "respite for work stress." In response, Ms. Emery scheduled a meeting with Plaintiff, which did not take place because Plaintiff advised that he would only meet with her in the presence of his attorney. On July 25, 2016, Plaintiff received a memorandum in response to the aforementioned accommodations requests, and recapping all of Plaintiff's accommodation requests and accommodations granted to date. **(Emery Depo. Ex. 8)**

56. On January 9, 2017, Plaintiff requested that he "not be required to meet with Becka Rich unless there is someone else in the meeting." Ms. Emery responded, advising that his request was denied because meeting with his supervisor was an essential function of his job, and would require other employees to cease work to accompany him to such frequent meetings. Ms. Emery was unable to identify any alternative accommodation for this request. **(Emery Aff. Ex. F; ¶ 16)**

57. On February 2, 2017, Plaintiff requested extended deadlines for all projects he was working on for Ms. Rich, and for every project that she gives him in the future. The request was denied on February 13, 2017 because it was impossible to assess the operational impact of extended deadlines for assignments that had not been assigned. **(Emery Aff. Ex. G, I; ¶¶ 17, 19)**

58. On February 6, 2017, Plaintiff submitted a complaint about Ms. Rich to Dean Feliu and Ms. Emery. Although not framed as a disability request, Plaintiff requested: (1) the cancellation of all discipline imposed by Ms. Rich since August 2015; (2) transfer to another supervisor; (3) proper provision of all accommodations granted in August 2015; and (4) "ongoing assistance from NSU personnel to address alterations, amendments, or adjustments of my accommodations,

as needed, or arranging for further accommodations." Ms. Emery responded on February 17, 2017, advising that Ms. Rich had been complying with his approved accommodations, that his request to retroactively cancel all discipline imposed by Ms. Rich, and transfer to another supervisor were denied. Ms. Emery noted that she herself had provided ongoing assistance with accommodations and remained available to address issues related to alterations, amendments, or adjustments and arranging for future accommodations. **(Emery Aff. Ex. H, J; ¶¶ 18, 21)**

59. On February 13, 2017, Plaintiff sent an e-mail to Ms. Rich listing a number of projects he was working on, stating "[i]n my opinion, all of those tasks are more important than any of the tasks you assigned." **(Rich Aff. Ex. Q; ¶ 35)**

60. On February 17, 2017, Plaintiff requested an "ADA and FMLA accommodation" of a waiver of NSU's requirement that he notify his supervisor of lateness or absence by 8:00 a.m. or 8:30 a.m. to allow him to provide such notification by 10:30 a.m. On February 21, 2017, Ms. Emery denied Plaintiff's request because it would not provide sufficient time for coverage arrangements to be made. **(Emery Aff. Ex. K; ¶ 22)**

61. Plaintiff was provided with the accommodations detailed in the August 14, 2015 accommodation approval memorandum, including those designed to address his issues relating to meeting deadlines. **(Rich Depo. p. 75, l. 11 to p. 84, l. 14) (Rich Aff. ¶ 36) (Feliu Depo. p. 22, l. 12 to p. 30, l. 3) (Emery Aff. ¶ 23)**

62. Ms. Rich informally offered Plaintiff a number of suggestions and methods to attempt to assist him with his issues concerning his inability to meet assigned deadlines including, but not limited to, various "to-do list" systems, color-coding systems, wall calendars, a mentor/job coach, utilizing cheat sheets/agendas, and offering time management training, all of which were either largely ineffective, or refused by Plaintiff. **(Rich Depo. p. 117, l. 14 to p. 124, l. 16)**

63. Despite receiving the accommodations relating to deadlines, Plaintiff continued to fail to complete projects by either the original or extended deadlines. **(Rich Aff. ¶ 36)**

64. Plaintiff's failure to timely complete tasks had a negative impact on the Law Library, its patrons, and the College of Law. **(Silverman Depo. Vol. II – p. 78, l. 17-22) (Rich. Aff. ¶ 32)**

65. At no point was Plaintiff ever denied the opportunity to request additional and/or modified disability accommodations. **(Rich Aff. ¶ 37) (Emery Aff. ¶ 24)**

66. Plaintiff is unable to recall any disability accommodations denied by NSU which he needed to perform his essential job functions. **(Silverman Depo. Vol II p. 24, l. 18-22).**

67. Plaintiff is not aware of any reasonable accommodation which would have allowed him to timely meet deadlines. **(Silverman Depo. Vol. II p. 80, l. 8-15)**.

68. Plaintiff never sought another position at NSU, but did request the removal of essential job functions. **(Silverman Depo. Vol. II p. 87, l. 21 to p. 92, l. 1) (Feliu Depo. p. 32, l. 5-9)**

69. Plaintiff had no knowledge of a position that existed within NSU that met his alleged needs. **(Silverman Depo. Vol. II p. 89, l. 25 to p. 90, l. 2; p. 91, l. 9, p. 92, l. 1)**

70. At the time of Plaintiff's request to have essential job functions removed, no positions were open at the Law Library. **(Feliu Depo. p. 46, l. 13-17.)**

71. Plaintiff has no direct evidence that his termination was retaliatory based upon his disability or FMLA. **(Silverman Depo. Vol. II p. 36, l. 14 to p. 38, l. 24)**

72. Plaintiff submitted multiple complaints to the Office of Human Resources alleging perceived discrimination. Each complaint that Plaintiff submitted to the Office of Human Resources and the two Charges of Discrimination he filed with the EEOC were reviewed for potential violations of NSU policy and the law. **(Waryjas Aff. ¶ 11-12, 16)**

73. Representatives from the NSU Office of Human Resources attempted to meet with Plaintiff to obtain any additional information he may have concerning his complaints, but he refused to speak to them. **(Waryjas Aff. Ex. B; ¶¶ 14-15)**

74. The allegedly discriminatory acts described in Plaintiff's complaints were determined not to be violations of either NSU policy or the law, or were too unclear to fully evaluate without further information from Plaintiff, which he refused to provide. **(Waryjas Aff. ¶ 13, 15, 17)**

75. Plaintiff's complaints consisted largely of grandiose, overstatements of perceived slights and petty annoyances he had with his supervisor. **(Silverman Depo. Vol II p. 39, l. 24 to p. 47, l. 5) (Complaint Ex. E, F)**.

76. No adverse action was ever taken against Plaintiff due to his disabilities, disability accommodations or requests, FMLA leave or requests, or for making any complaint. **(Silverman Depo. Vol. II p. 63, l. 15 to p. 64, l. 3) (Rich Aff. ¶ 38)**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 26th day of March, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing

document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing as indicated by asterisk.

> PANZA, MAURER & MAYNARD, P.A.
> Counsel for Defendant
> Nova Southeastern University
> Coastal Towers
> 2400 E. Commercial Blvd., Ste 905
> Fort Lauderdale, FL  33308
> Phone: (954)390-0100, Fax: (954)390-7991
>
> By: /s/Richard A. Beauchamp
> RICHARD A. BEAUCHAMP, ESQ.
> Fla. Bar No.: 471313
> E-Mail: rbeauchamp@panzamaurer.com

## SERVICE LIST

Mitchell Silverman v. Nova Southeastern University, Inc.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No: 17-62005-CIV-MORENO

**April Goodwin, Esq.**
**Counsel for Plaintiff**
**The Goodwin Firm**
**801 West Bay Drive, Suite 429B**
**Largo, FL 33770**
**E-Mail: april@goodwin-firm.com**
**\*Service through CM/ECF Electronic Filing**